**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

INSULET CORPORATION,                     :
                                          :
    *Plaintiff*,                         :
                                          :        Case No. 1:23-cv-11780-FDS
    v.                                    :
                                          :        **JURY TRIAL DEMANDED**
EOFLOW CO., LTD.; EOFLOW, INC.;          :
FLEX, LTD.;                               :
FLEXTRONICS CORPORATION;                 :        **ORAL ARGUMENT REQUESTED**
FLEXTRONICS MEDICAL                      :
SALES AND MARKETING, LTD.;               :        ▆▆▆▆▆▆▆▆▆▆▆
STEVEN DIIANNI;                          :
LUIS J. MALAVE; and                      :
IAN G. WELSFORD,                         :
                                          :
    *Defendants*.                        :
_____  :


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

    I.    Insulet's Two-Decades of Investments into an Improved Device for
        Insulin Therapy ................................................................................................ 3

    II.   EOFlow's Rapid Development of the EOPatch ............................................... 5

LEGAL STANDARD ....................................................................................................... 8

ARGUMENT ..................................................................................................................... 9

    I.    Insulet Is Likely to Succeed on the Merits of its Trade Secret Claim ............. 9

        A.    Insulet Indisputably Held Valuable Trade Secrets Regarding the
              Omnipod ............................................................................................. 10

        B.    Insulet Took Reasonable Steps to Guard Its Trade Secrets .................... 13

        C.    EOFlow Misappropriated Insulet's Secrets to Build a Competing
              Product ............................................................................................... 14

    II.   Insulet Will Suffer Irreparable Harm Without A TRO and Preliminary
        Injunction ........................................................................................................ 18

    III.  The Remaining Factors Favor Plaintiff's Requested Injunction ........................ 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Micro Devices, Inc. v. Feldstein*,
  No. CV 13-40007-TSH, 2013 WL 10944934 (D. Mass. May 15, 2013) ...............................11

*Alantra, LLC v. Apex Indus. Techs., LLC*,
  Civil Action No. 20-10852-FDS, 2020 WL 6263596 (D. Mass. Oct. 23, 2020)...............18, 19

*Am. Sci. and Eng'g, Inc. v. Kelly*,
  69 F. Supp. 2d 227 (D. Mass. 1999) .......................................................................................11

*Aspect Software, Inc. v. Barnett*,
  787 F. Supp. 2d 118 (D. Mass. 2011) .......................................................................................8

*Bos. Centerless, Inc. v. DeSantis*,
  No. 1:22-CV-11729-RGS, 2022 WL 16639138 (D. Mass. Nov. 2, 2022) ..............................20

*Bos. Sci. Corp. v. Lee*,
  No. CIV.A. 13-13156-DJC, 2014 WL 1946687 (D. Mass. May 14, 2014)..............................14

*Contour Design, Inc. v. Chance Mold Steel Co.*,
  No. CIV. 09-CV-451-JL, 2010 WL 174315 (D.N.H. Jan. 14, 2010)
  ..............................................................................................................12, 14, 15, 18

*Covidien LP v. Esch*,
  378 F. Supp. 3d 119 (D. Mass. 2019) .....................................................................................14

*CVD, Inc. v. Raytheon Co.*,
  769 F.2d 842 (1st Cir. 1985).............................................................................................11, 14

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 ............................................................................................................................19

*Electro-Miniatures Corp. v. Wendon Co.*,
  771 F.2d 23 (2d Cir. 1985).......................................................................................................18

*Elmagin Cap., LLC v. Chao Chen*,
  555 F. Supp. 3d 170 (E.D. Pa. 2021) ......................................................................................14

*FrontRunner HC, Inc. v. Waveland RCM, LLC*,
  No. CV 20-10230-DJC, 2020 WL 7321161 (D. Mass. Dec. 11, 2020)...................................20

*Incase Inc. v. Timex Corp.*,
  488 F.3d 46 (1st Cir. 2007).......................................................................................................9

*Jet Spray Cooler, Inc. v. Crampton*,
    361 Mass. 835 (1972) ........................................................................................... 11

*KPM Analytics N. America Corp. v. Blue Sun Scientific, LLC*,
    Civ. Action No. 4:21-CV-10572-TSH, 2021 WL 6275214 (D. Mass. Aug. 23,
    2021) ........................................................................................................... 9, 11, 18

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
    285 F.3d 1353 (Fed. Cir. 2002).............................................................................. 18

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d Cir. 2011).................................................................................... 19

*Optos, Inc. v. Topcon Medical Systems, Inc.*,
    777 F. Supp. 2d 217 (D. Mass. 2011) ......................................................... 8, 12, 18

*Parexel Int'l LLC v. Signant Health Holding Corp.*,
    No. 1:22-CV-11896-AK, 2023 WL 2938073 (D. Mass. Apr. 13, 2023)............ 9, 11

*Quincy Cable Systems, Inc. v. Sully's Bar, Inc.*,
    640 F. Supp. 1159 (D. Mass. 1986) .......................................................................... 8

*T.H. Glennon Co., Inc. v. Monday*,
    No. CV 18-30120-WGY, 2020 WL 1270970 (D. Mass. Mar. 17, 2020)................... 9

*TouchPoint Sols., Inc. v. Eastman Kodak Co.*,
    345 F. Supp. 2d 23 (D. Mass. 2004) .......................................................... *passim*

*U.S. v. Sells Eng'g*,
    463 U.S. 418 (1983).................................................................................................. 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................................ 8

**Statutes**

18 U.S.C. § 1839......................................................................................................... 9, 14

## INTRODUCTION

Plaintiff Insulet Corporation moves for a temporary restraining order and preliminary injunction to stop Defendants EOFlow Inc. and EOFlow Ltd. (collectively, "EOFlow") from further disclosing and exploiting trade secrets they misappropriated from Insulet through its contract manufacturer and former executives.  The trade secrets pertain to the design and manufacturing of Insulet's market-leading insulin delivery pump, the Omnipod.  EOFlow has used those secrets to develop and manufacture a competing commercial product, the EOPatch.  The need for judicial intervention is urgent because Medtronic, the world's largest medical device manufacturer, is poised to acquire EOFlow and its EOPatch technology within the next few weeks.  Late yesterday, counsel for EOFlow informed Insulet for the first time that the Medtronic acquisition was expected to close "as soon as a few weeks," and not by the end of October as EOFlow had publicly reported in its filings with Korean securities regulators.  As a result, Insulet seeks both a temporary restraining order and preliminary injunction, and requests that the Court order EOFlow to respond within one week and hold a hearing on the temporary restraining order at the Court's earliest convenience thereafter.

As a wearable medical device the size of a pocket watch, Insulet's Omnipod insulin pump is assembled from 72 precisely engineered components and worn on the skin while it automatically stores, measures, primes, and injects metered doses of life-sustaining insulin to people with diabetes throughout the day—all in less than 1.35 cubic inches of space.  But unlike a high-end watch, the Omnipod and its components must be profitably and reliably manufactured at a scale that allows hundreds of thousands of patients to apply and then throw away a new device every three days.  This engineering feat—which Medtronic and other competitors have failed to accomplish after significant investments—took Insulet's engineers over eighteen years of

1

continuous trial-and-error efforts to reliably achieve.  The company's success has changed the lives of millions of patients worldwide who were freed from choosing between self-administering multiple injections a day and carrying a bulky tubed pump throughout their daily activities.

EOFlow scaled the same hurdle in just a few years and at a tiny fraction of the cost.  It did so with the help of the other Defendants in this suit, each of whom undeniably had access to Insulet's most detailed and highly confidential design and manufacturing documents.  The available evidence indicates that the current version of the EOPatch was developed in as short a time span as between late 2015—right before EOFlow entered into a joint development agreement with Insulet's sole-source contract manufacturer, Flextronics—and 2018—when EOFlow began publicly touting an "improved" version of the EOPatch.  During that same time period, EOFlow hired as its senior executives and consultants Luis Malave, Steven DiIanni, and Ian Welsford—three former Insulet executives who had spearheaded the Omnipod's development, manufacturing scale-up, and regulatory approval.

Although EOFlow began touting its improved EOPatch in 2018 and obtained approval in Korea for the new EOPatch in July 2019, the device remained unavailable to the industry and Insulet until recently.  In December 2022, EOFlow submitted an application with FDA to market the EOPatch in the United States as the first "substantially equivalent" alternative to the Omnipod, but it withdrew that request in June of this year after Medtronic announced the acquisition.  Even by late 2022, only a few hundred people in Korea were reportedly using the EOPatch.  It was not until early 2023 that Insulet was able to obtain and analyze a sample EOPatch product.

An analysis of the hidden components and internal assembly of the EOPatch reveals striking similarities to the Omnipod across the majority of the components, including features that would have been impractical and illogical to reverse engineer without access to Insulet's

confidential information.  Critically, the differences between the Omnipod and EOPatch also demonstrate deep knowledge of confidential manufacturing and product-related challenges that Insulet faced.  As veteran medical device engineer April Marano opines in her declaration accompanying this motion, under the circumstances, the independent development of the EOPatch is highly improbable.  At the same time, EOPatch is actively prosecuting patents on secrets it stole from Insulet, including Insulet's confidential occlusion detection technology, which was publicly disclosed in a published EOFlow patent application just last week.

The Court should temporarily restrain EOFlow from any further disclosure of its misappropriated information regarding the design and manufacturing of the EOPatch devices to any third party, especially to Medtronic, its affiliates, and any other joint-venture partner of EOFlow.  This interim relief will preserve the status quo by preventing irreparable destruction of the value of Insulet's trade secrets and will serve the public interest in safeguarding the fruits of Insulet's substantial investments in the development of a critical health technology.

## STATEMENT OF FACTS

### I.   Insulet's Two-Decades of Investments into an Improved Device for Insulin Therapy

Insulet is a Massachusetts-based company founded in 2000 by a father with the goal of developing less burdensome insulin-delivery options for his young son with diabetes.  That vision led to the development of Insulet's flagship product, the Omnipod—the world's first disposable adhesive insulin "patch pump."  Since 2000, Insulet has dedicated its resources to improving and expanding access to the Omnipod for millions of people who need daily insulin therapy.

When Insulet was founded, the only alternatives to multiple daily insulin injections for diabetes patients were tethered pumps with up to 42 inches of external tubing that were pager-sized, cartridge-loaded, and carried in a pocket or on a belt.  The Omnipod revolutionized the market as a small, lightweight insulin "Pod" that a user fills with insulin and wears directly on the

██████████████████████████████████████████████████████

body via an adhesive patch for up to three days.  Unlike conventional insulin pumps, the Omnipod

"patch pump" uses no tubes, features automated and virtually pain-free cannula insertion, does not

require separate batteries, and is disposable.  Over numerous generations of the device, Insulet has

improved the Omnipod to be smaller, more convenient, and more manufacturable at scale.

Insulet's success has been hard-fought.  Manufacturing a cost-effective disposable patch

pump at scale is a significant challenge. It took Insulet years of work and hundreds of millions of

dollars in investments to overcome that challenge.  The first Omnipod product to receive FDA

approval in 2003 was practically impossible to make at scale and never launched.  O'Connor Decl.

¶ 5.  Three years later, despite substantial investments in automation, the first commercially

available version of the Omnipod ███████████████████████████████████

███████████████████████   *Id*. ¶ 5.  It took another three years to redesign the Omnipod's

components in a way that allowed large scale semi-automated assembly.  *Id*. ¶ 6; Benjamin Decl.

¶ 30.  Insulet then invested another five years improving the mechanical design of the Omnipod

before releasing it as the Omnipod "Eros" in the U.S. in 2013.  O'Connor Decl. ¶¶ 7-9; Benjamin

Decl. ¶¶ 31-32.

Insulet's manufacturing challenges stem from the Omnipod's size, intricate mechanisms,

and critical life-sustaining function.  O'Connor Decl. ¶¶ 12-16; Benjamin Decl. ¶¶ 28-29.  Over

countless iterations of drawing, building, testing, and redesigning each of the device's 72

individual components and numerous sub-assemblies, Insulet developed detailed design and

manufacturing specifications to ensure that all parts of the device functioned reliably when

manufactured at scale.  O'Connor Decl. ¶ 18.  In the process, Insulet also accumulated a significant

body of data and know-how about the "failure points" in its design and strategies for mitigating

them.  *Id*. ¶ 16.

4

████████████████████████████████████████████████████████████

Insulet shared this information with its contract manufacturer, Flextronics Marketing Ltd., and its affiliates (collectively, "Flex"), after the parties signed a Manufacturing Services Agreement in 2007 under which Flextronics would manufacture, assemble, and test Omnipod products pursuant to Insulet's specifications.  That agreement, and its superseding amendments, expressly provided that these specifications, including drawings, test instructions, quality instructions, manufacturing instructions, assembly instructions, and bills of materials (including approved vendors), were exclusively owned by Insulet and that Flex was obligated to maintain the confidentiality of Insulet's proprietary information.  Ex. 22[1]; Ex. 23.  Over the course of the many years during which Flex served as Insulet's exclusive manufacturing partner, Insulet engineers worked daily with Flex employees to design, test, and trouble shoot its manufacturing lines.  In addition to around-the-clock communications, Insulet shared thousands of drawings, specifications, and process validation documents with Flex that it kept on its systems.

Altogether, it took about two decades ███████████████ for Insulet to develop a device design and manufacturing process that allowed the company to reliably and profitably meet its customers' needs.  Benjamin Decl. ¶ 78.  The vast amount of information and documentation Insulet accumulated to overcome this challenge are the crown jewels of Insulet's business and have set it apart from competitors that tried and failed to commercialize a comparable product.

## II.     EOFlow's Rapid Development of the EOPatch

EOFlow is a South Korean company founded in 2011.  Until September of 2015, EOFlow touted its EOPatch as different from, and better than, the Omnipod.  EOFlow claimed that its patch pump was substantially smaller and lighter than the Omnipod.  Ex. 24.  By February of 2018, however, EOFlow's message changed, and its website began featuring an entirely redesigned

---

[1] Unless otherwise specified, Exhibit Nos. 16-21 refer to Exhibits to the Expert Declaration of April Marano, and Exhibit Nos. 22-29 refer to the  Declaration of Matthew Ginther.

pump, with dimensions that were at least 40 percent thicker, and substantially heavier than before, even without insulin:

| 2015 EOPatch Design | 2018 EOPatch Design |
|---|---|
|  |  |
| Dimensions:  40 mm x 50 mm x 9 mm  Weight:  15 g (including insulin) | Dimensions:  49.9 mm x 32.4 mm x 12.9 mm  Weight:  18 g (excluding insulin) |

*See id.*; Ex. 19.

During the same timeframe that EOFlow overhauled its EOPatch design, the company engaged with Flex and hired several former Insulet executives who were intimately familiar with the design, manufacturing, and regulatory approval of the Omnipod.  First, in 2016, EOFlow entered into a "Joint Development and Collaboration Agreement" with Flex for the purpose of conducting a "Design for Manufacturability Analysis."  Ex. 25.

The next year, EOFlow appointed as its president, Luis Malave, the former COO and SVP of Research, Development, and Engineering at Insulet.  EOFlow's press release announcing the appointment touted Malave as "one of the earliest employees at Insulet."  Ex. 26.  Then, in 2018, the former Director of Regulatory Affairs at Insulet, Dr. Ian Welsford, who had shepherded regulatory approval of Omnipod Eros, joined EOFlow as Chief Technology Officer.  EOFlow again highlighted that Welsford "already led FDA approval of U.S. competitor Insulet products, so he expects to play a major role in the FDA 510(k) approval of EOPatch."  Ex. 27.  Insulet also

6

learned that another former Insulet executive, Steven DiIanni had been working with EOFlow. DiIanni was one of Insulet's first employees, and oversaw development of the Omnipod for over a decade. According to Jason O'Connor, who worked closely Mr. DiIanni for most of those years, Mr. DiIanni had reviewed every key document and was familiar with every aspect of the design and manufacturing of the Omnipod device.

After going nowhere for years, EOFlow made lightning-fast progress on the EOPatch after 2016. In 2017, EOFlow announced the opening of its first production line and sought and obtained approval for a first-generation version of the EOPatch. Ex. 28. Then, in July 2019, EOFlow announced approval in Korea of an "improved" device, with a soft cannula for more comfortable wear and an extended life of 3.5 rather than 3 days. Ex. 20. EOFlow first reportedly made the EOPatch available to users in Korea in 2021. It then sought and obtained approval in Europe in 2022. In January 2023, EOFlow announced the installation of a fully automated assembly line capable of producing three million units a year to meet anticipated demand. Ex. 21.

Despite trying, Insulet was not able to obtain samples of the EOPatch that it could disassemble for inspection for years. In 2023, Insulet obtained and analyzed the insides of the EOPatch for the first time. That analysis revealed that the EOPatch used the exact same design and functionalities as the Omnipod for nearly all its components, including features that were not readily discernible to anyone without inside knowledge of the Omnipod's development. O'Connor Decl. ¶¶ 33-84. Even more recently, the USPTO has published patent applications filed by EOFlow within the past year that disclose and claim confidential technologies developed by Insulet, including the Omnipod's occlusion detection method. O'Connor Decl. ¶¶ 65-68.

In May of this year, Medtronic announced its intention to acquire EOFlow for $738 million. In explaining its motivations, Medtronic's CEO, Geoff Martha, stressed the importance of the

patch market as the most rapidly growing segment of the insulin pump market and noted that EOFlow accomplished something that no company other than Insulet had successfully done—manufacture a patch pump efficiently at scale.  Mr. Martha commented on the difficulties of automated manufacturing capabilities for patch pumps and discussed Medtronic's past failed efforts to develop a patch pump, both internally and through acquisitions.  Another Medtronic executive later reiterated Mr. Martha's excitement over EOFlow's manufacturing capabilities:

> One of the reasons we were very excited by EOFlow is their manufacturing, and how much progress they've made on it…. The manufacturing is one of the biggest challenges with getting a patch up to market.  You got to make a device that is super accurate to dose insulin…. [EOFlow brings] a lot of assets in that regard.

Medtronic's acquisition of EOFlow is expected to close any day.  Absent an injunction, EOFlow will continue to transfer Insulet's trade secrets to the public and to Medtronic and other joint venture partners, who have virtually unlimited resources to exploit the misappropriated technology and destroy Insulet's hard-earned place in the market for insulin delivery products.

## LEGAL STANDARD

A preliminary injunction is proper where a plaintiff shows (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of equities favors the plaintiff, and (4) the injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In assessing these factors, absent "sharp dispute[s]" that hinge on witness credibility, a court is "free to accept as true well-pleaded allegations in the complaint and uncontroverted affidavits."  *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 121 (D. Mass. 2011) (internal quotations, alterations, and citations omitted).  The same standards govern a request for a temporary restraining order. *See, e.g., Quincy Cable Systems, Inc. v. Sully's Bar, Inc.*, 640 F. Supp. 1159, 1160 (D. Mass. 1986). In trade secret cases, irreparable harm is presumed where there is a likelihood of success on the merits.  *See Optos, Inc. v. Topcon Medical Systems, Inc.*, 777 F. Supp.

8

2d 217, 241 (D. Mass. 2011); *KPM Analytics N. America Corp. v. Blue Sun Scientific, LLC*, Civ. Action No. 4:21-CV-10572-TSH, 2021 WL 6275214, at *10 (D. Mass. Aug. 23, 2021).

## ARGUMENT

### I.   Insulet Is Likely to Succeed on the Merits of its Trade Secret Claim

The Defense of Trade Secrets Act ("DTSA") authorizes district courts to grant injunctive relief "to prevent any actual or threatened misappropriation" on reasonable terms. § 1836(b)(3)(A).  To prevail on a misappropriation claim, a plaintiff must show (1) the information is a trade secret; (2) the plaintiff took reasonable steps to preserve the secrecy of the information; and (3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret.  *T.H. Glennon Co., Inc. v. Monday*, No. CV 18-30120-WGY, 2020 WL 1270970, at *13 (D. Mass. Mar. 17, 2020); *see also Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).  Under the DTSA, a trade secret is a piece of information that at the time of the misappropriation provided an actual or potential economic advantage to its holder from not being known or readily ascertainable. 18 U.S.C. § 1839(3); *Parexel Int'l LLC v. Signant Health Holding Corp.*, No. 1:22-CV-11896-AK, 2023 WL 2938073, at *8 (D. Mass. Apr. 13, 2023).  Trade secret protection extends to "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized...." 18 U.S.C. § 1839(3).  Here, there are ample facts to indicate that (i) Insulet possesses valuable trade secrets, developed over years of confidential work, that its competitors have been unable to replicate despite years of trying; (ii) EOFlow had access to Insulet's trade secrets through Flex, Malavi, DiIanni, and Welsford in breach of their confidentiality obligations; (iii) EOFlow wrongly used

those secrets to develop and manufacture the EOPatch; and (iv) EOFlow is threatening to further disclose those secrets to Medtronic, joint venture partners, and to the public.

### A. Insulet Indisputably Held Valuable Trade Secrets Regarding the Omnipod

There can be little dispute that Insulet has valuable trade secrets related to the design and manufacturing of the Omnipod.  Insulet's trade secrets are the product of many years and at least hundreds of millions of dollars in iterative, trial-and-error engineering.  Insulet's trade secrets relate to both the design and manufacturing processes of the Omnipod. They are reflected in (1) the design drawings and specifications for each of the 72 physical components of the Omnipod and their sub-assemblies; (2) the manufacturing and quality control instructions for each component and assembly; (3) revision histories and failure modes for each component design; (4) the bill of materials and lists of vendor pricing and capabilities for sourcing of components and raw materials; (5) process validation procedures, and (6) the software specifications for the device software, including the occlusion detection algorithm.  O'Connor Decl. ¶ 18.  These documents contain information about properties of the Omnipod's

Courts in Massachusetts look at six factors when evaluating whether information is entitled to trade secret protection: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent

of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972)[2]; *KPM Analytics*, 2021 WL 6275214, at *7 (D. Mass. Aug. 23, 2021); *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004); *Am. Sci. and Eng'g, Inc. v. Kelly*, 69 F. Supp. 2d 227, 238 (D. Mass. 1999).

In the nearly 20 years that Insulet's products have been on the market, no company—not even Medtronic, the biggest medical device company in the world—has been able to accomplish what Insulet has accomplished, *i.e.*, manufacture a safe and effective patch pump on a cost-efficient and reliable basis at scale. *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 858 (1st Cir. 1985) ("[T]he inability of competitors to reproduce a product or process tends to prove the existence of trade secrets."). Medtronic—the company that is in the process of buying EOFlow for $738 million—has taken multiple "shots on goal" of "deliver[ing] competitive CGM/patch pump technology," through internal R&D, structured partnerships, and investments in other companies but has yet to independently develop its own cost-effective, commercially-viable patch pump. *See* Benjamin Decl. ¶ 45 (quoting Medtronic Presentation at 40th Annual J.P. Morgan Healthcare Conference (Jan. 10, 2022)). After announcing the EOFlow acquisition, Medtronic senior executives publicly acknowledged that "the manufacturing is one of the biggest challenges with

---

[2] Courts regularly turn to trade secret cases under state statutory and common law in evaluating trade secret claims under the DTSA. *See, e.g., Parexel Int'l LLC*, 2023 WL 2938073, at *7 ("The DTSA and MUTSA are nearly equivalent."); *Advanced Micro Devices, Inc. v. Feldstein*, No. CV 13-40007-TSH, 2013 WL 10944934, at *8 (D. Mass. May 15, 2013) (recognizing that the standard may be "essentially identical" in Massachusetts under both the common law and statute) (citing *Incase Inc. v. Timex Corp.,* 488 F.3d 46, 52 n.10 (1st Cir. 2007)).

getting a patch up to market."   Ex. 29 at ¶ 36 (Transcript of Medtronic American Diabetes Association (ADA) Analyst and Investor Briefing, June 25, 2023).   Other major companies have also tried and failed to deliver commercially viable patch pumps, including Becton Dickinson and Eli Lilly.   *See* Benjamin Decl. ¶¶ 49-50.   And the only two patch pumps that are on the market— referred to as V-Go and CeQur Simplicity—do not come close to delivering the same robust functionality as the Omnipod and therefore have relatively trivial market share.   *See id.* ¶¶ 52-54. These failures of others support the value of Insulet's trade secrets.   *See Contour Design, Inc. v. Chance Mold Steel Co.*, No. CIV. 09-CV-451-JL, 2010 WL 174315, at *6 (D.N.H. Jan. 14, 2010) (trade secrets were not readily ascertainable or generally known in part because despite a "decade of experience" in the field others "had not incorporated" the secrets in their own products).

These trade secrets are competitively valuable to Insulet because they were the fruits of "painstakingly iterative" development over numerous years and hundreds of millions of dollars in investments.   O'Connor Decl. ¶ 15; Benjamin Decl. ¶¶ 27-44.   These secrets have prevented other device manufacturers from seeking regulatory approval for a substantially equivalent product for the last nearly 20 years that the Omnipod has been on the market, allowing Insulet to remain the market leader in patch pumps while other device manufacturers repeatedly failed to reliably manufacture a competitive patch pump product at scale.   *Optos,* 777 F. Supp. 2d at 239 (finding customer list was likely a trade secret because it gave plaintiff a significant competitive advantage and plaintiff compiled it "at considerable cost."); *Touchpoint Sols.,* 345 F. Supp. 2d at 28-29 (holding that computing solution developed by plaintiff's engineers that gave it competitive advantage constituted trade secret).   Indeed, Medtronic, which has been unable to get any foothold in the patch-pump market, has effectively acknowledged the value of Insulet's misappropriated manufacturing secrets to Medtronic by seeking to acquire EOFlow for $738 million dollars.   Fortt

██████████████████████████████████████████████████████

Knox Earnings, *Geoff Martha, Medtronic CEO: FY23 Q4 Earnings*, YouTube (2:05 and 4:05), https://m.youtube.com/watch?v=GnfgIMgJEBI.

**B.    Insulet Took Reasonable Steps to Guard Its Trade Secrets**

Insulet took reasonable steps to keep the details of its Omnipod design and manufacturing process confidential.  Courts consider several factors in evaluating the adequacy of a plaintiff's protection of its secrets, including (1) the existence or absence of a [non-disclosure agreement], (2) the nature and extent of precautions taken, (3) the circumstances under which the information was disclosed and (4) the degree to which the information has been placed in the public domain or rendered readily ascertainable.  *TouchPoint Sols.*, 345 F. Supp. 2d 23, 29 (D. Mass. 2004).  Each of these factors favors the adequacy of Insulet's efforts.

First, Insulet's employees, executives, and consultants, including Malave, DiIanni, and Welsford, as well as Insulet's contract manufacturers, including Flex, were (and continue to be) subject to non-disclosure agreements that cover the trade secret materials shared with them by Insulet. Benjamin Decl. ¶ 63. Second, Insulet took substantial precautions to maintain the secrecy of its Omnipod design and manufacturing information, including marking drawings and specifications as confidential, maintaining tight building security around its laboratories and manufacturing facilities, password protecting its computer systems, and even ████████████

████████████████████████████████.  *Id.*   Third, Insulet only disclosed its trade secrets to the Individual Defendants and Flex while they held positions of trust with Insulet, either as employees or contractors of the company while under confidentiality obligations. *See* Benjamin Decl. ¶¶ 63-66; **Ex. 22**; **Ex. 23**.  Fourth, Insulet has not placed its trade secrets in the public domain, and the hundreds of millions of dollars spent by Insulet's competitors in failed efforts to independently develop a comparable patch pump product over the last 20 years show that Insulet's secrets were not publicly accessible or widely known.  Benjamin Decl. ¶¶ 45-59, 61-63.  In similar

circumstances, courts have regularly found adequate efforts to maintain secrecy.  *See, e.g.*, *CVD, Inc.*, 769 F.2d at 858 (1st Cir. 1985) (inability of competitors to reproduce plaintiff's secret process tends to show the process was secret); *TouchPoint Sols.*, 345 F. Supp. 2d at 31 (D. Mass. 2004) (finding efforts adequate in dealing with a counterparty where a confidential disclosure agreement was in place, the parties used a password protected server to share confidential information, and the flow of information was monitored); *Bos. Sci. Corp. v. Lee*, No. CIV.A. 13-13156-DJC, 2014 WL 1946687, at *5 (D. Mass. May 14, 2014) (holding confidentiality agreement sufficient to constitute reasonable protective measures where distribution was limited).

     **C.**     **EOFlow Misappropriated Insulet's Secrets to Build a Competing Product**

The "misappropriation" of a trade secret includes the "disclosure or use" of the secret by a person who at the time had "reason to know that the knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II).  "[R]arely can a plaintiff demonstrate misappropriation through direct evidence," particularly when the plaintiff has received no discovery as is the circumstance here.  *Elmagin Cap., LLC v. Chao Chen*, 555 F. Supp. 3d 170, 181 (E.D. Pa. 2021).  Courts thus infer misappropriation based on, as here, "circumstantial evidence, such as proof that the defendants had access to its trade secret material and that there are similarities between its products and the defendants' products."  *Id.*; *Covidien LP v. Esch*, 378 F. Supp. 3d 119, 125 (D. Mass. 2019) ("Plaintiffs are not required to provide direct evidence of [Defendant's] alleged breach of confidentiality claim"); *Contour Design, Inc.*, 2010 WL 174315, at *7 (citations omitted) ("These showings—access and similarity—may support a trade secret misappropriation claim because they suggest that the defendant derived its product from the plaintiff's trade secret, rather than from an independent source.").

Here, the circumstances speak for themselves. EOFlow claims to have done something that much larger companies with access to substantially more resources have been unable to do, and to have done so on a much faster timeline than is reasonably possible in the industry. Marano Decl. ¶¶ 24-38. EOFlow also has managed to roll out a commercial scale patch pump manufacturing line at a fraction of the cost and investment that would be typical in the industry. Benjamin Decl. ¶ 71. While EOFlow announced only tens of millions of dollars in pre-IPO fundraising, it claims to have accomplished something that took ██████████████ *Id.* ¶ 43.

During the same few years that EOFlow revamped its EOPatch to replicate the Omnipod, EOFlow also (1) appointed Insulet's former Director of R&D as EOFlow USA's president, (2) engaged Insulet's contract manufacturer, Flex/Flextronics, as a research collaborator, (3) hired Insulet's former Director of Mechanical Engineering as a consultant, and (4) hired Insulet's Director of Regulatory Affairs as CTO to lead regulatory approval for the EOPatch. There can be no dispute that Flex and the former Insulet executives had deep access to and knowledge of Insulet's trade secrets. O'Connor Decl. ¶¶ 19-22. These facts—which are beyond reasonable dispute—create a strong inference of misappropriation and demonstrate that Insulet is likely to succeed on the merits of its trade secret misappropriation claim. *See Contour Design, Inc.*, 2010 WL 174315, at *7–8 (inferring misappropriation and knowledge of misappropriation where defendant launched a similar product and the defendant had access to plaintiff's secret design through an affiliate, which shared the same president as the defendant so that each "corporate personage 'knows'" what the other knows.")

The substantial similarities between the EOPatch and Omnipod are additional compelling evidence of EOFlow's misappropriation of Insulet's trade secrets. EOPatch replicates unique

███████████████████████████████████████████████████████████

features of the Omnipod not readily discernible through inspection, a number of which relate to

Insulet's secret manufacturing and validation processes.  By way of example:

- ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ████████████████████████████████████████

- ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ██████████████████████████████████

- ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ██████████████

- ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████
  ████████████████████████████████████████

- ███████████████████████████████████████████████████████████
  ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Equally telling are designs that EOFlow *changed* from the Omnipod, which suggest that EOFlow was deeply familiar with specific problems Insulet encountered during the manufacture of its Omnipod. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

When considered in their totality, the facts and circumstances in this case—EOFlow's extensive engagements with individuals and executives who possessed Insulet's trade secrets, the EOPatch's rapid development timeline, EOFlow's comparatively low spend on research and development, and the telling similarities and differences between the EOPatch and Omnipod devices—all point to EOFlow's misappropriation of Insulet's trade secret information. *See e.g.*,

*Contour Design, Inc.*, 2010 WL 174315, at *7 (inferring misappropriation based on similarity and access); *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 285 F.3d 1353, 1361 (Fed. Cir. 2002) (same); *Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 26-27 (2d Cir. 1985) (inferring misappropriation based on products brought to market quickly after hiring plaintiff's employee). Insulet is likely to succeed on the merits.

## II.     Insulet Will Suffer Irreparable Harm Without A TRO and Preliminary Injunction

Where, as here, a plaintiff demonstrates a likelihood of success on a misappropriation of trade secrets claim, "irreparable harm is presumed." *KPM Analytics*, 2021 WL 6275214, at *10 (D. Mass. Aug. 23, 2021); *see also Optos,* 777 F. Supp. 2d at 241.  "That is in recognition of the fact that, once the trade secret is lost, it is gone forever." *TouchPoint Sols.,* 345 F. Supp. 2d at 32 (internal quotations omitted); *see also Alantra, LLC v. Apex Indus. Techs., LLC,* Civil Action No. 20-10852-FDS, 2020 WL 6263596, at *2 (D. Mass. Oct. 23, 2020).  In addition to the applicable presumption, the evidence of imminent and irreparable harm here is clear.

EOFlow has announced that it plans to disclose Insulet's trade secrets not just to anyone, but to Medtronic, Insulet's largest competitor and the world's largest medical device company. Insulet is not a party to the EOFlow – Medtronic acquisition.  Yet, it is bearing all of the risk of Medtronic's access to its trade secrets, with no ability to impose any limit on Medtronic's access to information related to its trade secrets.  *See* McLean Decl. ¶¶ 70 – 75.  If (and when) the deal closes, Medtronic will have unfettered access to Insulet's trade secrets, which cannot be unlearned and damages will be extremely difficult, if not impossible to fully assess, to a reasonable degree of certainty. *Id.* ¶ 76.  In fact, there is substantial evidence that the motivation behind Medtronic's acquisition are the very trade secrets Insulet is seeking to protect here.  *See id.* ¶¶ 60 – 65. Medtronic has for years tried to develop a safe, effective, and commercially viable patch pump.

███████████████████████████████████████████████████████

*See id.* ¶ 64.  When its internal efforts to develop a patch pump failed, it brought in hundreds of millions of dollars in external funding and spent hundreds of millions on acquisitions.  *Id.*

Medtronic's full access to Insulet's trade secrets has the potential to be ruinous for Insulet effectively neutralizing Insulet's competitive advantage.  *See id.* ¶¶ 79-81.  Medtronic offers an inferior product whose existing market share is propped up by Medtronic's existing relationship with patients and prescribers and Medtronic's ability to invest billions every year in maintaining those relationships.  ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████    *See id.* ¶¶ 89-91; Benjamin Decl. ¶¶ 79-80.[3]

## III.    The Remaining Factors Favor Plaintiff's Requested Injunction

The balance of hardships from the entry of a status quo-maintaining preliminary injunction and the public interest weigh in favor of granting the injunction.  Insulet requests a prohibitory injunction to maintain the status quo by prohibiting EOFlow from engaging in a technology transfer to Medtronic, or disclosing its confidentiality manufacturing know-how and specifications to any third party during the pendency of this case.  This motion seeks only to enjoin EOFlow from disclosing confidential technical information about the design, manufacturing, and operation of the EOPatch to third parties, including most significantly, Medtronic.  For the reasons discussed

---

[3] *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (holding that "a substantial loss of business and perhaps even bankruptcy" would "certainly" meet the standards for granting interim relief because "otherwise a favorable final judgment might well be useless."); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (holding that "where the potential economic loss [to the movant] is so great as to threaten the existence of the movant's business," the court properly found irreparable harm justifying an injunction).

above, there is compelling evidence that EOFlow's technical design, manufacturing and operating information is, in fact, based on Insulet's trade secrets. EOFlow has no cognizable interest in disseminating this information. It is well-established that where a preliminary injunction merely restricts the dissemination of a plaintiff's trade secrets, the hardship of compliance with the Court's order is *de minimis*. *Bos. Centerless, Inc. v. DeSantis*, No. 1:22-CV-11729-RGS, 2022 WL 16639138, at *1–2 (D. Mass. Nov. 2, 2022) (balance of harms favors injunction where "Defendant will not incur any harm from restrictions on his ability to disclose or use Plaintiff's Confidential Information and trade secrets."); *FrontRunner HC, Inc. v. Waveland RCM, LLC*, No. CV 20-10230-DJC, 2020 WL 7321161, at *13 (D. Mass. Dec. 11, 2020) ("Defendants . . . will not face hardship if they are prevented from disclosing or using [Plaintiff's] trade secrets….").

After Insulet filed its complaint, counsel for EOFlow have represented to Insulet that EOFlow has withdrawn its § 510(k) application with FDA and, as a result, it does not have plans to imminently commercialize the EOFlow in the United States. Therefore, in this case, the preliminary injunction will have no effect on the availability of any product to patients in the U.S. (and thus no potential harm to the public interest), because as EOFlow has represented, no U.S. launch of the EOPatch is imminent. Rather, the public interest favors Insulet's requested injunction because the public interest is advanced "by deterring violations of our laws," particularly in light of the federal policy in favor of strong protections for trade secrets. *U.S. v. Sells Eng'g*, 463 U.S. 418, 471 (1983); *Bos. Centerless, Inc.*, 2022 WL 16639138, at *1–2.

## CONCLUSION

EOFlow should be temporarily restrained and enjoined from further disclosing the design and manufacturing information it misappropriated from Insulet to Medtronic, its joint venture partners, and others. For the foregoing reasons, Insulet's motion should be granted.

Dated: August 18, 2023

INSULET CORPORATION

By its attorneys,

*/s/Robert D. Carroll*
Robert D. Carroll (BBO# 662736)
Robert Frederickson III (BBO# 670111)
Scott T. Bluni (BBO# 660187)
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax.: (617) 321-4397
RCarroll@goodwinlaw.com
RFrederickson@goodwinlaw.com
SBluni@goodwinlaw.com

Jenny Zhang (BBO# 689838)
Matthew Ginther (*pro hac vice*)
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
Tel: (202) 346-1000
Fax: (202) 346-4444
JZhang@goodwinlaw.com
MGinther@goodwinlaw.com

James Breen (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 813-8800
Fax: (212) 355-3333
JamesBreen@goodwinlaw.com

*Attorneys for Plaintiff Insulet Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2023, I electronically filed the foregoing redacted version of Plaintiff's Memorandum in Support of its Motion for Temporary Restraining Order and Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

I further certify that undersigned counsel had previously served an unredacted copy of the foregoing document on counsel for all Defendants on August 18, 2023, a method of service counsel assented to in writing.

By: _Robert D. Carroll_
Robert D. Carroll

22