# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| INSULET CORPORATION,<br><br>               Plaintiff,<br><br>    v.<br><br>EOFLOW CO., LTD; EOFLOW, INC.; FLEX, LTD.; FLEXTRONICS CORPORATION; FLEXTRONICS MEDICAL SALES AND MARKETING, LTD.; STEVEN DIIANI; LUIS J. MALAVE; and IAN G. WELSFORD,<br><br>               Defendants. | Case No. 1:23-cv-11780-FDS<br><br>**JURY TRIAL DEMANDED ORAL**<br><br>**ARGUMENT REQUESTED**<br><br>**PUBLIC VERSION** |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ....................................................................................... 2

    I.     The Parties ........................................................................................ 2

          A.     INSULET ITSELF PUBLICIZED THE OMNIPOD DESIGN ............... 2

          B.     EOPATCH VERSION 2 IS DIFFERENT THAN OMNIPOD
                  AND TOOK YEARS AND EXTENSIVE CAPITAL TO BRING
                  TO MARKET. ...................................................................... 3

          C.     THE INDIVIDUAL DEFENDANTS DID NOT DRIVE THE
                  EOPATCH VERSION 2 DESIGN OR MANUFACTURE
                  PROCESS. ........................................................................... 5

          D.     THE FLEX DEFENDANTS ARE TELLINGLY NOT
                  INCLUDED IN INSULET'S REQUEST. ...................................... 5

    II.    Business Discussions Among Insulet, EOFLow, and Medtronic ......................... 6

    III.   Insulet's Litigation History With the EOPatch Version 2 ..................................... 7

LEGAL STANDARD ............................................................................................... 9

ARGUMENT ......................................................................................................... 9

    I.     Insulet Has Not Shown Likelihood of Success on the Merits ............................. 10

          A.     INSULET'S DTSA CLAIM IS TIME-BARRED. .................................. 10

          B.     INSULET'S DTSA CLAIM IS UNLIKELY TO SUCCEED ON
                  THE MERITS. ..................................................................... 12

          C.     INSULET HAS NOT TAKEN THE REQUIRED REASONABLE
                  MEASURES. ....................................................................... 17

          D.     EOFLOW IS NOT SUBJECT TO THE COURT'S PERSONAL
                  JURISDICTION. .................................................................. 18

    II.    Insulet Failed to Demonstrate Irreparable Harm ............................................. 18

    III.   The Remaining Factors Weight Against Preliminary Relief .............................. 20

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alamar Biosciences, Inc. v. Difco Lab'ys, Inc.*,
   1995 WL 912345 (E.D. Cal. Oct. 13, 1995) ....................................................................11, 17

*Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*,
   386 F. Supp. 3d 89 (D. Mass. 2019) ........................................................................................12

*Am. Fire-Hose Mfg. Co. v. Cornelius Callahan Co.*,
   41 F. 50 (C.C.D. Mass. 1890) ..................................................................................................10

*AnywhereCommerce, Inc. v. Ingenico Inc.*,
   2023 WL 2694043, at *12 (D. Mass. Mar. 29, 2023) ...............................................................11

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
   996 F.3d 37 (1st Cir. 2021) ......................................................................................................20

*Bridgeview Bank Grp. v. Meyer*,
   49 N.E.3d 916 (Ill. App. 2016) ................................................................................................19

*Carson Prod. Co. v. Califano*,
   594 F.2d 453 (5th Cir. 1979) .............................................................................................12, 15

*Castro v. United States*,
   775 F.2d 399 (1st Cir. 1985) ....................................................................................................19

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) ....................................................................................................18

*Chicago Lock Co. v. Fanberg*,
   676 F.2d 400 (9th Cir. 1982) ...................................................................................................13

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
   920 F.3d 560 (8th Cir. 2019) ...................................................................................................11

*Coenco, Inc. v. Coenco Sales, Inc.*,
   940 F.2d 1176 (8th Cir. 1991) .................................................................................................13

*Contour Design, Inc. v. Chance Mold Steel Co. Ltd.*,
   693 F.3d 102 (2012)..................................................................................................................15

*Costa v. FCA US LLC*,
   542 F. Supp. 3d 83 (D. Mass. 2021) ........................................................................................18

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Covidien LP v. Esch*,
  378 F. Supp. 3d 119 (D. Mass 2019) .......................................................................14

*Elmagin Cap. LLC v. Chao Chen*,
  555 F. Supp. 3d 170, 183 (E.D. Pa. 2021) .............................................................14

*Esso Standard Oil Co. v. Monroig-Zayas*,
  445 F.3d 13 (1st Cir. 2006) ......................................................................................9

*Exeter Grp., Inc. v. Sivan*,
  2005 WL 1477735 (Mass. Super. Mar. 24, 2005) ..................................................19

*Gentil v. Wingfield GmbH*,
  2021 WL 4979427 (N.D. Cal. Mar. 2, 2021) ..........................................................14

*HiRel Connectors, Inc. v. United. States*,
  2005 WL 4958547 (C.D. Cal. Jan. 4, 2005) ...........................................................17

*Imasuen v. Winn Prop. Mgmt.*,
  2013 WL 6859094 (D. Mass. Dec. 26, 2013) ...........................................................9

*Kadant, Inc. v. Seeley Mach., Inc.*,
  244 F. Supp. 2d 19 (N.D.N.Y. 2003) ......................................................................14

*Kewanee Oil Co. v. Bicron Corp.*,
  416 U.S. 470, 476 (1974) .................................................................................12, 13

*Knights Armament Co. v. Optical Sys. Tech., Inc.*,
  654 F.3d 1179 (11th Cir. 2011) ..............................................................................11

*Lunt v. Campbell*,
  2007 WL 2935864 (Mass. Sup. Ct. Sept. 24, 2007) ..............................................18

*MGA Ent., Inc. v. Mattel, Inc.*,
  41 Cal. App. 5th 554 (2019) ...................................................................................11

*Parexel Int'l LLC v. Signant Health Holding Corp.*,
  2023 WL 2938073 (D. Mass. Apr. 13, 2023) .........................................................15

*Patriot Energy Group, Inc. v. Kiley*,
  2014 WL 880880 (Mass. Super. Ct. Feb. 26, 2014) ..............................................20

*Pie Development, LLC v. Pie Insurance Holdings*,
  2023 WL 2707184 (5th Cir. Mar. 30, 2023) ..........................................................17

iii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Rice v. Wells Fargo Bank,*
   N.A., 2 F. Supp. 3d 25, 34 (D. Mass. 2014) ..........................................................................10

*Secure Servs. Tech., Inc. v. Time & Space Processing Inc.,*
   722 F. Supp. 1354 (E.D. Va. 1989) .......................................................................................13

*SI Handling Sys., Inc. v. Heisley,*
   753 F.2d 1244 (3d Cir. 1985)................................................................................................13

*Sionyx LLC v. Hamamatsu Photonics K.K.,*
   2016 WL 4007558 (D. Mass. July 26, 2016)...........................................................................9

*United States v. Booz Allen Hamilton Inc.,*
   2022 WL 16553230 (D. Md. Oct. 31, 2022) .........................................................................19

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,*
   645 F.3d 26 (1st Cir. 2011)....................................................................................................9

*World Gym, Inc. v. Baker,*
   474 F. Supp.3d 426 (D. Mass. 2020) .....................................................................................20

**Statutes**

18 U.S.C. § 1836(d) ........................................................................................................................10

18 U.S.C. § 1839.......................................................................................................................12, 15

**Other Authorities**

Fed. R. Civ. P. 65(c) .....................................................................................................................20

Five years after seeing EOFlow's product, and more than six months after tearing that product down, Insulet seeks an extraordinary remedy to thwart ordinary competition. Throughout this time, Insulet and EOFlow were in regular contact about the companies' insulin pump patch products. The parties discussed EOFlow's competitive product, Insulet's potential desire to buy EOFlow, and even a European patent litigation where Insulet analyzed every nook and cranny of EOFlow's device—but until this supposedly "urgent" lawsuit, Insulet never *once* raised any claim about any purported "trade secret."

Insulet's motion for a temporary restraining order and preliminary injunction fail for three reasons. *First*, Insulet cannot demonstrate a likelihood of success on its time-barred claim seeking trade secret protection for publicly disclosed, readily ascertainable product features. *Second*, Insulet's delays undercut any claim to irreparable harm where Insulet has been aware of the product at issue for years, the product has long been on the market, and Medtronic's interest in acquiring EOFlow was known for months before Insulet filed its "emergency" motion. *Third*, the balance of harms favors Defendants, as Insulet's 13th hour gambit imperils a $740M transaction that could determine EOFlow's future.

This is not a dispute over trade secrets. This is a case where Insulet, fearing a competitor with a fundamentally different and better product, leveled unsupported claims to extend its 20-year monopoly. Insulet has a covenant not to sue Medtronic or any Medtronic affiliate on its patent portfolio; once the Medtronic transaction closes, that covenant will be fatal to Insulet's pending patent claims. Rather than abide by its agreement, Insulet conjured an emergency "trade secret" claim to scuttle the deal. But Insulet has identified no trade secrets, including because its own patents disclose the same information. Rather than reward such tactics and punish EOFlow for being fully transparent about its product and plans, the Court should deny Insulet's motion.

1

## FACTUAL BACKGROUND

I.    **THE PARTIES**

    **A.    Insulet Itself Publicized the Omnipod Design.**

Insulet produces the Omnipod, a disposable, wearable insulin pump.  Technical development on the Omnipod began in 2002 and FDA 510(k) premarket approvals arrived in 2003 and 2005.  In just three years, Insulet developed, acquired FDA approval, and brought to market its first commercial version of Omnipod—a timeline roughly equivalent to EOFlow's. (*See* O'Connor Decl. ¶ 5; Exs. 1-3; Kim Decl. ¶ 4, 6, 7, 14-17.)

The Omnipod's components can be readily viewed by any purchaser, and no EULA or other customer-level protection exists to bar viewing and disassembling the device. (*See* Benjamin Decl. ¶¶ 62-63; O'Connor Decl. ¶ 18.)  For many years individuals have torn down Insulet's pod and provided detailed, publicly available analyses.  (*See* Schurman Decl. ¶¶ 26-34.)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ (Exs. 4-5; Kim Decl. ¶ 9.)

Insulet shared Omnipod's schematics, "under-the-hood" photographs, and technical specifications for a 2010 *Diabetes Therapies* article, "The Omnipod Insulin Management System: the Latest Innovation in Insulin Pump Therapy."  (Ex. 6.)  That article, readily available online to this day through PubMed Central and the National Institute of Health, reveals the pod's inner workings, parts, and mechanisms, with "thanks [to] Insulet Corporation for providing technical support [and] permission to use the photographs."  (*Id*. at 24.)  As shown below, Insulet also disclosed detailed information about its pod (and asserted "secrets") through its patent portfolio.

**B.      EOPatch Version 2 Is Different Than Omnipod and Took Years and Extensive Capital to Bring to Market.**

Founded in 2011, EOFlow is a Korea-based maker of insulin pump patches for patients with diabetes.  EOFlow's EOPatch is a cost-effective, efficient tube-free insulin pump.  ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████  (Kim Decl. ¶ 4.)  Flex neither manufactured anything for EOFlow nor disclosed any confidential Insulet manufacturing information.  (*Id*. ¶ 5.)

In December 2017, EOFlow obtained Korean regulatory approval for its EOPatch Version 1 device.  EOFlow's large team of Korean-based engineers then began developing the next-generation EOPatch, Version 2.  (*Id*. ¶ 7.) ████████████████████████████ ████████████████████████  (*Id*.)

The Korea-based engineers also developed internal components for EOPatch Version 2 that are fundamentally different from the Omnipod.  (*Id*. ¶ 10.)  As Insulet acknowledges in its Complaint, the heart of the machine—the actuator that drives insulin flow—bears no resemblance to Insulet's actuator.  Where Insulet's pod is driven by a shape memory alloy ("SMA") wire that stretches and contracts, EOFlow uses an entirely different mechanism—a positive displacement pump that operates by electro-osmosis.  (*Id*. ¶¶ 8, 11; Compl. ¶ 9.)

The EOPatch Version 2's pump provides more accurate dose delivery and power-efficiency than Insulet's Omnipod.  Where Insulet's pod requires three batteries to last three days, EOPatch Version 2 uses just two batteries and lasts three-and-a-half days—a significant advantage to diabetes patients who must frequently purchase, and change, these disposable devices.  (*See* Ex. 7, at 4; Ex. 8, at 19.)

The devices' insertion needles are also substantially different. Whereas Omnipod includes a long soft cannula inserted at a forty-five-degree angle, the EOPatch Version 2's soft cannula (ported from Version 1) is less than an inch and enters the patient's skin vertically.

As Insulet admits, by 2018, EOFlow was widely publicizing and marketing EOPatch Version 2. (Compl. ¶ 8.) EOPatch Version 2 was also presented at trade shows, including the June 2018 American Diabetes Association Conference that Insulet attended in Orlando, Florida. (Kim Decl. ¶ 13.) There, without any NDA or any other restriction, EOFlow showcased EOPatch Version 2 with a clear case cover allowing attendees to inspect the device's components. (*Id.*)

**EOPatch Version 2 – Clear Case Cover Demo Unit**
**As Displayed at the June 2018 ADA Conference**



Insulet attended and approached EOFlow's booth to inspect EOPatch Version 2. (Benjamin Decl. ¶ 68.)

EOPatch Version 2 received Korean regulatory approval in July 2019 and CE mark approval for European distribution in May 2021. (Kim Decl. ¶¶ 15-16; Exs. 9-11.) EOFlow considered entering the U.S. market and submitted an FDA 510(k) application for EOPatch

Version 2 in December 2022 but ████████████████████, well before Insulet filed its

Complaint.  (Kim Decl. ¶ 17; Exs.12, 13.)  ████████████████████████

████████████████████████████████████████████████████

█, which would likely take at least six months and more likely twelve.  (Kim Decl. ¶ 17; *see also*

Compl. ¶ 108.)

       **C.**      **The Individual Defendants Did Not Drive the EOPatch Version 2 Design or Manufacture Process.**

Defendants Malave, Welsford, and DiIanni (the "Individual Defendants") had long-time

industry experience before ever working at Insulet, left Insulet many years ago, and worked for

other companies before even starting at EOFlow.  For example, Mr. Malave left Insulet in

August 2010, and only joined EOFlow seven years later.  (Benjamin Decl. ¶ 66; Exs. 3, 14.)  Mr.

Malave's EOFlow role focused not on technical issues or engineering, but rather business

development—making and strengthening EOFlow's industry relationships, including with

Insulet.  Similarly, Mr. Welsford joined EOFlow in April 2018, eight years after leaving Insulet,

to focus on EOFlow's regulatory agency applications for the EOPatch Version 2—a position

unrelated to the engineering and design for EOPatch Version 2, and one marked not by secret

processes, but public filings.  (Benjamin Decl. ¶ 65; Ex. 15.)  Finally, Mr. DiIanni left Insulet in

January 2015, almost three years before any consulting for EOFlow.  (Benjamin Decl. ¶ 64.)

EOFlow's Korean engineers, and not any Individual Defendant, drove the design and

manufacturing processes for EOPatch Version 2.  (Kim Decl. ¶ 7.)

       **D.**      **The Flex Defendants Are Tellingly Not Included in Insulet's Request.**

Insulet alleges the Flex Defendants "possessed every detail of Insulet's proprietary and

confidential manufacturing processes," (Compl. ¶ 7), but apparently saw no need to move for an

injunction against Flex to recover that purportedly vital trade secret information.

## II.      BUSINESS DISCUSSIONS AMONG INSULET, EOFLOW, AND MEDTRONIC

In March 2019, well after viewing the transparent EOPatch Version 2 at the 2018 trade show, Insulet's former VP of Strategy and Corporate Development, Brittany Bradrick, contacted Mr. Malave requesting a further, "overview of EOFlow" that the parties conducted by phone. (Exs. 16, 17.)   In May 2021, Insulet and EOFlow commenced long-running, off-and-on conversations about a potential collaboration.  During those discussions that May, Mr. Malave shared with Insulet EOFlow's 2021 Investor Relations presentation.  (Exs. 8, 18.)  The 2021 Investor Relations presentation showed the Insulet and EOFlow patches side-by-side, just as Insulet would in its complaint filed years later.   (*See* Compl. ¶ 8.)   EOFlow's presentation, provided to Insulet in 2021, explicitly put Insulet on notice that the EOFlow Version 2 was the "sole competitor to Insulet . . . the monopolistic market leader" and even presented the products' similar dimensions.  (Ex. 8, at 11; Compl. ¶ 8.)



**Ex. 8, EOFlow 2021 Investor Relations Presentation, at 11.**

The 2021 presentation gave Insulet notice, two years ago, of EOFlow's:

- global marketing plans;
- competitive advantages over Insulet in "convenience," "compliance," and "cost,";
- research and product development timelines;
- recognition by the FDA as a "Breakthrough Device";

- Korean market approval; and
- signed "EU distribution agreement" with Menarini Diagnostics.

(*Id.*, 17-20, 29.)  None of this is news to Insulet.

The presentation also showed EOPatch Version 2's internal components, contrasting Insulet's SMA wire mechanism with EOFlow's electro-osmotic actuator.



| Ex. 8, EOFlow 2021 Investor Relations Presentation, at 14. |
| --- |

Insulet ultimately decided not to pursue a joint venture or acquisition of EOFlow but requested an informal right of first refusal, which was never exercised.  (Kim Decl. ¶ 18.)

In time, EOFlow entered acquisition discussions with Medtronic.  In February 2023, industry news outlets reported that Medtronic had started a due diligence process to acquire EOFlow.  (Ex. 19.)  On May 23, 2023, Medtronic and EOFlow formally announced an agreement to acquire EOFlow stock on the Korean stock exchange.  (Exs. 20, 21.)  As reported in February, Medtronic and EOFlow have already conducted significant technical diligence on EOPatch Version 2.  (Kim Decl. ¶ 19.)

## III.   INSULET'S LITIGATION HISTORY WITH THE EOPATCH VERSION 2

Around the time Medtronic's deal diligence was reported in February, Insulet sued

EOFlow's European distributor Menarini Diagnostics in Germany, alleging EOPatch Version 2 infringed a European patent.  (Ex. 22.)  In papers filed six months ago, Insulet included photographs—remarkably similar to those filed in its "urgent" motion last week—showing that Insulet had torn-down and analyzed an EOPatch Version 2.  While Insulet remained in communication with EOFlow, Insulet never once—in that suit or afterward—mentioned any trade secrets, sent a cease-and-desist letter, or demanded the return of any such secrets.

| Ex. 22, Insulet's February 22, 2023 Application for Interim Injunction, at 4, 22-31. |
| --- |



Six months later, Insulet filed the present action, demanding extraordinary relief on the grounds that Medtronic's public tender offer to purchase shares in EOFlow, a Korean public company, would erode "Insulet's competitive advantage."  (Br. at 19.)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citation omitted). Instead, to issue a preliminary injunction "a district court must find that the moving party has established (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) that the balance of equities weighs in his favor, and (4) that a preliminary injunction is in the public interest." *Sionyx LLC v. Hamamatsu Photonics K.K.*, 2016 WL 4007558, at *8 (D. Mass. July 26, 2016); *Imasuen v. Winn Prop. Mgmt.*, 2013 WL 6859094, at *3 (D. Mass. Dec. 26, 2013) ("To warrant the more extraordinary relief of a temporary restraining order, plaintiff must demonstrate that his injury of loss is 'immediate and irreparable.'"). If any factor favors the non-movant, an injunction cannot issue because "[t]he party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## ARGUMENT

Five years after seeing EOFlow's device publicly displayed at a trade show, Insulet is demanding an extraordinary and drastic remedy by insisting "judicial intervention is urgent." (Br. at 1.) The facts and the law show otherwise. Insulet alleges harm is imminent because EOFlow was "on the cusp" of launching its product in the United States. (Compl. ¶ 12.) However, a standard pre-suit letter to EOFlow would have revealed that EOFlow had already *withdrawn* any request for FDA approval and has *no* plans to enter the U.S. market with EOPatch Version 2.

Insulet's motion fails because (1) Insulet has not demonstrated a likelihood of success on its time-barred, meritless claim; (2) Insulet has not demonstrated irreparable harm after lengthy

delay; and (3) the balance of harms and public interest weight against a sweeping injunction that functionally thwarts a $740M acquisition and deprives diabetes patients of a market alternative.

Insulet has stitched together at best a counter-factual, implausible, "circumstantial" argument about what might have happened or "would have been," (Br. at 2), but such injunction motions that fail to prove their claims *with evidence* are "easily dispensed with." *Rice v. Wells Fargo Bank*, N.A., 2 F. Supp. 3d 25, 34 (D. Mass. 2014) (denying preliminary injunction motion because "[i]t is not Defendant who must present evidence . . . it is Plaintiffs who must prove that they are entitled to an injunction."). This has been black-letter law in this District for over a century, including in intellectual property disputes. *See, e.g.*, *Am. Fire-Hose Mfg. Co. v. Cornelius Callahan Co*., 41 F. 50, 50–51 (C.C.D. Mass. 1890) (denying preliminary injunction motion where both parties submitted affidavits, and recognizing that where "the evidence is conflicting, and my mind is not free from doubt . . . the courts should not grant an injunction").

## I.     INSULET HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON THE MERITS

### A.     Insulet's DTSA Claim Is Time-Barred.

DTSA claims expire *three years* after the date a misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d).

*Five years ago*, Insulet attended the June 2018 ADA conference, visited EOFlow's booth and concluded EOFlow's product "bore a stunning resemblance to Omnipod." (Kim Decl. ¶ 13; Benjamin Decl. ¶¶ 68, 69; Compl. ¶ 8 (alleging that "in 2018, EOFlow started advertising its . . . strikingly similar" product). As a result of that notice, Insulet claims to have "constantly watched" EOFlow's operations. (Benjamin Decl. ¶ 70.) Yet Insulet took no action when EOFlow: (1) provided Insulet an "overview" of the product in March 2019; (2) announced regulatory approval from the Korean Ministry of Food and Drug Safety in July 2019; and (3) publicly announced a distribution agreement with Menarini Diagnostics to "commercialize the

Insulin Patch Pump product developed by EOFlow" in September 2019.  (Exs. 16, 17, 23-25.)

This occurred openly, four and five years before Insulet filed suit, exceeding the three-year limit.

Courts consistently hold such trade secret claims are time barred.  A 2023 case from this

District is on point.  *AnywhereCommerce, Inc. v. Ingenico Inc*., granted summary judgement that

a trade secret claim was untimely because the plaintiff "saw the [defendant's] product at the []

trade show" more than three years before filing suit.  2023 WL 2694043, at *12 (D. Mass. Mar.

29, 2023).  As the court recognized, "although [plaintiff] did not physically inspect the product

himself," it was "almost the same" as plaintiff's product.  *Id.*  As a result, "regardless of when

[defendant's] product went on the market," plaintiff "reasonably knew" from the trade show that

the defendant had "a very similar product such that [plaintiff] was on notice by then of the

potential claim," and its DTSA claim, filed more than three years later, was untimely.  *Id.*

Federal courts across the country have similarly held that defendants' trade show

presentations provide inquiry notice rendering trade secret claims time barred.  *See, e.g.*, *MGA*

*Ent., Inc. v. Mattel, Inc*., 41 Cal. App. 5th 554, 563-64 (2019) (affirming summary judgment

because an industry event provided "inquiry notice as to whatever trade secrets were being

displayed," and a party "cannot don blinders to avoid the accrual of the statute of limitation.");

*Alamar Biosciences, Inc. v. Difco Lab'ys, Inc*., 1995 WL 912345, at *4 (E.D. Cal. Oct. 13, 1995)

(holding trade secret claim for bacterial testing kits untimely where defendant had presented

technology at "trade shows" that "looked very much like" plaintiff's technology); *see also CMI*

*Roadbuilding, Inc. v. Iowa Parts, Inc*., 920 F.3d 560, 565 (8th Cir. 2019) (affirming trade secret

claim as time-barred because activities such as "exhibits at an [industry] trade show" meant

plaintiff was "continuously on notice" with "a duty to investigate, regardless of [its] exact

knowledge"); *cf. Knights Armament Co. v. Optical Sys. Tech., Inc*., 654 F.3d 1179, 1184 (11th

Cir. 2011) (affirming trade secret claim to night vision technology was time-barred based on party communications where even the plaintiff admitted the statute of limitations started as soon as it "first viewed [the] competing device at a trade show.").

Far from having a likelihood of success on the merits to justify drastic relief, Insulet's DTSA claim—its sole grounds for an injunction—is demonstrably time-barred by the five years that passed since Insulet saw EOFlow's product at the 2018 trade show.

### B.        Insulet's DTSA Claim Is Unlikely to Succeed on the Merits.

A DTSA claimant must demonstrate: (1) the information at issue constitutes a trade secret; (2) the owner took reasonable measures to secure its confidentiality information; and (3) the defendant obtained the trade secret through improper means.  *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 386 F. Supp. 3d 89, 94-95 (D. Mass. 2019).  The first and third elements reinforce one another because if the information is generally known, readily ascertainable, or "discoverable by fair and honest means" such as through reverse engineering, then the information is not "entitled to legal protection" and "cannot be the subject of a trade secret."  *Carson Prod. Co. v. Califano*, 594 F.2d 453, 461-62 (5th Cir. 1979), *citing Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974).

To justify a TRO or preliminary injunction, Insulet has a heavy burden to demonstrate a trade secret, reasonable measures, and misappropriation.  Insulet has demonstrated none of the above.  Instead, Insulet marketed a product with no EULA or use restriction, publicly disclosed the purported "secrets," and sat on its hands for years with knowledge of EOFlow's product, which was lawfully designed through proper means under Supreme Court law and the DTSA.

### 1.        Insulet Demonstrated Neither Trade Secrets nor Misappropriation.

DTSA claims of misappropriation require proof of "improper means," and "improper means … does not include reverse engineering."  18 U.S.C. § 1839(6)(B).  This follows Supreme

Court precedent that trade secret law "does not offer protection against discovery by fair and honest means, such as by … reverse-engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture." *Kewanee Oil*, 416 U.S. at 476.

If Insulet's components can be reverse engineered, Insulet has demonstrated neither a trade secret nor misappropriation.  And Insulet admits, point-blank, that it is "possible to deconstruct an Omnipod and eventually build a prototype copy."  (Benjamin Decl. ¶ 38.)

Insulet further admits it lacks actual evidence of any misappropriation.  (Br. at 2, 14 (providing no evidence of any improper conduct and asserting only that, in a theoretical sense, somehow reverse engineering "would have been impractical").)  Across five declarations, three expert submissions, and twenty-nine exhibits painstakingly assembled amidst a purported emergency, Insulet points to *zero* facts showing any misappropriation by any Defendant.

Under such circumstances, courts have consistently held injunctions cannot issue because (a) information that can be reverse engineered is not a trade secret, and (b) reverse engineering is *not* misappropriation.  *See, e.g.*, *Coenco, Inc. v. Coenco Sales, Inc*., 940 F.2d 1176, 1179 (8th Cir. 1991) (plaintiff's machine did not embody trade secrets because the information was "ascertainable by proper means [] such as reverse engineering."); *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 405 (9th Cir. 1982) (reversing injunction because a locksmith's purchasing a product he previously designed and then "reverse-engineering" the lock "is an example of the independent invention and reverse engineering expressly allowed by trade secret doctrine."); *Secure Servs. Tech., Inc. v. Time & Space Processing Inc.,* 722 F. Supp. 1354, 1361 (E.D. Va. 1989) (granting defendant summary judgment because reverse engineering to manufacture fax machines was "proper"); *see also SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir.

1985) (vacating preliminary injunction because matters "fully disclosed by a marketed product and [] susceptible to reverse engineering . . . cannot be protected as trade secrets."). As these decisions demonstrate, "even if [EOFlow] had purchased the [Insulet] device with the intent of reverse engineering it, this practice is allowed under existing trade secret law." *Gentil v. Wingfield GmbH*, 2021 WL 4979427, at *6 (N.D. Cal. Mar. 2, 2021) (granting dismissal).

Insulet cannot escape these precedents and have the Court simply "infer misappropriation"—and based on that "inference" thwart a $740M transaction. (Br. at 14.) Insulet's grasping for such an inference based on a competitor's purportedly rapid development contravenes the facts, because it took EOFlow years of trial and error to develop its product (Kim Decl. ¶¶ 4, 7, 9, 12), and the law, which squarely rejects such arguments. *Kadant, Inc. v. Seeley Mach., Inc.*, 244 F. Supp. 2d 19, 38 (N.D.N.Y. 2003) (denying injunction because plaintiff failed to present "evidence [the ex-employee] actually stole the design specifications. It instead necessarily relies upon an inference—that the only way defendants could develop, market, and sell their products in so short of time is if [the ex-employee] stole the design specification information," which does not satisfy the "clear showing" required to secure an injunction).

Nor can Insulet secure its much-needed "inference" by invoking inapposite quotations from cases addressing totally different burdens. (*See* Br. at 14.) For example, *Elmagin Cap. LLC v. Chao Chen* did not absolve a plaintiff of proving misappropriation; that case *denied* cross-motions for summary judgment because "fact issues *preclude* a finding of misappropriation" and a finding as to whether the information represented "trade secrets." 555 F. Supp. 3d 170, 183 (E.D. Pa. 2021); *see also Covidien LP v. Esch*, 378 F. Supp. 3d 119, 125 (D. Mass 2019) (holding only that on a *defendant's* summary judgment motion, where defendant had

"the burden," plaintiff's circumstantial evidence could help that plaintiff "survive" summary judgment).  Using circumstantial evidence to survive an opposing party's summary judgment is a far cry from securing and *imposing* an inference of liability to support a preliminary injunction.[1] As Insulet's cited case of *Parexel International* demonstrates, to secure affirmative relief as Insulet seeks here, the movant cannot merely "raise questions" about defendant's conduct but must instead "show that Defendants acquired the trade secrets by improper means."  *Parexel Int'l LLC v. Signant Health Holding Corp.*, 2023 WL 2938073, at *9 (D. Mass. Apr. 13, 2023). Insulet has not done so, and this alone undermines any likelihood of success.

### 2.    Insulet Has Not Met Its Burden to Prove Its Purported "Trade Secrets" Were Not Generally Known or Readily Ascertainable.

Information that is "generally known," "readily ascertainable through proper means" such as reverse engineering, or "divulged in a published article or in publicly filed patents cannot be the subject of a trade secret."  18 U.S.C. § 1839; *Carson Prod.*, 594 F.2d at 461-62.

Remarkably, Insulet reverse engineered EOFlow's device—while asserting it would have been "impractical" for EOFlow to have done the same—then ignored the products' fundamental differences and claimed as its secrets a handful of peripheral similarities.  (Br. at 16.)  All these "secrets" are ascertainable through reverse engineering, were previously disclosed, or both.



■—Insulet lists as a primary trade secret a ■■■ ■■■■ *Id.*  But Insulet disclosed the ■■■ four years ago, in at least U.S. Patent Application Publication No. 2019/0151568, published on May 23, 2019.  (Ex. 26, [0024]-[0027] (disclosing how to address "■■■

---

[1] Insulet also cites a district court decision between *Contour Design* and *Chance Mold Steel Co.* for  this proposition but fails to cite the First Circuit's opinion in *Contour Design, Inc. v. Chance Mold Steel Co. Ltd.*, 693 F.3d 102, 110 (2012) ("[T]he record does not support a finding that Chance used Contour's confidential electronic files to make the molds for the ErgoRoller, and the district court's finding to the contrary was clearly erroneous. Contour's theory of misappropriation of confidential information fails.").



█████████████████████████████████████████████████████████████

███████████████████████████████████   Further, Insulet admits this physical component

can be ascertained by inspection.  (O'Connor Decl. ¶¶ 46-47; *see also* Schurman Decl. ¶¶ 48-60.)

*Occlusion Detection*—Insulet disclosed its occlusion detection algorithm in at least U.S.

Patent Application Publication No. 2022/0031944, published on February 3, 2022.  (Ex. 27,

[0061] (disclosing how to handle "occlusion" by employing ████████████████████

██████████████████████████████████████████████████████████████

████   And there is no evidence that EOFlow misappropriated any software algorithm instead of,

*e.g.*, independently coding this basic technology.  (Schurman Decl. ¶¶ 69-79.)

██████████████████████   ██████—Insulet disclosed its "secret" ██████ design three

years ago in at least US Patent Application Publication No. 2020/0023123, published January 23,

2020. (Ex. 28, [0046] (describing and depicting a drug delivery device whose "██████████████

██████████████").)  The ███████████████████████   are readily ascertained  through

reverse-engineering and routine experimentation.  (Schurman Decl. ¶¶ 61-68.)

████████████████████████—This assembly is merely a physical component that may

be reverse-engineered.  The purportedly secret "████████████████████" is readily ascertained

with an ████████████████████████████   (Schurman Decl. ¶¶ 42-43.)  Insulet's

own  purported  expert,  Mr. O'Connor,  confirmed  as  much  by  declaring  he had  measured

EOFlow's ██████  with a ████████   (O'Connor Decl. ¶ 40.) ████████████████████

███████   can be similarly measured using standard measurement tools, and manufacturing

specifications drawn up with routine experimentation.  (Schurman Decl. ¶¶ 44-47.)

████████████████████████—████████████   is an obvious need and

a  reverse-engineerable  physical  component.   The  composition  and  tolerances  are  readily

ascertained by reverse-engineering and routine experimentation.  (Schurman Decl. ¶¶ 80-86.)

████████████████████████████ Insulet disclosed the ███████████████████ in

WO2022/046995 A1, published March 3, 2022  (Ex. 29, FIG. 6B) (displaying the █████ also

ascertainable by reverse-engineering and routine experimentation.  (Schurman Decl. ¶¶ 87-91.)

Insulet's failure to identify cognizable trade secrets is, independently, fatal to its claim.

## C.    Insulet Has Not Taken the Required Reasonable Measures.

As courts across the country have held, even if Insulet had filed within the limitations

period, its claim would still likely fail because prolonged inaction constitutes a lack of

reasonable measures.  *Pie Development, LLC v. Pie Insurance Holdings*, 2023 WL 2707184, at

*3 (5th Cir. Mar. 30, 2023) (affirming dismissal because a trade secret plaintiff who "waited two

years without sending any cease-and-desist letter or requesting any preliminary injunctive relief .

. . cannot now assert a claim."); *HiRel Connectors*, 2005 WL 4958547, at *5-*6 (plaintiff who

sued within the limitations period nonetheless "no longer possesse[d] trade secret protection"

because it "could have filed suit sooner and sought injunctive relief," and merely making a single

demand—infinitely more than Insulet did—"does not constitute reasonable efforts"); *Alamar*

*Biosciences*, 1995 WL 912345, *6 (granting summary judgment because a potential trade secret

claimant cannot wait to file but "must exercise eternal vigilance").

Insulet stood by and watched while EOFlow:

- displayed its transparent, "strikingly similar" product in 2018;
- announced regulatory approvals in Europe and Asia throughout 2019;
- announced that EOPatch Version 2 was "available to all users [online] from early April" 2021 (Exs. 30, 31);
- announced EOPatch Version 2's Europe launch in September 2022 (Ex. 32); and
- announced partnership deals, due diligence, and the Medtronic acquisition.

The notion that Insulet was vigilant yet unable to buy a product that was openly available in

Korea in 2021 holds no water.  Nor does that explain or excuse why, once Insulet tore down

17

EOFlow's device in February, rather than act to protect "trade secrets," Insulet chose to wait until after the publicly known Medtronic acquisition was signed, sealed, and all-but delivered. This lack of reasonable measures is sufficient, independent grounds to deny Insulet's motion.

### D. EOFlow Is Not Subject to the Court's Personal Jurisdiction.

"Plaintiffs bear the burden of establishing the Court's personal jurisdiction," which they cannot meet through "unsupported allegations in their pleadings," but "are instead obliged to adduce evidence of specific facts." *Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 92 (D. Mass. 2021) ("[p]ersonal jurisdiction refers to a court's power to require the parties to obey its [orders].")  Insulet would have this Court reach halfway around the world to tell a company that is *not* selling any product in the U.S. market that it cannot share information with its acquirer, and thus impeding the $740M transaction.  Insulet provides no evidence to justify that overreach. Nor has it established personal jurisdiction over EOFlow's California-based affiliate.

## II. INSULET FAILED TO DEMONSTRATE IRREPARABLE HARM

"A preliminary injunction is a potent weapon that should only be used when necessary to safeguard a litigant's legitimate interests," and a party's "cries of urgency are sharply undercut by its own rather leisurely approach." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004).  "Unexplained delay in seeking relief . . . may indicate an absence of irreparable harm" making an injunction "inappropriate." *Lunt v. Campbell*, 2007 WL 2935864, at *5 (Mass. Sup. Ct. Sept. 24, 2007).

Here, Insulet's alleged harm has nothing to do with the purported "trade secrets" it has failed to protect for years or the false premise that EOFlow was poised to launch in the U.S.[2] The alleged "irreparable harm" is strictly a business concern that Medtronic, a large company,

---

[2] Any potential harm can be quantified and does not justify an injunction.  (Kidder Decl. ¶¶ 70-75.)

may publicly acquire a share of EOFlow.  (Compl. ¶ 12.)  Even if the harm from one company purchasing stock in another were legally cognizable, which it is not, even on this narrow front Insulet has taken a "leisurely approach," because news of the acquisition—and diligence— leaked *six months ago*.  (Ex. 19.)  A formal announcement followed in May.  (Exs. 20, 21.)

Insulet posits that any information sharing with Medtronic would "moot or limit the relief" available (Mot. at 3), but Insulet allowed that technical diligence to proceed for half-a-year before telling this Court that "judicial intervention is urgent."  (Br. at 1.)  Insulet's requested relief is indeed moot because "that ship has sailed."  *United States v. Booz Allen Hamilton Inc.*, 2022 WL 16553230, at *2 (D. Md. Oct. 31, 2022) (denying preliminary injunction that aimed "to pause [an] acquisition"); *Bridgeview Bank Grp. v. Meyer*, 49 N.E.3d 916, 923 (Ill. App. 2016) (holding that injunctive relief is forward-looking and "cannot remedy misconduct, such as the improper acquisition of trade secrets, that occurred in the past.") (quotation omitted).

Similarly, EOFlow announced long ago, in press releases from 2017 and 2018, that it had hired Individual Defendants Malave and Welsford.[3]  (Exs. 14-15.)  Far from hiding, Mr. Malave interfaced directly with Insulet at the 2018 trade show, then provided Insulet an EOFlow "overview," and later discussed Insulet's potential acquisition of EOFlow—with Insulet never raising any trade secret concern.  (Exs. 16, 18, 33-35.)  Where a party waits even months after an employee joins a competitor, never mind many years as Insulet has, the "lack of urgency belies its contention that it will be irreparably harmed."  *Exeter Grp., Inc. v. Sivan*, 2005 WL 1477735, at *6 (Mass. Super. Mar. 24, 2005) (denying motion for a preliminary injunction).

Parties that have shown more urgency than Insulet have found that even far shorter delays preclude injunctions.  *E.g.*, *Castro v. United States*, 775 F.2d 399, 408 (1st Cir. 1985), *abrogated*

---

[3] The third Individual Defendant had no hiring announcement as he merely consulted.

*on other grounds*, *Stevens v. Dept. of Treasury*, 500 U.S. 1 (1991) ("[D]elay of more than one year before seeking injunctive relief militates against a claim of irreparable injury"); *Patriot Energy Group, Inc. v. Kiley*, 2014 WL 880880, at *11 (Mass. Super. Ct. Feb. 26, 2014) (denying injunction due to "lengthy delay" of "several months" because if a party "was concerned that it was suffering significant, irreparable harm during this period, it would have acted to protect its interests."). The lack of irreparable harm, on its own, dooms Insulet's motion.

## III.   THE REMAINING FACTORS WEIGHT AGAINST PRELIMINARY RELIEF

"In assessing plaintiff's request for an injunction, we consider also the balance of potential harms that confront us as a result of plaintiff sitting on its collective hands." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021) (affirming injunction denial because plaintiff who "waited over four months" exacerbated potential harm to others). Insulet's fear of enhanced competition sits lightly on the scale beside the existential threat the sweeping proposed injunction would pose for EOFlow. Designing, manufacturing, and distributing a diabetes patch pump is capital intensive and an order scuttles the deal—the motion's practical effect—would gravely harm EOFlow.[4] (Kidder Decl. ¶¶ 92-94.)

"The public interest" favors outcomes that boost "the public health." *World Gym, Inc. v. Baker*, 474 F. Supp. 3d 426, 434 (D. Mass. 2020). Here that interest powerfully favors Defendants, given the strong interest in having Medtronic, a United States company, complete the transaction it aims to finalize, to provide diabetes patients around the world an alternative, longer-lasting patch to improve their health. (Kidder Decl. ¶ 95.)

## CONCLUSION

For the foregoing reasons, EOFlow respectfully requests the Court deny Insulet's Motion.

---

[4] Were the Court to issue any preliminary relief, Insulet should first need to furnish a security of $738M, the price of the transaction Insulet is undermining. Fed. R. Civ. P. 65(c).

COOLEY LLP

*/s/ Michael Sheetz*
Michael Sheetz (#548776)
Adam S. Gershenson (#671296)
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736
(617) 937-2300
msheetz@cooley.com
agershenson@cooley.com

*Attorneys for Defendants EOFlow Co., Ltd. and EOFlow, Inc.*

Dated: August 25, 2023

## **CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that on this 25th day of August, 2023, the foregoing document was filed through the ECF system and will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

*/s/ Dawn R. Roelofs*