# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

INSULET CORPORATION,

    *Plaintiff*,

    v.

EOFLOW CO., LTD.; EOFLOW, INC.;
FLEX, LTD.; FLEXTRONICS
CORPORATION; FLEXTRONICS
MEDICAL SALES AND MARKETING,
LTD.; LUIS J. MALAVE; STEVEN
DIIANNI; and IAN G. WELSFORD,

    *Defendants*.

Case No. 1:23-cv-11780-FDS

**EXPERT DECLARATION OF DR. MATTHEW SCHURMAN, PH.D IN SUPPORT OF EOFLOW'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.      INTRODUCTION AND ASSIGNMENT ........................................................................1
II.     QUALIFICATIONS ..................................................................................................1
III.    COMPENSATION ....................................................................................................2
IV.     LEGAL PRINCIPLES ..............................................................................................2
V.      MATERIALS REVIEWED .......................................................................................4
VI.     SUMMARY OF OPINIONS .....................................................................................5
VII.    ANALYSIS AND STATEMENT OF OPINIONS.......................................................6
        A.      The Omnipod and Its Internal Components Are Publicly Disclosed......................6
        B.      No Direct Evidence of Alleged Trade Secret Misappropriation..........................16
        C.      No Evidence of Misappropriation in Asserted Similarities Between
                Omnipod and EOPatch Devices...........................................................................17
                1.      No Misappropriated Trade Secret in the Design and Assembly of
                        █████████████ ............................................................................17
                2.      No Misappropriated Trade Secret in the ███████████████ ........22
                3.      No Misappropriated Trade Secret in the █████████████
                        ██████████ ....................................................................................29
                4.      No Misappropriated Trade Secret in Occlusion Detection ......................33
                5.      No Misappropriated Trade Secret in the ████████████████
                        ████████████ ..........................................................................40
                6.      No Misappropriated Trade Secret in the ███████████████
                        █████████████████ ..........................................................44
        D.      No Evidence of Misappropriation in Asserted "Notable Differences"
                Between Omnipod and EOPatch Devices...............................................................47
                1.      No Misappropriated Trade Secret in the ███████████ ....................47
                2.      No Misappropriated Trade Secret in the ████████████
                        ████████ ..........................................................................................49
        E.      No Misappropriated Trade Secret Evident fFrom Development Timeline ...........52
                1.      The Development of the Second-Generation EOPatch Leveraged
                        Work and Experience From the First-Generation EOPatch .....................52
                2.      The Development of the Second-Generation EOPatch May Have
                        Additionally Leveraged Permissible Reverse Engineering ......................55
                3.      The Marano Declaration Improperly Addresses Additional Work
                        Specific to FDA Approval Requirements, Not Product
                        Development ............................................................................................58

████████████████████████████████████████

## I.   INTRODUCTION AND ASSIGNMENT

1.   I have been engaged by counsel on behalf of EOFlow Co., Ltd. ("EOFlow") as an expert witness to provide my opinions in response to papers submitted on behalf of Insulet Corp. ("Insulet") in the above-captioned litigation.

## II.   QUALIFICATIONS

2.   I am an engineer and consultant in the areas of medical device design and development, including design and development of continuous glucose monitor technology, insulin delivery technology, and materials science. I hold a Bachelor of Arts degree in Physics from Franklin and Marshall College in Lancaster, Pennsylvania, and a Ph.D. in materials science and engineering from Rutgers University in New Brunswick, New Jersey.

3.   For the past 12 years, I have consulted on design of medical devices, including for diabetes management. My areas of expertise include design and development of technology for glucose monitoring (including continuous glucose monitors), evaluation of glucose monitors, sensor design (materials, structure and performance), insulin delivery devices (materials, mechanics, algorithms), and clinical design for validation of devices (including working with clinicians and review boards on study design and approval).

4.   I am currently the managing partner of a specialty engineering consulting firm, newForge Technologies, which develops products, performs contract research, and consults on science and engineering issues in the medical device industry, semiconductors, space-based solar power for spacecraft, among many others.

5.   From 2002 to 2009, I was a founder and Chief Technology Officer of GlucoLight Corporation, which was focused on developing a novel sensor for glucose monitoring in diabetes patients. During my time at GlucoLight, I led the development of several generations of optical glucose sensors and systems. I co-designed over 12 clinical trials with over 500 subjects for

system validation, and am named as an inventor on roughly 10 U.S. patents relating to glucose sensors. As part of my experience in founding and leading the technology development for a company dedicated to glucose monitoring technology, I also extensively researched glucose monitoring technology, insulin delivery technologies, and the integration of these technologies in the emerging artificial pancreas efforts being developed and publicized by others at the time. Since then, I have continued to maintain my knowledge and expertise in the diabetes technology field through continued review and monitoring of the literature, as well as consulting in the field of glucose monitoring and insulin delivery.

6.      A copy of my curriculum vitae is attached hereto as Appendix A.

III.    **COMPENSATION**

7.      I am being compensated at my standard hourly rate of $550 per hour.  My compensation is not dependent on the opinions that I provide or the outcome of this litigation.

IV.    **LEGAL PRINCIPLES**

8.      I am not an attorney.  I have been provided with the following legal principles relating to the law of trade secrets and trade secret misappropriation.  I have applied these legal principles in developing my opinions.

9.       A trade secret is information that: derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10.     Courts evaluate several factors in deciding whether information is a trade secret, including: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of

information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

11.     Only an owner of a trade secret that is misappropriated may bring a civil action. The term "owner," with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed.

12.     The trade secret owner bears the burden of demonstrating its claimed secrets are protectable and are not general industry knowledge.

13.     An employee's general know-how does not constitute trade secret information.

14.     The subject of a trade secret must be secret and must not be of public knowledge or of general knowledge in the trade or business.

15.     Trade secrets which will be so protected must be particular secrets of the complaining employer and not general secrets of the trade in which he is engaged.

16.     Trade secret law does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.

17.     Information that can be obtained from examining products sold into the public domain cannot constitute a trade secret.  The public is free to discover and exploit trade secrets through reverse engineering of products in the public domain.

18.     A trade secret, once disclosed to the public domain, is lost.

19.     The term "misappropriation" means (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper

means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that— (I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake.

20.     The term "improper means" (A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition.

## V.   MATERIALS REVIEWED

21.     I have reviewed the following materials in connection with this declaration:

- Declaration of Jason O'Connor, dated August 17, 2023 ("O'Connor Declaration") and exhibits cited in it.

- Declaration of April Marano, dated August 18, 2023 ("Marano Declaration") and exhibits cited in it.

- Declaration of Eric Benjamin, dated August 17, 2023 ("Benjamin Declaration") and exhibits cited in it.

- The Complaint filed by Insulet in this action.

- Other documents and online information sources cited in this declaration.

22.     I reserve the right to provide additional opinions and comments in view of any further materials and information that may be provided in this matter.  I have also relied upon my many years of experience and general knowledge in the field.

## VI.     SUMMARY OF OPINIONS

23.     Based on my review, the evidence presented does not indicate that EOFlow has misappropriated any asserted trade secrets of Insulet.  As an initial matter, no evidence is presented that EOFlow received or accessed any confidential documents or other materials of Insulet.  Instead, the allegations relate to purported similarities and differences that are visible from inspecting disassembled samples of the Omnipod and EOPatch devices.  These purported similarities and differences do not indicate any trade secret misappropriation.  The dimensions and properties of the internal components of the Omnipod device are readily ascertainable by disassembling the device and analyzing it, and therefore they do not constitute trade secrets.  In this way, the dimensions and properties of the Omnipod's internal components are in the public domain.  In addition, much of the asserted trade secret information was publicly disclosed in patent filings and other sources, which negates any assertion that the information constitutes a trade secret.

24.     I understand that reverse engineering does not constitute a misappropriation of trade secrets under the law.  Because the internal components of the Omnipod are in the public domain, their dimensions and properties can be reverse engineered.  In fact, the Benjamin Declaration admits that "it may be possible to deconstruct an Omnipod and eventually build a prototype copy of the Omnipod through careful examination of each individual component."  (Benjamin Decl., ¶ 38 (emphasis added).)

25.    Based on publicly available information, the development timeline for the EOPatch product appears to be reasonable and consistent with a timeline that did not involve any misappropriation of trade secrets.  The Marano Declaration estimates that the development of the second-generation EOPatch product following the earlier development of the first-generation EOPatch of the product took approximately two to four years.  Based on my experience and review of the materials, a relatively fast development timeline would be reasonable for a second generation of this type of product, particularly where the development would have leveraged expertise and experience gained from the first-generation product and may have taken advantage of permissible reverse engineering.  In my opinion, the Marano Declaration does not properly account for the substantial head-start in development time that would have resulted from (1) work previously performed for the first-generation product, and (2) the availability of reverse engineering.

## VII.    ANALYSIS AND STATEMENT OF OPINIONS

### A.    The Omnipod and Its Internal Components Are Publicly Disclosed

26.    For background context, I note that there are many publicly available descriptions of the internal components and functions of the Omnipod product in a wide range of sources, including patents, publications, and various online sources.  There is no confidentiality over the internal components of the Omnipod product.  The components are in the public domain, available to be viewed and analyzed by anyone who has sufficient time, interest, skills, and equipment.

27.    The O'Connor Declaration acknowledges that all the features under discussion were observed through visual inspection of a disassembled EOPatch product: "These similarities and differences between the Omnipod and EOPatch devices that I have discussed here are only

illustrative of those I was <u>able to observe through visual inspection of the used and disassembled</u> <u>sample</u> I received."  (O'Connor Decl., ¶ 84 (emphasis added).)

28.     Publicly available Internet sources demonstrate that numerous individuals have taken apart the Omnipod product and examined its internal components.  The following are some examples readily available online.

29.     An individual, Mike Harrison, whose YouTube channel "mikeselectricstuff" has garnered close to 15 million views, posted a 30-minute detailed teardown video of the Omnipod product on September 26, 2016.  (*See* https://www.youtube.com/watch?v=e2MQUUkubgs.)



The teardown shows in detail the internal components of the Omnipod, including specific features that are alleged by the O'Connor Declaration to involve trade secrets—the ██████ ██ ████████████, ████████████ and needle, "████████" with "████████████," ████████████████████████████████, and adhesive pad with ██████ ████████████████████████████

██████████.  In addition to visually presenting the components of the product, the narrator also shows the product in operation (with moving parts to emit fluid through the cannula) by applying electricity to the product, and discusses in detail the functions of the components that he sees and/or surmises based on his review and analysis.  All this appears to have been done by the narrator with only basic equipment.  Much more detailed and precise analysis would be readily achievable with industry-grade laboratory equipment.  Below I summarize some of the observations about features and functions of the Omnipod components that discussed by the narrator of the video:

- How the "walking man" drive works and that it must be high torque, low speed motion

- How the needle / canula is deployed and held in place ██████████

- The ████████████████████████████████████████████

- Deduces the cam spring operation for filling the reservoir

- Deduces the friction coupling of the cam on the ████████

- Identifies the rotation encoder on the end of the shaft

- Deduces the spring contacts for detecting when the reservoir is filled

- Identifies the piston composition as a soft silicone material

- Estimates the force of the spring used for needle deployment

- Deduces that the piston assembly is BeCu due to "springiness" of assembly.

- Tested and determined the pumping rate

- Easily measured piston thread count and teeth count on the drive

Below are some screenshots from the video as example illustrations.

████████████████████████████████████████████



(██████████████████)



(█████████████ and needle)

████████████████████████████████



(███████████████████████)



(██████████████████████████████████████████)

████████████████████████████████████████



(██████████████████████)



(adhesive layer ████████████████)

30.     Another individual, Ido Roseman, posted an "Omnipod DASH insulin pump teardown" on his blog on October 1, 2022.  His post includes pictures of his teardown as well as descriptions of various internal components.

████████████████████████████





31.     Yet another individual, Ken Shiriff, "helped reverse-engineer the Omnipod

insulin pump, analyzing firmware from the S08 microcontroller (a descendant of the Motorola

6800)" and posted pictures and an article on the X social media website (formerly known as

Twitter) on May 26, 2019.  (*See* https://twitter.com/kenshirriff/status/1132743658904539137 .)



The article also shows that Mr. Sherriff reverse-engineered algorithms.  (*See*

https://medium.com/@ps2/insulin-pumps-decapped-chips-and-software-defined-radios-

1be50f121d05.)

32.    Additionally, Insulet itself has published videos of the Omnipod that demonstrate its internal components.  (*See* https://youtu.be/rCjcZ6QXfSc.)









33.     Insulet's website also lists numerous patents that allegedly cover the Omnipod

products.  (*See* https://www.insulet.com/patents.)  Many of those patents, including the 3 patents

asserted in this case, provide details on the internal components of the claimed inventions.  (I

understand that the patents are not an affirmative part of Insulet's instant motion for a temporary

restraining order and preliminary injunction, but that does not erase their public disclosures.)

15

34.     Additionally, a search on Google Patents reveals that Insulet appears to be the assignee of over 600 patents.  Most of them appear to be related to insulin-delivery devices, as one would expect.

**B.     No Direct Evidence of Alleged Trade Secret Misappropriation**

35.     As an overarching observation, I note that none of the O'Connor Declaration, Benjamin Declaration, or Marano Declaration provides any evidence showing that any Insulet confidential documents or other confidential materials were actually transmitted to EOFlow.  No evidence is cited showing that EOFlow or any manufacturer for EOFlow obtained or used any Insulet documentation.

36.     There is also no evidence provided that would show any alleged wrongdoing by the three individual defendants.  There are assertions that the individual named defendants (Mr. DiIanni, Mr. Malave, and Mr. Welsford) previously worked for Insulet, but apparently they all stopped working for Insulet years ago.  According to the Benjamin Declaration, it appears that Mr. DiIanni stopped working for Insulet in January 2015 and was working for EOFlow three years later, by June 2018; Mr. Malave left Insulet in August 2010 and did not join EOFlow until October 2017; and Mr. Welsford left Insulet employment in 2010 and transitioned to a consulting role for some unspecified amount of time and did not start with EOFlow until April 2018.  (Benjamin Decl., ¶ 64.)

37.     Insulet presents no direct evidence of misappropriation, and instead the three declarations speculate that there was allegedly some misappropriation of trade secrets because the design of certain components of the EOPatch product is similar to Omnipod components in certain ways, and the development timeline for the EOPatch product was apparently only a few years.  Based on my review of the materials, including the specific assertions raised in the declarations, there is no indication from these materials that any trade secret misappropriation

has occurred.  As I discuss further below, the identified similarities between the two products are all reflected in publicly available information that could be reversed engineered, and a relatively fast development timeline would be reasonable under the circumstances.

**C.    No Evidence of Misappropriation in Asserted Similarities Between Omnipod and EOPatch Devices**

38.    The O'Connor Declaration addresses several specific components of the Omnipod and EOPatch devices.  In my opinion, none of these components evidences any trade secret misappropriation.  I address each component below.

**1.    No Misappropriated Trade Secret in the Design and Assembly of the** ███████

39.    In my opinion, the O'Connor Declaration does not present evidence indicating misappropriation of any trade secret relating to the ████ (O'Connor Decl., ¶¶ 35-45.)

40.    The O'Connor Declaration provides the following annotated photos that purport to show the EOPatch components on the left and the Omnipod components on the right:



(O'Connor Decl. ¶ 35.)

41.     It is not clear what, specifically, Mr. O'Connor or Insulet assert to be the particular trade secret(s) allegedly at issue relating to the ██████.  As shown in the annotated photos above, the design and assembly of the Omnipod ██████ is plainly visible from disassembling the product.  The O'Connor Declaration suggests that one or more of the following items relating to the Omnipod might be purported trade secrets: ████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████.

In my opinion, the O'Connor declaration does not provide evidence indicating that any of these features, or anything else, constitutes a trade secret that was misappropriated.

42.     First, the ██████████████████ is not a trade secret.  The O'Connor Declaration asserts that the following Insulet documentation, annotated in the O'Connor Declaration, defined a ████████████████████

████████████████████████████████████

██████████████



(O'Connor Decl. ¶ 39.)

43. 

████████████████████████████████████████████

███████████████████████████████████████████

████████████████

44.      Next, similar observations apply █████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

45.      In any event, even if there were evidence that ███████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

(O'Connor Decl., ¶ 41.)

46.   ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████   This is readily ascertainable

information that does not constitute a trade secret.

47.   There is also no indication of any trade secret misappropriation with respect to ██
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████

    **2.      No Misappropriated Trade Secret in the** ██████████████████

48.      In my opinion, the O'Connor Declaration does not present evidence indicating

misappropriation of any trade secret relating to ████████████████████. (O'Connor Decl.,

¶¶ 46-51.)

49.      The O'Connor Declaration provides the following annotated photos that purport

to show the Omnipod component on the left and the EOPatch component on the right:

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

(O'Connor Decl. ¶ 47.)

50.      I have multiple observations as to why there is no evidence of any trade secret

misappropriation here.  First, there is no evidence demonstrating ████████████████████

█████████████████████████████████████████.  As shown in the

████████████████████████████████████████████

photos above, ███████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████

    51.    ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████



████████████████████████████████████

(O'Connor Decl., ¶¶ 48-50.)

52.     These excerpts from documents do not provide any more detail about ██████████

than could be obtained by obtaining an Omnipod device, disassembling it, and measuring █

██████     As such, they do not contain any trade secret information regarding ████████████

████████

53.     Third, contrary to the suggestion in the O'Connor Declaration, the use of a

████████████████████████████████████████████████████████████████

████████████████ .  ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████



54. █████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████

55. █████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████



(*Id.* at 3.)

CONFIDENTIAL PURSUANT TO THE COURT'S DEFAULT PO

56.

58. ██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ In my

opinion, an engineer familiar with the literature and having years of general knowledge in this

field and focusing on the publicly visible operation of the Omnipod would appreciate that the

likely purpose and functionality behind this feature ████████████████████

59.     In addition, the purpose of this readily viewable component could be discernible

from analyzing and testing the publicly available device components in operation.  The

O'Connor Declaration states that ████████████████████████████████

██████████████████████████████████████

(O'Connor Decl., ¶ 46.)  A designer of a similar product could develop a prototype device based

on the Omnipod device and observe ████████████████████████

█████████████████

60.     Finally, it is immaterial that the O'Connor Declaration asserts that the "design and

manufacturing of ████████████ is not intuitive and underwent multiple revisions over

several years."  (O'Connor Decl., ¶ 48.)  Any difficulty in coming up with the original design

and manufacturing process is not relevant to the ability to permissibly view and reverse engineer

the final component itself.  Regardless of how much time and effort might have gone into

originally designing ███████ both the component itself and the purpose behind it ███████

███████████████ are readily ascertainable in the public domain—they are not trade secrets.

**3.       No Misappropriated Trade Secret in the ████████████████████████**
████

61.     In my opinion, the O'Connor Declaration does not present evidence indicating

misappropriation of any trade secret relating to ██████████████████████ (O'Connor

Decl., ¶¶ 52-59.)

62.     The O'Connor Declaration provides the following photos that purport to show the





(O'Connor Decl. ¶¶ 52-53.)

63.    For multiple reasons, there is no evidence of any trade secret misappropriation here.  As an initial matter, while the photos show some overall similarity, no evidence is presented that ███████████████████████████████████████████████████ ███████████████  Nor is any evidence presented that the components in the two products use the same material, which is a significant omission that undermines the assertions in the O'Connor Declaration about the manufacturing ███████████████ ████████████ ████████.  Absent such a detailed showing that the components are essentially the same, the assertions in the O'Connor Declaration appear to be assuming a level of sameness that has not been demonstrated to exist.

64.    Furthermore, even if the two ████████████ were shown to be the same, these components would be plainly visible upon disassembling the Omnipod and EOPatch devices.  That is what allows them to be photographed, as shown in the O'Connor Declaration. Creating substantially the same components would be a relatively straightforward matter of engineering work.  There is no trade secret in the visible design and physical dimensions of the

████████, and the material that the ████████████████ are composed of, which are all readily ascertainable.

65.     The O'Connor Declaration asserts that the "████████████████████████" should have ████████████████████████████████████ ████████████████████████████ (O'Connor Decl., ¶ 54.)  But there is no evidence that this idea is a trade secret.  On the contrary, the notion of ████████████ ████████████████████████████████████ ████████  In fact, Mr. O'Connor himself was named as the lead inventor in disclosing this idea to the public.  ████████████████████████████████████

████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████

████████████████████████████████████



(highlighting added).

66.     The O'Connor patent application, published more than three years ago, thus

teaches that ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

67.     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

These are not trade secrets.

68.     The O'Connor Declaration also points to purported complications in

manufacturing ██████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████ (O'Connor Decl., ¶¶ 54-59.)  But those purported activities

would have all worked toward designing suitable dimensions of ████████████████████

██████████████████████████ Once the ██████ was completely designed, manufactured, and

included in commercial products, its design including all design dimensions was readily

available in the public domain, as discussed above.

### 4.     No Misappropriated Trade Secret in Occlusion Detection

69.     In my opinion, the O'Connor Declaration does not present evidence indicating

misappropriation of any trade secret relating to occlusion detection.  (O'Connor Decl., ¶¶ 60-68.)

70.     The O'Connor Declaration asserts that EOFlow allegedly misappropriated a trade

secret relating to detecting occlusions (blockages in the fluid path).  Specifically, the declaration

asserts that Insulet developed a technique for detecting occlusion by ██████████████████████

███████████████████████████████████████████████████████

██████████████████████████████ (O'Connor Decl., ¶ 62.)  The O'Connor

Declaration provides the following annotated photo that purportedly shows the Omnipod

█████████████████████

████████████████████████████████████████████



(O'Connor Decl., ¶ 62.)

71.     Based on my review, there is no evidence of any trade secret here.  First, the internal components of the Omnipod and ████████████████████████████ are in the public domain, available to anyone who partially disassembles the device to analyze its operation.  As noted previously, Insulet itself published a video online showing the internal components of the Omnipod, which includes an animation of the ████████ ██████ ███████ ██████████ ██████, as shown in the screenshot below with a red box annotation added.

CONFIDENTIAL PURSUANT TO THE COURT'S DEFAULT PO





73. ███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████



74.





75.     From this basic public-domain information, in view of the disclosure of the configuration and operation ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████

76.     Other similar public disclosures describing occlusion detection techniques are available in the patent literature.  For example, another patent assigned to Insulet similarly describes ████████████████████████████████████████████

████████████████████████████████████████████████████

██████



77.     Thus, the concept of ████████████████████████████ ████████████████ is in the public domain.  It would have been readily ascertainable to apply that concept to the context of ████████████████████████████ ████████████████████████. There is no trade secret in these public domain disclosures.

78.     In addition to Insulet's own patents, the O'Connor Declaration also asserts that the same occlusion detection ████████████████████████

79.     Furthermore, the content of the disclosure in the published patent applications is not a trade secret because this information has been made available to the general public.  There is no evidence that this idea was a trade secret at some previous point in time, but even it if had been, it is not a trade secret now.

**5.      No Misappropriated Trade Secret in the** ██████████████

80.      In my opinion, the O'Connor Declaration does not present evidence indicating

misappropriation of any trade secret relating to the ████████████████████.

(O'Connor Decl., ¶¶ 69-71.)

81.      The O'Connor Declaration asserts that the Omnipod and EOPatch both ████

███████████████████████████████████████████████████████████████████

█████████████████      (O'Connor Decl., ¶ 71.)  The declaration provides a cursory and

speculative opinion that, without access to Insulet's confidential information, it would have taken

"many months if not years" to "develop, troubleshoot, and reliably automate at commercial

scale" the housings in the EOPatch product.  (*Id*.)  But nothing in that opinion provides any

evidence indicating any trade secret misappropriation.  The O'Connor Declaration asserts that it

took time to develop the appropriate material composition that was deemed suitable.  (O'Connor

Decl., ¶ 70.)  However, once that work was completed, the final material composition used in the

commercialized product would be available for testing to determine that composition.  The

O'Connor Declaration does not dispute that the materials themselves are available in the public

domain for materials testing and could be readily ascertainable with appropriate equipment as

part of a permissible reverse engineering effort.  As such, there is no showing of any trade secret

here.

82.      There is also nothing remarkable about the suggestion of the O'Connor

Declaration that it may have taken many months to develop these materials without access to

Insulet's confidential information.  There is no indication as to how long it took to develop these

components for the EOFlow product, whether it was several months or more.  Nothing set forth

in the O'Connor Declaration indicates any trade secret misappropriation.

83.     Furthermore, the ███████████████████ described in the
O'Connor Declaration is not unique to Insulet.  This technique for ████████████████ is
a widely known, publicly available manufacturing technique in the industry.  The O'Connor
Declaration discusses ████████████████████████████
███████████████████ ████████████████████
████████████████████████████
████████████████████ (O'Connor
Declaration, ¶¶ 69-71.) ████████████████████
████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████

████████████████████████





85.     These are merely examples from a large number of published sources that have
described in detail ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

        ██     ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

        **6.     No Misappropriated Trade Secret in the** ████████████████████████
                ██████████████████████████████

87.     In my opinion, the O'Connor Declaration does not present evidence indicating
misappropriation of any trade secret relating to ████████████████████████. (O'Connor
Decl., ¶¶ 72-76.)

88.     The O'Connor Declaration asserts that ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████



(O'Connor Declaration, ¶ 75.)

89.    Based on my review, there is no trade secret here.  As shown in the illustrations, ███████████ in the Omnipod can be viewed by any interested person who disassembles the product.  As such, the design that includes █████ not a trade secret.  Indeed, the same design appears in published Insulet patent application disclosures.  For example, the following image from an Insulet published patent application appears to show the same ████████ ████ as shown below, with a red arrow annotation added:





90.    In addition, contrary to the suggestions of the O'Connor Declaration, it would have been readily ascertainable to surmise potential functions of ███████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████   █████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

91.     It is immaterial that the O'Connor Declaration asserts that there was a process of development that resulted in ███████████████████████████   The resulting design itself is in the public domain.  There is no evidence that EOFlow misappropriated any trade secrets relating to that design.

**D.     No Evidence of Misappropriation in Asserted "Notable Differences" Between Omnipod and EOPatch Devices**

92.     In addition to purported similarities between the Omnipod and EOPatch products, the O'Connor Declaration discusses some differences between them.  Based on my review, none of those differences indicates any trade secret misappropriation.

**1.     No Misappropriated Trade Secret in the ██████████████**

93.     In my opinion, the differences between ████████████████████████████ ████████████████████████████████   do not indicate any trade secret misappropriation.  (O'Connor Decl., ¶¶ 78-81.)

94.     The O'Connor Declaration purports to show photos of the relevant component in the Omnipod (on the left below) and the relevant component in the EOPatch (on the right).

████████████████████████████████████████



(O'Connor Decl., ¶¶ 78, 80.)

95.     The O'Connor Declaration asserts that the ███████ in the Omnipod product

became a "pain point" due to its design, which resulted in a design change adding cost and effort

to the manufacturing process.  (O'Connor Decl., ¶ 79.)  The declaration further asserts that the

█████████████████████████████████████████████████████████████████████

█████████████    Nothing about that difference indicates any trade secret misappropriation.  The

EOPatch has a different design, indicating that it does not follow the design of the Omnipod

product in this regard.  The design of the EOPatch component may well result from any number

of factors and considerations in the design and engineering process for the EOPatch product that

have nothing to do with any alleged Insulet trade secret.  There is no suggestion or allegation by

the O'Connor Declaration that EOFlow did not have a highly talented team of engineers and

product designers at its disposal to develop the design for the product.  Nothing indicates any

trade secret misappropriation from merely designing this particular part in a different way,

particularly in a way that is supported by sound engineering principles as the O'Connor

Declaration asserts.

█████████████████████████████████████████████

2.        **No Misappropriated Trade Secret in the** ██████████████████████

96.     In my opinion, the differences between the ██████ components in the Omnipod

and the EOPatch product do not indicate any trade secret misappropriation.  (O'Connor Decl.,

¶¶ 82-84.)

97.     The O'Connor Declaration points to the ████████████████████████

████████████████ in the Omnipod, which the declaration purports to show in the below photo.

The declaration annotates the design ██████████████████████████████

██████████

████████████████████████████████████████████████████████

(O'Connor Decl., ¶ 82.)

98.     The O'Connor Declaration asserts that this design created ████████████████

████████████████████████████████████ which resulted in ████████████████████

████████████████████████████████ (O'Connor Decl., ¶¶ 82-83.)

99.     The O'Connor Declaration then points to the ████████████████████████

████████████████████████

████████████████████████████████████████████████



(O'Connor Decl., ¶ 84.)

100.    The O'Connor Declaration asserts that the EOPatch ███████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████  The declaration speculates that

this different design might have resulted from the use of confidential Insulet information.  It is

not clear what specific trade secret, if any, might allegedly be involved here.  In my opinion,

nothing about the different EOPatch design is suggestive of any trade secret misappropriation.

On the contrary, the design of the EOPatch ████████ is very different in many ways from the

████████ of the Omnipod, as can be seen by even a cursory review and comparison between the

two photos above.  The ██████████████████████████████████████████████████

███████████████████████████████████████████████████.  These

██████████████████████████████████████████████

differences presumably relate to the ███████████████████████████
███████████████████████████████████████   ████████.  In addition, the
design of the EOPatch ██████ accords with mechanical design principles insofar as ██████████
███████████████████████████████████████████████████
████████████   This principle should be well-understood by any experienced product designer
in this field who would be tasked with ██████████████████████████████████

101.   In addition, I disagree with the suggestion in the O'Connor Declaration that
████████████████████████████████████████████████
█████████████████████████████   (O'Connor Decl., ¶ 84.)  Based
on my experience, I would estimate that there would be no non-negligible overall net additional
cost for the ██████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████   There should not be any substantial "complexity" in
manufacturing either, as ████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████.

102.   For these reasons, there is no basis for the insinuation in the O'Connor
Declaration that there was any use of confidential information to █████████████████████
opposed to the ███████████████ designed consistent with the particular needs, constraints,
and goals of the design process for that product without any reference to internal Insulet
confidential information.

████████████████████████████████████████

### E.      No Misappropriated Trade Secret Evident From Development Timeline

103.      The Marano Declaration reviews publicly available information to estimate that the development of the second-generation EOPatch product, which was introduced in 2018, took approximately two to four years.  (Marano Decl., ¶¶ 19-22, 24.)

104.      The Marano Declaration asserts an opinion that the development of the second-generation EOPatch product would have required a substantial amount of time and effort to complete.  (Marano Decl., ¶¶ 24-41.)  In my opinion, no information has been presented that indicates that the development of the second-generation EOPatch product was anything other than the result of engineering and design work that might have involved some permissible reverse engineering.  Based on my review, there are a number of deficiencies in the analysis set forth in the Marano Declaration that render unreliable the stated opinions.

### 1.      The Development of the Second-Generation EOPatch Leveraged Work and Experience From the First-Generation EOPatch

105.      The Marano Declaration does not properly account for the years of research, development, and design work that was already completed in connection with the first generation of the EOPatch product.  According to the Marano Declaration, the first generation of the EOPatch device was another insulin patch product that was comparable to the Omnipod product at the time, as the declaration cites the following webpage dating from 2015 and identifies the "Competitor" product as the Omnipod product from the time:



(Marano Decl., ¶ 20.)

106.    No detailed evaluation and analysis of the internal components of this first-generation product, or any of the related publications and research that EOFlow developed, is presented in any of the Marano Declaration, Benjamin Declaration, or O'Connor Declaration. According to the publicly available information cited in the Marano Declaration, the first-generation product was a light-weight insulin delivery patch that used an electro-osmotic pump. But no analysis of the internal components and functions of the first-generation EOPatch product is presented.

107.    In view of the first-generation product, it is an erroneous assumption for the Marano Declaration to assume that EOFlow had no prior relevant work and related design and development experience to be leveraged for the second-generation product.  For example, the Marano Declaration asserts:

> Prior to commencing development, an organization would need to locate, recruit, and hire individuals with the required skillsets and expertise. This, alone is a difficult task, since technologists are highly specialized and there are only a few individuals with the required degree of applicable experience. For example, one may find a microfluidics expert, but that expert may be unfamiliar with the idiosyncrasies of pumping insulin.

(Marano Decl., ¶ 26.)

108.    These assertions ignore the fact that, apparently dating back to around 2011, EOFlow was working on developing an insulin pump patch, which resulted in the first-generation EOPatch being produced by around 2015, according to the Marano Declaration. Presumably, all that development work for the first-generation EOPatch would have been performed by engineers and designers who developed years of experience and expertise in their areas of focus, which could then be leveraged toward work on the second-generation product.

109.    Based on my experience, there would have been extensive design and
development work performed in connection with the first-generation product that did not result
in components in the first generation of the product but could be revisited for a second-
generation product.  As a result, the work on the second-generation of the EOPatch product
would not have started completely from scratch, as the Marano Declaration seems to assume.
Instead, the work would have enjoyed a substantial benefit from the years of development that
had come before.  The work on the second-generation product naturally would leverage all
relevant work that had already been completed on the first generation of the product, including
both the design and components of the first generation product as well as other work that was not
directly reflected in the product.

110.    Therefore, where the Marano Declaration speculates that developing a product
like the second-generation EOPatch would have taken 10 years or more, the declaration ignores
the fact that EOFlow apparently started insulin patch pump development work around 2011 and
introduced the second generation product in 2018, around 7 years, which is not an unreasonably
fast overall timeframe under the circumstances—especially when the availability of reverse
engineering is considered, as discussed further below.

**2.      The Development of the Second-Generation EOPatch May Have
Additionally Leveraged Permissible Reverse Engineering**

111.    A second overarching deficiency is that the Marano Declaration does not
adequately account for the substantial decrease in development time that can be achieved
through permissible reverse engineering.  All three of these declarations submitted on behalf of
Insulet assert that there were a number of similarities between components in the second
generation EOPatch product and the Omnipod product.  For example, the Marano Declaration
points to a number of features that she compared between the Omnipod and the EOPatch based

on visual inspection of the two devices, including ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Marano Decl., ¶

23.)  Generally, however, all these components could be readily reverse engineered.  The

Benjamin Declaration similarly states: "I remember well the first time I saw the pictures of the

tear down of the EOPatch.  I recall feeling numb at the sight of what was under the hood: it was a

copy." (Benjamin Decl., ¶ 75.)  As discussed previously, it is my understanding that under trade

secret law, it is generally permissible to reverse engineer or copy publicly visible components of

a product without misappropriating any trade secret.  Assuming the second generation EOPatch

did copy a number of components from the Omnipod device, enormous time and effort could

have been saved by reverse engineering the components as opposed to attempting to design and

develop them from scratch.  The availability of reverse engineering together with the work and

expertise from the first-generation product would reasonably reduce a longer development period

(if a product were designed completely from scratch with no reference point) to a much shorter

timeframe.

112.    There does not appear to be any dispute that the components of the Omnipod

product could be reverse engineered.  The Benjamin Declaration admits that "it may be possible

to deconstruct an Omnipod and eventually build a prototype copy of the Omnipod through

careful examination of each individual component." (Benjamin Decl., ¶ 38.)  The Marano

Declaration never directly disputes that the product could be reverse-engineered, and does not

directly dispute that reverse engineering would enable a much faster development timeline than

starting from scratch.  The Marano Declaration discusses a number of tasks that would need to

be performed as part of reverse engineering. (Marano Decl., ¶¶ 42-46.)  The Benjamin

████████████████████████████████████████████████████

Declaration also discusses, at a high level, that reverse engineering would be available to replicate though would require various work. (Benjamin Decl., ¶¶ 38-40.) Of course, any reverse engineering effort would require a substantial amount of work. But a team of dedicated engineers could reasonably be expected to perform that work with reasonably defined projects and project timelines.

113.    Again, the Marano Declaration also ignores that substantial expertise and knowledge would have been developed for the first-generation EOPatch product, which could then be leveraged toward reverse engineering efforts. For example, the Marano Declaration posits that to reverse engineer the components in a product, "one requires having an understanding of their performance characteristics and limitations which can only be gleaned through time consuming experimentation and testing." (Marano Decl., ¶ 43.) This assertion ignores the fact that EOFlow and its engineers were working in the field for years on insulin pump patch components and would have gained experience to develop a deep understanding of materials, components, and design considerations to be applied toward the reverse engineering effort.

114.    The Marano Declaration asserts that there are "seventy-two components" in the Omnipod that would need to be analyzed and understood as part of a reverse engineering effort. (Marano Decl., ¶ 43.) However, the declaration does not fully acknowledge that in any mechanical product of this type, dozens of the components should be relatively simple and straightforward to reverse engineer. I note that out of the 72 components that are purportedly in the product, only a very small subset of those components are specifically discussed in the Insulet declarations—and at least some of those components generally would be relatively straightforward to reverse engineer, as Insulet's own O'Connor Declaration acknowledges by

discussing tear-down work and analysis similarly performed on the EOPatch device.  In addition, the Marano Declaration does not fully acknowledge that work on many different components can be performed in parallel by different members of a team.  It would not be a matter of serially analyzing and developing one component at a time.  Instead, teams of engineers would be assigned to groups of components to work in parallel.

115.    Again, where the Marano Declaration generally speculates that developing the second-generation EOPatch would have taken 10 years or more if started from scratch without reverse engineering, a more fulsome evaluation would appreciate that the second-generation EOPatch did not start from scratch and may have employed reverse engineering based on publicly available information, and leveraging expertise and knowledge from the first-generation EOPatch work, to substantially accelerate the development timeframe.  Overall, based on the information presented in the Marano Declaration, the publicly indicated timeline for the second-generation EOPatch product is reasonable and does not suggest any misappropriation of trade secrets.

### 3.    The Marano Declaration Improperly Addresses Additional Work Specific to FDA Approval Requirements, Not Product Development

116.    Finally, the Marano Declaration incorrectly suggests that certain work and activities would have needed to be completed as part of the development of the second-generation EOPatch product prior to its introduction in 2018, when in fact those activities would not have been necessary for initial product development and instead would have been directed toward the separate process of submitting an application for approval from the United States FDA.  The Marano Declaration discusses requirements and activities for FDA clearance, such as a 510(k) submission, apparently based on Ms. Marano's personal experience with FDA submissions.  (*E.g.*, Marano Decl., ¶¶ 1, 14, 25.)  Some of the work that she discusses is specific

to FDA submissions, such as the Qualification Test Procedure ("QTP") whose results are "enclosed as part of the 510(k) submission" to the FDA.  (Marano Decl., ¶ 41.)  Accordingly, that FDA-specific work—such as the particular testing and validations discussed in paragraph 41 of the Marano Declaration—can be completed later and separately from the initial product design and development.  However, the Marano Declaration incorrectly suggests that such work specific to the FDA submission process would have needed to be completed in the "approximately 2015 to 2018" timeframe for the second generation EOPatch, when in fact it did not need to be.  (*See* Marano Decl., ¶¶ 39-41.)  I understand from the Complaint that EOFlow did not submit its 510(k) application to the FDA until December 2022—more than four years later than the 2018 timeframe and 11 years after EOFlow apparently started working on insulin pump patch product development.  (Complaint, ¶ 11.)  The Marano Declaration makes no mention of the fact that the FDA application was not submitted until December 2022.  Therefore, it is reasonable to surmise that after the initial product development phase, EOFlow would have later worked on the additional validation and testing items required for FDA submission.

117.    All these observations are consistent with a reasonable product development timeframe totaling approximately seven years, followed by an FDA application timeframe, with a total timeframe from commencement of product development through submission to the FDA totaling more than 11 years from 2011 to December 2022.  Nothing in these overall timelines would suggest that any trade secret information of Insulet was misappropriated.

118.    I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct to the best of my knowledge.

Dated: August 25, 2023                                 /s/ _____

                                                       Dr. Matthew J. Schurman, Ph.D

# APPENDIX A

# Matthew J. Schurman, Ph.D

5 Purdue Drive • Richboro,  PA • 18954          732-266-4155          matthewjschurman@gmail.com

I am a seasoned technologist that has worked across a wide variety of technologies and industries and have remained hands on in research and product development despite holding many VP and CTO positions.  I have utilized my strong communication talents to raising money for technology companies, writing successfully awarded grants, and providing expert witness support in complex patent litigation.

## Education

- Ph.D. Materials Science and Engineering, Rutgers University , New Brunswick, NJ, 1996
- BA Physics, Franklin and Marshall College, Lancaster PA, 1993

## Areas of Expertise

**Medical Devices:** glucose monitoring (spot, continuous, non-invasive), statistical methods for evaluation of glucose monitors, insulin delivery, optical diagnostics (i.e. pulse oximetry, peripheral perfusion) with particular expertise in optical skin coupling and light / tissue interaction, Continuous glucose monitor sensor design (materials and structure), clinical design for validation of devices (working with clinicians and IRBs on study design and approval), Hydrogen Peroxide sterilization.

**Optics and Optoelectronics:** Optical system design, laser and detector technologies, Light Emitting Diodes, Interferometry, spectrometry, low coherence interferometry, optical coherence tomography, fiber optic sensors and communication, machine vision, image processing and analysis

**Materials Science and Engineering:** semiconductors (silicon, compound semiconductors), metals and metallurgy (particularly for medical devices), silicones and adhesives (particularly for space applications)

**Semiconductors:** semiconductor fabrication (lithography, etching, metal deposition) for optical semiconductors, optical chips, semiconductor material growth (metal organic vapor deposition MOCVD), optical semiconductor device design

**Data Analysis and Algorithm Development:** Data and image analysis, analog / digital filtering, signal extraction, machine learning (Python, MATLAB)

**Computer Languages:** Python, MATLAB, C / C++ (embedded microcontrollers), Labview. All utilized in development and final deployment in products.  Experienced with all major operating systems (Windows, Mac, Linux)

**System Design and Automation:** optical, mechanical, electrical, and control design and implementations for capital equipment through small battery powered embedded systems, test equipment automation, PLCs, motor and motion control.


## Work Experience

- **Principal / Consultant,** 2009 to Present.
  - **Managing Partner, newForge Technologies.** Co-founder and managing partner of an interdisciplinary engineering team serving the engineering and research needs of the semiconductor, alternative energy, medical device, and specialty lighting industries
  - **Medical Device Subject Matter Expert:** Reviewed 1000s of lines of code in embedded consumer medical device. Provided analysis of algorithm used and demonstrated the part of the code that executed it enabling client's successful defense during a patent litigation.
  - **Medical Device Subject Matter Expert:** Successfully defended 80% of patent claims from 4 patents during Patent Office **Inter Partes Review** as part of a broader patent litigation. This enabled the continuation and eventually settlement of the litigation. Provided expert witness testimony during depositions.
  - **Grove Instruments.** Managed team of 12 scientists and engineers in the development of novel non-invasive technology. Introduced Agile development to the team, turned around failing program and helped raise over $3 million in funding
  - **Helmsley Charitable Trust.** Consulted on trust funded emerging technologies for the management of type one diabetes. Developed road map, solicitation, web content and intellectual property terms and conditions for grant.
- **Chief Technology Officer,** GlucoLight Corporation, 2002 to 2009. $12M biomedical device company. Took on raw technology for non-invasive glucose monitor, developing into viable product. Executed due diligence, writing, evaluating and securing patent portfolio. Managed operation that included 13 employees. Conducted pre-clinical and clinical trials.
- **VP – Engineering / Director of Operations,** Qusion Technologies, 2001 to 2002. Turned around $11M start-up telecom firm with depleted financial resources. Refined failing technology. Slashed overhead 40%. Started from scratch, developing successful state-of-the-art clean room. Secured $500K from secondary financial backer. Managed 10 employees.
- **Director, Application & Advanced Research Group,** Emcore Corporation, 1994 to 2001. $200M technology corporation. Hired as staff scientist while completing Ph.D. Directed team of 30 scientists, engineers and technicians. Researched capital equipment, solid state lighting and optoelectronics. Oversaw field engineering and training.

**List of Litigation Worked on in Last 4 years:**
Agamatrix vs. Dexcom


**Publications In Last 10 Years**
Patent US10791971B2
Patent US20190216370A1
UV Degradation of Space Solar Cell Assemblies under High Temperature and Irradiance, PVSC Talk 2018
Path Dependent Power Degradation via UV Exposure for the Parker Solar Probe, Space Power Workshop 2018
Characterizing UV Degradation of Silicone in Solar Cells: Lessons Learned from the Parker Solar Probe and the Game Changing Development for Extreme Environments Solar Power Programs, Space Power Workshop 2021