**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

INSULET CORPORATION,

*Plaintiff*,

v.

EOFLOW CO., LTD.; EOFLOW, INC.; NEPHRIA BIO, INC.; JESSE J. KIM (a/k/a JAE JIN KIM); LUIS J. MALAVE; STEVEN DIIANNI; and IAN G. WELSFORD,

*Defendants*.

No. 1:23-cv-11780-FDS

**DEFENDANTS EOFLOW CO., LTD.; EOFLOW, INC.; AND JESSE J. KIM'S**
**ANSWER TO SECOND AMENDED COMPLAINT**

Defendants EOFlow Co., Ltd.; EOFlow, Inc. (together, "EOFlow"); and Jesse J. Kim (together, "Defendants") hereby file their answer and affirmative defenses ("Answer") to Plaintiff Insulet Corporation's ("Insulet" or "Plaintiff") Second Amended Complaint ("SAC"). Each of the numbered paragraphs below corresponds to the same numbered paragraph in the SAC. Defendants deny all allegations in the SAC, whether express or implied, that are not specifically admitted below. Defendants further deny that Insulet is entitled to the relief requested in the SAC, or to any other relief.

## I. INTRODUCTION[1]

1. This case arises from Defendants' theft of pioneering intellectual property covering Insulet's first-of-its-kind "patch pump," a compact, wearable, waterproof, adhesive medical device that delivers insulin to people with insulin-dependent diabetes.

[1] For convenience, Defendants have incorporated the section titles that appear in the SAC. Defendants do not necessarily agree with the characterizations of such section titles, which are not factual allegations requiring responses. Defendants reserve the right to dispute those characterizations. To the extent that a response is deemed necessary, Defendants deny any and all allegations in each and every heading and subheading in the SAC.

**ANSWER:** Defendants admit that the SAC purports to raise a claim for trade secret misappropriation, but deny that the allegations have any merit or that Plaintiff is entitled to any relief. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations of Paragraph 1 of the SAC.

2. Approximately 40 million Americans suffer from diabetes, with many—nearly eight million—requiring insulin to manage the condition. Before Insulet revolutionized insulin delivery, people who required insulin had two basic, and unsatisfying, options: either self-administer insulin injections multiple times over the course of the day, or wear a bulky, multi-component pump in a satchel or clipped to clothing that delivered insulin through a long, flexible tube.

**ANSWER:** Defendants admit that Plaintiff's description of the number of diabetes patients in the United States and the treatment options available to them before insulin patch-pump products appears generally accurate. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 2 of the SAC.

3. Insulet was founded in Massachusetts in 2000 by a father who was unsatisfied with these insulin-delivery options for his young son. After five years of research and development, Insulet changed the paradigm for insulin delivery when, in January 2005, the U.S. Food and Drug Administration (FDA) approved Insulet's Omnipod® System—the first ever adhesive, wearable, and disposable insulin patch pump. Unlike insulin pumps available at the time, Insulet's Omnipod System featured only two discreet, easy-to-use components: a small, lightweight, self-adhesive, disposable insulin infusion pump that patients could wear directly on the skin called the Omnipod or "pod" and a wireless, menu-driven, handheld device (like a personal digital assistant) called the Personal Diabetes Manager or "PDM":



**ANSWER:** Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 3 of the SAC and therefore deny them.

4. Insulet's Omnipod System eliminated the need for the bulky pump, tubing, and separate blood glucose meter that prior devices required and created a new market for tubeless, wearable insulin-delivery systems. Since its founding nearly a quarter century ago, Insulet has invested hundreds of millions of dollars to bring new generations of the Omnipod System to diabetes patients. In 2022, FDA cleared the fifth generation of Insulet's Omnipod line of products: the Omnipod 5 Automated Insulin Delivery System. Insulet's Omnipod 5 and its previous generation product, the Omnipod DASH System, remain the only widely used FDA-approved insulin patch pumps sold in the United States. Both versions of Omnipod on the market today are based on the same underlying hardware platform first launched in 2011 but include numerous software improvements. In the case of the Omnipod 5, those improvements allow for automated insulin delivery in conjunction with a continuous glucose monitor.

**ANSWER:** Defendants admit that Insulet's Omnipod devices are wearable insulin-delivery systems. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 4 of the SAC.

5. Insulet faced several substantial challenges in bringing the first FDA-approved patch pump to diabetes patients. Insulet's new system needed to deliver precise doses of insulin to patients reliably and safely. The product needed to be easy-to-use, lightweight enough to attach to a user's skin, accurate in dose delivery, inexpensive, and precisely manufactured for quality assurance. The system required software and communication protocols to enable the Omnipod to communicate safely and effectively with the PDM. And Insulet needed a way to manufacture its Omnipod products safely, reliably, and at scale. Manufacturing was a particular challenge—one that Insulet spent hundreds of millions of dollars researching, testing, and refining over several years. Indeed, one of the keys to Insulet's success has been its development and implementation of robust and reliable manufacturing processes.

**ANSWER:** Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the SAC and therefore deny them.

6. Many other companies—including some of the largest medical device companies in the world—have tried and failed to develop a patch pump that can be manufactured on a time-efficient, accurate, affordable, and reproducible basis. For example, Medtronic—the largest medical device company in the world—has been unable to develop a patch pump. In fact, senior executives at Medtronic have repeatedly acknowledged publicly that manufacturing patch pumps is extremely difficult and have attributed Medtronic's failure to develop a competitive product to Omnipod to difficulties in the manufacturing processes.

**ANSWER:** Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 6 of the SAC and therefore deny them.

7. The EOFlow Defendants, however, claim they have done—in a shorter period and with substantially less investment than Insulet—something that Medtronic and every other company has failed to do: manufacture at scale a patch pump that is, in most respects, virtually indistinguishable from Insulet's Omnipod System.

**ANSWER:** Denied.

8. Defendant Jesse Kim founded EOFlow Ltd. in 2011 and, since then, has served as its Chief Executive Officer and, on information and belief, its largest shareholder. Kim and EOFlow initially focused on developing patch pumps that used a different pumping technology from the Omnipod system. Early prototypes of EOFlow's product—called the EOPatch—looked nothing like Insulet's Omnipod products. But, starting around 2017, something changed. Instead of continuing to independently design and develop its own patch pump, EOFlow pivoted and launched a plan to brazenly copy Insulet's Omnipod System. EOFlow hired former Insulet senior executives and critical employees—including Defendants Malave, DiIanni, and Welsford—to oversee the development, manufacturing, regulatory approval, and marketing of the EOPatch. EOFlow also entered into a "joint development and collaboration" contract with Insulet's primary contract manufacturer of the Omnipod products, Flex, who possessed every detail of Insulet's proprietary and confidential manufacturing processes through its own manufacturing agreement with Insulet. Through these actions, EOFlow misappropriated Insulet's trade secret product details and manufacturing processes and, moreover, copied patented components of Insulet's Omnipod products.

**ANSWER:** Defendants admit Defendant Kim founded EOFlow Co., Ltd. in 2011 and has served as its Chief Executive Officer since its founding. Defendants also admit that Defendants Kim and EOFlow developed the EOPatch, a patch pump that uses a different pumping technology, or actuator, than the Omnipod system. Defendants also admit that EOFlow hired Individual Defendants Malave, DiIanni, and Welsford as employees and/or consultants and that each Individual Defendant previously worked at Insulet. Defendants also admit that EOFlow entered into a "joint development and collaboration" agreement with Flex. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 8 of the SAC.

9. After initially having spent six years with no meaningful progress building a patch pump of its own design, in the course of ***less than two years*** after hiring Insulet's former executives and engineers with detailed knowledge of Insulet's manufacturing and quality assurance operations, in 2018, EOFlow started advertising its completely redesigned EOPatch product—one that looked strikingly similar to Insulet's Omnipod product:



**Omnipod (left) and EOPatch (right)**

**ANSWER:** Defendants admit that, in 2018, EOFlow issued press releases about the EOPatch 2. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 9 of the SAC.

10. As Insulet learned only in 2023 after it received and examined an EOPatch device, the similarities between the Omnipod and the redesigned EOPatch do not end with the exterior appearance. Nearly every aspect of the EOPatch pumping mechanism is substantially identical to Insulet's Omnipod product, including, but not limited to:

- a pivoting, two-arm "walking man" hook;
- two ratchet gear wheels each having fifty teeth and driven by the "walking man" hook;
- a tube nut within the ratchet gear wheels;
- a spring clutch mechanism;
- an oval reservoir shape with a single O-ring;
- a leadscrew driven by the tube nut and fixed to a plunger;
- a rod on the plunger;
- two hook switch cups;
- spring contacts on the circuit board and ground spring contacts;
- rotational sensors;
- a "nail head" seal on the cannula;
- use of a needle cap vent;
- a piezoelectric kill break on the circuit board; and
- the particular adhesive pad weld configuration.

Indeed, many of the components are entirely interchangeable between the two products. Shown below are several illustrative examples of the similarities in physical components between Insulet's Omnipod and EOFlow's EOPatch:

| **Component/System** | **Insulet's Omnipod Product** | **EOPatch** |
| --- | --- | --- |
| Drive System with Walking-Man Hook |  |  |
| Clutch/Tube Nut for Drive Rod Engagement |    |    |
| Ratchet Gears (each with 50 teeth per wheel) |   |   |
| Insulin Reservoir and Plunger with Drive Rod |  |  |

| **Component/System** | **Insulet's Omnipod Product** | **EOPatch** |
| --- | --- | --- |
| "Nail Head" Cannula Seal |  |  |
| Adhesive Pad Weld |  |  |

**ANSWER:** Defendants admit that Paragraph 10 of the SAC purports to provide side-by-side pictorial comparisons of the Omnipod and EOPatch devices. Defendants lack information sufficient to form a belief as to the accuracy of the pictorial comparisons. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations of Paragraph 10. Defendants further deny that Plaintiff is entitled to any relief.

11. EOFlow's rapid development of a patch pump and the complex manufacturing processes required to produce it where others have repeatedly failed is no accident. It is based on EOFlow's wholesale theft of Insulet's intellectual property, through the use of former Insulet employees who were highly involved in the design, development, and/or manufacture of the Omnipod product.

**ANSWER:** Denied.

12. For several years following its redesign, EOFlow's EOPatch was unavailable to the public and to Insulet. Although EOFlow had announced the regulatory approval of EOPatch in Korea, Europe, the United Arab Emirates, and Indonesia by the end of 2022, only a few hundred end-users were reportedly using commercially sold EOPatch products by that time, and only in Korea. On December 27, 2022, Defendant EOFlow announced plans to launch the redesigned EOPatch in the United States. On that date, EOFlow submitted a premarket submission to FDA under section 510(k) of the Federal Food, Drug, and Cosmetic Act for approval of its EOPatch. Section 510(k) allows medical device manufacturers to seek and obtain FDA clearance without the type of clinical trials and testing required in the case of new device approvals. Rather, EOFlow need only show that its device is "substantially equivalent" to another device already on the market—presumably, Insulet's Omnipod.

**ANSWER:** Defendants admit that the EOPatch received regulatory approval in Korea in 2019, in Europe in 2021, and in the United Arab Emirates and Indonesia in 2022. Defendants also admit that, on December 27, 2022, EOFlow publicly announced its plans to seek regulatory approval for the EOPatch in the United States and submitted a § 510(k) application to the FDA. The remaining allegations in Paragraph 12 of the SAC assert legal conclusions to which no response is required. To the extent a response is required, Defendants deny these allegations.

13. EOFlow's intellectual property theft has paid off handsomely so far. EOFlow claims to earn millions from selling its clone product around the world. EOFlow also has compensated the Insulet employees who facilitated its theft of Insulet's trade secrets with millions of dollars of compensation in cash and stock.

**ANSWER:** Denied.

14. But EOFlow's main objective is much bigger. For at least six years, EOFlow's principal goal has been to cash in on its misappropriation of Insulet's trade secrets by selling the company to one of Insulet's major competitors, including those same competitors who repeatedly tried and failed to bring their own insulin patch-pump product to market.

**ANSWER:** Denied.

15. At one point, EOFlow was just weeks away from achieving its ultimate goal. On May 25, 2023, about two months before this action was brought, Medtronic announced its intention to acquire EOFlow for $738 million, which would have resulted in a windfall of more than a hundred million dollars for Malave and Kim. Medtronic was clear on why it was spending so much on a company with almost no proven revenue customers: it sought to acquire access to the stolen technology undergirding the EOPatch product.

**ANSWER:** Defendants admit that, on May 25, 2023, Medtronic announced its agreement with EOFlow Co., Ltd. to acquire existing shares from Defendants Kim and Malave; to acquire new

shares; and to undertake a public tender offer to acquire all public shares outstanding on the Korean stock exchange. Defendants also admit that the total consideration for these shares totaled $738 million. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 15 of the SAC.

16. Although Medtronic's $738 million acquisition of EOFlow has been put on hold since Insulet brought this lawsuit, EOFlow's misappropriation continues. EOFlow continues its efforts to bring its EOPatch to markets worldwide and has threatened to resume negotiations with various companies, including Medtronic, in its attempt to cash in on its theft of Insulet's trade secrets.

**ANSWER:** Defendants admit that, on December 6, 2023, Medtronic announced that it had exercised its right to terminate its agreement to acquire EOFlow. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 16 of the SAC.

17. The disclosure of Insulet's trade secrets to Medtronic, another competitor, or even to the public will work immediate and irreparable harm to Insulet and effectively rob all value from Insulet's trade secrets.

**ANSWER:** Denied.

## II. NATURE OF THE ACTION

18. This is an action for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. (DTSA); breach of contract; patent infringement under 35 U.S.C. § 271; unfair competition in violation of Mass. G.L. ch. 93A; and civil conspiracy.

**ANSWER:** Defendants admit that the SAC purports to bring claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*; 35 U.S.C. § 271; and Mass. Gen. Laws ch. 93A, as well as claims for breach of contract and civil conspiracy. Defendants deny that the allegations have any merit or that Plaintiff is entitled to any relief.

## III. THE PARTIES

19. Plaintiff Insulet Corporation is a Delaware corporation with its principal place of business at 100 Nagog Park, Acton, MA 01720.

**ANSWER:** Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 19 of the SAC and therefore deny them.

20. EOFlow Ltd. is a Korean corporation with a principal place of business in Seongman-si, Korea. On information and belief, EOFlow Ltd. does and/or plans to do business throughout the United States by selling the EOPatch, including in Massachusetts.

**ANSWER:** Defendants admit that EOFlow Co., Ltd. is a corporation organized in Korea with its principal place of business in Seongman-Si, Korea. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 20 of the SAC.

21. EOFlow Inc. is a Delaware corporation with its principal place of business at 3003 North 1st Street, #221, San Jose, CA 95134. On information and belief, as a subsidiary of EOFlow Ltd., EOFlow Inc. does and/or plans to do business throughout the United States by selling the EOPatch, including in Massachusetts. Upon information and belief, EOFlow Inc. and its officers, acting for and on behalf of EOFlow Inc., have participated and/or facilitated EOFlow Ltd.'s efforts directed at obtaining FDA clearance for EOFlow Ltd.'s EOPatch and commercializing the same in the United States. Indeed, EOFlow Ltd. has publicly acknowledged that it has used EOFlow Inc. and its officers and employees to facilitate FDA clearance of the EOPatch.

**ANSWER:** Defendants admit that EOFlow, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 3003 North 1st Street, #221, San Jose, California 95134. Defendants also admit that EOFlow, Inc. is a subsidiary of EOFlow Co., Ltd. and that one or more employees of EOFlow, Inc. participated and/or facilitated efforts to seek FDA approval for the EOPatch. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 21 of the SAC.

22. Nephria Bio, Inc., is a Delaware corporation with its principal place of business at 15 Rye St., Portsmouth, NH 03801. EOFlow is the majority owner of Nephria Bio and Defendant Ian G. Welsford is the CEO of Nephria Bio. Upon information and belief, Nephria Bio and its officers acting for and on behalf of Nephria Bio have participated and/or facilitated EOFlow Ltd.'s efforts directed at misappropriating Insulet's trade secrets and other confidential information for the benefit of EOFlow. Upon information and belief, Nephria Bio conspired with EOFlow to perpetuate its unlawful scheme and acted as an agent of EOFlow in furtherance of this scheme.

**ANSWER:** Defendants admit that Nephria Bio, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 15 Rye Street, Portsmouth, NH 03801. Defendants also admit that EOFlow Co., Ltd. is the majority owner of Nephria Bio and that Defendant Welsford currently serves as the CEO of Nephria Bio. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 22 of the SAC.

23. Defendant Jesse J. Kim (a/k/a Jae Jin Kim) is an individual who purports to reside in Seongnam-si, South Korea. Kim is a citizen of the United States but claims to not have a physical residence in the United States and is not otherwise subject to jurisdiction in any state's courts of general jurisdiction. Kim is the CEO of EOFlow and EOFlow Inc. and is also CEO or otherwise effectively manages various EOFlow proxy entities, agents, and affiliates operating in the United States, including but not limited to Pharmeo, Inc.; Nephria Bio, Inc.; SanPlena LLC; and Ferrex Therapeutics, Inc.

**ANSWER:** Defendants admit that Jesse J. Kim lives in Seongnam-Si, Korea, is a citizen of the United States, and does not have a residence in the United States. Defendants also admit that Defendant Kim is the CEO of EOFlow Co., Ltd. and EOFlow, Inc. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 23 of the SAC.

24. Defendant Luis J. Malave is an individual who resides at 1712 Azul Vista, San Marcos, CA 92078. On information and belief, Malave is a citizen of Venezuela. Malave started working at Insulet in January 2002, less than two years after it was founded, and was one of Insulet's first 40 employees. During his tenure at Insulet, Malave was Vice President of Research and Development from January 2002 to January 2003; Senior Vice President of Research, Development and Engineering from February 2003 to January 2007; and Chief Operating Officer from January 2007 until he left Insulet in August 2010. On information and belief, Malave was hired by EOFlow Inc. in October 2017 and served as its president until January 2022, at which time he was promoted to the role of CEO of SanPlena, LLC, a Delaware company established in December 2021, majority owned by EOFlow Inc. At all times relevant to this action, Malave acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow.

**ANSWER:** The allegation that "Malave acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow" asserts legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegation. The remaining allegations in Paragraph 24 of the SAC solely involve Defendant Malave. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

25. Defendant Steven DiIanni is an individual who resides at 80 Market Street, Amesbury, MA 01913. Like Malave, DiIanni started working at Insulet in January 2002, less than two years after it was founded, and was one of Insulet's first 40 employees. DiIanni was employed by Insulet until January 2015, serving in several roles including Director of Mechanical Engineering, Development Engineering Manager, Senior Development Engineer, and other technical roles. On information and belief, DiIanni has been a consultant for one or more of the EOFlow Defendants since at least June 2018. At all times relevant to this action, DiIanni acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow.

**ANSWER:** The allegation that "DiIanni acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow" asserts legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegation. The remaining allegations in Paragraph 25 of the SAC solely involve Defendant DiIanni. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

26. Defendant Ian G. Welsford is an individual who resides at 14 Whittaker Drive, Stratham, NH 03885. Welsford was employed by Insulet from 2008 until 2010, where he served as Director of Regulatory Affairs. In 2010, Welsford transitioned from employee to consultant for Insulet and he continued to work on regulatory approval of the Eros version of Insulet's Omnipod product in the United States and Europe. Welsford was hired by EOFlow Inc. in April 2018, as Chief Technology Officer and led the preparation of EOFlow's section 510(k) application for approval of the EOPatch in the United States. Welsford currently serves as the CEO of Nephria

Bio, Inc., a Delaware corporation established in January 2021, majority owned by EOFlow. At all times relevant to this action, Welsford acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow.

**ANSWER:** The allegation that "Welsford acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow" asserts legal conclusions, to which no response is required. To the extent a response is required, Defendants deny the allegation. The remaining allegations in Paragraph 26 of the SAC solely involve Defendant Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

## IV. JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over Insulet's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Insulet's state law claims pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over Insulet's claims for patent infringement pursuant to 28 U.S.C. § 1338(a).

**ANSWER:** Paragraph 27 of the SAC asserts legal conclusions to which no response is required. To the extent a response is required, Defendants admit that the SAC purports to be an action that satisfies the requirements for subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1367, but deny that the allegations have any merit or that Plaintiff is entitled to any relief.

28. This Court has personal jurisdiction over both Kim and EOFlow Ltd. because the claims against them arise out of activities with substantial and direct connections to Massachusetts. Kim, through EOFlow, organized and orchestrated a conspiracy to steal Insulet's valuable intellectual property for his and his company's own personal gain. To achieve this theft, Kim and EOFlow Ltd. necessarily directed their activities to Massachusetts, where Insulet and its trade secrets are at home. Kim and EOFlow recruited Massachusetts citizens to join in their tortious scheme to infringe Insulet's intellectual property and arranged for unlawful payments to Massachusetts citizens in return for access to Insulet's trade secrets. On information and belief, Kim either travelled to Massachusetts or directed others to travel to Massachusetts for the purposes of acquiring and/or capitalizing on Insulet's trade secrets. Kim and EOFlow also purposefully availed themselves of the privilege of doing business in Massachusetts by establishing at least one proxy entity based in Massachusetts: Ferrex Therapeutics, Inc. Ferrex operates, for all intents and purposes, as a Massachusetts-based arm of EOFlow and/or Kim and, in fact, identifies Kim as its corporate President, Treasurer, Secretary, Vice President, and Director. Upon information and belief, the business objectives and operations of Ferrex are to improperly use Insulet's trade secrets for the benefit of Kim and EOFlow in furtherance of their scheme.

**ANSWER:** In response to Paragraph 28 of the SAC, Defendants do not contest personal jurisdiction over Defendants Kim and EOFlow Co., Ltd. for purposes of this action only. Defendants otherwise deny the remaining allegations in Paragraph 28.

29. Alternatively, if the exercise of personal jurisdiction in this Court is not held to be proper based on Kim and EOFlow's contacts with Massachusetts specifically, then, on information and belief, neither Kim nor EOFlow are subject to jurisdiction in any state's court of general jurisdiction and therefore personal jurisdiction over Kim and EOFlow in this Court is proper pursuant to Fed. R. Civ. P. 4(k)(2) based on their contacts with the United States.

**ANSWER:** In response to Paragraph 29 of the SAC, Defendants do not contest personal jurisdiction over Defendants Kim and EOFlow Co., Ltd. for purposes of this action only. Defendants otherwise deny the remaining allegations in Paragraph 29.

30. This Court has personal jurisdiction over EOFlow Inc. because, on information and belief, EOFlow Inc. is EOFlow Ltd.'s proxy entity in the United States. On information and belief, EOFlow Inc. is the principal United States operating entity of EOFlow Ltd. and was incorporated to facilitate the domestic employment of, and payments to, United States citizens—including Defendants Malave, DiIanni, and Welsford—and to otherwise act as EOFlow's agent for its efforts to commercialize the EOPatch in the United States. Among other things, EOFlow Ltd. and EOFlow Inc. have common ownership, intermingle business assets, commonly refer to themselves and do business as a single entity (EOFlow), and offer the same products and services, all marketed and sold under the EOFlow brand. In addition, on information and belief, EOFlow Ltd. exercises control over EOFlow Inc. and holds out the place of business of EOFlow Inc. as the place of business of EOFlow Ltd. Further, on information and belief, EOFlow Inc. is thinly capitalized and relies on influxes from EOFlow Ltd. to maintain operations. Further, EOFlow Inc. knowingly engaged in tortious acts primarily and substantially in Massachusetts, including developing infringing products at its "Innovation Center" address at 100 Main St. in Amesbury, Massachusetts. In addition, EOFlow Inc., on behalf of EOFlow Ltd., engaged Malave, DiIanni, Welsford, and others to commit acts of trade secret misappropriation in Massachusetts and directed at Acton, Massachusetts-based Insulet. For these reasons, jurisdiction is proper as to EOFlow Inc. for all the reasons articulated in paragraphs 28 and 29 as to EOFlow Co. Ltd.

**ANSWER:** In response to Paragraph 30 of the SAC, Defendants do not contest personal jurisdiction over Defendant EOFlow, Inc. for purposes of this action only. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 30.

31. This Court has personal jurisdiction over Nephria Bio because the claims against it arise out of activities with substantial and direct connections to Massachusetts. Welsford and others, through Nephria Bio, organized and orchestrated a conspiracy to steal Insulet's valuable intellectual

property for the benefit of Welsford, Nephria Bio, and the other EOFlow entities. To achieve this theft, Welsford and Nephria Bio necessarily directed their activities to Massachusetts, where Insulet and its trade secrets are at home. Welsford and Nephria Bio recruited Massachusetts citizens to join in their tortious scheme to infringe Insulet's intellectual property and arranged for unlawful payments to Massachusetts citizens in return for access to Insulet's trade secrets. On information and belief, Welsford often travelled to Massachusetts or directed others to travel to Massachusetts for the purposes of acquiring and/or capitalizing on Insulet's trade secrets. This Court also has personal jurisdiction over Nephria Bio because Nephria Bio acted as an agent of EOFlow in the furtherance of EOFlow's tortious scheme to misappropriate the Insulet Trade Secrets. Thus, jurisdiction is proper as to Nephria Bio for all the reasons articulated in paragraphs 28, 29, and 30 as to EOFlow Co., Ltd., and EOFlow Inc.

**ANSWER:** The allegations in Paragraph 31 of the SAC solely involve Defendant Nephria Bio, Inc. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

32. This Court has general personal jurisdiction over DiIanni because he is a citizen of Massachusetts.

**ANSWER:** The allegations in Paragraph 32 of the SAC solely involve Defendant DiIanni. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

33. This Court has personal jurisdiction over Defendants Malave, DiIanni, and Welsford by virtue of their employment at Insulet, a company with its principal place of business in Massachusetts, and because Defendants Malave, DiIanni, and Welsford entered into employment and consulting agreements with Massachusetts-based Insulet to perform services on behalf of Insulet.

**ANSWER:** The allegations in Paragraph 33 of the SAC solely involve Defendants Malave, DiIanni, and Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

34. This Court has personal jurisdiction over Defendants Malave, DiIanni, and Welsford by virtue of their consent to this jurisdiction for all actions by any of them against Insulet (and vice versa) arising out their respective relationships with Insulet, regardless of whether they arise under the employment agreement between the parties.

**ANSWER:** The allegations in Paragraph 34 of the SAC solely involve Defendants Malave, DiIanni, and Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

35. This Court also has personal jurisdiction over Defendants Malave, DiIanni, and Welsford because, as detailed *infra* §§ V.C-V.D and Count I, each performed acts of misappropriation of Insulet's trade secrets, both on their own behalf and on behalf of both EOFlow Defendants, primarily and substantially in Massachusetts, including at Insulet's former headquarters in Billerica and/or Bedford and/or its current headquarters in Acton, which caused harm to Insulet in Massachusetts.

**ANSWER:** Defendants deny that Defendants Malave, DiIanni, and Welsford performed acts of misappropriation of Insulet's trade secrets on behalf of both EOFlow Defendants. The remaining allegations in Paragraph 35 of the SAC solely involve Defendants Malave, DiIanni, and Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them. Defendants further deny that Plaintiff is entitled to any relief.

36. Venue is proper in this judicial District for all claims under 28 U.S.C. § 1391(b)(2), § 1391(b)(3), and § 1391(c)(3).

**ANSWER:** In response to Paragraph 36 of the SAC, Defendants do not contest venue for purposes of this action only.

## V. INSULET'S INTELLECTUAL PROPERTY AND THE DEFENDANTS' MISAPPROPRIATION AND INFRINGEMENT

### A. Development of the Omnipod System and Related Manufacturing Processes

37. Insulet was founded almost a quarter century ago with the goal of developing a cost-effective, wearable, disposable, waterproof, tubeless insulin pump that can be controlled wirelessly through a handheld device containing a fully integrated blood-glucose meter. The first design of Insulet's Omnipod took over five years (from 2000 to 2005) and more than $40 million dollars in research and development to yield an initial, safe and reliable, FDA-approved product; an additional six years and more than $170 million to develop its "Eros" version of the Omnipod System; and then another eight years and more than $600 million to develop its "DASH" version of the Omnipod System. The amount of time and resources that Insulet expended is unsurprising. Insulet's Omnipod contains high-precision electromechanical components and software to accurately and safely dispense insulin in specific doses over prolonged periods. Among other things, Insulet had to design and build customized and purpose-built manufacturing machinery to assemble components into finished products in a cost-efficient and reliable manner. Insulet kept all aspects of this work strictly confidential.

**ANSWER:** To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 37 of the SAC and therefore deny them.

38. In 2005, Insulet became the first company to commercially launch a tubeless insulin-delivery system with a "Personalized Diabetes Manager":




**ANSWER:** To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 38 of the SAC and therefore deny them.

39. Insulet's first revolutionary Omnipod System was lauded throughout the industry. In 2006, the Omnipod System received the Gold Industrial Excellence Award (IDEA) from the Industrial Designers Society of America. The IDEA competition is among the world's most prestigious design competitions, with awards based on excellence and innovation in the design and functionality of individual products. That same year, Insulet also received the Medical Design Excellence Award for General Hospital and Therapeutic Products from Canon Communications, LLC, and a 2006 New England Innovation Award from the Smaller Business Association of New England.

**ANSWER:** To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 39 of the SAC and therefore deny them.

40. Insulet's Omnipod System was designed to meet all insulin needs of patients with insulin-dependent diabetes. People suffering from diabetes generally need two modes of insulin delivery to best manage their condition: basal insulin and bolus insulin. Generally speaking, basal insulin is a small amount of insulin delivered at regular, short time intervals throughout the day and night to keep the user's glucose levels stable, and bolus insulin is a one-time, user-prompted dose delivered to address the intake of meals with carbohydrates and/or to otherwise correct for high glucose readings. From its first product iteration, Insulet's Omnipod System has been engineered to deliver both basal insulin and bolus insulin.

**ANSWER:** Defendants admit that Plaintiff's description of diabetes and insulin relief in the second and third sentences of Paragraph 40 of the SAC appears generally accurate. To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40 and therefore deny them.

41. By 2007, demand for Insulet's Omnipod product was exceeding Insulet's in-house manufacturing capabilities. So in late 2007, Insulet announced it had entered into a manufacturing and supply relationship with Flex, a global medical device manufacturing company.

**ANSWER:** To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 41 of the SAC and therefore deny them.

42. After its initial product launch, Insulet continued to innovate and improve the Omnipod System. By 2011, Insulet launched the "Eros" version of the Omnipod System, which included significant mechanical and structural updates for improved product performance and to facilitate manufacturing processes at scale. By the time Insulet launched Eros, Insulet had spent over $170 million in research and development. Between 2011 and 2016, Insulet invested substantially in improving the safety, reliability, and manufacturability of the Eros version and invested many more hundreds of millions in refining the Eros and the systems and tools for manufacturing Eros. Every Omnipod product since Eros is based on the Eros hardware platform.

**ANSWER:** To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 42 of the SAC and therefore deny them.

43. By 2019, Insulet developed the "DASH" version of its Omnipod System, which replaced the Eros PDM with a new, smartphone-based PDM running an app for pump control. By the time DASH was launched in 2019, Insulet had spent a total of over $600 million in research and development, including manufacturing development costs.

**ANSWER:** To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 43 of the SAC and therefore deny them.

44. Insulet has also had success using the Omnipod hardware platform as a tool for drug delivery for treatment of conditions outside of diabetes. Namely, Insulet today is in an active partnership with Amgen to use a customized version of Omnipod to deliver Neulasta—a drug that stimulates production of white blood cells—to patients undergoing chemotherapy. Insulet continues to research other patient populations that can benefit from the Omnipod platform.

**ANSWER:** To the extent an answer is required, Defendants lack information sufficient to form a belief as to the truth of the allegations in Paragraph 44 of the SAC and therefore deny them.

**B. Insulet's Trade Secrets**

45. Through nineteen years of development work and the investment of more than $600 million in research and development, Insulet developed extensive trade secrets concerning the development, design, manufacturing, and production of the Omnipod.

**ANSWER:** Paragraph 45 of the SAC asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

46. Insulet's trade secrets related to the development, design, manufacturing, and production of the Omnipod, as relevant to this action, include at least the following, individually and in combination (collectively, the "Insulet Trade Secrets"):

- detailed product drawings;
- quality control systems;
- process validation procedures;
- failure mode and effects analysis reports (FMEAs);
- approximately 8,000 pages of detailed manufacturing specifications;
- the specific ordering of the manufacturing process;
- Insulet's suppliers for its 72 components of the Omnipod;
- pricing information for all components of the Omnipod;
- manufacturing techniques and know-how;
- software with complex security protocols for the operation of the Omnipod, the PDM and smartphone app, and the communications between these components;
- know-how concerning integration of a continuous glucose monitor (CGM) and an insulin-delivery pump into a single device;
- negative know-how including information concerning techniques that *do not* work or do not work well based on years of engineering work and trial and error; and
- confidential communications between Insulet and regulators worldwide, including but not limited to feedback provided by regulators in response certain Insulet designs and the specific steps that Insulet took in response to that feedback.

**ANSWER:** Denied.

47. Insulet developed each category of the Insulet Trade Secrets over many years of extensive development and engineering work and expensive and time-consuming trial and error.

**ANSWER:** Denied.

48. Each category of the Insulet Trade Secrets is commercially valuable to Insulet because of its secrecy.

**ANSWER:** Denied.

49. Insulet has taken extensive steps to protect its trade secret information, including:

- imposing confidentiality obligations on Insulet's employees and contracting parties;
- entering into confidentiality agreements prior to sharing any confidential information with third parties;
- physically securing Insulet's facilities;
- employing password protection, encryption, and other computer security technologies, both on Insulet's computer systems and on the Omnipod device; and
- limiting the distribution of confidential information to those employees and contractors with a need to know that confidential information;
- establishing and enforcing company-wide policies and procedures to ensure the security of Insulet confidential information; and
- limiting access to the Insulet Trade Secrets on a need-to-know basis.

**ANSWER:** Denied.

50. None of the Insulet Trade Secrets is publicly available, nor can they be determined through public means.

**ANSWER:** Denied.

### C. Defendants Malave, DiIanni, and Welsford Held Positions of Trust in Insulet, Were Intimately Involved in the Development of the Eros Platform, and Had Access to the Insulet Trade Secrets

51. Defendants Malave, DiIanni, and Welsford were entrusted with details of every aspect of the research and development efforts to create the world's first insulin patch pump.

**ANSWER:** The allegations in Paragraph 51 of the SAC solely involve Defendants Malave, DiIanni, and Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

52. As Insulet's Vice President of Research, Development and Engineering, and also as its Chief Operating Officer, Malave was intimately involved in the development, contractual engagement, and implementation of manufacturing of Insulet's Omnipod product at scale. Malave is a named inventor on 27 patents and patent applications that Insulet filed worldwide relating to non-trade secret technologies it used in its Omnipod product.

**ANSWER:** The allegations in Paragraph 52 of the SAC solely involve Defendant Malave. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

53. As Director of Mechanical Engineering at Insulet, DiIanni was highly involved in developing manufacturing processes and resolving manufacturing issues. In fact, while at Insulet, DiIanni reviewed and had final sign-off on most documentation related to mechanical R&D developments for the Omnipod, including protocol reports, drawings, and specifications. DiIanni is a named inventor on 40 patents and patent applications that Insulet filed worldwide relating to non-trade secret technologies it used in its Omnipod product, including the patents Insulet asserts in this case: U.S. Patent Nos. 11,229,741 ("the '741 Patent"), 10,420,883 ("the '883 Patent"), and 9,402,950 ("the '950 Patent").

**ANSWER:** The allegations in Paragraph 53 of the SAC solely involve Defendant DiIanni. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

54. As a result of their respective roles designing and developing the Omnipod product, Malave and DiIanni had access to and had possession of detailed technical information about the product, including but not limited to product designs and specifications, FMEAs, material compositions, coating materials, plating specifications, operational software requirements and details, product functional requirements, dimensional tolerances, drive stroke and force requirements, and other product and manufacturing details.

**ANSWER:** The allegations in Paragraph 54 of the SAC solely involve Defendants Malave and DiIanni. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

55. As Director of Regulatory Affairs at Insulet, Welsford was responsible for managing a variety of activities concerning regulatory approvals and regulatory compliance for Insulet's Omnipod product. He also was responsible for working with management in planning, organizing, and preparing regulatory documents for submission to governmental regulatory agencies worldwide. In his role, Welsford had access to every record regarding the Omnipod product and every communication between Insulet and regulatory authorities around the world. Importantly, Welsford was intimately knowledgeable about the challenges and compliance issues encountered during the product development process and the time-consuming trial and error corrective actions

Insulet took to address them. One notable example is Welsford's involvement in the development of FMEAs, which serve as comprehensive documents identifying all the ways in which Insulet's hardware, software, manufacturing, design, and process componentry could fail. FMEAs are critical for medical devices, particularly insulin infusion devices, which can cause serious injury or death if they malfunction. In addition, Welsford had intimate knowledge of Insulet's validation testing protocols that were created for the purposes of establishing, for both Insulet and regulators, that the Omnipod device is safe and reliable. Examples of these validation reports include, but are not limited to, user interactions with the patch adhesive, effectiveness of the patch adhesive, timing and efficacy of needle deployment, safety and reliability of communications between the PDM and pump, insulin compatibility with Omnipod components, the accuracy of delivered insulin dose, occlusion susceptibility, sterilization compatibility, maintaining function with changes in pressure and altitude, and many others.

**ANSWER:** The allegations in Paragraph 55 of the SAC solely involve Defendant Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

**D. Defendants' Misappropriation of Insulet's Trade Secrets**

56. During the course of their employment and consultancy agreements with Insulet, at least Defendants DiIanni and Welsford improperly transferred thousands of confidential Insulet documents to their personal computers. The stolen documents included hundreds, if not thousands, of documents and files comprising the Insulet Trade Secrets, including CAD files, product drawings, product specifications, manufacturing specifications, FMEAs, and regulatory documents. These defendants knowingly continued to retain these documents after the term of their employment with Insulet. Ultimately, as set forth in further detail below, DiIanni and Welsford teamed with EOFlow, Kim, and Malave to leverage these trade secrets to help Kim and EOFlow bring to market a clone version of the Omnipod at a fraction of the speed and cost expended not only by Insulet, but by many other companies that had tried and failed to bring a competing patch pump to market.

**ANSWER:** Denied.

57. Defendant Jesse Kim founded EOFlow Ltd. in Seoul in 2011. The "EO" in "EOFlow" refers to the electro-osmotic pumps that were the focus of EOFlow's original work on low-cost disposable "patch-like" drug delivery solutions. By 2012, EOFlow had developed a prototype of its electro-osmotic patch-pump device, focusing on specific issues unique to electro-osmotic pumps. EOFlow's 2012 prototype looked nothing like Insulet's Omnipod products:




**ANSWER:** Defendants admit that Defendant Kim founded EOFlow Co., Ltd. in 2011. Defendants also admit that the EOPatch product uses electro-osmotic pumping technology as its actuator and that EOFlow had developed its first prototype of the EOPatch in 2012. Defendants also admit that Paragraph 57 of the SAC purports to provide pictorial representations of an EOPatch prototype. Defendants lack information sufficient to form a belief as to the accuracy of the pictorial representations. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations of Paragraph 57.

58. By 2015, EOFlow introduced its first insulin-delivery patch pump, the "EOPatch 1." EOFlow designed and marketed the EOPatch 1 as a direct competitor to the Omnipod. In marketing the product, EOFlow highlighted the distinct, smaller profile of its product as compared to the Omnipod, which it labelled "Competitor" in the image from the EOFlow website below:




| | |
|---|---|
| SIZE | 40 x 50 x 9mm |
| WEIGHT | 15 g (including insulin) |
| RESERVOIR CAPACITY | 200 U |

**ANSWER:** Defendants admit that by 2015, EOFlow had developed EOPatch 1, which may have competed with Omnipod had it proceeded to the market. Defendants also admit that the graphic presented in Paragraph 58 of the SAC at one time appeared on the EOFlow website and depicts an Omnipod product. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 58.

59. The EOPatch 1 failed commercially. At some point in 2017, EOFlow decided to change course and attempt to bring to market a clone version of the Omnipod. To achieve this, Kim reached out to Luis Malave, Insulet's former COO, to assist Kim and EOFlow in this effort. Just two months after hiring Malave as a consultant for EOFlow, Kim offered Malave the role of President of both EOFlow, Inc., and parent Korean entity, EOFlow Co., Ltd.

**ANSWER:** Defendants admit that EOFlow hired Defendant Malave, who has served as President of both EOFlow, Inc. and EOFlow Co., Ltd. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 59 of the SAC.

60. Shortly after joining EOFlow, Malave and Kim worked together to hire, or otherwise engage, other former Insulet employees who to assist Malave and Kim in their mission to bring an Omnipod knock-off to market

**ANSWER:** Defendants admit that after EOFlow hired Malave, EOFlow hired additional former Insulet employees as EOFlow employees or consultants. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 60 of the SAC.

61. By 2018, EOFlow had hired Ian Welsford and appointed him to be the Chief Technology Officer of the company. Also by 2018, EOFlow brought on DiIanni as a consultant.

**ANSWER:** Admitted.

62. By February 2018, just months after hiring Malave, the design of the EOPatch had been transformed to appear as it does today, a clone of the Omnipod:



**Omnipod (left) and EOPatch (right)**

**ANSWER:** Denied.

63. Whereas it took Insulet nineteen years and over $600 million in research and development to bring the DASH version of its Omnipod System to market, it took EOFlow at most four years—from 2017 (at the earliest) to 2021—to abandon its initial EOPatch design and to redesign, manufacture, achieve regulatory approval in Korea, and reportedly provide to Korean users its current EOPatch product as an Omnipod clone.

**ANSWER:** Denied.

64. Similarly, over the course of only a few years, the EOFlow Defendants have been able to install a manufacturing line capable of producing three million units of its product per year at its new facility in Gonjiam, Korea. The pace at which EOFlow was able to build and accelerate the manufacture of its clone product is unmatched.

**ANSWER:** Denied.

65. At the same time, based upon information EOFlow published since it became a publicly traded company in 2018, EOFlow's total research and development expenditures during this period was approximately $10–15 million, or less than 3% of the research and development expenditures Insulet made through the development of the DASH version of Omnipod.

**ANSWER:** Denied.

66. EOFlow achieved this seemingly incredible feat because it cheated. Instead of developing its EOPatch device from the ground up, or even performing a clean-room reverse engineering development of a clone of the Omnipod, with the assistance of Malave, DiIanni, Welsford and Nephria Bio, EOFlow stole the Insulet Trade Secrets and effectively obtained a 15 year and billion dollar head start that it did not earn.

**ANSWER:** Denied.

67. Indeed, at all relevant times, Malave, Welsford, DiIanni's role at EOFlow and Nephria Bio was clear to everyone involved; in return for sharing the Insulet Trade Secrets with EOFlow, each of these individuals would be compensated, handsomely in some cases. And it was

also clear to everyone involved how Nephria Bio, EOFlow, and Kim would use the Insulet Trade Secrets: to compete with Insulet without having to first invest the substantial time and money required to bring a patch pump to market.

**ANSWER:** Denied.

68. For example, throughout the course of his consulting agreement with EOFlow, Kim and other EOFlow and Nephria Bio employees acting at Kim and Malave's direction repeatedly asked for DiIanni's assistance in recreating certain aspects of the Omnipod design and Insulet's learnings in creating Omnipod. In answering these requests, DiIanni relied upon and disclosed to EOFlow and Nephria Bio the Insulet Trade Secrets, including the documents and files that he improperly retained after his employment. And Kim, Malave, Nephria Bio, and EOFlow knew that DiIanni was utilizing the Insulet Trade Secrets in the course of providing material assistance. This is because (1) on information and belief, Kim and Malave knew that DiIanni had improperly retained Insulet documents; (2) Kim and Malave specifically requested that DiIanni consult Insulet confidential information in the course of his work for EOFlow and Nephria Bio; and (3) DiIanni admitted in contemporaneous notes that the information he was providing was based upon confidential Insulet information.

**ANSWER:** Denied.

69. At some point, DiIanni advised Malave and Kim that EOFlow and Nephria Bio should retain another former Insulet employee and Massachusetts resident, Robert Strand, because Strand had knowledge about Insulet's manufacturing process. Kim and Malave, acting on behalf of EOFlow, ultimately did retain Strand as a consultant for EOFlow.

**ANSWER:** Defendants admit that Robert Strand is a former Insulet employee and that EOFlow hired him as a consultant. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 69 of the SAC.

70. Like DiIanni, Welsford also assisted Malave, Kim, and EOFlow with their efforts to bring EOFlow's clone product to market by wrongfully leveraging the Insulet Trade Secrets. As set forth above, in his role of Director of Regulatory Affairs at Insulet, Welsford had full access to and was responsible for the preparation and submission of regulatory quality assurance documents for the Omnipod, including FMEAs, validation testing protocols, and quality assurance procedures. Upon the termination of his consulting agreement with Insulet, Welsford also improperly retained thousands of Insulet confidential documents reflecting Insulet's accumulated knowledge and procedures, as reflected in these documents.

**ANSWER:** Denied.

71. Without the time, money, or personnel required to develop its own FMEAs, validation testing protocols, and quality assurance procedures, EOFlow brought on Welsford so that EOFlow could misappropriate the Insulet documents instead. However, because these documents would be submitted to regulatory bodies, the documents had to be reformatted for EOPatch and EOFlow, a painstaking and time-consuming process. To address this issue, EOFlow and Welsford

hatched a plan in which EOFlow and Welsford would create a separate New Hampshire entity called Nephria Bio, Inc., with EOFlow as the company's majority investor. Although Nephria Bio purports to be a renal therapy company developing dialysis technology, in reality it served as a conduit by which EOFlow would exchange substantial payments to Welsford in the form of his annual compensation from Nephria Bio in return for laundered versions of the Insulet regulatory documents. In order to facilitate these ends, Nephria Bio hired up to a half- dozen individuals whose jobs it was to copy and reformat the Insulet confidential documents provided by Welsford. Once the job was complete, Nephria Bio cleared house. Today, the only employees of Nephria Bio are Welsford and his daughter, Acacia, both of whom continue to collect salaries (in the case of Welsford, a substantial salary) through EOFlow's "investments" in the company.

**ANSWER:** Denied.

72. EOFlow and Nephria Bio are also using the Insulet Trade Secrets to expand into market segments outside of insulin delivery. For example, EOFlow established a partially-owned subsidiary, Pharmeo, Inc., to bring to market non-insulin wearable drug pumps. EOFlow also established SanPlena, LLC, a joint venture with Zihipp, LLC, a UK-based biopharmaceutical company, to bring to market drug delivery for obesity and nonalcoholic steatohepatitis ("NASH") disease. EOFlow also has a majority interest, and now controls and operates, Ferrex Therapeutics, Inc., a Massachusetts-based company that intends to bring to market the EOPatch as a drug- delivery system for treatment of iron overload disorder. And, on information and belief, Nephria Bio is pursuing a patch-pump product for the treatment of Kidney disease. Indeed, EOFlow has publicly stated its intent to leverage the EOPatch as a "core platform technology" for these businesses and others.

**ANSWER:** Defendants admit that EOFlow Co., Ltd. partially owns Pharmeo, Inc.; that SanPlena LLC is a joint venture with Zihipp, LLC, which is a UK-based biopharmaceutical company; and that EOFlow Co., Ltd. partially owns Ferrex Therapeutics, Inc. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations of Paragraph 72 of the SAC.

73. On information and belief, EOFlow has filed patent applications in the United States and elsewhere that improperly disclose and/or claim the Insulet Trade Secrets as inventions made by EOFlow and its employees.

**ANSWER:** Defendants admit that EOFlow has filed patent applications in the United States and elsewhere. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations of Paragraph 73 of the SAC.

74. EOFlow is not entitled to patents on the aforementioned patent applications and any related applications. On information and belief, the inventions disclosed therein were conceived at Insulet by Insulet engineers and/or contain trade secrets owned by Insulet.

**ANSWER:** Denied.

75. In sum, Nephria Bio and EOFlow, through Welsford, Malave, and Kim, knowingly, willfully, and maliciously received and misappropriated, and is now further misusing and misappropriating, the Insulet Trade Secrets with knowledge that the Insulet Trade Secrets were indeed trade secrets. To assist them in this venture, Malave and Kim recruited and conspired with DiIanni, and his company Coral C Ventures LLC, and Welsford's company, Nephria Bio, Inc., to further EOFlow's mission of bringing a clone product to market by leveraging the valuable and proprietary information that Insulet had created and acquired over the course of twenty years of research and development. To fully capitalize on this venture, EOFlow has also established joint ventures and other partially-owned subsidiaries whose role is to use the misappropriated Insulet Trade Secrets in furtherance of EOFlow's broader scheme.

**ANSWER:** Denied.

76. In furtherance of this joint venture, Malave, Welsford, and DiIanni knowingly and wrongfully breached their confidentiality agreements by disclosing the Insulet Trade Secrets to EOFlow for the specific purpose of furthering the interests of the joint venture for their own personal gain.

**ANSWER:** Denied.

### E. Insulet's Patents

77. Insulet's Omnipod pump is protected by numerous issued U.S. patents, including those listed on Insulet's website pursuant to 35 U.S.C. § 287(a). This case involves U.S. Patent Nos. 11,229,741; 10,420,883; and 9,402,950 (collectively, the "Patents-in-Suit").

**ANSWER:** Defendants admit that this case purports to involve the '741, '883, and '950 patents. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 77 of the SAC.

78. Each of the Patents-in-Suit relate to a "clutch mechanism" for advancing a leadscrew and plunger inside a pump device. Each of these patents derives from a U.S. provisional application, Application No. 61/618,028, which was filed on March 30, 2012. The three patents, all entitled "Fluid delivery device, transcutaneous access tool and fluid drive mechanism for use therewith," share a common specification, and were issued to the same inventors, including Defendant Steven DiIanni, Ian McLaughlin, Jason Brian O'Connor, Robert Campbell, and Kevin Schmid.

**ANSWER:** Defendants admit that the '741, '883, and '950 patents purport to be titled "FLUID DELIVERY DEVICE, TRANSCUTANEOUS ACCESS TOOL AND FLUID DRIVE MECHANISM FOR USE THEREWITH." Defendants also admit that the '741, '883, and '950

patents list as inventors: Steven DiIanni, Ian McLaughlin, Jason Brian O'Connor, Robert Campbell, and Kevin Schmid. Defendants also admit that the '741, '883, and '950 patents use the term "clutch mechanism." Defendants also admit that the '741, '883, and '950 patents list the U.S. provisional application, No. 61/618,028, filed on March 30, 2012, as "related U.S. application data." To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 78 of the SAC.

79. The common specification of the Patents-in-Suit describes the then-existing need for therapeutic fluid pumps with improved mechanisms for driving fluid from a reservoir into the patient through a "transcutaneous access tool" such as a needle or a soft cannula. As a solution, the patents teach and claim a "clutch mechanism" that reduces "the number of fluid path prime pulses needed to prime the pump" and better assures "a full and proper priming of the fluid path before placement on the body."

**ANSWER:** Defendants admit that the '741, '883, and '950 patents use the terms and phrases "transcutaneous access tool," "clutch mechanism," "the number of fluid path prime pulses needed to prime the pump," and "a full and proper priming of the fluid path before placement on the body." To the extent Paragraph 79 of the SAC purports to characterize the contents of the Patents-in-Suit, the documents speak for themselves. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 79.

80. Specifically, as shown in the figure reproduced below, the patents describe a fluid drive mechanism that includes a threaded elongated shaft or "leadscrew" **(152)** with external threads extending from a plunger **(136)** received in the reservoir **(130)**. As described in the patents, a second elongated shaft with internal threads, called a "tube nut" **(154),** threadably engages the leadscrew **(152)** and may be driven by a drive wheel **(156)** via a clutch mechanism **(160)**.




FIG. 8

**ANSWER:** To the extent Paragraph 80 of the SAC purports to characterize the contents of the Patents-in-Suit, the documents speak for themselves. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 80.

81. As described in the patents, when the reservoir is empty, the plunger is extended and positioned at one end of the reservoir such that the plunger is extended and the clutch mechanism is disengaged. When the reservoir is filled and the plunger moves to the opposite (retracted) end of the reservoir, the clutch mechanism remains disengaged to allow the tube nut **(154)** to pass into an elongated cylindrical bore (along the drive axis) of a hub of the drive wheel **(156)**. The clutch mechanism may then be engaged such that rotation of the drive wheel causes the clutch mechanism to rotate the tube nut **(154)**, which causes the leadscrew **(152)** to advance the plunger into the reservoir **(130)** to deliver its fluid.

**ANSWER:** To the extent Paragraph 81 of the SAC purports to characterize the contents of the Patents-in-Suit, the documents speak for themselves. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 81.

82. The patents explain certain benefits of this mechanism:

> By using a clutch mechanism, the engagement between the leadscrew and the nut occurs at assembly, and thus no rotation is needed for the nut to engage the leadscrew by operation of the device. This reduces the number of fluid path prime pulses to prime the pump and assures a full and proper priming of the fluid path before placement on the body. The clutch mechanism also enables the changing of thread pitch for other drug applications without a need to redesign the tilt nut used in fluid driving mechanisms in other existing pumps.

**ANSWER:** Defendants admit that the ’741, ’883, and ’950 patents contain the quoted language. To the extent Paragraph 82 of the SAC purports to characterize the contents of the Patents-in-Suit, the documents speak for themselves. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 82.

83. The ’741 Patent duly issued on January 25, 2022, and is listed on Insulet’s website pursuant to 35 U.S.C. § 287(a). A true and correct copy of the ’741 Patent is attached hereto as Exhibit A.

**ANSWER:** Defendants admit that Exhibit A attached to the SAC purports to be a copy of the ’741 patent and that, on the face of the purported copy in Exhibit A, it issued on January 25, 2022.

Defendants deny that the ’741 patent is valid and enforceable. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 83 of the SAC and therefore deny them.

84. The ’883 Patent duly issued on September 24, 2019, and is listed on Insulet’s website pursuant to 35 U.S.C. § 287(a). A true and correct copy of the ’883 Patent is attached hereto as Exhibit B.

**ANSWER:** Defendants admit that Exhibit B attached to the SAC purports to be a copy of the ’883 patent and that, on the face of the purported copy in Exhibit B, it issued on September 24, 2019. Defendants deny that the ’883 patent is valid and enforceable. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84 of the SAC and therefore deny them.

85. The ’950 Patent duly issued on August 2, 2016, and is listed on Insulet’s website pursuant to 35 U.S.C. § 287(a). A true and correct copy of the ’950 Patent is attached hereto as Exhibit C.

**ANSWER:** Defendants admit that Exhibit C attached to the SAC purports to be a copy of the ’950 patent and that, on the face of the purported copy in Exhibit C, it issued on August 2, 2016. Defendants deny that the ’950 patent is valid and enforceable. Defendants lack information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 of the SAC and therefore deny them.

86. The Patents-in-Suit are valid and enforceable.

**ANSWER:** Denied.

87. Insulet is the owner and assignee of the Patents-in-Suit and holds the right to sue for and recover damages for infringement thereof, including past infringement.

**ANSWER:** Paragraph 87 of the SAC asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

### F. EOFlow Has Imported the EOPatch for Commercial Demonstrations, Has Disclosed Insulet's Trade Secrets to Insulet's U.S.-Based and Foreign Competitors, and Has Actively Pursued Selling the Company as a Means to Launder Insulet's Trade Secrets

88. Corresponding with EOFlow's decision to pursue a clone of the Omnipod product with the benefit of the Insulet Trade Secrets, EOFlow began a world-wide effort to find a suitor or suitors to buy EOFlow so that EOFlow could profit off of its misappropriation of Insulet's intellectual property. As part of these efforts, EOFlow has engaged in additional acts of misappropriation that occurred principally and substantially in the United States and Massachusetts.

**ANSWER:** Denied.

89. For example, EOFlow imported one or more samples of its infringing patch pump, the EOPatch, into the United States and displayed that sample at the 78th Scientific Sessions of the American Diabetes Association in Orlando, Florida in June 2018 (the "2018 ADA Meeting").

**ANSWER:** Defendants admit that EOFlow attended the 2018 ADA Meeting and had at least one sample of the EOPatch on display. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 89 of the SAC.

90. On information and belief, EOFlow also imported samples of its infringing patch-pump product into the United States for the purpose of marketing EOFlow to potential suitors, including Medtronic.

**ANSWER:** Denied.

91. On information and belief, EOFlow also imported samples of its infringing patch-pump product into the United States—including, specifically, Massachusetts—for the purpose of facilitating DiIanni's efforts to assist EOFlow in bringing to market a clone of the Omnipod.

**ANSWER:** Denied.

92. On information and belief, EOFlow also imported samples of its infringing patch-pump product into the United States for the purpose of facilitating the efforts of its proxy entities, agents, and affiliates, Pharmeo, Nephria, Ferrex, and SanPlena, to use the infringing patch-pump product for therapeutic applications outside of insulin delivery. EOFlow has also misappropriated the Insulet Trade Secrets in furtherance of this effort as well, including the specific knowledge and know-how Insulet obtained through its efforts to bring the benefits of Omnipod to treat diseases outside of diabetes.

**ANSWER:** Denied.

93. On information and belief, EOFlow has imported samples of its infringing patch-pump product for the purpose of facilitating the transfer of technical information to Medtronic in anticipation of the acquisition of EOFlow by Medtronic.

**ANSWER:** Defendants admit that Medtronic received samples of the EOPatch 2 as a result of negotiations between EOFlow and Medtronic about a potential acquisition. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 93 of the SAC.

94. On information and belief, EOFlow has also disclosed at least some of the Insulet Trade Secrets to Insulet's United States-based and foreign competitors as part of EOFlow's efforts to sell the company.

**ANSWER:** Denied.

95. And in furtherance of these efforts, on December 27, 2022, EOFlow submitted an application under section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360(k), seeking FDA clearance of the EOFlow pump in the United States. EOFlow sought section 510(k) approval on the grounds that its product was "substantially similar" to Omnipod. On information and belief, EOFlow's submission copied extensively from Insulet's intellectual property.

**ANSWER:** Defendants admit that, on December 27, 2022, EOFlow submitted a § 510(k) application for FDA approval of the EOPatch 2. Defendants also admit that the FDA requires that a device be deemed "substantially equivalent" to a legally marketed device in order to approve its § 510(k) submission. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 95 of the SAC.

### G. Unable to Bring its Own Patch Pump to Market, Medtronic Attempted to Acquire EOFlow and the Fruits of Its Misappropriation and Infringement for $738 Million

96. On May 25, 2023, EOFlow and Medtronic plc announced that they entered into a set of definitive agreements for Medtronic to acquire EOFlow for $738 million.

**ANSWER:** Admitted.

97. Shortly after Medtronic announced its agreement to acquire EOFlow, Medtronic CEO Geoff Martha appeared in an interview with CNBC Anchor Jon Fortt and discussed the significance of EOFlow to Medtronic. Among other things, Mr. Martha stressed the importance of the patch market as the most rapidly growing segment of the insulin pump market, and that the acquisition of EOFlow would significantly speed up Medtronic's market entry into the patch pump market and make Medtronic the second player (other than Insulet) on the market. Mr. Martha also noted that EOFlow accomplished something that others (other than Insulet) have tried and failed to do—manufacture a patch pump efficiently at scale. Mr. Martha remarked that the manufacturing capabilities for patch pumps is very difficult and that several companies have failed, but that EOFlow

has succeeded by pulling in product design engineers and manufacturing engineers to manufacture a patch pump at scale. Mr. Martha also discussed the fact that Medtronic has been working both internally and through acquisitions to develop a patch pump, but the only one to emerge from such efforts was EOFlow.

**ANSWER:** Defendants admit that Geoff Martha, CEO of Medtronic plc, appeared in an interview with Jon Fortt on May 25, 2023 and that Martha discussed Medtronic's announcement released on the same day of its agreement to acquire EOFlow. To the extent Paragraph 97 of the SAC purports to characterize the contents of the interview, a recording of the interview is available at https://bit.ly/49HYgTa and speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 97.

98. As Mr. Martha indicated during the interview with Jon Fortt, not only did Medtronic's internal efforts to develop a patch pump fail to yield a commercial product, but its previous acquisition efforts have also failed. For example, Medtronic was reportedly in advanced negotiations to acquire an Israeli medical device company called Triple Jump, that is (or was) developing an insulin patch pump, for $300 million in October 2021. Medtronic has not capitalized on any such investments with any commercialized patch pump technology.

**ANSWER:** Defendants admit that Geoff Martha, CEO of Medtronic plc, appeared in an interview with Jon Fortt on May 25, 2023 and that Martha discussed Medtronic's announcement released on the same day of its agreement to acquire EOFlow. To the extent Paragraph 98 of the SAC purports to characterize the contents of the interview, a recording of the interview is available at https://bit.ly/49HYgTa and speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 98.

99. At Medtronic's American Diabetes Association (ADA) Analyst and Investor Briefing on June 25, 2023, Que Dallara, Medtronic's Executive Vice President and President, Diabetes, reiterated Mr. Martha's excitement over EOFlow's manufacturing capabilities: "***One of the reasons we were very excited by EOFlow is their manufacturing, and how much progress they've made on it***, so we don't intend to change the form factor [of the EOFlow product] ***[T]he manufacturing is one of the biggest challenges with getting a patch up to market***. You got to make a device that is super accurate to dose insulin [EOFlow brings] a lot of assets in that regard." (emphasis added).

**ANSWER:** Defendants admit that Medtronic held an Analyst and Investor Briefing at the American Diabetes Association 83rd Scientific Sessions on June 25, 2023. To the extent Paragraph

99 of the SAC purports to characterize the contents of the presentation, a recording of the presentation is available at https://bit.ly/3STUT4L and speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 99.

100. On information and belief, the agreements that EOFlow and Medtronic entered into included a Joint Development Agreement pursuant to which EOFlow would and did transfer its purported intellectual property—what was in fact the Insulet Trade Secrets and other intellectual property derived from the same—to Medtronic for the purposes of developing a Medtronic- branded patch-pump using the laundered Insulet Trade Secrets. On information and belief, the technology transfer associated with this Joint Development Agreement commenced even prior to the completion of the acquisition. The extent of the scope of any disclosure of the Insulet Trade Secrets to Medtronic through this Joint Development Agreement is the subject of ongoing investigation.

**ANSWER:** Defendants admit that Defendant EOFlow entered into a Joint Development Agreement with Medtronic on May 25, 2023 for the development of an insulin patch pump and that EOFlow shared technical information about the EOPatch with Medtronic. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 100 of the SAC.

101. In furtherance of this transition to a joint-development effort, EOFlow surreptitiously withdrew its own 510(k) application shortly after the Medtronic acquisition agreement was announced.

**ANSWER:** Defendants admit that EOFlow withdrew its § 510(k) application from FDA consideration. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 101 of the SAC.

### H. Insulet Brings This Lawsuit to Restrain the Further Dissemination of the Insulet Trade Secrets and Medtronic Terminates the EOFlow Acquisition

102. Insulet filed this lawsuit on August 3, 2023, seeking, inter alia, a temporary restraining order and preliminary injunction restraining EOFlow's misappropriation of the Insulet Trade Secrets.

**ANSWER:** Defendants admit that Insulet filed a complaint on August 3, 2023. Defendants also admit that Insulet subsequently filed Insulet's Motion for Temporary Restraining Order and Preliminary Injunction and Request for Expedited Brief on August 18, 2023. To the extent a response

is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 102 of the SAC.

103. On August 29, 2023, the Court issued a Temporary Restraining Order restraining EOFlow "from further disclosing product or manufacturing technical information related to the EOPatch or Omnipod products." The Court also issued an Order granting Insulet's request to take expedited discovery from EOFlow related to its purported development of the EOPatch.

**ANSWER:** Defendants admit that the Court issued the orders reflected in ECF Nos. 62 and 63. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 103 of the SAC.

104. The information Insulet uncovered during three weeks of limited, expedited discovery revealed extensive evidence that Defendants knowingly and purposefully soliciting, acquiring, and/or exploiting the Insulet Trade Secrets.

**ANSWER:** Denied.

105. On October 24, 2023, after having had the opportunity to present some of this evidence to the Court, the Court issued a Preliminary Injunction restraining EOFlow from "manufacturing, marketing, or selling any product that was designed, developed, or manufactured, in whole or in part, using or relying on" Insulet's trade secrets. The Preliminary Injunction also restrained EOFlow from disclosing Insulet's trade secrets to any third party. The Preliminary Injunction contained minor carve-outs allowing EOFlow to sell the EOPatch to existing users in the Republic of Korea and the European Union for a limited time period. The Court's Preliminary Injunction expressly also restrained EOFlow's officers, agents, servants, employees, and attorneys as well as any other persons in active concert or participation with the same.

**ANSWER:** Defendants admit that the Court issued the order reflected in ECF No. 158. To the extent Paragraph 105 of the SAC purports to characterize the contents of the order, the document speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 105.

106. On December 6, 2023, Medtronic publicly announced that "based upon multiple breaches" of its agreement with EOFlow, it had "exercised its right to terminate" the acquisition. Exhibit D.

**ANSWER:** Defendants admit that Medtronic filed a Form 8-K with the Securities and Exchange Commission on December 6, 2023 and that this document contains the quoted language. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 106 of the SAC.

### I. The Medtronic Deal Purportedly Terminated, EOFlow Resumes the Search for a Suitor, Suggests Continued Misappropriation and Disclosure of the Insulet Trade Secrets

107. During a December 11, 2023 Investor Presentation, Jesse Kim publicly announced to investors the termination of the Medtronic tender offer. *See* Exhibit E; Exhibit F. However, notwithstanding the Court's Preliminary Injunction, Kim repeatedly made clear to investors that EOFlow's efforts to capitalize on the Insulet Trade Secrets would continue unabated. Kim's statements were widely reported. *See* Exhibit G; Exhibit H.

**ANSWER:** Defendants admit that, on December 11, 2023, Defendant Kim held a public presentation with EOFlow investors and that he discussed the termination of EOFlow's agreements with Medtronic. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 107 of the SAC.

108. Indeed, Kim stated that, notwithstanding the termination, there was keen interest on both sides of the EOFlow-Medtronic deal to still make that deal happen, stating that that the termination "does not mean that we have lost interest in one another" and that "in fact we are mutually still very much interested in the deal. We are interested in Medtronic. Medtronic is very much interested in EOFlow." Exhibit E at 3:20–4:1.

**ANSWER:** Defendants admit that the text in Exhibit E to the SAC corresponding to the 3:20–4:1 entries appears accurately set forth in Paragraph 108 of the SAC. To the extent Paragraph 108 purports to characterize the contents of Exhibit E, the document speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 108.

109. Kim also stated that EOFlow had options outside of Medtronic that it would be pursuing, remarking that even before EOFlow had a deal with Medtronic, EOFlow "had at least three companies in dialogue with us" and that "we know that the market is still interested in acquiring a company like ours." Exhibit E at 16:13–16.

**ANSWER:** Defendants admit that the text in Exhibit E to the SAC corresponding to the 16:13–16 entries appears accurately set forth in Paragraph 109 of the SAC. To the extent Paragraph 109 purports to characterize the contents of Exhibit E, the document speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 109.

110. Kim also emphasized that, notwithstanding the Preliminary Injunction, EOFlow would be pursuing ventures across the globe to bring its patch-pump to various markets. Kim primarily emphasized a joint venture between EOFlow and Changsha Sinocare, called Sinoflow. Exhibit E at 13:10–11. EOFlow has previously publicly reported that Sinoflow would manufacture and distribute the EOPatch in China. Exhibit I. In the December 11, 2023 Investor Presentation, Kim reported that EOFlow's efforts to bring a patch-pump product to China was proceeding "irrespective of the preliminary injunction", Exhibit F at 9 (38:37), and that it would "make an application for product approval in China soon." *Id.* Kim also suggested that the product being brought to market in China would be built on a manufacturing line developed with the benefit of the Insulet Trade Secrets. *Id.*

**ANSWER:** Defendants admit that the text in Exhibit F to the SAC corresponding to the 38:37 entry appears accurately set forth in Paragraph 110 of the SAC. To the extent Paragraph 110 purports to characterize the contents of Exhibits E, F and I, the documents speak for themselves. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 110.

111. Kim also dismissed concerns about the Company's finances, stating "we are still okay, and we should be able to recapitalize ourselves fairly easily." Exhibit E at 10:20–21.

**ANSWER:** Defendants admit that the text in Exhibit E to the SAC corresponding to the 10:20–21 entries appears accurately set forth in Paragraph 111 of the SAC. To the extent Paragraph 111 purports to characterize the contents of Exhibit E, the document speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 111.

112. On information and belief, in contravention of the Court's Preliminary Injunction, EOFlow continues to market, promote, and sell EOPatch 2 to new customers in Korea.

**ANSWER:** Denied.

**COUNT I (AGAINST ALL DEFENDANTS):**
**MISAPPROPRIATION OF TRADE SECRETS**
**UNDER THE DEFEND TRADE SECRETS ACT (DTSA)**
**(18 U.S.C. § 1836 et seq.)**

113. Insulet incorporates the preceding paragraphs 1–112 of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein.

114. Each of the Defendants has committed trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.

**ANSWER:** Denied.

115. Insulet, through years of investments and development work, developed the Insulet Trade Secrets, described in detail, *supra* §§ V.A, V.B.

**ANSWER:** Insulet's use of the term "Trade Secrets" is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegation. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 115 of the SAC.

116. All of the Insulet Trade Secrets derive economic value from their secrecy.

**ANSWER:** Denied.

117. Insulet employs the Insulet Trade Secrets for commercial use in interstate commerce.

**ANSWER:** Denied.

118. Insulet has and continues to take reasonable measures to protect the confidentiality of the Insulet Trade Secrets, including, through requiring employees and consultants to sign confidentiality agreements, employing physical security, encryption and the other measures described *supra* § V.B.

**ANSWER:** Denied.

119. Malave, DiIanni, and Welsford owed and continue to owe confidentiality obligations to Insulet, both by contract and operation of law, not to use or disclose the Insulet Trade Secrets, other than for the benefit of Insulet.

**ANSWER:** The allegations in Paragraph 119 of the SAC solely involve Defendants Malave, DiIanni, and Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

120. Malave, DiIanni, and Welsford all had, and on information and belief, still have access to the Insulet Trade Secrets.

**ANSWER:** The allegations in Paragraph 120 of the SAC solely involve Defendants Malave, DiIanni, and Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

121. All Defendants, through improper means, wrongfully obtained, disclosed, and used the Insulet Trade Secrets for the benefit of EOFlow, namely in order to develop the EOPatch device.

**ANSWER:** Denied.

122. At the direction of Kim and EOFlow, Malave, DiIanni, and Welsford disclosed and sold the Insulet Trade Secrets to EOFlow as part of a joint enterprise to profit off of EOFlow's clone product, the EOPatch.

**ANSWER:** Denied.

123. At the direction of Kim and EOFlow, EOFlow Inc., Nephria Bio, and other EOFlow proxy entities, agents, and affiliates impermissibly acquired and accessed, and continue to impermissibly access the Insulet Trade Secrets as part of EOFlow's efforts to commercialize the EOPatch in the United States and abroad and otherwise monetize the Insulet Trade Secrets.

**ANSWER:** Denied.

124. The EOPatch device has been and will be used in foreign and interstate commerce.

**ANSWER:** Paragraph 124 of the SAC asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

125. EOFlow and Nephria Bio received and misused the Insulet Trade Secrets knowing or having reason to know that Malave, DiIanni, and Welsford conveyed them and used them through improper means, and in violation of legal obligations owed to Insulet.

**ANSWER:** Denied.

126. All Defendants misappropriated the Insulet Trade Secrets willfully and maliciously.

**ANSWER:** Denied.

127. All Defendants continue to misappropriate and improperly disclose the Insulet Trade Secrets willfully and maliciously.

**ANSWER:** Denied.

128. Insulet is being irreparably harmed by the Defendants' ongoing misappropriation, in addition to pecuniary harm it has suffered.

**ANSWER:** Denied.

129. EOFlow improperly used the Insulet Trade Secrets to apply for regulatory approval for the EOPatch in the United States and abroad.

**ANSWER:** Denied.

130. EOFlow improperly used the Insulet Trade Secrets to apply for patents in the United States and abroad based on disclosures comprising the Insulet Trade Secrets. These disclosures irreparably harm Insulet and Insulet has no adequate remedy at law.

**ANSWER:** Denied.

131. For years, Defendants concealed their misappropriation of Insulet's trade secrets. The EOPatch device itself was unavailable to Insulet until very recently. Although EOFlow reportedly made the EOPatch device available to users in Korea by April 2021, on information and belief, access to the EOPatch device was limited, with only a few hundred patients using the device as of December 2022. In addition, EOFlow did not begin expanding its market reach outside of Korea until late 2022. As a result, Insulet did not discover Defendants' misappropriation of the Insulet Trade Secrets until 2023, when Insulet was able to obtain a sample EOPatch product that was distributed at a trade show in Berlin, Germany during the last week of January. Analysis of that sample revealed, for the first time, that practically all aspects of the EOFlow product was substantially similar to the Omnipod.

**ANSWER:** Denied.

132. As set forth throughout this Complaint, acts in furtherance of this offense were committed in the United States.

**ANSWER:** Denied.

**COUNT II (AGAINST EOFLOW LTD.):**
**INFRINGEMENT OF THE '741 PATENT**
**(35 U.S.C. § 271)**

133. Insulet incorporates the preceding paragraphs 1–132 of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein.

134. Defendant EOFlow has imported into the U.S. and offered to sell a fluid pump device that infringes the ’741 Patent. Specifically, EOFlow imported at least one sample of the EOPatch device for display at the 2018 ADA Meeting.

**ANSWER:** Defendants admit that EOFlow attended the 2018 ADA Meeting and had at least one sample of the EOPatch on display. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 134 of the SAC.

135. As evidenced in the sample of the EOPatch device obtained by Insulet in 2023 and the corresponding product manual, attached hereto as Exhibit J, the EOPatch is a fluid delivery device that (1) includes a fluid reservoir; (2) a drive mechanism for driving fluid from the fluid reservoir; (3) a plunger within the fluid reservoir; (4) a drive rod extending from the plunger; (5) a nut threadedly engaged with the driving rod; (6) a drive wheel; and (7) a clutch mechanism coupled to the drive wheel and configured to allow the nut to pass through the clutch mechanism when disengaged, and to grip the nut when engaged such that the drive wheel rotates the nut to bias the drive rod and the plunger within the fluid reservoir. An illustrative claim chart identifying the features of the EOPatch corresponding to the elements of claim 11 of the ’741 Patent is attached hereto as Exhibit K.

**ANSWER:** Defendants admit that Exhibit J attached to the SAC purports to be a copy of the manual for the EOPatch. To the extent Paragraph 135 of the SAC purports to characterize the contents of Exhibit J, the document speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 135.

136. EOFlow knew or should have known of its infringement of the ’741 Patent. Defendant DiIanni is the first-named inventor of the ’741 Patent and EOFlow was on notice of the ’741 Patent and its contents through its work with Malave, DiIanni, and Welsford in their collective efforts to design and develop the infringing EOPatch device. In addition, the patent was listed on Insulet’s patent marking website for the Omnipod device.

**ANSWER:** Defendants admit that Defendant DiIanni is a named inventor on the ’741 Patent. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 136 of the SAC.

137. Defendants’ infringement of the ’741 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys’ fees and costs pursuant to 35 U.S.C. §§ 284–285.

**ANSWER:** Paragraph 137 of the SAC asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

138. As a result of EOFlow's infringement of the '741 Patent, Insulet has suffered and will suffer irreparable harm, in addition to monetary damages.

**ANSWER:** Denied.

**COUNT III (AGAINST EOFLOW LTD.):**
**INFRINGEMENT OF THE '883 PATENT**
**(35 U.S.C. § 271)**

139. Insulet incorporates the preceding paragraphs 1–138 of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein.

140. Defendant EOFlow has imported and offered to sell a fluid pump device that infringes the '883 Patent. Specifically, EOFlow imported into the United States at least one sample of the EOPatch device for display at the 2018 ADA Meeting.

**ANSWER:** Defendants admit that EOFlow attended the 2018 ADA Meeting and had at least one sample of the EOPatch on display. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 140 of the SAC.

141. As evidenced in the sample of the EOPatch device obtained by Insulet in 2023 and the corresponding product manual, attached hereto as Exhibit J, the EOPatch is a fluid delivery device that (1) includes a fluid reservoir; (2) a transcutaneous access tool fluidly coupled to the fluid reservoir; (3) a drive mechanism for driving fluid from the fluid reservoir; (4) an elongated assembly comprising a first elongated member and a second elongated member; (5) a drive wheel; and (6) a clutch mechanism coupled to the drive wheel and configured to allow the nut to pass through the clutch mechanism when disengaged, and to grip the nut when engaged such that the drive wheel rotates the nut to bias the drive rod and the plunger within the fluid reservoir. An illustrative claim chart identifying the features of the EOFlow Pump corresponding to the elements of claim 1 of the '883 Patent is attached hereto as Exhibit L.

**ANSWER:** Defendants admit that Exhibit J attached to the SAC purports to be a copy of the manual for the EOPatch. To the extent Paragraph 141 of the SAC purports to characterize the contents of Exhibit J, the document speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 141.

142. EOFlow knew or should have known of its infringement of the ’883 Patent. Defendant DiIanni is the first-named inventor of the ’883 Patent and EOFlow was on notice of the ’883 Patent and its contents through its work with Malave, DiIanni, and Welsford in their collective efforts to design and develop the infringing EOPatch device. In addition, the patent was listed on Insulet’s patent marking website for the Omnipod device.

**ANSWER:** Defendants admit that Defendant DiIanni is a named inventor on the ’883 Patent. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 142 of the SAC.

143. Defendants’ infringement of the ’883 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys’ fees and costs pursuant to 35 U.S.C. §§ 284–285.

**ANSWER:** Paragraph 143 of the SAC asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

144. As a result of EOFlow’s infringement of the ’883 Patent, Insulet has suffered and will suffer irreparable harm, in addition to monetary damages.

**ANSWER:** Denied.

**COUNT IV (AGAINST EOFLOW LTD.):**
**INFRINGEMENT OF THE ’950 PATENT**
**(35 U.S.C. § 271)**

145. Insulet incorporates the preceding paragraphs 1–144 of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein.

146. Defendant EOFlow has imported and offered to sell a fluid pump device that infringes the ’950 Patent. Specifically, EOFlow imported into the United States at least one sample of the EOPatch device for display at the 2018 ADA Meeting.

**ANSWER:** Defendants admit that EOFlow attended the 2018 ADA Meeting and had at least one sample of the EOPatch on display. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 146 of the SAC.

147. As evidenced in the sample of the EOPatch device obtained by Insulet in 2023 and the corresponding product manual, attached hereto as Exhibit J, the EOFlow product is a fluid

delivery device that (1) includes a fluid reservoir; (2) transcutaneous access tool fluidly coupled to the fluid reservoir; (3) a drive mechanism for driving fluid from the fluid reservoir; (4) a plunger within the fluid reservoir; (5) a leadscrew extending from the plunger; (6) a nut threadably engaged with the leadscrew; and (7) a drive wheel operable with a clutch mechanism coupled to the drive wheel and configured to allow the nut to pass through the clutch mechanism when disengaged and to grip the nut when engaged such that the drive wheel rotates the nut to advance the leadscrew and the plunger into the reservoir. An illustrative claim chart identifying the features of the EOPatch corresponding to the elements of claim 1 of the ’950 Patent is attached hereto as Exhibit M.

**ANSWER:** Defendants admit that Exhibit J attached to the SAC purports to be a copy of the manual for the EOPatch. To the extent Paragraph 147 of the SAC purports to characterize the contents of Exhibit J, the document speaks for itself. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 147.

148. EOFlow knew or should have known of its infringement of the ’950 Patent. Defendant DiIanni is the first-named inventor of the ’950 Patent and EOFlow was on notice of the ’950 Patent and its contents through its work with Malave, DiIanni, and Welsford in their collective efforts to design and develop the infringing EOPatch device. In addition, the patent was listed on Insulet’s patent marking website for the Omnipod device.

**ANSWER:** Defendants admit that Defendant DiIanni is a named inventor on the ’950 Patent. To the extent a response is required, and except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 148 of the SAC.

149. Defendants’ infringement of the ’950 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys’ fees and costs pursuant to 35 U.S.C. §§ 284–285.

**ANSWER:** Paragraph 149 of the SAC asserts legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations therein.

150. As a result of EOFlow’s infringement of the ’950 Patent, Insulet has suffered and will suffer irreparable harm, in addition to monetary damages.

**ANSWER:** Denied.

**COUNT V (AGAINST ALL DEFENDANTS):**
**UNFAIR COMPETITION AND UNFAIR OR DECEPTIVE ACTS IN CONDUCT OF TRADE OR COMMERCE**
**(Mass. G.L. ch. 93A, § 11)**

151. Insulet incorporates the preceding paragraphs 1–150 of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein.

152. All Defendants are, in various ways, engaged in trade or commerce for purposes of Mass. G.L. ch. 93A, § 11. EOFlow is engaged in trade or commerce by virtue of its bringing to market, and sale of, patch-pump products across the globe. Nephria Bio is engaged in trade or commerce also through its efforts to develop and market medical devices, including patch-pump devices. In addition, Nephria Bio is engaged in trade or commerce by offering "consulting services" to EOFlow that were, in effect, operations to launder the Insulet Trade Secrets. Malave, Kim, and Welsford are engaged in trade or commerce by virtue of their role as principals of EOFlow Co., Ltd., EOFlow, Inc., Nephria Bio, Inc., and other proxy entities, agents, and affiliates operated by EOFlow and/or Jesse Kim and as officers of these entities acting within the scope of their employment. DiIanni is engaged in trade or commerce by virtue of his consultancy business, Coral C Ventures LLC. Namely, on information and belief, DiIanni has sold his services—which include the disclosure of Insulet confidential information—not only to EOFlow-associated enterprises, but to other medical device businesses. DiIanni has done so in furtherance of his own business interests as independent consultants in the medical-device industry.

**ANSWER:** Denied.

153. Defendants' misappropriation of Insulet's intellectual property—including its trade secrets, patents, and other confidential information—constitutes an unfair method of competition and an unfair or deceptive act or practice declared unlawful by Mass. G.L. ch. 93A, § 2.

**ANSWER:** Denied.

154. For the reasons set forth below, the thrust of Defendants' conduct in violation of Mass. G.L. ch. 93A took place primarily and substantially in Massachusetts.

a. As every Defendant is aware, Insulet's world headquarters and principal operations are, and always have been, located in Massachusetts.

b. Indeed, Malave, Welsford, DiIanni, and others who conspired with EOFlow and Nephria Bio all worked for Insulet in Massachusetts and were involved in the generation of the Insulet Trade Secrets in Massachusetts.

c. Insulet's misappropriated trade secrets were likewise physically located in Massachusetts at the time they were created and when they were stolen.

d. On information and belief, EOFlow established an office in Amesbury, Massachusetts where it engaged in misappropriation of the Insulet Trade Secrets;

e. Malave, Welsford, DiIanni, and others recruited by EOFlow and Nephria Bio stole the Insulet Trade Secrets from Insulet in Massachusetts.

f. The harm to Insulet and Insulet's employees arising out of Defendants' tortious conduct will be felt principally in Massachusetts.

g. At all times relevant to the tortious conduct alleged herein, including the tortious conspiracy, DiIanni and others recruited by EOFlow and Nephria Bio operated out of Massachusetts.

h. On information and belief, Welsford and other Nephria Bio employees travelled frequently to Massachusetts for the purposes of furthering the broader scheme of misappropriating the Insulet Trade Secrets.

i. Knowing that DiIanni and others resided in and were citizens of Massachusetts, Kim, Welsford, and Malave actively recruited DiIanni and others in Massachusetts to join in their collective efforts to misappropriate the Insulet Trade Secrets.

j. DiIanni and others then became key participants in the broader conspiracy, through acts taken principally and substantially in Massachusetts, and facilitated Kim, Welsford's, Nephria Bio, and EOFlow's misappropriation through their Massachusetts-based businesses including, in the case of DiIanni, Coral C Ventures LLC.

k. DiIanni and others used DiIanni's Amesbury, Massachusetts, lab and another lab in Billerica, Massachusetts, to assist Kim, EOFlow, and Nephria Bio in their broader scheme to misappropriate the Insulet Trade Secrets. Kim, EOFlow, and Neprhia Bio knew that DiIanni and others were using these Massachusetts-based labs as part of this effort.

l. Throughout this joint enterprise, Kim, Nephria Bio, and EOFlow maintained close communication with DiIanni and other Massachusetts citizens as they assisted Kim, Nephria Bio, and EOFlow in their efforts to misappropriate the Insulet Trade Secrets. For example, during the relevant period DiIanni had hundreds of communications with Kim, Welsford, Malave, and EOFlow's Chief Science Officer, Dr. Jonathan Woo. For practically all of these communications, Kim, Welsford, Malave, Woo, Nephria Bio and EOFlow knew that DiIanni and others were participating in the conversation and the broader joint effort to misappropriate the Insulet Trade Secrets from Massachusetts.

m. In return for DiIanni and others' assistance, Kim, Welsford, Nephria Bio, and EOFlow directed payments to DiIanni and others in Massachusetts. These payments were made pursuant to contractual agreements that DiIanni and others entered into with EOFlow and Nephria Bio in Massachusetts. Those contracts expressly acknowledge that DiIanni and others, and their respective businesses, were operating from within Massachusetts.

n. Kim and EOFlow have established a Massachusetts-based proxy entity, Ferrex Therapeutics, Inc., as part of their tortious conspiracy to monetize the Insulet Trade Secrets. While Ferrex Therapeutics is, on paper, a separate legal entity, it operates in all respects as an arm of Jesse Kim and EOFlow. Jesse Kim and EOFlow not only own a majority share of Ferrex, but Jesse Kim serves as the President, Treasurer, Secretary, Vice President, and Director of the Corporation, and shares office space with other EOFlow entities. Ferrex's publicly disclosed business model is to deploy the EOPatch hardware in the treatment of diseases other than diabetes. Thus, Kim and EOFlow are using Massachusetts-based Ferrex to monetize the Insulet Trade Secrets in furtherance of their broader tortious conspiracy.

**ANSWER:** Denied.

155. The Defendants' conduct in misappropriating and/or infringing Insulet's intellectual property was undertaken willfully and knowingly thereby also entitling Insulet to an award of up to treble damages.

**ANSWER:** Denied.

156. As a result of Defendants' unfair competition in violation of Mass. G.L. ch. 93A, § 2, Insulet has suffered and will suffer irreparable harm, in addition to monetary damages.

**ANSWER:** Denied.

**COUNT VI (AGAINST ALL DEFENDANTS):**
**CIVIL CONSPIRACY**

157. Insulet incorporates the preceding paragraphs 1–156 of this Complaint as if fully set forth herein.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein.

158. Defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc.; Kim, Malave; DiIanni; and Welsford had a common plan, design, and agreement to engage in the misappropriation of Insulet's Trade Secrets in violation of DTSA.

**ANSWER:** Denied.

159. Defendants acted to encourage the achievement of the conspiracy's objective: to misappropriate, copy, disclose, and use the Insulet Trade Secrets for the benefit of EOFlow. Namely, the Defendants supported the broader conspiracy in two ways:

a. Each of the Defendants acted in concert in furtherance of the broader scheme to misappropriate the Insulet Trade Secrets. More specifically, each of the Defendants agreed to work together in a joint effort to misappropriate the Insulet Trade Secrets in a concerted effort to bring to market the EOPatch.

b. Each of the Defendants provided substantial assistance to EOFlow in EOFlow's efforts to tortiously misappropriate the Insulet Trade Secrets. More specifically, each of the Defendants gave substantial assistance or encouragement to EOFlow's tortious activities. The Defendants' assistance, moreover, played a substantial factor in the tortious injury that Insulet suffered and continues to suffer as a result of EOFlow's misappropriation. And the Defendants provided this assistance with full knowledge that EOFlow was engaging in tortious conduct and with the unlawful intent to substantially assist or encourage that conduct.

**ANSWER:** Denied.

160. As described throughout this Complaint, this tortious scheme reached beyond the persons and entities named as Defendants in this Complaint and included others including but not limited to Coral C Ventures LLC; Pharmeo, Inc.; Ferrex Therapeutics, Inc.; and SanPlena LLC.

**ANSWER:** Denied.

161. At all relevant times, although Welsford, Nephria Bio and DiIanni sometimes acted as agents of EOFlow, all entered into the alleged tortious conspiracy for their own economic interests.

**ANSWER:** The allegations in Paragraph 161 of the SAC solely involve Defendants Malave, DiIanni, and Welsford. Defendants lack information sufficient to form a belief as to the truth of these allegations and therefore deny them.

162. As a result of Defendants' tortious conspiracy, Insulet has suffered and will continue to suffer irreparable harm, in addition to monetary damages.

**ANSWER:** Denied.

**PRAYER FOR RELIEF**

WHEREFORE, Insulet respectfully demands judgment in its favor against Defendants as follows:

a) Award on Count I judgment to Plaintiff Insulet Corporation against all Defendants in the amount of actual damages, a reasonable royalty, exemplary damages up to two times the amount of the damages for willful and malicious appropriation, plus reasonable attorneys' fees and costs, plus unjust enrichment caused by Defendants' misappropriation of Insulet's trade secrets to the extent that it is not addressed in computing damages for actual loss, with all categories calculated based on Defendants' domestic and extraterritorial conduct, as provided under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B) and 18 U.S.C. § 1837;

b) Award on Count II judgment to Plaintiff Insulet Corporation against EOFlow Ltd., that EOFlow Ltd. has imported into the U.S. and offered to sell a fluid pump device that infringes the '741 Patent and awarding damages in the amount of actual damages, lost profits and/or a reasonable royalty and judgment that EOFlow Ltd.'s infringement of the '741 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees and costs pursuant to 35 U.S.C. §§ 284–285.

c) Award on Count III judgment to Plaintiff Insulet Corporation against EOFlow Ltd., that EOFlow Ltd. has imported into the U.S. and offered to sell a fluid pump device that infringes the '883 Patent and awarding damages in the amount of actual damages, lost profits and/or a reasonable royalty and judgment that EOFlow Ltd.'s infringement of the '883 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees and costs pursuant to 35 U.S.C. §§ 284–285.

d) Award on Count IV judgment to Plaintiff Insulet Corporation against EOFlow Ltd., that EOFlow Ltd. has imported into the U.S. and offered to sell a fluid pump device that infringes the '950 Patent and awarding damages in the amount of actual damages, lost profits and/or a reasonable royalty and judgment that EOFlow Ltd.'s infringement of the '950 Patent has been and continues to be deliberate and willful, and this is therefore an exceptional case warranting an award of enhanced damages and attorneys' fees and costs pursuant to 35 U.S.C. §§ 284–285.

e) Award on Count V judgment to Plaintiff Insulet Corporation against all Defendants in the amount of actual damages, punitive damages in the amount of triple the amount of actual damages for willful or knowing unfair or deceptive conduct, plus full attorneys' fees and costs, and award full punitive damages individually and separately against each and every Defendant;

f) Award on Count VI judgment to Plaintiff Insulet Corporation against all Defendants;

g) Preliminarily and permanently enjoin all Defendants from marketing and selling any products containing, incorporating, or derived from Insulet's confidential and trade secret information and from using, copying, retaining, or further disclosing any of Insulet's confidential trade secret information;

h) Order Defendants to deliver to Insulet for destruction at Defendants' expense all products containing, incorporating, or derived from Insulet's confidential and trade secret information;

i) Order Defendants to return all confidential and trade secret information to Insulet and confirm in writing, verified under the pains and penalties of perjury, that all copies have been destroyed, and outline with specificity exactly what actions were taken by Defendants to ensure the return and destruction of such information, including identifying the files where all such information was located and the custodian of such files;

j) Order an accounting of all sales of Defendants' products incorporating, using, or derived from Insulet's confidential and trade secret information;

k) Order a constructive trust in favor of Insulet and/or reassignment of pending patent applications, and any and all related applications that have been filed or will be filed, which used or were derived from Insulet's Confidential and Trade Secret information;

l) Enjoin Defendants from further prosecution of patent applications of which Insulet is the rightful owner and/or which contain Insulet proprietary information, except as necessary to ensure that such applications are rightfully placed into the possession of Insulet, as Insulet may elect;

m) Preliminarily and permanently enjoin EOFlow Ltd., from making, using or selling in the United States products that infringe U.S. Patent Nos. 11,229,741; 10,420,883; and 9,402,950;

n) Awarding Insulet pre- and post-judgment interest the statutory rate of 12%, Mass. G.L. ch. 231, or the maximum rate allowable by law; and

o) All other relief that the Court deems just and proper.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein. The paragraphs setting forth Plaintiff's prayer for relief do not contain any allegations, and thus no response is required. To the extent a response is required, Defendants deny the allegations therein. Defendants further deny that the allegations have any merit or that Plaintiff is entitled to any relief.

**DEMAND FOR JURY TRIAL**

Plaintiff Insulet respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

**ANSWER:** Defendants incorporate by reference all preceding paragraphs of this Answer as if fully set forth herein. The paragraphs setting forth Plaintiff's demand for jury trial do not contain any allegations, and thus no response is required. To the extent a response is required, Defendants deny the allegations therein.

## DEFENDANTS' AFFIRMATIVE DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(c), and without altering any applicable burdens of proof, Defendants assert the following defenses to the SAC:

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

1. Insulet has failed to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Equitable Defenses)

2. Insulet's claims are barred, in whole or in part, by the equitable doctrines of acquiescence, laches, equitable estoppel, waiver, and/or unclean hands. To the extent Insulet claims to own rights to technology independently developed by Defendants or that Defendants have allegedly been infringing Insulet's purported intellectual property rights, Insulet has known of these claims and engaged in conduct inconsistent with those rights and/or inexcusably delayed in asserting such rights to the prejudice of Defendants, with such prejudice including without limitation the significant investment Defendant EOFlow has made in developing its proprietary technology. Permitting Insulet to pursue its claims would cause significant undue harm to Defendants.

### THIRD AFFIRMATIVE DEFENSE
### (No Trade Secrets)

3. Insulet's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, are barred, in whole or in part, because the information at issue does not constitute legally protected trade secrets.

### FOURTH AFFIRMATIVE DEFENSE
### (Failure to Identify Trade Secrets with Reasonable Particularity)

4. Insulet's claims are barred, in whole or in part, because Insulet has not identified the trade secrets with reasonable particularity.

**FIFTH AFFIRMATIVE DEFENSE**
**(No Reasonable Steps to Maintain Secrecy)**

5. Insulet's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, are barred, in whole or in part, because Insulet did not take reasonable steps to maintain the secrecy of the information over which it claims trade secret protection.

**SIXTH AFFIRMATIVE DEFENSE**
**(Publicly Available)**

6. Insulet's claims are barred, in whole or in part, because the information at issue is publicly available.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Readily Ascertainable)**

7. Insulet's claims are barred, in whole or in part, because the information at issue was readily ascertainable by proper means.

**NINTH AFFIRMATIVE DEFENSE**
**(Reverse Engineered and/or Independently Developed)**

8. Insulet's claims are barred, in whole or in part, to the extent that EOFlow reverse engineered and/or independently developed the information at issue.

**TENTH AFFIRMATIVE DEFENSE**
**(Generally Known)**

9. Insulet's claims are barred, in whole or in part, because the information at issue is generally known.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(No Improper Means)**

10. Insulet's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, are barred, in whole or in part, because Defendants did not misappropriate any trade secrets of Insulet or acquire the alleged trade secrets by improper means.

**TWELFTH AFFIRMATIVE DEFENSE**
**(No Independent Economic Value)**

11. Insulet's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, are barred, in whole or in part, because the information at issue does not derive independent economic value from not being known to the public or to other persons who can obtain economic value from its disclosure or use.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(Lack of Intent)**

12. Insulet's claims are barred, in whole or in part, at least because Insulet has failed to show, and cannot show, that any misappropriation has been willful and/or knowing.

**FOURTEENTH AFFIRMATIVE DEFENSE**
**(Statute of Limitations)**

13. Insulet's claims are barred, in whole or in part, by the applicable statutes of limitations.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**(Non-Infringement)**

14. Defendants do not and have not infringed, directly or indirectly, either literally or under the doctrine of equivalents, any valid or enforceable claims of the Patents-in-Suit.

**SIXTEENTH AFFIRMATIVE DEFENSE**
**(No Willful Infringement)**

15. Insulet is not entitled to enhanced damages under 35 U.S.C. § 284, at least because Insulet has failed to show, and cannot show, that any infringement has been willful and/or knowing.

**SEVENTEENTH AFFIRMATIVE DEFENSE**
**(No Exceptional Case)**

16. Defendants' actions in defending this case, or otherwise, do not give rise to an exceptional case in Insulet's favor under 35 U.S.C. § 285.

**EIGHTEENTH AFFIRMATIVE DEFENSE**
**(No Damages)**

17. Insulet's claims for damages are barred, in whole or in part, because it has not suffered

harm and any claimed damages as a result of Defendants' activities alleged in the SAC are speculative and uncertain.

**NINETEENTH AFFIRMATIVE DEFENSE**
**(No Right to Injunctive Relief)**

18. Insulet is not entitled to injunctive relief at least because any alleged injury is not immediate or irreparable, and because Insulet has an adequate remedy at law for any alleged injury.

**TWENTIETH AFFIRMATIVE DEFENSE**
**(Unjust Enrichment)**

19. Insulet's claims are barred, in whole or in part, because any recovery by Insulet would constitute unjust enrichment.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**
**(No Entitlement to Requested Fees & Costs)**

20. Insulet's claims for attorneys' fees, treble damages, and other costs are prohibited by law.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**
**(Invalidity)**

21. One or more claims of the Patents-in-Suit are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. § 101, *et seq.*, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**
**(Limitation on Damages)**

22. Insulet's claims for damages and/or costs are barred, in whole or in part, under 35 U.S.C. §§ 286, 287, and/or 288.

**RESERVATION OF RIGHTS**

23. Defendants have insufficient knowledge or information upon which to form a belief as to whether it may have additional affirmative defenses and reserves the right to assert additional defenses if and as it learns of facts that may support such defenses.

**PRAYER FOR RELIEF**

**WHEREFORE,** Defendants respectfully request that the Second Amended Complaint be dismissed against Defendants with prejudice and that judgment be entered in favor of its favor and for such other and further relief as the Court deems just and proper.

**DEFENDANTS' DEMAND FOR JURY TRIAL**

Pursuant to the Federal Rule of Civil Procedure 38(b), Defendants demand a jury trial on all claims in Plaintiff's Second Amended Complaint that are so triable.

Dated: February 26, 2024

COOLEY LLP

*/s/ Lowell Mead*

Michael Sheetz (BBO #548776)
Adam S. Gershenson (BBO #671296)
Zachary Sisko (BBO #705883)
Kimberley A. Scimeca (BBO #780962)
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
(617) 937-2300
msheetz@cooley.com
agershenson@cooley.com
zsisko@cooley.com
kscimeca@cooley.com

Lowell Mead
4401 Eastgate Mall
San Diego, CA 92121
(858) 550-6453
lmead@cooley.com

Elizabeth M. Flanagan
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383
bflanagan@cooley.com

Dustin Knight
1299 Pennsylvania Ave, NW, Suite 700
Washington, DC 20004
(202) 842-7800
dknight@cooley.com

Alexandra Mayhugh
355 South Grand Avenue, Suite 900
Los Angeles, CA 90071
(213) 561-3250
amayhugh@cooley.com

*Attorneys for Defendants EOFlow Co., Ltd.; EOFlow, Inc.; and Jesse J. Kim*

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that on February 26, 2024 the foregoing Answer to Second Amended Complaint, filed through the ECF system, will be sent electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

*/s/ Lowell Mead*
Lowell Mead