UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INSULET CORPORATION,<br><br>         *Plaintiff*,<br>v.<br><br>EOFLOW CO., LTD.; *et al.*,<br><br>         *Defendants*. | No. 23-cv-11780-FDS<br>**LEAVE TO FILE<br>UNDER SEAL<br>GRANTED 9/19/2024** |

**JOINT STATUS REPORT AND AGENDA FOR SEPTEMBER 20, 2024
STATUS CONFERENCE**

The parties submit the joint agenda for the status conference scheduled for September 20, 2024.

**I. Deposition & Documents of Arthur Schick**

  **A. Defendants' Position**

At the last conference, the Court ordered production of documents relating to Insulet's Trade Secret Summary, including the consulting agreement between Insulet and Arthur Schick. Insulet has since produced only the consulting agreement and represented the rest of the documents ordered by the Court will be produced by the end of this week. The produced agreement already indicates that, far from an engagement limited to manufacturing trade secrets, Mr. Schick's work explicitly called for a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 1, Consulting Agreement at 8 (emphasis added) (attached to this report).

Defendants request leave to take a deposition of Mr. Schick to question him regarding the documents and his related work for three primary reasons:

1

***First,*** the consulting agreement contemplates Mr. Schick's cooperation with Insulet. █

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ Insulet's outside counsel represents Mr. Schick and has agreed to accept any subpoena on his behalf (while objecting to the subpoena). And Mr. Schick lives in in North Falmouth, within 100 miles of the Court. *See* Ex. 1 at 1.

***Second,*** the deposition would reveal relevant information at the core of this case regarding Insulet's asserted trade secrets. Mr. Schick was engaged to ████████████████ ████████████████████████████████████████████ *Id*. at 8 (emphasis added). ██████████████████████████████████████████████████████████████ ████████████████ *Id*. ████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████ *Id*.[1] Discovery to date has put front and center the dispositive issue of whether Insulet took "reasonable measures" to protect what it now asserts are trade secrets, and Mr. Schick's testimony on the issue is obviously relevant to that determination.

***Third,*** the consulting agreement alleviates or eliminates any significant privilege concerns in questioning Mr. Schick regarding the non-privileged documents Insulet is producing and related work. Mr. Schick's agreement makes no reference to any legal analysis, legal claims, or communications with lawyers. ████████████████████████████████████████ ██████████████████████████████████████████████████████ *Id*. at 3. He is outside

---

[1] These facts are new to Defendants. Mr. Anderson, Insulet's in-house lawyer previously claimed Mr. Schick was retained only for "an analysis and evaluation of some of Insulet's manufacturing-related trade secrets." Anderson Decl. ¶ 7 (ECF No. 385).

2

the ambit of a privilege claim. *See, e.g., Narayanan v. Sutherland Glob. Holdings Inc.*, 285 F. Supp. 3d 604, 618 (W.D.N.Y. 2018) (holding independent contractor retained "to consult with and assist with providing outsourced internal control assessment services" and "providing recommendations for improvements to internal controls at [defendant]" fell outside the ambit of privilege). Indeed, the contract only requires confidentiality for five years. Such a short period of time is incongruous for a privilege that "survives the death of a client." *Off. Comm. of Admin. Claimants v. Moran*, 802 F. Supp. 2d 947, 948 (N.D. Ill. 2011). Tellingly, the consulting agreement makes no mention of working with any lawyer or legal team. ███████████████████████████████

███████████████████████████ *Id*. at 7.

For these reasons, Defendants request leave to take Mr. Schick's crucial deposition.

Additionally, Plaintiff refuses to identify the scope of the search of documents for Mr. Schick, despite Defendants' request that it "not be a black box process." 9.12.24 Wray Email to A. Raince. Plaintiffs should be required to explain their process for collecting documents. Moreover, the collection should cover the scope of Mr. Schick's work: his entire scope of work is relevant, and also far larger than Insulet initially represented.

### B. Plaintiff's Position

As an initial matter, Defendants' deposition and production requests related to Mr. Schick are premature. Insulet is complying with the Court's September 4, 2024 order regarding production of Mr. Schick's documents. Insulet has already produced Mr. Schick's consulting agreement consistent with this Court's Order and intends to complete production of all responsive, non-privileged documents by the end of this week, as Defendants concede. Moreover, contrary to Defendants' assertions regarding the scope of Insulet's search, Insulet has disclosed the scope of its search of Mr. Schick's documents as all responsive "communications within the date range in

which he was working on the spreadsheet in question." Sept. 13, 2024 Email From A. Raince to J. Wray.

EOFlow's demand for a deposition of Mr. Schick and documents regarding the "entire scope" of Mr. Schick's work for Insulet *before* even taking the Court-ordered 30(b)(6) testimony and reviewing the relevant documents exemplifies the Court's concerns about "ever-expanding discovery." Sept. 4, 2024 Hearing Tr. 20:20–22. Defendants' broad requests are also contradictory to its previous position regarding the spreadsheet. Defendants previously represented that they sought "the small number of relevant emails and documents from Mr. Andersen and [the] select group of individuals" who provided edits to the spreadsheet. D.I. 454 at 13–14. Indeed, they requested only that the Court "order Insulet to produce all copies and versions of the Trade Secret Summary in its possession, custody, or control, with no redactions beyond the limited ones the Court previously permitted (ECF No. 427), including all emails to which any copy or version is attached." D.I. 454 at 20. Insulet has also requested that Defendants provide their availability to complete the Court-ordered Rule 30(b)(6) deposition so that it can be completed on or before October 2, 2024. As Insulet is complying with the Court's order and is producing documents responsive to this order tomorrow, any requests for a deposition of Mr. Schick or for the "entire scope" of his work are premature and baseless.

Importantly, a deposition of Mr. Schick would also present the same privilege concerns as the proposed deposition of Mr. Thomas Andersen that Defendants sought earlier this year. Aug. 18, 2024 Hearing Tr. 25:5–7. Indeed, a deposition of Mr. Schick would touch on the Court's "concern[s] . . . about the possibility of going in privileged areas" as Mr. Schick's work was regularly meeting and coordinating with Insulet's in-house counsel, Mr. Andersen. Sept. 4, 2024 Hearing Tr. 20:20–22.

4

In the Court's own words, "we need to at some point say enough is enough." *Id.* at 20: 18–19. That point is now. Insulet has offered a 30(b)(6) witness to be deposed regarding the development of the spreadsheet. The Court should deny Defendants' request for discovery beyond that which the Court has already ordered.

## II. Deposition of Mr. McLaughlin

### A. Defendants' Position

When the Defendants filed a Motion to Strike information provided by Insulet engineer Ian McLaughlin to Insulet's damages expert, Insulet offered Mr. McLaughlin's deposition, stating "there will be no issue scheduling a short deposition on the McLaughlin estimates." *See* ECF No. 482. After the issue was argued at the August 14, 2024 status conference, Insulet filed a supplemental brief and once again "Insulet propose[d] to make Ian McLaughlin available for a deposition of no more than three hours on the relative effort he calculated for each of the asserted trade secrets." ECF No. 523 at 2.

Now that the Court declined to strike the information—such that McLaughlin's estimates are currently *in* the case—Insulet is refusing to provide the deposition. This is backwards. The information is important, and there was no way for Defendants to have obtained the information previously.

At a September 5, 2024 hearing, the Court denied Defendants Motion to Strike, but noted it was not deciding "whether [Insulet's damages expert's] methodology used is valid under *Daubert* or Rule 702." Sept. 5, 2024 Hearing Tr. 5:21-23. Shortly thereafter, Defendants sought to take the deposition of Mr. McLaughlin, as Insulet proposed in its Opposition. *See* Sept. 10, 2024 Email from J. Wray to R. Carroll. Insulet denied the request, claiming that the offer in Insulet's Opposition was "a compromise that Defendants refused." Sept. 11, 2024 Email from A.

Raince to J. Wray. That purported "compromise" position in Insulet's filings had neither been offered to Defendants, nor refused.

In light of the Court's ruling allowing this damages theory, Defendants now need to at least depose the man who created the factual underpinning after discovery had closed. Insulet has already told the Court "there will be no issue" in doing so. Without such a deposition, Defendants would be severely prejudiced: Insulet's damages opinions rely in significant part on Mr. McLaughlin's estimates of the "efforts" attributable to the Asserted Trade Secrets. Defendants have never had the opportunity to interrogate those estimates, because at the time of his deposition Mr. McLaughlin had no understanding of what the Asserted Trade Secrets were and had not yet undertaken his estimation exercise. *See* McLaughlin Dep. Tr. 47:24-48:8 ("Q. … [D]o you personally have an understanding of what Insulet has asserted to be its trade secrets in this litigation. A. No, I do not.").

Although Defendants questioned Insulet's damages expert on this topic, he had almost no understanding of how Mr. McLaughlin arrived at his estimations and did not know which documents Mr. McLaughlin used or on what information he relied. *See* ECF No. 542 (*Daubert* motion). Insulet asserts hundreds of millions of dollars in purported damages; Defendants are entitled to discovery on the factual basis for those assertions. A short deposition of Mr. McLaughlin, and production of the documents and information (if any) he relied on, is a simple request that Insulet agrees would pose "no issue." The Court should allow this request.

### B. Plaintiff's Position

Defendants' renewed attempt to seek a deposition of Ian McLaughlin distorts the facts and the Court's own rulings on this issue. Defendants argue that Insulet "offered" McLaughlin and has now reneged on that offer. That is simply not the case. Instead, in Insulet's Opposition to Defendants' Motion to Strike, Insulet argued that "*If the Court concludes that Insulet should have*

*disclosed the McLaughlin effort estimates sooner*, the Court still should not preclude McLaughlin from testifying about his estimates, or [Insulet's damages expert] from relying on them." Instead, Insulet argued, "*to the extent [the Court] believes some relief is warranted*, there will be no issue scheduling a short deposition of the McLaughlin estimates." ECF 508 at 16-20. Insulet made the same point in its Supplemental submission on the issue. ECF 523. Now, Defendants remove the context from Insulet's statements and misrepresent to the Court that Insulet has refused to provide a deposition that was never promised or offered to Defendants.

The Court has already found that there was no discovery violation or any violation of expert disclosure requirements or any other rule. Sept. 5, 2024 Hr'g Tr. 5:17-19. That ruling was correct before and is correct now that Defendants have re-raised *the same issue* but this time requesting substantially narrower relief. As the Court noted during the September 5 status conference, Defendants will have the opportunity (and have now availed themselves of the opportunity) to challenge the reliability and admissibility of Insulet's damages experts' analysis.

Finally, Insulet notes that Insulet's damages expert was far from the only expert in this case to rely on factual testimony from party witnesses that were outside the scope of their earlier depositions. For example, EOFlow's damages expert, Chris Vellturo, pinned his entire affirmative damages opinion on previously undisclosed and entirely unsupported testimony from Jesse Kim and Richard An. There would be no basis for allowing EOFlow to re-depose Mr. McLaughlin while not providing Insulet that same opportunity to re-depose Jesse Kim and Richard An.

### III. Disputed redactions

#### A. Defendants' Position

On June 21, 2024, the Court ordered Insulet to produce a redacted copy of its "Trade Secret Summary" document "with the entries *under* Column A ('Criticality') and Column H ('Comments/Ideas/Follow Up') in redacted form." ECF No. 427 at 2 (emphasis added). Insulet has produced the redacted document, but redacted an additional cell *above*—not under—the "Criticality" column, as shown below. This conflicts with the Court's order.



Defendants respectfully request that Insulet be ordered to produce the contents of cell A2 in accordance with the Court's Order. For the Court's convenience, Defendants have asked Insulet to bring to the status conference an unredacted version of the document so that, if desired, the Court can review the redaction.

#### B. Plaintiff's Position

Insulet's redactions comply with both the letter and spirit of the Court's June 21 order. That order authorized Insulet to redact "the entries under Column A." ECF No. 427, at 2. The cell to which Defendants now seek access—cell A2—is indisputably part of Column A. Defendants argue otherwise only by artificially cropping the image of the spreadsheet supplied above. A review of the original native file—with the column and row labels visible and the margins

8

appropriately spaced—leaves no doubt that the redacted information is "under Column A" (red boxes added):



Defendants also attach significance to the fact that the "Criticality" header appears in cell A4—*i.e.*, below the redacted cell. But as the Court can see from the original file provided *in camera*, the contents of cell A2 are part and parcel of the "Criticality" column.

## IV. Insulet CAD Files In EOFlow's Possession

### A. Plaintiff's Position

On May 16, 2024, EOFlow produced a CAD file of the Omnipod. The CAD file was in "STEP" format, and EOFlow produced it with no accompanying metadata. Counsel for EOFlow represented that the CAD file produced was the same CAD file that Steven DiIanni gave to Seung Ha Kim, EOFlow's lead mechanical engineer, in April 2018. Kim May 17, 2024 Tr. at 196:24-198:21.

However, record evidence is inconsistent with the representation that what EOFlow produced is the same as the CAD file that Steven DiIanni gave to Seung Ha Kim. First, EOFlow's witness, Mr. Han, testified that he found the CAD file in August or September 2023 because he was searching for the word "Omnipod" and came across an Omnipod CAD file. But nothing in

9

the CAD file or metadata provided by EOFlow includes the term "Omnipod." EOFlow has refused to produce metadata as required under the ESI protocol: for example, they repeatedly refused to provide file path information that would indicate where the CAD file was found. When pressed during a meet-and-confer, counsel for EOFlow admitted that the version they produced was from a file-sharing site, and was not collected in a way that would preserve the requested metadata including the file path information. Counsel for EOFlow has represented they will collect the file directly from EOFlow and not via the file-sharing site to provide at least the requested file path data, but have not yet made that production.

Second, Mr. DiIanni's testimony from his August 29, 2024 deposition indicates that the STEP file produced by EOFlow is not the same as the Omnipod CAD file he provided on a drive to Seung Ha Kim in April 2018: Mr. DiIanni never had a STEP file on his laptop.

Given these revelations, Insulet, heeding the Court's guidance, requested that EOFlow produce all metadata for the STP file and asked EOFlow to confirm whether they had produced all Omnipod CAD files in Defendants' possession, custody or control. EOFlow admitted that they have not ever conducted a search to identify Insulet or Omnipod CAD files in their databases, claiming not to know how to search for those files. EOFlow represented they would be willing to conduct that search if Insulet provided search terms to conduct that search. Insulet provided the search terms last Friday, September 13, 2024. Counsel for EOFlow has represented that the search terms returned 5 million hits. Insulet requested that EOFlow share the "hit" report showing how many files hit on each term—just the numbers—which would enable the parties to identify and modify terms that may be providing false hits; counsel for EOFlow refused, claiming the hit report is attorney work product. Insulet has requested that counsel for EOFlow to bring the supposedly "privileged" hit count results the September 20, 2024 status conference so that the Court may

10

review it *in camera* to assess EOFlow's (baseless) claims of privilege. EOFlow has now retracted their offer to conduct a comprehensive search for Insulet/Omnipod files. Insulet is willing to negotiate narrower search terms—a process that would be substantially aided and expedited by reference to the hit report—but given the stage of this case and time to trial, has concerns that EOFlow will abide by their initial representation of being willing to conduct that search.

Insulet respectfully asks that the Court require EOFlow to produce all metadata for the STP file and to produce all Insulet/Omnipod CAD files in EOFlow's possession.

### B. Defendants' Position

Months after the close of fact discovery, Insulet belatedly raised untimely questions about EOFlow's document production relating to CAD files. The Court should deny Insulet's untimely request to reopen fact discovery for three primary reasons.

***First***, Insulet's request for a one-sided reopening of fact discovery improperly puts the cart before the horse. To be relevant to Insulet's trade secret case, Insulet would first need to carry its burden to show that its Omnipod CAD files contain trade secret information whose secrecy Insulet took reasonable measures to protect. As demonstrated in Defendants' pending motion for summary judgment, Insulet failed to carry its burden. *See* ECF No. 544 at 36-37.

In fact, Insulet failed to even produce in discovery copies of the set of CAD files that it claims are Insulet's valuable "trade secret" constituting Asserted Trade Secret No. 1, let alone specifically identify trade secret information within the files. Insulet has no basis for an untimely request to EOFlow to conduct another search for CAD files when Insulet itself failed to produce its own CAD files to craft a tailored search request. Why did Insulet fail to produce copies of its supposedly valuable "trade secret" CAD files? Did Insulet destroy those files or carelessly misplace them? Insulet refuses to answer these questions because every answer would lead to the

11

same inescapable conclusion: Insulet's neglected, missing CAD files never contained any carefully protected trade secret. It is no wonder Insulet let these files walk out the door, no questions asked, when employees left the company.

Insulet also complains about metadata but ignores the fact that its own incomplete, partial production of CAD files omits the very same "file path" metadata that it claims is missing from EOFlow's production—and omits much more, including the "date created" of each file and other fields, as shown in the attachment hereto. *See* Ex. 2 (September 3, 2024 correspondence with Excel file attachment). EOFlow raised this issue with Insulet long ago and again more recently, but Insulet never offered any explanation and never supplemented its deficient production.

**Second**, even if Insulet had properly identified a trade secret—which it did not—no relevant new information arose after the close of fact discovery that would justify reopening discovery. No relevant new information arose from the August 2024 deposition of Mr. DiIanni. The files produced from the forensic inspection of the devices of Steven DiIanni were also available months earlier. *See* Ex. 2.

**Third**, EOFlow has not refused any reasonable request for supplemental discovery, on condition that the request is properly focused and tailored to Insulet's alleged trade secret information—if any. The problem has been Insulet's refusal to tailor any proposed supplemental search to the non-existent, supposedly valuable CAD files that are missing from Insulet's own document production. Insulet proposed an unsupported, overbroad set of search terms with no meaningful connection to its purported trade secret CAD files—for example, seeking every CAD file with any of the letters "im" or "ins" or "jo" or "aw" in the file name, with no basis. *See* Ex. 3 (email demanding search terms).

12

As of this filing, EOFlow had raised a more reasonable proposal to tailor the search based on names of files located on the devices of Mr. DiIanni and Insulet had not identified any problem with that proposal. EOFlow remains committed to negotiate a more reasonable narrower search terms and is hopeful that the parties will be able to resolve this issue without requiring Court intervention.

Respectfully submitted,

Sept. 19, 2024

/s/ Robert D. Carroll
Robert D. Carroll (BBO #662736)
Robert Frederickson III (BBO #670111)
Scott T. Bluni (BBO #660187)
Gerard J. Cedrone (BBO #699674)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
RCarroll@goodwinlaw.com
RFrederickson@goodwinlaw.com
SBluni@goodwinlaw.com
GCedrone@goodwinlaw.com

Jenny Zhang (BBO #689838)
Matthew Ginther (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-1000
JZhang@goodwinlaw.com
MGinther@goodwinlaw.com

Alexandra D. Valenti (*pro hac vice*)
James Breen (*pro hac vice*)
Timothy Keegan (*pro hac vice*)
Arshjit Raince (*pro hac vice*)
Danit Maor (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018

/s/ Adam S. Gershenson
Adam S. Gershenson (BBO #671296)
Michael Sheetz (BBO #548776)
Kimberley A. Scimeca (BBO #708962)
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736
(617) 937-2300
agershenson@cooley.com
msheetz@cooley.com
kscimeca@cooley.com

Reuben Chen (*pro hac vice*)
Lowell D. Mead (*pro hac vice*)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
rchen@cooley.com
lmead@cooley.com

Elizabeth M. Flanagan (*pro hac vice*)
COOLEY LLP
30 S. 9th St., 7th Floor
Minneapolis, MN 55401
(312) 881-6383
bflanagan@cooley.com

Dustin Knight (*pro hac vice*)
COOLEY LLP
One Freedom Square

13

(212) 813-8800
AValenti@goodwinlaw.com
JamesBreen@goodwinlaw.com
TKeegan@goodwinlaw.com
ARaince@goodwinlaw.com
DMaor@goodwinlaw.com

*Counsel for Plaintiff Insulet Corporation*

Reston Town Center
11951 Freedom Drive
Reston, VA 20190-5656
 (703) 456-8708
dknight@cooley.com

*Counsel for Defendants EOFlow Co., Ltd., EOFlow, Inc., and Jesse J. Kim (a/k/a Jae Jin Kim)*

/s/ T. Christopher Donnelly
T. Christopher Donnelly (BBO #129930)
Nathaniel R.B. Koslof (BBO #691094)
DONNELLY, CONROY & GELHAAR, LLP
260 Franklin Street, Suite 1600
Boston, Massachusetts 02110
(617) 720-2880
tcd@dcglaw.com
nrbk@dcglaw.com

*Counsel for Defendants Luis J. Malave, Steven DiIanni, and Ian G. Welsford*

/s/ Brendan M. Shortell
Brendan M. Shortell (BBO# 675851)
Justin P. Tinger (BBO# 707807)
Lambert Shortell & Connaughton
100 Franklin Street, Suite 903
Boston, MA 02110
Main: (617)-720-0091
shortell@lambertpatentlaw.com
tinger@lambertpatentlaw.com

*Counsel for Defendant Nephria Bio, Inc.*