UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
INSULET CORPORATION,                          )
                                              )
            Plaintiff,                        )
                                              )        Civil Action No.
       v.                                     )        23-11780-FDS
                                              )
EOFLOW CO., LTD., et al.,                     )
                                              )
            Defendants.                       )
_____)


<u>__MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT__</u>

SAYLOR, C.J.

This is a dispute concerning the alleged misappropriation of trade secrets for the design

and manufacture of a medical device.  The device at issue is an insulin patch pump, the

Omnipod, manufactured by plaintiff Insulet Corporation.  The defendants are EOFlow Co., Ltd.,

and EOFlow, Inc. (collectively, "EOFlow"); Nephria Bio, Inc.; EOFlow's Chief Executive

Officer, Jesse Kim; and three former Insulet employees, Luis Malave, Steven DiIanni, and Ian

Welsford.  The second amended complaint asserts claims for violation of the Defend Trade

Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"); unfair competition in violation of Mass. Gen.

Laws ch. 93A; and civil conspiracy.[1]

Both parties have moved for partial summary judgment.  Defendants assert that (1) the

DTSA claims are time-barred; (2) the descriptions of two of plaintiff's trade secrets lack

sufficient specificity; (3) the alleged misconduct did not occur "primarily and substantially" in

Massachusetts, as required by Mass. Gen. Laws ch. 93A; and (4) the intra-corporate conspiracy

---

[1] Insulet also asserted claims for patent infringement under 35 U.S.C. § 271, which have been stayed by assent pending resolution of the other claims.

doctrine bars the civil-conspiracy claim.  Plaintiff's motion seeks summary judgment as to the statute of limitations defense.

For the following reasons, defendants' motions will be granted in part and denied in part, and plaintiff's motion will be denied.

## I.  Background

The following facts are undisputed unless otherwise noted.

### A.  Factual Background

#### 1.  Parties

Insulet Corporation is a Delaware corporation founded in Massachusetts in 2000.  (Sec. Am. Compl. ¶ 3).  It designs and manufactures disposable insulin patch pumps.  (*Id.*)  Its flagship product is the Omnipod, an adhesive wearable device that monitors patient glucose levels and directly delivers insulin to them.  (*Id.* 3-5).

EOFlow Co., Ltd., is a Korean corporation founded in 2011.  It has a subsidiary, EOFlow, Inc., which is based in the United States.  (Defs.' Stmt. Undisp. Mat. Facts ["Defs.' SMF"] ¶¶ 29-30, 33).  EOFlow is also in the business of designing and manufacturing disposable insulin patch pumps.  Its flagship product is the EOPatch.  (Sec. Am. Compl. ¶ 8).  Like the Omnipod, the EOPatch is an adhesive wearable device.  (*Id.*).

Nephria Bio, Inc., is a Delaware corporation founded in 2021 and headquartered in New Hampshire.  (*Id.* ¶ 22).  EOFlow is the majority owner of Nephria Bio.  (*Id.*).  Pursuant to a consulting agreement, Nephria Bio provides EOFlow with research and development and regulatory support for its diabetes-related products, including the EOPatch.  (Defs.' SMF ¶ 43).

Jesse Kim is a United States citizen residing in South Korea.  (*Id.* ¶ 32).  He is the founder and current Chief Executive Officer ("CEO") of EOFlow.  (*Id.* ¶¶ 32-33).  Kim led the

development of the EOPatch and oversees EOFlow's operations and subsidiary entities. (*Id.* ¶ 33; Sec. Am. Compl. ¶ 23).

Luis Malave is an individual residing in California. (Defs.' SMF ¶ 45). He worked at Insulet from January 2002 until August 2010. (Sec. Am. Compl. ¶ 24). Malave held multiple senior-level positions throughout his tenure with Insulet, including Senior Vice President of Research, Development, and Engineering and Chief Operating Officer ("COO"). In October 2017, he began working for EOFlow and served as its president until January 2022. (*Id.*).

Steven DiIanni in an individual residing in Massachusetts. (*Id.* ¶ 25). Like Malave, DiIanni began working at Insulet in January 2002 in various technical capacities, including Senior Development Engineer. (*Id.*). Insulet terminated DiIanni in January 2015. (Defs.' SMF ¶ 13). In October 2017, he began working as a third-party consultant for EOFlow. (*Id.* ¶ 51).

Ian Welsford is an individual residing in Oregon. (*Id.* ¶ 49). Insulet employed Welsford as its Director of Regulatory Affairs from 2008 until 2010, and then as a consultant. (Sec. Am. Compl. ¶ 25). In 2017, Welsford began consulting for EOFlow, eventually transitioning to a full-time role with the company in April 2018. (Defs.' SMF ¶ 46). At EOFlow, Welsford served as its Chief Compliance Officer ("CCO"), then as its Chief Technology Officer ("CTO"). He has also served as the CEO of Nephria Bio. (*Id.* ¶ 49).

### 2. Alleged Misappropriation of Insulet's Trade Secrets

#### a. Insulet's Development of the Omnipod

In 2005, after five years of research and development, Insulet received approval from the U.S. Food and Drug Administration ("FDA") to launch its first-generation Omnipod insulin patch pump system. (Pl.'s Stmt. Mat. Facts ["Pl.'s SMF"] ¶ 3). The Omnipod offered patients a uniquely compact and wearable product providing regular insulin delivery for patients with diabetes. (Sec. Am. Compl. ¶ 3).

Over the years, Insulet has released different iterations of the Omnipod patch pump as it has refined the product's design.  (*Id.* ¶ 4).  In 2011, the company launched the "Eros" version of the Omnipod, which included mechanical and structural updates and implemented the baseline hardware platform used in subsequent Omnipod products.  (*Id.* ¶ 42).  In 2019, the company developed the "DASH" version of the Omnipod system, adding a smartphone-based app to connect to the wearable patch pump.  (*Id.* ¶ 43).

Insulet estimates that by 2019, it had invested more than $600 million in research and development costs for its patch-pump devices.  (*Id.*).  Although other companies have attempted to develop and launch patch-pump products of their own to compete with the Omnipod, no competitor has yet successfully launched such a device in the United States.  (Pl.'s SMF ¶ 4).

### b.       EOFlow's Development of the EOPatch

After founding EOFlow in Korea in 2011, Kim began leading a team of engineers to develop the company's first-generation wearable insulin patch pump, the EOPatch 1.  (Defs.' SMF ¶ 33).  The device received regulatory approval in Korea in December 2017.  (*Id.* ¶ 34).

Early EOPatch models, including the EOPatch 1, employed a different pumping mechanism than the Omnipod.  (Pl.'s SMF ¶ 24).  The EOPatch 1 varied in size and shape from the Omnipod, and the two products were technologically distinct from one another.  (*Id.* ¶ 24-25).

In 2017, EOFlow hired several former high-level Insulet employees, including Malave, DiIanni, and Welsford.  (Defs.' SMF ¶ 27, 46, 51).

While working at Insulet, Malave, DiIanni, and Welsford had served in multiple high-level roles, including COO, Senior Development Engineer, and Director of Regional Affairs, respectively.  (Sec. Am. Compl. ¶ 54-55).  For several years, the three of them had extensive

access to detailed technical and regulatory information about the Omnipod, including the patch pump's designs and specifications.  (*Id.*).

Insulet required Malave, DiIanni, and Welsford to sign confidentiality and non-disclosure agreements at the beginning of their employment with Insulet.  (Pl.'s SMF ¶ 9-10).  The agreements provided, among other things, that they would still owe a duty of confidentiality to the company even if they moved to a competitor in the future.  (*Id.*).

Upon DiIanni's departure from Insulet in 2015, he initially refused to sign a termination agreement requiring him to return company documents and reiterating his duty to abide by the terms of his prior confidentiality agreement.  (Defs.' SMF ¶ 14-15).  He instead retained copies of Insulet's documents containing the asserted trade secrets.  (*Id.* ¶ 16).

Plaintiff's second amended complaint alleges that during their employment with Insulet, DiIanni and Welsford transferred thousands of confidential corporate documents to their personal computers; kept those documents after their tenure with Insulet ended; and later provided the information from those documents to Malave (who by that time had begun working for EOFlow), Kim, and EOFlow.  (Sec. Am. Compl. ¶ 56, 68).  Among other things, those documents included detailed information concerning the design and the engineering history of the device, including such things as failure analyses.  (*Id.* ¶ 56)

In 2017, the same year that EOFlow hired Insulet's former employees, EOFlow began developing its second-generation EOPatch 2.  (Defs.' SMF ¶ 34).  The device received regulatory approval in Korea in 2019.  (*Id.* ¶ 35).  Two years later, in 2021, EOFlow launched the product commercially in Korea.  (*Id.* ¶ 35-36).  Soon thereafter, the company received approval to sell the EOPatch 2 in Europe.  (*Id.* ¶ 37).  To date, the FDA has not approved the product for sale in the United States.  (*Id.* ¶ 40).  The EOPatch 2 was a commercial success, and

in May 2023, Medtronic—a large medical device company and one of Insulet's competitors—
announced its intention to acquire EOFlow for $738 million.  (Sec. Am. Compl. ¶ 15).[2]

In February 2023, Insulet obtained and analyzed a sample EOPatch 2 device.  (Pl.'s SMF
¶ 54).  According to the second amended complaint, Insulet determined at that time that rather
than improving the first-generation EOPatch design, the EOPatch 2 utilized a system that was
substantially identical to that found in the Omnipod.  (Sec. Am. Compl. ¶ 8).  It alleges that
"[n]early every aspect of the EOPatch pumping mechanism is substantially identical to Insulet's
Omnipod product," including its external appearance and internal components.  (*Id.* ¶ 10).  It
further alleges that the design similarities resulted from the misappropriation of trade secrets by
Malave, DiIanni, and Welsford, who allegedly stole information about the Omnipod's design
while working at Insulet and later disclosed that information to EOFlow.  (*Id.* ¶ 120-123).

Insulet brought this action on August 3, 2023.  (Pl.'s SMF ¶ 58).

### 3.        Insulet's Discovery of the Alleged Misappropriation

The parties dispute when Insulet knew, or reasonably should have known, about
EOFlow's misappropriation of its internal documents.  Insulet's position is that it did not
discover, and could not reasonably have discovered, the misappropriation until February 2023,
when it physically acquired and inspected the EOPatch 2.  (*Id.* ¶ 60-61).  Defendants contend
that Insulet should have known about the misappropriation as early as mid-2018.  (Defs.' Memo.
Supp. Mot. Summ. J. ["Defs.' Memo."] at 12).

It is undisputed that Insulet became aware of EOFlow's existence in 2016, when it
identified it as one of a handful of prospective competitors for the company to monitor going

---

[2] Medtronic's acquisition of EOFlow was put on hold and eventually canceled after Insulet brought this
suit.  *See Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 884 (Fed. Cir. 2024).

forward.  (Pl.'s SMF ¶ 26).  At the time, Insulet understood EOFlow to still be in the pre-commercial stage of developing its own patch pump.  (*Id.* ¶ 27).

In January 2018, Insulet learned that Malave, its former COO, had become EOFlow's president.  (Defs.' SMF ¶ 59).  Around the same time, Insulet's competitive-intelligence team reported internally that EOFlow was "copying/targeting the Omnipod" with a product that "looks very similar to the Omnipod and most of the features mimic the Omnipod."  (*Id.* ¶ 60).

The parties dispute the degree to which Insulet perceived EOFlow to be a competitive threat at that point.  Although internal Insulet documents acknowledged EOFlow as the "furthest along" among a set of similarly situated companies, it also knew that EOFlow had not yet received any regulatory approval for the EOPatch 2.  (*Id.* ¶ 61; Pl.'s Resp. to Defs.' SMF ¶ 61).

In June 2018, representatives from both Insulet and EOFlow attended an American Diabetes Association ("ADA") Conference.  At the conference, EOFlow had a booth that showed a prototype of the EOPatch 2.  (Pl.'s SMF ¶ 29-31).  EOFlow's booth also displayed three posters advertising the EOPatch 2's "soft cannula" and "fast occlusion detection" features—features that are also found in the Omnipod.  (Defs.' SMF ¶ 67-68).

Insulet contends that at the conference, it was unable to handle or closely inspect the EOPatch 2 prototype and that it was unable to gather any information about the prototype's mechanics.  (Pl.'s SMF ¶ 32-33).  According to Insulet, discovery has since shown that Malave, Welsford, and Kim had discussed how to "'gracefully' explain[] how our design is similar to Omnipod's, without making it sound like piracy."  (*Id.* ¶ 84).[3]  In addition, it has submitted evidence that at the conference, EOFlow employees described the prototype as having "poor design and poor usability."  (Pl.'s Resp. to Defs.' SMF ¶ 65).

---

[3] Defendants contend that these comments were made in reference to EOFlow's presentation at a different conference that year, not the ADA Conference.  (Defs.' Resp. to Pl.'s SMF ¶ 84).

According to defendants, EOFlow employees provided "extensive" proprietary information to Insulet about the product and company at the conference, and handed out sample prototypes to multiple attendees at their booth.  (Defs.' Resp. to Pl.'s SMF ¶ 32-33, 43; Defs.' SMF ¶ 65-66).  Either way, during and after the conference, Insulet personnel commented on the "stunning resemblance" between the EOPatch 2 prototype and the Omnipod, and noted that the two devices' exteriors "look[ed] almost identical."  (Defs.' SMF ¶ 72, 74).  Shortly after the conference, on June 28, 2018, an Insulet employee sent an internal email stating that "EOFlow has cloned our product and is (presumably) selling it in Korea (only).  Our legal team is aware of this.  Someone should request samples."  (*Id.* ¶ 77).

In March 2019, EOFlow publicly announced that it had received "breakthrough designation" status from the FDA for its continued development of the EOPatch.  That announcement led Insulet's then-CEO, Shacey Petrovic, to encourage her staff to "look at [EOFlow's] IP" to see "if they [are] infring[ing]," because EOFlow's product "looks just like ours and their CEO [sic] is former COO of Insulet."  (*Id.* ¶ 87).

The following day, Insulet's Director of Mechanical and Materials Engineering, David Nazzaro, sent an email to a colleague commenting that "[t]he people running EO flow . . . are past Insulet folks.  They have useful knowledge on how to get a product to market, but [in my opinion] were not the strong leadership that really made Insulet successful."  (*Id.* ¶ 89).  The email went on to state that Nazzaro "would recommend we . . . do an in[-]depth scrub of domestic and foreign IP" because "it's possible this becomes real."  (*Id.* ¶ 90).

Insulet then arranged a non-confidential virtual meeting with two EOFlow employees, including Malave, to gather information about the EOPatch.  (Pl.'s SMF ¶ 37-38).  Insulet maintains that no confidential information concerning the EOPatch 2's design was exchanged in

the meeting, and that these types of meetings are standard practice in the medical-device industry.  (*Id.* ¶ 38, 43).

Representatives from both companies again attended the ADA Conference in 2019. There, Insulet employees were able to look more closely at the external appearance of an EOPatch 2 prototype, although none of them were able to handle or inspect the product.  (*Id.* ¶ 44-45).

Shortly after the conference, EOFlow issued a press release on its website stating that the EOPatch 2 had been approved by regulators in South Korea.  (Defs.' SMF ¶ 97).  Several Insulet personnel visited EOFlow's website the next day.  (*Id.* ¶ 99).

In July 2020, EOFlow filed a 507-page prospectus with Korean financial regulators in advance of its public offering.  (Pl.'s SMF ¶ 62).  Written in Korean, the prospectus contained several pages discussing the EOPatch 2's technical design and operation.  (*Id.* ¶ 62-63).  The parties disagree as to whether Insulet obtained or reviewed the prospectus in 2020, and whether it contained a sufficient level of relevant detail to indicate possible misappropriation.  (*Id.* ¶ 64-71; Defs.' Resp. to Pl.'s SMF ¶ 64-71).

In early 2021, after EOFlow announced that it would sell the EOPatch 2 device in Korea, Insulet attempted to obtain samples of the device for inspection and analysis.  (Pl.'s SMF ¶ 46-47).  Among other things, Insulet investigated whether its European employees or its Korean business partners could acquire samples, but its efforts were not successful.  (*Id.* ¶ 47).  The company did not reach out to EOFlow directly to inquire about obtaining a sample EOPatch 2. (Defs.' Resp. to Pl.'s SMF ¶ 47).  The parties dispute whether Insulet had a physical presence in Korea through which it could acquire an EOPatch 2, or whether the company would have been able to legally import an EOPatch device into the United States, as the product had not yet been approved by the FDA.  (Pl.'s SMF ¶ 48, 50; Defs.' Resp. to Pl.'s SMF ¶ 48, 50).

Insulet finally obtained an EOPatch 2 device in February 2023, after the product launched commercially in Europe in late 2022.  (Pl.'s SMF ¶ 53-54).  Insulet inspected the device and concluded that EOFlow had infringed on its patents and potentially misappropriated its trade secrets.  (*Id.* ¶ 55-57).

Defendants contend that as early as January 2018, prior to acquiring the actual device, Insulet had already known or should have known about the misappropriation, thereby time barring Insulet's present action.  (Defs.' Resp. to Pl.'s SMF ¶ 55-56).  Insulet, however, asserts that it needed to physically inspect the inner mechanics of the EOPatch 2—a step that could not have reasonably been taken much earlier than February 2023—to determine whether its trade secrets had been misappropriated.  (Pl.'s SMF ¶ 72).

### B.    Procedural Background

On August 3, 2023, Insulet brought this suit.  The second amended complaint asserts claims for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (DTSA) (Count 1); patent infringement under 35 U.S.C. § 271 (Counts 2-4); unfair competition in violation of Mass. Gen. Laws ch. 93A (Count 5); and civil conspiracy (Count 6).  As noted, the patent infringement claims have been stayed pending resolution of the other claims.

On August 18, 2023, Insulet moved for a temporary restraining order and preliminary injunction.  After a hearing, the Court entered the requested TRO on August 29, 2023, enjoining EOFlow from disclosing or using any technical information related to the EOPatch and Omnipod products.  On October 6, 2023, after another hearing and review of additional evidence, the Court entered the requested preliminary injunction, prohibiting EOFlow from manufacturing, marketing, or selling the EOPatch.  On October 24, 2023, the Court granted defendants' motion to modify the injunction to accommodate EOFlow's existing patient population in Korea, Europe, and the United Arab Emirates.

Two weeks later, defendants appealed this Court's decision to the Federal Circuit.  While the appeal was pending, the parties moved this Court to again modify the injunction, which the Court granted on April 24, 2024.

On May 7, 2024, the Federal Circuit issued a temporary stay of the Court's October 24, 2023 injunction, and the Court subsequently issued a temporary stay of its April 24, 2024 injunction.  On June 17, 2024, the Federal Circuit reversed the preliminary injunction and remanded the case to this Court.

On September 17, 2024, defendants moved for summary judgment as to Counts 1, 5, and 6 of the second amended complaint, contending that (1) plaintiff's DTSA claims are time-barred; (2) plaintiff's descriptions of two of its trade secrets lack sufficient specificity; (3) the alleged misconduct did not occur primarily and substantially in Massachusetts, as required by Chapter 93A; and (4) the intra-corporate conspiracy doctrine bars the civil-conspiracy claim.  The same day, plaintiff moved for summary judgment as to the statute of limitations defense.

For the following reasons, defendants' motions for summary judgment will be granted as to the Chapter 93A claims; granted in part as to the civil-conspiracy claims; and otherwise denied, and plaintiffs' motion for summary judgment will be denied.

## II.     **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of

either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)

(citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable

inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st

Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may

not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence."  *Id.* at 256-57.

### III.   Analysis

#### A.   Statute of Limitations

Defendants first contend that the DTSA claims are barred by the applicable three-year

statute of limitations.  *See* 18 U.S.C. § 1836(d).  They contend that the limitations period began

to run as early as mid-2018, shortly after the 2018 ADA Conference, and approximately two

years before the statutory bar date of August 3, 2020.  (Defs.' Memo. at 10).  Plaintiff asserts that

the limitations period did not begin to run until February 2023, when it acquired, disassembled,

and inspected the EOPatch 2.  (Pl.'s Memo. Supp. Mot. Summ. J. ["Pl.'s Memo."] at 14).

Both parties seek summary judgment as to the question of whether the DTSA claims are

time-barred.  The central issue, at this stage, is when those claims accrued.

##### 1.   Burden of Proof

The statute of limitations is an affirmative defense.  *See Ouellette v. Beaupre*, 977 F.3d

127, 135 (1st Cir. 2020).  Where, as here, a defendant moves for summary judgment on the basis

of that defense, it bears the burden of proof and "cannot attain summary judgment unless the

evidence that he provides on that issue is conclusive."  *See Torres Vargas v. Santiago

Cummings*, 149 F.3d 29, 35 (1st Cir. 1998).

If the defendant does produce such evidence, then "the burden shifts to the plaintiff to establish that the statute of limitations does not apply." *Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez*, 659 F.3d 42, 50 n.10 (1st Cir. 2011). The plaintiff may, for example, provide evidence that the statutory bar should be tolled.

### 2.   <u>Legal Standard for Accrual</u>

Under the DTSA, private civil actions "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Misappropriation is defined as (1) acquisition of a trade secret "by improper means" or (2) "disclosure or use of a trade secret of another without express or implied consent" by one who either used "improper means" or "at the time of disclosure or use," had reasons to know it was acquired by "improper means." 18 U.S.C. § 1839(5).

As noted, the central issue here is when the DTSA claims accrued. The parties dispute both the relevant legal standard and the underlying facts.

Defendants contend that the proper legal standard is "inquiry notice," arguing that the clock starts the moment a plaintiff "has a cause for concern" of a violation. (Defs.' Memo. at 11). They thus contend that the limitations period should commence "when the first event occurs that would prompt a reasonable person to inquire into a possible injury." (*Id.*) (quoting *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 187 (1st Cir. 2006)). Plaintiff contends that its claims accrued only when it "discovered or through reasonable diligence should have discovered the facts of [defendants'] misappropriation." (Pl.'s Memo. at 12-13).

Plaintiff largely relies on the Supreme Court's decision in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). *Merck* involved the accrual of the limitations period of a private action for securities fraud. The applicable statute of limitations, 28 U.S.C. § 1658(b), provides that such an

13

action "may be brought not later than . . . 2 years after the discovery of the facts constituting the violation." *Merck*, 559 U.S. at 637.  The Court held that claims for securities fraud accrue under the statute "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation—whichever comes first."  *Id.* (quotations omitted).

The statute at issue in *Merck* used the term "discovery," and did not contain any reference to the exercise of "reasonable diligence."  Nevertheless, the Court noted that "in the statute of limitations context, the word 'discovery' is often used as a term of art in connection with the 'discovery rule,' a doctrine that delays accrual of a cause of action until the plaintiff has 'discovered' it."  *Id.* at 644.  Under the "discovery rule," a claim accrues when the plaintiff actually discovers the facts constituting the violation, or should have discovered those facts in the exercise of reasonable diligence.  *Id.*[4]  The Court concluded that "Congress intended courts to interpret the word 'discovery' in § 1658(b)(1) similarly."  *Id.* at 646.  In other words, it concluded that the term "discovery" encompassed both actual discovery and the hypothetical discovery that would occur through the exercise of reasonable diligence.

The Court noted that in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), it had interpreted a predecessor statute to require that a private securities-fraud action "must be commenced within one year *after the discovery of the facts constituting the violation,*" and that "[s]ubsequently, every Court of Appeals to decide the matter held that 'discovery of the facts constituting the violation' occurs not only once a plaintiff *actually* discovers the facts, but also when a hypothetical reasonably diligent plaintiff would have

---

[4] The Court also observed that the discovery rule first arose in the context of fraud cases; that "both state and federal courts have applied forms of the 'discovery rule' to claims other than fraud"; and that legislatures "have codified the discovery rule in various contexts."  *Id.* at 644-45.

discovered them." *Merck*, 559 U.S. at 646-47.  Congress then enacted the statute of limitations at issue in *Merck*, which "repeated *Lampf's* critical language." *Id.* at 647.  "We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Id.* at 648.

The Court then considered—and expressly rejected—the argument that the limitations period began to run when the plaintiff was on "inquiry notice." *Id.* at 650.

> If the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'  But the statute says that the plaintiff's claim accrues only after the 'discovery' of those latter facts.  Nothing in the text suggests that the limitations period can sometimes begin before 'discovery' can take place. . . . [T]he court-created 'discovery rule' exception to ordinary statutes of limitations is not generally available to plaintiffs who fail to pursue their claims with reasonable diligence.  But we are dealing here with a statute, not a court-created exception to a statute.  Because the statute contains no indication that the limitations period should occur at some earlier moment before 'discovery,' when a plaintiff would have begun investigating, we cannot accept Merck's argument.

*Id.* at 651.

In summary, the Supreme Court in *Merck* concluded that a claim for securities fraud accrues under § 1658(b)(1) when the plaintiff actually discovers the facts constituting the violation or when a reasonably diligent plaintiff would have discovered those facts, whichever comes first.  And it expressly rejected the "inquiry notice" standard for determining accrual.  Specifically, the Court rejected the notion that the statutory clock begins when "a plaintiff possesses a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry." *Id.* at 650.

It is true that *Merck* did not address trade-secret misappropriation claims under the DTSA, and therefore is not binding here.  Nonetheless, the question presented is whether the reasoning of *Merck* requires a similar result.

The two statutes—that is, the one at issue in *Merck* and the one at issue here—are not literally identical.  However, as interpreted, they are substantially alike:

| | |
|---|---|
| § 1658(b): | an action "may be brought not later than" |
| DTSA: | an action "may not be commenced later than" |
| | |
| § 1658(b): | "2 years after" |
| DTSA: | "3 years after" |
| | |
| § 1658(b): | "the discovery of the facts constituting the violation" |
| DTSA: | "the misappropriation with respect to which the action would relate is discovered" |
| | |
| § 1658(b): | [as interpreted in *Merck*]: "or when a reasonably diligent plaintiff would have discovered [those facts]" |
| DTSA: | "or by the exercise of reasonable diligence [the misappropriation] should have been discovered" |

It is noteworthy that the Supreme Court did not reject the "inquiry notice" standard because securities-fraud cases have special features not present in other types of cases; its ruling was based on the language of the relevant statute of limitations.  It is also significant that *Merck* was issued in 2010, and the DTSA was enacted in 2016.  As the *Merck* court noted, it is normally assumed "that when Congress enacts statutes, it is aware of relevant judicial precedent."  *Id.* at 648.

As a matter of logic, it would seem to follow that this Court should reject the "inquiry notice" standard here, on the ground that the adoption of such a standard conflicts with the language of the relevant statute of limitations.  As in *Merck*, nothing in the text of the DTSA indicates that the accrual period can begin before the point at which a plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the misappropriation.

The principal problem with that conclusion is that it appears to conflict with the conclusion of every court to have thus far considered the issue.  *See CMI Roadbuilding¸ Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 565 (8th Cir. 2019) (holding that the inquiry notice standard

16

applies to DTSA claims, and that the limitations period begins when "the plaintiff was aware a problem existed. . . . The plaintiff need only know a problem exists."); *Hardwire, LLC v. Freyssinet Int'l Et Cie*, 2023 WL 1819321, at *3 (E.D.N.Y. Feb. 8, 2023) (stating that the DTSA "incorporate[s] the concept of inquiry notice to determine whether a plaintiff should have been aware of the misappropriation"); *Alta Devices, Inc. v. LG Elecs., Inc.*, 2019 WL 1924992, at *13 (N.D. Cal. Apr. 30, 2019) (stating that a DTSA claim begins to accrue when a plaintiff is on "inquiry notice," meaning that he "by the exercise of reasonable diligence should have [] discovered" the misappropriation); *RoboticVISIONTech, Inc. v. ABB Inc.*, 2024 WL 1299691, at *4 (D. Del. Mar. 27, 2024) (stating that a DTSA claim begins to accrue when "notice of facts from which the basis for the cause of action could have been discovered by the exercise of reasonable diligence"); *Phoenix Co., Inc. v. Castro-Badillo*, 2024 WL 3742368, at *4 (D.P.R. Aug. 9, 2024) (similar); *PTP OneClick, LLC v. Avalara, Inc.*, 2020 WL 4729174, at *11 (W.D. Wash. May 27, 2020) (holding that DTSA claims begin to accrue when a plaintiff is "on notice of its trade secret misappropriation claims"); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459 (S.D.N.Y. 2020), aff'd, 838 F. App'x 582, 586 (2d Cir. 2020) (stating that "[t]he existence of a patent application or a public patent puts parties on notice of their existence and therefore starts the clock on the [DTSA] limitations period").

None of those courts, however, considered whether the reasoning of *Merck* should apply to DTSA claims.  Indeed, none even mentioned that decision.[5]  Furthermore, the analysis

---

[5] Plaintiff suggests that the Third Circuit has previously applied *Merck* to the Pennsylvania equivalent of the DTSA.  *See Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 734 (3d Cir. 2019).  But the *Heraeus* court did not cite *Merck* for the specific proposition that the DTSA (or a state equivalent) requires actual or hypothetical discovery in lieu of inquiry notice.  Rather, the court was asserting that scienter is a necessary element of a Pennsylvania trade-secret misappropriation claim, and must therefore be established before the limitations period can commence.  *Id.*  In support of its argument, the court included a "*cf.*" citation to *Merck* for the proposition that "'scienter' is a fact which a plaintiff must discover in order for the statute of limitations to begin running" under a securities-fraud claim.  *Id.* (quotations omitted).

performed by those courts is limited at best.  Several decisions simply relied on state law to determine the federal accrual standard.  *See CMI Roadbuilding*, 920 F.3d at 565 (applying Iowa law); *RoboticVISIONTech*, 2024 WL 1299691, at *2 (applying Delaware law); *PTP OneClick*, 2020 WL 4729174, at *5 (applying Washington law).  The court in *Alta Devices* essentially assumed that the DTSA incorporates an inquiry notice standard, without providing any explanation as to why that is the case.  2019 WL 1924992, at *12.  The court in *Phoenix* relied principally on the *RoboticVISIONTech* decision and provided no reasoning for why inquiry notice is the proper rule.  2024 WL 3742368, at *4.  The court in *Hardwire* declared that "[c]laims under [the DTSA] incorporate the concept of inquiry notice to determine whether a plaintiff should have been aware of the misappropriation," without providing any citation or analysis justifying its assertion.  2023 WL 1819321, at *3.  And the court in *Zirvi* applied an inquiry-notice standard without explanation, finding that the plaintiffs were "on inquiry, if not actual, notice" when third-party litigation commenced concerning the patents at issue in the case. 433 F. Supp. 3d at 459.[6]

In light of the absence of any detailed analysis, the Court does not find that authority persuasive.  It of course gives this Court considerable pause to adopt a standard that is at odds with every other reported decision on the issue.  But it also gives the Court pause to ignore the clear implications of a Supreme Court opinion interpreting almost identical language.  Under the circumstances, the more prudent course appears to be to follow the principles articulated in *Merck*, and to reject the use of the "inquiry notice" standard here.

---

[6] In affirming the district court's decision, the Second Circuit took as given that the DTSA incorporated the inquiry-notice standard without considering an alternative standard.  838 F. App'x at 586.

Accordingly, and based on the statutory language, the Court concludes that a cause of action accrues under the DTSA when "the misappropriation with respect to which the action would relate" is (1) actually discovered or (2) "by the exercise of reasonable diligence should have been discovered."  18 U.S.C. § 1836(d).  And based on the reasoning of *Merck*, it does not accrue when the plaintiff merely has sufficient information to put it on inquiry notice.  *See* 559 U.S. at 650-51.

The question then becomes the application of that standard to the facts of this case.

### 3.    <u>Analysis</u>

The undisputed record indicates that by early 2019, plaintiff's senior executives harbored concern that defendants had infringed on the company's intellectual property.  For example, one internal email sent shortly after the 2018 ADA Conference stated that "EOFlow has cloned our product and is (presumably) selling it in Korea (only).  Our legal team is aware of this.  Someone should request samples."  (Defs.' SMF ¶ 77).  Others working for plaintiff at the time commented that the EOPatch 2 bore a "stunning resemblance" to the Omnipod, and that the two devices "look[ed] almost identical."  (*Id.* ¶ 72, 74).  In 2019, after a publicized announcement concerning EOFlow's development, plaintiff's senior executives sought to "look at [EOFlow's] IP" to see "if they [are] infring[ing]," since EOFlow's product "looks just like ours."  (*Id.* ¶ 87).  By that point, plaintiff's employees were also aware that a handful of former colleagues had joined EOFlow in senior-level positions.  (*Id.*).  Altogether, plaintiff plainly had at least a cause for concern that defendants had engaged in prohibited conduct by early 2019.

But a mere cause for concern is not enough to trigger the running of the limitations period under the DTSA.  Instead, the analysis turns on when a hypothetical similarly situated company, exercising reasonable diligence, should have discovered the misappropriation.

Here, there are genuine disputes of material fact as to when a reasonably diligent company, standing in plaintiff's shoes, should have discovered the alleged misappropriation. Defendants note that after the 2018 ADA Conference, plaintiff failed to contact EOFlow directly to request samples of the EOPatch or technical details about the product.  (Defs.' Memo at 17). In defendants' view, such a query would have led plaintiff, and presumably any reasonable company in its position, to discover the alleged misappropriation.

Plaintiff responds that a direct outreach to EOFlow would have been unlikely to yield useful information, as competitors are generally hesitant to divulge confidential information to one another, much less confess to misappropriation.  When competitors do divulge information, it is generally under the auspices of highly restrictive non-disclosure agreements.  (Pl.'s Memo. at 17-18).  And the non-confidential introductory meeting that the parties did hold apparently offered little insight into defendants' technology.  (Pl.'s SMF ¶ 37-38, 43).

Defendants further contend that plaintiff should have proactively investigated its own internal files to determine which documents its former employees had retained after their departure from the company.  (Defs.' Memo at 16).  But plaintiff responds that it had no reason to believe that its former employees kept confidential materials after they had left the firm, and that in any event, the former employees had all previously signed agreements requiring that confidentiality be maintained even after departure.  (Pl.'s Memo at 22).

Moreover, even assuming a reasonable company would have reviewed its internal files for possible theft, plaintiff maintains that an objectively reasonable company still could not have discovered the alleged misappropriation without physically obtaining and opening the EOPatch 2.  The parties again dispute whether plaintiff could have obtained a sample EOPatch 2 before the statutory bar date.  Plaintiff contends it could not even examine a sample EOPatch 2 at the ADA Conferences, let alone procure a device for its own use.  It instead asserts, and defendants

dispute, that a hypothetical company in its position could not have reasonably acquired the EOPatch until its commercial availability in Europe in 2022.

In any event, there are multiple material factual disputes concerning the time at which a reasonably diligent company should have discovered the alleged misappropriation.  The question of the accrual of the statute of limitations is thus proper for the jury.  The Court will therefore deny both plaintiff's and defendants' motions for summary judgment as to the statute of limitations defense.

**B.      Specificity of Plaintiff's Trade Secrets Claims**

Defendants further contend that they are entitled to summary judgment on two of plaintiff's asserted trade secrets for failing to define them with the specificity required to sustain a DTSA claim.

The definition of what may be deemed a "trade secret" under the DTSA is broad.  *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020).  Under the DTSA, a trade secret includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible."  18 U.S.C. § 1839(3).  The information must "derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information."  18 U.S.C. § 1839(3)(B).

A protectable trade secret may include "any confidential information used in a business that gives [the owner] an advantage over competitors who do not know or use it."  *Neural Magic, Inc. v. Meta Platforms, Inc.*, 659 F. Supp. 3d 138, 167 (D. Mass. 2023) (quoting *Sensitech Inc. v. LimeStone FZE*, 548 F. Supp. 3d 244, 261 (D. Mass. 2021)).  Notably, "[a] trade secret can exist

in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Sutra, Inc. v. Iceland Exp., ehf*, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)).

For the purposes of bringing a DTSA claim, a plaintiff must "adequate[ly]" describe the asserted trade secrets "with clarity that can be understood by a lay person." *Neural Magic*, 659 F. Supp. 3d at 166-167 (quoting *Sutra*, 2008 WL 2705580, at *4). "[A] court should not have to 'sift through technical data to distill out a trade secret.'" *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 456 (D. Mass. 2017) (quoting *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004)).

Although "courts have required specificity" when evaluating the adequacy of a trade secret description, "specificity is highly fact dependent." *Iconics*, 266 F. Supp. 3d at 456. Ultimately, courts must approach the analysis with "a modicum of common sense" that recognizes the fundamental purpose of requiring plaintiffs to describe their trade secrets with specificity: to allow defendants to effectively prepare a rebuttal and to ensure that the trier of fact can actually understand the claims asserted. *See Broad-Ocean Techs., LLC v. Lei*, 649 F. Supp. 3d 584, 594 (E.D. Mich. 2023).

Defendants have moved for summary judgment as to two of plaintiff's trade secrets: first, the computer-aided design ("CAD") files for the Omnipod ("Trade Secret 1") and second, the Omnipod Eros design history file ("DHF") ("Trade Secret 2"). The Court will discuss each in turn.

### 1.    <u>Trade Secret 1</u>

Defendants challenge plaintiff's Omnipod CAD files on the grounds that plaintiff has

failed to (1) identify the boundaries of the trade secret and (2) distinguish public from non-public information contained in the CAD files.  (Defs.' Memo. at 36).[7]

> Trade Secret 1 is defined by plaintiff as follows:
>
> <u>CAD Files for the Omnipod</u>. Insulet's CAD files for its components, sub-assemblies, and complete assembly provide detailed 3-dimensional renderings with precise nominal dimensions for the Omnipod components as well as the relative positioning of different components (e.g., offsets) within an assembly, including, among other things, native assembly CAD files and the .STP export of the 13800-PODASSEMBLY.

(Defs.' Memo. Ex. 3 at 1).  Plaintiff also provided a follow-up description of Trade Secret 1, in which it stated that the CAD files at issue included "the 13800-pod-assembly file for the Eros Omnipod (including EOFLOW_04366457) and the CAD files cited in Exhibit G to the Expert Report of M. McGowan."  (Defs.' Memo. Ex. 4 at 2).  Exhibit G of McGowan's expert report contains a list of more than 1,300 files.  (Defs.' Memo. Ex. 60).

"It is well settled that detailed manufacturing drawings . . . are prima facie trade secrets." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) (quoting *A.H. Emery Co. v. Marcan Products*, 389 F.2d 11 (2d Cir. 1968)).  And "[w]hen material such as design drawings or manuals are trade secrets based on a unique combination of both protected and unprotected material, a plaintiff should not be obligated to identify which components of the protected material is secret."  *Mike's Train House*, 472 F.3d at 411.

As a result, courts have held that a plaintiff satisfies its burden of specifically defining a trade secret when it refers to "dimensions and tolerances" or other details contained in the "engineering drawings and blueprints" constituting the trade secret.  *See Imax Corp. v. Cinema*

---

[7] A CAD file is "a digital file format of an object generated using CAD software, containing a blueprint, technical drawing, schematic, or 3D rendering of an object. . . . [T]hese files may contain other data used to create a CAD project, such as information on materials, dimensions in an architectural plan, construction processes, etc." Anindita Sengupta, CAD File, Technology Glossary Definitions—G2 (last visited Oct. 22, 2024), https://www.g2.com/glossary/cad-file-definition.

*Techs., Inc.*, 152 F.3d 1161, 1166 (9th Cir. 1998) (citing *Forro Precision, Inc. v. Intern. Business Machines*, 673 F.2d 1045, 1057 (9th Cir. 1982)).  Of course, a plaintiff must do more than merely allege that its "computer-aided design files are secret because they contain computer-aided design models."  *Broad-Ocean*, 649 F. Supp. 3d at 593.  But when a plaintiff provides concrete evidence that its misappropriated files contain valuable trade secrets, that is sufficient to avoid summary judgment on the ground of lack of specificity.  *See id.* at 595.

Here, plaintiff describes Trade Secret 1 with sufficient particularity for a lay person to understand.  Its description of the bounds of its trade secrets articulates the substance of the secrets in narrative form—stating that the secrets at issue are the "three-dimensional renderings" containing "precise nominal dimensions for the Omnipod components" along with the "relative positioning of different components"—and by citing a specific set of files containing that information—namely, "the 13800-pod-assembly file for the Eros Omnipod" and the files appended to McGowan's report.  At this stage, plaintiff's references to various aspects of the product's blueprints captured in specifically listed CAD files are adequate to define the bounds of Trade Secret 1.

Moreover, plaintiff need not spell out every single piece of public and non-public information contained within the CAD files.  The CAD files at issue in Trade Secret 1 surely comprise information that is both protected and unprotected.  But requiring plaintiff to detail the murky line between each public and non-public piece of information within the CAD files would be impractical, and goes well beyond plaintiff's legal obligation to "adequate[ly]" describe the asserted trade secret.  *See Neural Magic*, 659 F. Supp. 3d at 167.

Defendants contend that the First Circuit's decision in *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46 (1st Cir. 2020), holds that a trade secret cannot stand as a matter of law if it fails to separate what is and is not public information.  (Defs.' Memo at 22).  In *TLS*,

the plaintiff claimed that its report for a client constituted a trade secret, even though the plaintiff

conceded that the report contained no trade secrets, and was instead made up of only "public and

general information such as the meaning of tax terms, . . . case law, IRS regulations and tax

statutes, state tax laws," and "individual client information."  966 F.3d at 53.  The court asked

the plaintiff to "articulate what aspects of the [report] qualified as a trade secret," which it could

not do.  *Id.*  The plaintiff cited vague references to business recommendations—

recommendations that may not have even been in the report—to support its trade secret claim,

and nothing more.  *Id.* at 54.  Without any further guidance from the plaintiff, the court held that

it had not established a trade secret because it failed to "separate the [purported] trade secrets

from the other information . . . [that was] known to the trade."  *Id.* (quoting *IDX Sys. Corp. v.

Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002)).

The specificity requirement of *TLS* is not as demanding as defendants suggest.  First, the

present case deals with CAD files, which are "inherently [] more secret than the business

processes and strategies" at issue in *TLS*.  *Broad-Ocean*, 649 F. Supp. 3d at 594.  Second, and

more importantly, the *TLS* court's primary frustration with the plaintiff's claim was that it had

failed to "identify" any colorable trade-secret information whatsoever.  966 F.3d at 54.  The

court did not demand that the plaintiff categorize every piece of information as private or non-

private.   Instead, it simply asked for some "articulat[ion]" of the alleged trade secret, as the

plaintiff had already conceded that the report at issue contained no trade secret information at all.

*Id.* at 53.

Plaintiff here has adequately identified the trade secrets contained in its CAD files,

including the dimensions and positioning of the component parts, which are distinct from "other

general information" that may also exist in the CAD files.  Thus, at this stage, it has submitted

sufficient evidence demonstrating that the CAD files at issue in Trade Secret 1 contain a defined

set of valuable, confidential information, thereby meeting its burden to survive a specificity challenge at summary judgment.

The Court does, however, agree with defendants' concern about plaintiff's inclusion of the phrase "including, among other things" in its description of the CAD files at issue. Sometimes the term "including" may refer to a defined and exhaustive list.[8]  But here, plaintiff uses it to indicate that the enumerated files are (or may be) a representative, non-exhaustive list of the files constituting Trade Secret 1.  Indeed, plaintiff maintains that such language is necessary to preserve flexibility as it reviews delayed or yet-to-be-produced documents.

At this stage, at least, that door cannot be left ajar.  The Court will not permit plaintiff to expand the bounds of Trade Secret 1 by the use of the phrase "including, among other things."  It will therefore limit the scope of Trade Secret 1 to the specific set of files listed in plaintiff's follow-up description:  "the 13800-pod-assembly file for the Eros Omnipod (including EOFLOW_04366457) and the CAD files cited in Exhibit G to the Expert Report of M. McGowan."  (Defs.' Memo. Ex. 4 at 2).

With that limitation, the Court will deny defendants' summary judgment motion as to Trade Secret 1.

### 2.  __Trade Secret 2__

Defendants similarly contend that plaintiff's DHF for the Omnipod Eros lacks sufficient specificity and fails to distinguish private and non-private information, thereby requiring a grant of summary judgment for Trade Secret 2.  (Defs.' Memo. at 23, 25).

Plaintiff has defined Trade Secret 2 as follows:

The "Design History File" for the Omnipod Eros, including, among other things,

---

[8] For example, one might properly say that "the teams in the AFC East include Buffalo, Miami, New England, and New York," without necessarily suggesting that there are other, unnamed teams that could be included.

      a.   Insulet's Product Definition Document
      b.   Insulet's Design Failure Modes Effects Analysis
      c.   Insulet's Software Failure Modes Effects Analysis
      d.   Insulet's Hardware Requirements Specifications
      e.   Insulet's Hardware Description Documents
      f.   Insulet's Software Requirements Specifications
      g.   Insulet's Software Design Documents
      h.   Insulet's Quality Control Instructions
      i.   Insulet's Documented and Controlled Procedures
      j.   Insulet's Standard Operating Procedures
      k.   Insulet's procedures and learnings related to corrective and preventative actions
      l.   Insulet's Bill of Materials
      m.   Insulet's Assembly Drawings for Omnipod
      n.   Insulet's Safety Assurance Case for Omnipod
      o.   Insulet's drawings and schematics for Omnipod

(Defs.' Memo. Ex. 4 at 2-4).  Trade Secret 2 comprises the 15 individually listed components, as well as the combination of those components.  As with Trade Secret 1, plaintiff provided defendants with additional follow-up details identifying file names and types from each of the 15 DHF categories.  (*Id.*).

      For similar reasons as those discussed for Trade Secret 1, plaintiff sufficiently specifies the boundaries and contents of Trade Secret 2 to avoid summary judgment.

      To begin, the scope of Trade Secret 2 is confined by the phrase "Design History File," which plaintiff represents is a term of art in the medical-device industry.  Under FDA regulations, manufacturers such as plaintiff must "establish and maintain a DHF for each type of device," which must "contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements of this [regulation]."  21 C.F.R § 820.30(j).  According to plaintiff, medical-device manufacturing companies in the United States understand that a DHF is a standard collection of information, generally comprising documents that spell out the development and design of the medical device in question.  Such boundaries, tightened by plaintiff at the Court's instruction to 15 categories

and further supplemented with specific file names, allow for a layperson to adequately understand the scope and contents of the DHF.[9]

Plaintiff has also presented evidence showing that the combination of those 15 components constitutes a valuable trade secret.  For example, plaintiff's expert noted that the DHF serves as a "playbook" for any medical-device company, including a competitor, to manufacture the subject device in an economically advantageous way.  (Defs.' Memo. Ex. 61 ¶ 58-59).  Plaintiff has also alleged that the DHF in its entirety was particularly valuable to defendants to facilitate Medtronic's due diligence leading up to the planned acquisition.  (Pl.'s Resp. to Defs.' SMF ¶ 161).  Thus, at this stage, plaintiff has met its burden of specifying the boundaries and contents of the component and collective trade secrets at issue in Trade Secret 2.

Defendants again contend that *TLS* requires plaintiff to distinguish between public and private information in the DHF.  But again, *TLS* required a plausible identification of the trade secret, not a detailed differentiation of every public and non-public aspect of the alleged trade secret.[10]  And, in any event, the present case is much different than *TLS*.  Unlike the plaintiff in *TLS*, plaintiff here has not stipulated that the DHF contains no trade secrets.  To the contrary, plaintiff has presented evidence that the DHF contains "invaluable information" not disclosed by its public patents, such as "manufacturing instructions, and material sourcing information."

---

[9] In this context, the use of the phrase "among other things" is arguably permissible to the extent it refers to the two additional categories in the DHF that the Court struck for failure to make adequate disclosure.  Nonetheless, to avoid ambiguity, the Court will not permit the use of the phrase.

[10] Defendants' reliance on the decision of the Seventh Circuit in *IDX* faces the same limitation.  There, the court held that the plaintiff's "43-page description of the methods and processes . . . making up [the plaintiff's] software package" was insufficiently specific.  *IDX*, 285 F.3d at 583.  The court pointed out that the report was nothing more than a summary description of the software alleged to be a trade secret; the plaintiff failed entirely to identify anything secret about the software.  Indeed, the *IDX* court noted that "the algorithms that the software uses to do real-time error checking . . . may be genuine trade secrets, but [the plaintiff] has not tried to separate them from" other general information.  *Id.* at 584.  Here, plaintiff has done more than the plaintiff in *IDX*.  Plaintiff has provided evidence that components of the DHF are valuable secrets and that the file, as a whole, forms a definite, economically advantageous package of information supporting a trade-secret claim.

(Defs.' Memo. Ex. 67 ¶ 43).  It has also presented evidence indicating that combination of information within the DHF provides distinct economic advantage, thereby constituting a trade secret.  (Defs.' Memo. Ex. 61 at 12).  It has therefore gone much further than the plaintiff in *TLS*, who provided essentially nothing to the court that could substantiate a trade secret.  Although defendants contest the validity of plaintiff's proffered evidence, a reasonable jury could find that the DHF—as a whole and in its parts—forms a defined trade secret.  Plaintiff has thus met *TLS*'s requirements by identifying plausible trade secrets in the DHS that are "separate" from other general and public information.

It is plausible, as defendants note, that the DHF contains a voluminous amount of information.  But that is not enough to render a trade-secret description insufficiently specific. *See, e.g.*, *Motorola, Inc. v. Lemko Corp.*, 2012 WL 74319, at *15 (N.D. Ill. Jan. 10, 2012) (finding that the identification of over four million files had no bearing on whether the trade secret was sufficiently particularized).  Nor does the fact that the DHF "sweeps in public information," (Defs.' Memo at 29), render the DHF ineligible as a trade secret, *see Integrated Cash*, 920 F.2d at 174 (stating that a unique combination of publicly known components may still qualify as a trade secret).  And, again, the combination of the listed DHF files alone can constitute a trade secret, even if items within individual files themselves do not.  *See Sutra*, 2008 WL 2705580, at *4.

The Court will therefore deny defendants' motion for summary judgment as to Trade Secret 2.  As with Trade Secret 1, the Court will limit the scope of Trade Secret 2 to exclude the phrase "among other things," and instead confine it to the 15 listed DHF categories, plus the combination of those categories.

C.     __Mass. Gen. Laws ch. 93A__

Defendants next seek summary judgment on plaintiff's unfair-competition claim under Mass. Gen. Laws ch. 93A ("chapter 93") because the alleged misconduct did not occur "primarily and substantially" within Massachusetts.

Section 11 of chapter 93A expressly provides that no action may be brought under the statute unless the complained-of conduct occurred "primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11. Defendants bear the burden of proving that the alleged misconduct occurred primarily or substantially outside of Massachusetts. *Zyla v. Wadsworth*, 360 F.3d 243, 255 (1st Cir. 2004).

The Supreme Judicial Court has indicated that the critical inquiry is "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787 (2003). That requires a holistic, fact-based analysis, in which the relevant factors include, but are not limited to, "where the defendant commits the unfair or deceptive act or practice," "where the plaintiff receives or acts on the wrongful conduct," and "where the plaintiff sustained losses caused by the wrongful conduct." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2024 WL 1558167, at *19 (D. Mass. Apr. 10, 2024) (quoting *Kuwaiti*, 781 N.E.2d at 798 n.13). Despite the inquiry's fact-intensive nature, courts may still grant summary judgment when the undisputed facts demonstrate that the center of defendants' misconduct occurred outside of Massachusetts. *See Spring Inv. Servs.*, 2013 WL 1703890, at *12-13.

Importantly, in conducting its analysis, a court may only consider the actionable conduct that gave rise to the alleged violation; other conduct, no matter where it takes place, may not be considered. *Kuwaiti*, 781 N.E.2d at 787. If the alleged misconduct occurred in multiple jurisdictions, such that "the significant contacts of the competing jurisdictions are approximately

in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." *Neural Magic*, 659 F. Supp. 3d at 182-83 (quoting *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 45 (1st Cir. 2005)).  Thus, if the alleged wrongdoing has "relevant and substantial impact" across the country or globe, the "primarily" requirement of chapter 93A is not satisfied.  *Id.*

Based on the record evidence, no reasonable jury could find that the alleged misconduct occurred "primarily and substantially in the commonwealth."  Mass. Gen. Laws ch. 93A, § 11. The second amended complaint alleges that "[d]efendants' misappropriation of [plaintiff's] intellectual property" constitutes the basis of its chapter 93A claim.  (Sec. Am. Compl. ¶ 153). Misappropriation refers to the improper acquisition, disclosure, or use of confidential information.  *See Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 405 (S.D.N.Y. 2021). Mere possession of confidential information does not constitute misappropriation.  *Id.*  Thus, retention of confidential documents alone by plaintiff's former employees would not constitute misappropriation.  Instead, the misappropriation (that is, the unfair conduct) that is potentially actionable under chapter 93A occurred when plaintiff's former employees allegedly disclosed— and EOFlow allegedly acquired and used—the confidential information concerning the Omnipod.

The "primary and substantially" analysis therefore focuses on the center of gravity related to the transfer of confidential information from plaintiff's former employees to EOFlow, and defendants' subsequent use of that information.  Based on the record, the center of gravity of defendants' alleged misconduct occurred primarily and substantially in Korea, not Massachusetts.  Plaintiff's former employees delivered the trade secrets to EOFlow in Korea, where the company was headquartered.  Defendants then allegedly used plaintiff's trade secrets in Korea to develop and manufacture the EOPatch 2 there.  Defendants then sold the EOPatch 2

exclusively in Korea before later expanding to Europe; without FDA approval, defendants have never been permitted to sell their product anywhere in the United States, including in Massachusetts. Thus, the misappropriation constituting the alleged unfair practice under chapter 93A occurred primarily and substantially in Korea, not Massachusetts.

Plaintiff points to a number of apparent contacts that defendants had with Massachusetts to support its position that the center of gravity of defendants' conduct lies in the Commonwealth. For example, plaintiff highlights that its injuries have manifested primarily in Massachusetts, where the company is headquartered and where thousands of its employees work. (Pl.'s Opp. at 43-44). But that argument fails for two reasons. First, defendants' product has never been sold in Massachusetts or anywhere else in the United States, preventing it from competing with the Omnipod in Massachusetts. As a result, harm to plaintiff's sales or competitive advantage in the patch pump market resulting from defendants' unfair practices could not be concentrated in Massachusetts, and instead are more likely to be felt in other markets, such as Europe, where both products are commercially available and do in fact compete.

Second, even if plaintiff suffered its injuries in Massachusetts, the relevant inquiry is ascertaining the center of gravity of *defendants'* wrongful conduct, not plaintiff's place of injury. *See Neural Magic*, 659 F. Supp. 3d at 183. Several courts have held that a place of injury within Massachusetts is not by itself a sufficient basis to find the misconduct occurred primarily and substantially within the Commonwealth. *See, e.g.*, *id.* (stating that the "primarily and substantially" test is not satisfied even when the plaintiff was a Massachusetts company and its former employee signed his employment contract in Massachusetts); *see also Korpacz v. Women's Prof'l Football League*, 2006 WL 220762, at *5 (D. Mass. Jan. 27, 2006) (stating that "although plaintiffs themselves reside in Massachusetts and any losses they may have suffered

32

would have been incurred here, defendants' conduct occurred outside of the state"); *Central Mass. Television, Inc. v. Amplicon, Inc.*, 930 F. Supp. 16, 27 (D. Mass. 1996) (stating that "when 'place of injury' is the only factor weighing in favor of a claimant, the admonition of Massachusetts courts that liability under chapter 93A is not to be imposed lightly is particularly relevant"). Indeed, if the analysis hinged chiefly on the place of *injury*, "practically no case involving a Massachusetts plaintiff would be exempt from chapter 93A status, no matter how negligible the defendants' business activity in this [s]tate." *Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 518 N.E.2d 519 (Mass. App. Ct. 1988). Accordingly, plaintiff's location in Massachusetts, without more, does not satisfy the standard.

Beyond its presence in the Commonwealth, plaintiff also points to contacts between its former employees and Massachusetts, including the fact that they all worked in Massachusetts during their employment with plaintiff, accessed confidential information that had been developed in Massachusetts, and violated confidentiality agreements under Massachusetts law. (Pl.'s Opp. at 44). In addition, DiIanni remained in Massachusetts throughout the misappropriation scheme and his laboratory was listed as a registered office for EOFlow.

Again, those facts fail to establish Massachusetts as the center of gravity of the alleged unfair misconduct. Nothing suggests that plaintiff's former employees disclosed—that is, misappropriated—confidential information to defendants during their tenure with the company. Rather, the alleged misappropriation occurred after the ex-employees' tenure with plaintiff had ended, when every individual defendant but DiIanni lived and worked outside of Massachusetts. Thus, the fact that plaintiff's former employees worked in Massachusetts while at the company does not change the analysis.

Moreover, merely accessing documents located in Massachusetts during one's employment in Massachusetts does not constitute an unfair or deceptive practice. And although

the individual defendants may have violated confidentiality agreements governed by

Massachusetts law, the underlying misconduct occurred overwhelmingly in Korea.  Finally,

DiIanni's continued residence and opening of a laboratory registered as an EOFlow office in

Massachusetts does not show that defendants unfair and deceptive practices occurred primarily

and substantially in Massachusetts, "since mere presence here is not sufficient."  *Neural Magic*,

659 F. Supp. 3d at 184.

On balance, the majority of defendants' alleged unfair practices—including their use of

plaintiff's trade secrets, development of the EOPatch 2, and sale of their competing product—

occurred outside of Massachusetts, primarily and substantially in Korea.  Thus, "[e]ven reading

the record in the light most favorable to [plaintiff]," defendants' alleged wrongful conduct did

not occur primarily and substantially in Massachusetts.  *EMC Corp. v. Pure Storage, Inc.*, 2016

WL 7826662, at *2 (D. Mass. Aug. 19, 2016).

Accordingly, the Court will grant defendants' motion for summary judgment as to

plaintiff's chapter 93A claim.

### D.    Civil Conspiracy

Finally, defendants have moved for summary judgment on the civil-conspiracy claim,

arguing that the claim is barred by the intra-corporate conspiracy doctrine.

"Massachusetts recognizes two types of civil conspiracy, so-called 'true conspiracy' and

conspiracy based on section 876 of the Restatement (Second) of Torts."  *Taylor v. Am. Chemistry*

*Council*, 576 F.3d 16, 34 (1st Cir. 2009).  "The 'true conspiracy' is a very limited cause of action

that requires an element of coercion"—an element not alleged in plaintiff's complaint.  *Blake v.*

*Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 391 (D. Mass. 2012).  Thus, the civil-conspiracy

claim here is necessarily based on § 876 of the Restatement (Second) of Torts.

To prove a civil-conspiracy claim based on § 876 of the Restatement, "the [plaintiff] must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement.'" *Blake*, 898 F. Supp. 2d at 392 (citations omitted). Here, the second amended complaint alleges that defendants engaged in a civil conspiracy by acting in concert to misappropriate plaintiff's trade secrets in violation of DTSA. (Sec. Am. Compl. ¶ 158).

Defendants contend that the conspiracy claim is foreclosed by the intra-corporate conspiracy doctrine, which states that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is *not* an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153, (2017) (emphasis added). The doctrine reflects the fact that a conspiracy requires an agreement between or among two or more separate persons to conduct an illicit act. *Id.* But "[w]hen two agents of the same legal entity make an agreement in the course of their official duties, . . . as a practical and legal matter their acts are attributed to their principal." *Id.* In such a case, there is no agreement between two or more separate entities, and thus no civil conspiracy. If, however, the agents acted "for their sole personal benefit and thus outside the course and scope of their employment," then the intra-corporate conspiracy doctrine does not apply. *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999).

Plaintiff relies on the assertion that the intra-corporate defense "requires showing a 'complete unity of interest'" between the principal and its agents. (Pl.'s Opp. at 49) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)). Because plaintiff's former employees could benefit from the alleged misappropriation individually and separate from EOFlow, plaintiff argues that the parties lacked a "complete unity of interest" such that the intra-corporate defense does not apply.

35

The Supreme Court in *Copperweld*, however, did not go so far as to say that *every* application of the intra-corporate conspiracy doctrine requires a "complete unity of interest." 467 U.S. at 771.  Rather, the court simply observed that in the case before it, a parent company and its wholly owned subsidiary do exhibit such unity of interest, thereby eliminating any legal possibility of an agreement between those two entities under the Sherman Act.  *Id.*  A complete unity of interests may be a sufficient condition for the application of the intra-corporate conspiracy doctrine, but the *Copperweld* Court's discussion does not suggest that it is a legal requirement.  In fact, some courts have set the minimum threshold much lower, barring application of the intra-corporate conspiracy doctrine only when employees act "for their sole personal benefit."  *See, e.g.*, *BlueRadios, Inc. v. Hamilton, Brook, Smith & Reynolds, P.C.*, 2022 WL 138642, at *9 (D. Mass. Jan. 14, 2022) (quotations omitted).

Thus, defendants need not have complete unity of interest to assert a valid intra-corporate conspiracy doctrine defense.  They need only show that they acted as agents of a principal— here, EOFlow—and did not act for their "sole personal benefit" in the coordination and execution of the alleged misappropriation of plaintiff's trade secrets.  *Id.*

### 1. <u>Malave, Welsford, and Kim</u>

It is undisputed that Malave and Welsford had both already started working for EOFlow as full-time employees at the time of the alleged misappropriation.  And the record does not suggest that either of them coordinated the theft of plaintiff's confidential information at any point before their employment with EOFlow began.  It is also clear that Malave and Welsford were acting in their official capacities as officers (COO and CTO, respectively) of EOFlow to carry out the alleged misappropriation, as opposed to acting in a solely personal capacity.  Thus, the intra-corporate conspiracy doctrine bars a civil-conspiracy claim against Malave and Welsford as agents of EOFlow.

There is also no question that Kim—the founder and CEO of EOFlow—was an officer of the company during the entirety of the alleged tortious conduct.  Thus, because "an entity cannot conspire with itself," summary judgment as to Malave, Welsford, and Kim on the civil-conspiracy claim will be granted.  *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130-31 (1st Cir. 2008).

### 2.    DiIanni

As for DiIanni, plaintiff maintains that his undisputed status as an independently contracted consultant, as opposed to a full-time employee, forecloses the possibility that he may have acted as an agent of EOFlow in misappropriating plaintiff's trade secrets.  Plaintiff's position contradicts its initial characterization of DiIanni's role in the scheme that "[a]t all times relevant to this action, DiIanni acted as an agent for EOFlow as he acted on behalf of and for the benefit of EOFlow."  (Sec. Am. Compl. ¶ 25).  As a result, defendants ask the Court to judicially estop plaintiff from now staking out a new, opposing view.

"[A]t a minimum, two conditions must be satisfied before judicial estoppel can attach.  First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive.  Second, the responsible party must have succeeded in persuading a court to accept its prior position."  *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (citations omitted).  Courts also frequently consider whether "the party asserting the inconsistent position [would] derive an unfair advantage" in the absence of an estoppel.  *Id.*

Plaintiff's apparent shift on the nature of DiIanni's relationship with EOFlow satisfies the first requirement of judicial estoppel.  However, the Court has not previously accepted its prior position on the issue.  The Court's order granting plaintiff's motion to leave to file a second amended complaint was not evidence that it accepted plaintiff's position regarding DiIanni's status.  In that order, the Court explicitly declined to opine on whether the alleged conspiring

parties are "independent agents, not employees of the same enterprise." (ECF No. 270 at 5). In fact, the Court permitted plaintiff to add to its complaint that "Malave and Kim recruited and conspired with DiIanni, *and his company Coral C Ventures LLC*, . . . to further EOFlow's [tortious conduct]." (*Id.*) (emphasis added). At no point did the Court rely on plaintiff's representation of DiIanni as an independent contractor as a relevant factor in granting it leave to file a second amended complaint. Nor is it clear that plaintiff would derive an unfair advantage in the absence of an estoppel. Thus, the Court declines to judicially estop plaintiff from revising its position that DiIanni acted in an independent capacity to effectuate the alleged conspiracy with EOFlow.

Because there are material factual disputes as to whether DiIanni acted independently or under the control and direction of EOFlow to carry out the alleged misappropriation, the Court will deny summary judgment as to the civil-conspiracy claim against DiIanni.[11]

### 3.    Nephria Bio

Defendants similarly seek summary judgment on the civil-conspiracy claim as to Nephria Bio. Defendants assert that Nephria Bio, whose majority owner is EOFlow and whose CEO during the relevant period was Welsford, acted as an agent of EOFlow in carrying out the alleged misappropriation, thereby barring a civil-conspiracy claim between Nephria Bio and EOFlow.

The intra-corporate conspiracy doctrine applies not just to employees, but also to corporate affiliates controlled by a parent entity. *See Copperweld*, 467 U.S. at 771. When

---

[11] Courts have taken different positions as to whether an independent contractor may ever be considered a corporate agent in the civil conspiracy context. Some courts have allowed for the possibility that the "intra-corporate conspiracy doctrine extends to . . . independent contractors of a corporation" where "they were acting within the scope of their duties." *Lucero v. Safeway, Inc.*, 2022 WL 79860, at *7 (D. Colo. Jan. 7, 2022); *see also United States v. Premier Med., Inc.*, 2023 WL 9060896, at *13 (D.S.C. Sept. 28, 2023). Other courts, however, have suggested that the intra-corporate conspiracy doctrine does not apply to independent contractors. *See, e.g., Morgan v. Noss*, 2023 WL 11866929, at *13 (W.D. Pa. Aug. 28, 2023). Because the factual record is ambiguous as to whether DiIanni operated as an agent within the scope of his consulting duties to carry out the alleged misappropriation, the Court declines to address whether the intra-corporate conspiracy doctrine can, as a matter of law, bar a civil-conspiracy claim against an independent contractor.

determining whether two separately incorporated entities are capable of conspiracy, a court focuses on the "substance, not form" of the entities' relationship.  *Id.* at 773 n.21.  "[T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010).  Rather, "[t]he question is whether the [allegedly conspiratorial] agreement joins together 'independent centers of decision[-]making.'"  *Id.* at 196 (quoting *Copperweld*, 467 U.S. at 769).

Two centers of decision-making "are not 'independent' if one sufficiently controls the other."  *Commonwealth ex rel. Martino-Fleming v. S. Bay Mental Health Ctr., Inc.*, 334 F. Supp. 3d 394, 402 (D. Mass. 2018) (quoting *In re Aluminum Warehousing Antitrust Litig.*, 95 F.Supp.3d 419, 445 (S.D.N.Y. 2015)).  By extension, "a non-wholly owned affiliate cannot conspire with its parent . . . if they are jointly controlled," just as "agents [] merely carrying out the decisions of principals . . . are not separate entities" and thus cannot conspire with each other. *Martino-Fleming*, 334 F. Supp. 3d at 402-03.  Therefore, the intra-corporate conspiracy doctrine may bar a civil-conspiracy claim against a non-wholly owned subsidiary, like Nephria Bio, if its majority stakeholder exercises sufficient control over it.

Defendants argue that plaintiff has previously benefitted from its characterization of Nephria Bio as an agent working at the direction of EOFlow, and therefore the Court should hold plaintiff to the same position here.  Again, for judicial estoppel to apply, "a party [must have] adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage."  *Alternative Sys. Concepts*, 374 F.3d at 33 (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003)).

Plaintiff has consistently maintained that Nephria Bio was controlled by EOFlow in the execution of the alleged misappropriation.  In its second amended complaint, for example,

plaintiff alleges that Nephria Bio "acted as an agent of EOFlow" in furtherance of its tortious conduct.  (Sec. Am. Compl. ¶¶ 22, 31, 92, 161).  Moreover, in arguing for and securing an adverse-inference sanction stemming from Welford's spoliation of evidence, plaintiff repeatedly asserted that Nephria Bio acted pursuant to EOFlow's direction.  (Pl.'s Mot. Adv. Inf. at 3, 16).  To persuade the Court that the adverse inference should extend beyond Welsford to Nephria Bio and EOFlow, plaintiff explicitly adopted an agency theory and represented that "[a]t all times during the development of EOPatch 2, Nephria took direction from EOFlow and acted as its agent," (*id.* at 3), and that "Nephria . . . takes direction from EOFlow," (Pl.'s Reply Supp. Mot. Adv. Inf. at 13).

Relying in part on plaintiff's characterization, the Court granted its motion for an adverse-inference instruction against Nephria Bio, Welsford, and EOFlow.  (ECF No. 532).  Plaintiff thus successfully convinced the Court to accept its prior position—which is directly inconsistent with its current view—in a decision that delivered a benefit to plaintiff in this case.  Allowing plaintiff to reverse course at this point would give it an unfair advantage.  Under the circumstances, plaintiff is estopped from arguing that Nephria Bio was not acting under the control of EOFlow throughout the alleged tortious conduct.

The Court will therefore grant defendants' summary judgment motion in favor of Nephria Bio as to the civil-conspiracy claim.

## IV.    <u>Conclusion</u>

For the foregoing reasons,

1.     Plaintiff's motion for summary judgment as to defendants' statute of limitations defense is DENIED.

2.     Defendants' motions for summary judgment are GRANTED in part and DENIED in part, as follows:

     a.      the motion concerning the statute of limitations defense is denied;

     b.      the motion concerning the specificity of Trade Secrets 1 and 2 is denied;

     c.      the motion concerning the chapter 93A claim is granted; and

     d.      the motion concerning the civil-conspiracy claim is granted as to defendants Malave, Welsford, Kim, and Nephria Bio, and denied as to defendants DiIanni and EOFlow.

**So Ordered.**

                           /s/ F. Dennis Saylor IV
                           F. Dennis Saylor IV
Dated:  October 31, 2024         Chief Judge, United States District Court