**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| INSULET CORPORATION, | |
| *Plaintiff*, | **No. 1:23-cv-11780-FDS** |
| v. | ORAL ARGUMENT REQUESTED |
| EOFLOW CO., LTD.; *et al.*, | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF INSULET CORPORATION'S
MOTION FOR A PERMANENT INJUNCTION**

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 3

Legal Standard ..................................................................................................................... 7

Argument .............................................................................................................................. 7

    I.   All the traditional factors support issuance of a permanent injunction. ........................... 7

        A.  Without an injunction, Insulet will suffer further irreparable harm from Defendants' willful and malicious misappropriation. ..................................................... 7

        B.  Money damages are inadequate to compensate Insulet for Defendants' misappropriation. ........................................................................................................ 14

        C.  The balance of hardships strongly favors a permanent injunction. ........................... 16

        D.  The public interest strongly favors an injunction. ...................................................... 17

    II.  The scope of the proposed permanent injunction is appropriate. .................................... 19

    III. A permanent injunction would not amount to a double recovery .................................... 23

Conclusion .......................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*10X Genomics, Inc. v. Bruker Spatial Biology, Inc.*,
2024 WL 5201115 (D. Del. Dec. 23, 2024)..................................................................16

*Acumed LLC v. Stryker Corp.*,
551 F.3d 1323 (Fed. Cir. 2008)..................................................................................10

*Allstate Ins. Co. v. Fougere*,
581 F. Supp. 3d 307 (D. Mass. 2022) ........................................................................14

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
187 F. Supp. 3d 217 (D. Mass. 2016) ........................................................................12

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*,
663 F.3d 966 (8th Cir. Dec. 2011) .............................................................................22

*Benchmark Techs., Inc. v. Tu*,
2023 WL 8371973 (D. Mass. May 30, 2023) ...............................................10, 13, 14

*BioPoint, Inc. v. Dickhaut*,
110 F.4th 337 (1st Cir. 2024)......................................................................................23

*Bos. Centerless, Inc. v. DeSantis*,
2022 WL 16639138 (D. Mass. Nov. 2, 2022) .............................................................17

*Boston Sci. Corp. v. Lee*,
2014 WL 1946687 (D. Mass. May 14, 2014) ..............................................................11

*Builder Servs. Grp., Inc. v. Harkins*,
2023 WL 4685943 (D. Mass. July 21, 2023).........................................................16, 17

*ClearOne Commc'ns, Inc. v. Bowers*,
643 F.3d 735 (10th Cir. 2011) ..............................................................................23, 25

*Comerica Bank & Tr., N.A. v. Habib*,
433 F. Supp. 3d 79 (D. Mass. 2020) ...........................................................................7

*Comet Techs. USA Inc. v. XP Power LLC*,
2022 WL 4625149 (N.D. Cal. Sept. 30, 2022) .....................................................22, 23

*Complex Sys., Inc. v. ABN AMRO Bank N.V.*,
2014 WL 1883474 (S.D.N.Y. May 9, 2014) ...............................................................10

*Crane Sec. Techs., Inc. v. Rolling Optics AB,*
    337 F. Supp. 3d 48 (D. Mass. 2018) ................................................12

*DraftKings Inc. v. Hermalyn,*
    732 F. Supp. 3d 84 (D. Mass. 2024) ................................................17

*DSC Commc'ns Corp. v. Next Level Commc'ns,*
    107 F.3d 322 (5th Cir. 1997) ................................................24, 25

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ................................................7

*Endo-Surgery, Inc. v. Crescendo Techs., LLC,*
    2009 WL 2707805 (S.D. Ohio Aug. 24, 2009) ................................................22

*Gen. Elec. Co. v. Sung,*
    843 F. Supp. 776 (D. Mass. 1994) ................................................22

*Glob. NAPs, Inc. v. Verizon New England, Inc.,*
    706 F.3d 8 (1st Cir. 2013) (per curiam) ................................................13

*Indio Prods., Inc. v. C S P Yemaya Int'l, Inc.,*
    2021 WL 2169123 (C.D. Cal. Jan. 4, 2021) ................................................18

*Kelly Toys Holdings, LLC v. alialialiLL Store,*
    606 F. Supp. 3d 32 (S.D.N.Y. 2022) ................................................13

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC,*
    729 F. Supp. 3d 84 (D. Mass. 2024) ................................................7, 8, 13, 18, 23

*Merial Ltd. v. Cipla Ltd.,*
    681 F.3d 1283 (Fed. Cir. 2012) ................................................11

*NuScience Corp. v. Henkel,*
    2009 WL 10700220 (C.D. Cal. Apr. 14, 2009) ................................................18

*OmniGen Research, LLC v. Wang,*
    2017 WL 5505041 (D. Or. Nov. 16, 2017) ................................................20

*PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd,*
    47 F.4th 156 (3d Cir. 2022) ................................................24

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH,*
    237 F.3d 1359 (Fed. Cir. 2001) ................................................10

*ResMan, LLC v. Karya Prop. Mgmt., LLC,*
    2021 WL 3423345 (E.D. Tex. Aug. 5, 2021) ................................................24

*RKI, Inc. v. Grimes*,
    200 F. Supp. 2d 916 (N.D. Ill. 2002) ...................................................................................24

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ...........................................................................16, 17, 25

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
    1993 WL 286484 (N.D. Ill. July 29, 1993) ..........................................................................23

*Union Carbide Corp. v. Tarancon Corp.*,
    742 F. Supp. 1565 (N.D. Ga. 1990) ....................................................................................22

*Veracode, Inc. v. Appthority*,
    137 F. Supp. 3d 17 (D. Mass. 2015) .............................................................................10, 25

*Versah, LLC v. UL Amin Industr.*,
    2021 WL 3885865 (E.D. Mich. Aug. 31, 2021) ...................................................................19

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
    782 F.2d 995 (Fed. Cir. 1986) ............................................................................................17

*Zeltiq Aesthetics, Inc. v. Brown Health Relaxation Station LLC*,
    2014 WL 1818154 (E.D. Wis. May 6, 2014) ........................................................................18

**Statutes**

18 U.S.C. § 1836.................................................................................................................23

18 U.S.C. § 1837.................................................................................................................20

## INTRODUCTION

Insulet risked years of labor and a massive investment of capital to develop the innovative trade secrets embodied in its market-leading Omnipod.[1]   The jury found by overwhelming evidence that Defendants willfully and maliciously misappropriated those trade secrets, by copying Insulet's proprietary designs, sharing confidential Insulet documents with competitors, and using the Omnipod's regulatory documentation to make it appear that the EOPatch 2 is safe and effective, thus short-circuiting both the design and regulatory processes.   The jury properly concluded that EOFlow had unjustly enriched itself by hundreds of millions of dollars and ordered it to pay these ill-gotten gains to Insulet in damages.

Nothing about the jury's verdict, however, prevents Defendants from continuing their wide-ranging misuse of Insulet's trade secrets.   Today, EOFlow can still sell the pirated EOPatch 2 wherever it has been approved, and can still seek regulatory approval in new markets, including ones where Insulet operates.   Nothing stops Defendants from sharing or selling the confidential specifications for the Omnipod to Insulet's most significant global competitors.   And nothing prevents Defendants from advertising Insulet's trade secrets to the world in patent applications and other public filings.   To prevent these irreversible harms, the Court should enter a permanent injunction in the form proposed by Insulet.   *See* Proposed Order.

All four of the traditional permanent-injunction factors are satisfied here.   ***First***, without an injunction, Insulet faces a classic form of irreparable harm:  loss of its core trade secrets, an

---

[1] For purposes of this brief, "trade secrets" means the four trade secrets on which the jury found liability:  the computer-aided design (CAD) files for the Omnipod, the design and manufacturing process for the Omnipod soft cannula, the occlusion detection algorithm (ODA), and the Design History File (DHF) for the Omnipod Eros.   *See* ECF No. 833 (Jury Verdict Form).   Unless otherwise specified, "Defendants" means Defendants EOFlow Co., Ltd., EOFlow, Inc. Nephria Bio, Inc., Jesse Kim, Ian Welsford, and Steven DiIanni.   "EOFlow" means both EOFlow Co., Ltd. and EOFlow, Inc.

injury that cannot be undone. From that loss a series of irreparable competitive harms will follow, including erosion of Insulet's market share, customer base, pricing, goodwill, and reputation. Many of these harms are ongoing now. And given Defendants' record of willful and malicious misappropriation, along with new evidence that Defendants are *continuing* to deceive the markets and seek new deals to commercialize their misappropriated technology, there is every reason to think more harms will follow unless an injunction issues. ***Second***, these competitive harms cannot be remedied by money damages. Nor could the jury's damages award possibly compensate for these injuries. The jury's damages award was based on the unjust enrichment *to EOFlow* for its *past* misappropriation, not *future* harm *to Insulet* from ongoing misappropriation. Moreover, Insulet has little chance of collecting all (or even most) of that award. ***Third***, the equities strongly favor an injunction: Defendants face no unfair harms from complying with the law, but Insulet faces destruction of its lawfully earned competitive advantage. ***Fourth***, an injunction is in the public interest, because the DTSA was written to protect transformative trade secrets like the ones at issue here, and patients will be safer (and will have ready alternatives) with EOFlow's counterfeit device off the market.

The scope and terms of the proposed injunction are proper. The jurisdictional prerequisite for a worldwide injunction (misappropriation abroad that has been substantially aided by domestic misconduct) is satisfied here. And the components of the injunction—including a blanket prohibition on further use of the trade secrets, claw-backs of Insulet's confidential information, assignment of relevant patents and patent applications to Insulet, disgorgement of any breakup fee EOFlow receives from Medtronic, and an audit mechanism—are standard in cases like this one. Finally, issuing an injunction in tandem with the damages award poses no double-recovery problem. Again, whereas the jury's damages award (most of which Insulet probably never will be

able to collect) focused on EOFlow's unjust enrichment from past misappropriation, the injunction will prevent harm to Insulet from future acts.

## BACKGROUND

The trial has already established the enormous value of Insulet's trade secrets. They are the product of years of work and tens of millions of dollars of investment.[2] Each brings unique value to the design and manufacturing of the Omnipod. The CAD files allow Insulet's engineers to study the entire design for the Omnipod at the most granular level of detail and obtain the thousands of nominal dimensions and tolerances for the Omnipod that cannot be discerned through examination of a physical sample. 3 Tr. at 50:14-51:6, 57:18-61:11(O'Connor); 10 Tr. 78:17-84:3 (Clemens). The ODA fulfilled an "important requirement that the [Omnipod] detect an occlusion in less than or equal to five units of missed delivery," (3 Tr. 180:22-24 (McLaughlin)), which is crucial "for the patient's safety and life," (5 Tr. 136:25-137:6 (DiIanni)). The "new, innovative, all-in-one cannula design was" "important" because it helped meet the significant "goal" of "mak[ing] the pump smaller and more affordable and more reliable." 3 Tr. 27:4-16 (O'Connor). And the DHF provides a comprehensive package of information necessary to manufacture the Omnipod at scale, safely, and in compliance with regulatory requirements.[3] The unique value of

---

[2] *See, e.g.*, 12 Tr. 86:3-6, 89:21-90:7 (McLean testimony that total research and development expenses for Insulet from 2008 to 2012 was $89 million and breaking down expenses attributable to CAD, cannula, and ODA trade secrets); 4 Tr. 27:7-18 (McLaughlin) (estimating efforts to develop cannula trade secret from 2008 to 2012); 3 Tr. 29:10-30:1 (O'Connor) (testifying that work on cannula took "at least six, seven-plus years"); 4 Tr. 26:3-27:1 (McLaughlin) (estimating efforts to develop Omnipod Eros CAD files from 2008 to 2010); 4 Tr. 8:14-10:21 (McLaughlin) (estimating work developing the ODA trade secret from 2009 to 2013); 10 Tr. 41:12-46:16, 54:15-21 (Perkins) (testifying on work developing the Omnipod Eros DHF from 2009 to 2012).

[3] *See, e.g.*, 10 Tr. 30:14-15 (Perkins) ("[The DHF] tells you everything you need to know to design and develop and manufacture the pod, the device."); 4 Tr. 98:22-23 (McLaughlin) ("All of the design work for designing Eros would be included in the design history file as a portion of it."); 3 Tr. 68:6-12 (O'Connor) ("[The DHF is] the full history of the design."); 9 Tr. 107:22-25 (Hamm)

these trade secrets is illustrated by the inability of numerous medical-device companies—including Medtronic, Tandem, Roche, Eli Lilly, and Becton Dickinson—to replicate the Omnipod's design and commercial success, even after considerable expenditures and effort.  Benjamin Decl. ¶¶ 5-9; 4 Tr. 113:15-115:2 (Benjamin).

New developments further confirm the trade secrets' unique value.  For example, in 2024, Insulet spent over $200 million dollars in research and development (some 75% of the company's net income) to create new products derived from the trade secrets.  Benjamin Decl. ¶ 10.  The company has also received regulatory approval to market the Omnipod 5 to patients with type 2 diabetes, which makes the Omnipod 5 the first automated patch pump indicated for both type 1 and type 2 diabetes.  Benjamin Decl. ¶ 11.  At the same time, Insulet's competitors still struggle to duplicate the Omnipod's success—indeed, while the trial was ongoing, Embecta, one of Insulet's competitors, exited the patch pump space despite spending considerable capital to develop a viable device.  Benjamin Decl. ¶¶ 7-9.

By misappropriating trade secrets from Insulet, EOFlow sidestepped years of trial and error and millions in development costs—accomplishing in a matter of months what none of Insulet's better-resourced competitors could, and turning EOFlow almost overnight into an acquisition target worth $738 million to Medtronic, one of the world's largest medical-device companies.  *See* 4 Tr. 113:15-115:2 (Benjamin)**;** McLean Decl. ¶¶ 14, 27, 41.  To accomplish this misappropriation, Defendants engaged in egregious misconduct, as reflected in the jury's verdict of willful and malicious misappropriation.  Among other things, the trial record showed that EOFlow's CEO, Defendant Jesse Kim, ordered EOFlow employees to take a "complete 3D CAD file for the Insulet

---

(agreeing that the DHF "is the essential recipe that outlines what the product went through as it was being developed from the initial phases and kickoffs").

Eros" from Defendant Steven DiIanni.  5 Tr. 78:2-12, 113:9-16, 181:2-18 (DiIanni).  All told, Defendants and their employees misused thousands of documents embodying the trade secrets, 11 Tr. 238:20-239:2, 243:25-244:6, 245:20-25 (McGowan), and they acknowledged in real time that they were "stealing" (Tr. Ex 840.5) from Insulet and engaging in "piracy" (Tr. Exs. 443.1, 468).

On top of this, because they knew they were breaking the law, Defendants deliberately concealed their misconduct from Insulet.  Among other things, Defendants cautioned each other to "avoid[] mechanical features discussion[s]" of the pirated EOPatch 2 in public.  Tr. Exs. 468.2, 443; *see also* 6 Tr. 58:20-65:19 (Kim testimony on these emails).  Elsewhere, EOFlow's internal documents stressed how the company "[n]eed[ed] to keep [Insulet] guessing on our corporate plans," (Tr. Ex. 384.2); that Defendants "[j]ust need[ed] to find out what [Insulet] want[ed] while keeping a low profile on our own plans," (Tr. Ex. 580.2); and that EOFlow "did not share any [non-public] material with Insulet," (Tr. Ex. 566.1).  Genie Han, EOFlow's head of engineering, hardware development, and R&D, also admitted at trial that there were no "polic[ies] or instruction within EOFlow to not request Insulet documentation" from Insulet's ex-employees "in the development of EOPatch 2" (10 Tr. 158:2-13, 166:3-5); and he conceded that he was not "aware of any discussion within EOFlow about not using Insulet's confidential information as part of the development process" for the EOPatch 2 (10 Tr. 166:13-16).

As a result of this brazen disregard for Insulet's intellectual property, EOFlow ultimately revealed significant aspects of the trade secrets to third parties.  For example, EOFlow disclosed confidential documents embodying the trade secrets (in some instances without even removing Insulet logos from the documents) with Medtronic and other potential commercial partners (and Insulet competitors) like Tandem.  *See, e.g.*, 12 Tr. 69:25-73:8 (Beske) (acknowledging that Insulet confidential documents were placed in the EOFlow-Medtronic data room by EOFlow); Tr. Exs.

1134, 1135, 1136.  EOFlow has also applied for and obtained patents covering elements of the trade secrets.  *See* 11 Tr. 179:2-14 (Desborough); Tr. Ex. 1634.

Defendants' willful misconduct continued even after this litigation began.  Notably, this Court found that Defendant Ian Welsford "intentionally deleted" Nephria Bio email accounts containing "information [that] was unfavorable to Welsford, Nephria Bio, and EOFlow," 17 Tr. 148:6-18; ECF No. 865 at 2.  The Court also came close to holding Defendants in contempt of the preliminary injunction issued earlier in the case.  *See* ECF No. 351 at 55:14-56:20 ("I think the contempt standard has likely been met, but, nonetheless, I'm not going to do it.").

Defendants' conduct since the trial confirms that they cannot be trusted to play by the rules. For example, even as EOFlow recently acknowledged that it is facing a "liquidity crunch" after the jury's verdict and tried to assure investors that it was "securing funds" to shore up the company's finances (ECF No. 874-4 at 2), reports have emerged that Mr. Kim has been *selling off* his company shares (*see* ECF Nos. 874-5, 874-6), which has caused the South Korean securities authorities to open an investigation into EOFlow and issue a "Prior Notice of Designation as Violator of Disclosure Obligations" based on the company's failure to disclose information to the market regarding this litigation (*see* ECF No. 873-1).  And throughout the litigation and into the present, Mr. Kim has told the public that he is still considering a sale of EOFlow—and with it all the trade-secret information EOFlow has misappropriated from Insulet—to a "pharmaceutical compan[y]" that could offer a global platform for the EOPatch 2.  Carroll Decl., Ex. A at 4.  Mr. Kim has stressed that Medtronic "continues to be interested in EOFlow," (McLean Decl. ¶ 42), and analysts have touted other potential ventures for EOFlow, including "other CGM [i.e., continuous glucose monitoring] companies out there that EOFLOW could partner with," including "China's [Sinocare] and Korea's iSense."  ECF No. 874-5 at 5.

## LEGAL STANDARD

This Court "may, in its discretion, issue a permanent injunction, if it concludes": "(1) that a party has suffered—or will suffer—an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 122 (D. Mass. 2024) (brackets, ellipses, and quotation marks omitted) (quoting *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013) (per curiam)). "As the First Circuit has explained, '[t]he first two factors together require a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *Id.* at 123 (quoting *Glob. NAPs, Inc.*, 706 at 13). Because "[a] permanent injunction is an extraordinary remedy," *Comerica Bank & Tr., N.A. v. Habib*, 433 F. Supp. 3d 79, 101 (D. Mass. 2020), the Court must address all four traditional factors and make findings that the law and "facts of a situation require it to issue an injunction," *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006) (citation omitted).

## ARGUMENT

### I.    All the traditional factors support issuance of a permanent injunction.

#### A.    Without an injunction, Insulet will suffer further irreparable harm from Defendants' willful and malicious misappropriation.

The jury's award of damages properly compensates Insulet for EOFlow's unjust enrichment from its past acts of misappropriation. *See* 12 Tr. 79:16-102:2, 105:10-115:12 (McLean testimony on damages). But nothing about that award prevents Defendants from *continuing* to exploit Insulet's trade secrets. If that goes unchecked, Insulet will suffer irreparable harm. Most fundamentally, Insulet faces the ongoing "loss of [its] trade secret[s]," which courts

regularly find "to constitute irreparable harm," "in recognition of the fact that once the trade secret is lost, it is gone forever." *KPM*, 729 F. Supp. 3d at 123 (quotation marks omitted). From that loss of its trade secrets, Insulet will suffer a series of additional irreparable harms, the risk of which is only heightened by Defendants' egregious record of misconduct.

### 1. Without an injunction, Insulet will suffer losses to its market share, customer base, and competitive advantage.

When Insulet first filed this suit, EOFlow was on the verge of selling its pirated technology to Medtronic, a medical device giant with billions of dollars in resources and millions of customers around the world. 12 Tr. 59:18-20 (Beske). Such a transaction would have put EOFlow's counterfeit device in the hands of a company with the deep financial pockets, regulatory and marketing know-how, and manufacturing infrastructure to compete against Insulet directly. *See* 12 Tr. 63:24-64:2, 64:22-65:23 (Beske). Perhaps most importantly, a deal with a partner like Medtronic would allow the rapid conversion of that company's large, global population of tubed pump patients to the EOPatch 2 rather than to the Omnipod. Benjamin Decl. ¶¶ 33–34.

Crucially, this threat of a transaction between EOFlow and one of Insulet's global competitors was not unique or unrepeatable—it is just as possible now as it was when this suit was filed. Start with the fact that, at the time the Medtronic merger was in due diligence, Mr. Kim announced that EOFlow "was having discussions with a minimum of three or more companies." McLean Decl. ¶ 44. In fact, financial analysts identified at least *seven* other potential merger partners for EOFlow at the time, some four of which had a purchasing "firepower" of over $3.5 billion. McLean Decl. ¶ 44. And as noted, Mr. Kim has repeatedly told the public that a deal with Medtronic or another large pharmaceutical company remains a serious possibility, and that EOFlow is exploring a number of partnerships that would allow the company to further commercialize its products. *See* p. 6, *supra*.

Indeed, EOFlow may be an even *more* attractive acquisition target today, because the jury's misappropriation is confirmation that EOFlow has stolen Insulet's core trade secrets and is thus publicly known to possess Insulet's successful technology. Unless an injunction enters, Insulet's competitors know they can get the keys to the Omnipod by partnering with EOFlow.

As explained, if EOFlow were able to consummate such a transaction, the harms to Insulet would be enormous. Head-to-head competition from a well-financed rival offering a competing patch pump built on the back of misappropriation of Insulet's trade secrets would cause Insulet significant losses to its market share and customer base, with losses potentially exceeding the unjust-enrichments damages awarded by the jury. McLean Decl. ¶¶ 20-21. Third parties recognize the likelihood of these injuries—for example, after the Medtronic deal was announced, analysts opined that Insulet would face serious headwinds from the new competition. McLean Decl. ¶ 48. These competitive harms are compounded by the fact that Insulet is effectively a one-product company: all the current variants of the Omnipod offered to patients are built off the trade secrets. *See* e 4 Tr. 110:18-111:1 (Benjamin) (discussing similarities between Omnipod 5 and Eros and how "the mechanics of the Omnipod 5 platform are almost exactly the same as the Eros system"); 2 Tr. 127:17-129:17 (Ly) (discussing different versions of the Omnipod and how the core technology is essentially the same). And because of the considerable investment necessary to develop the trade secrets, Insulet has only just begun to earn an annual profit in the last few years (and is still not profitable on a cumulative basis). Benjamin Decl. ¶¶ 20-21. The upshot is that if EOFlow continues capitalizing on their misappropriation, Insulet and its investors likely will never see a full return on their investment, and the company will suffer significant and irreparable loss to its market share and customer base.

In addition to these risks on the horizon, Insulet is suffering irreversible competitive harm

now, even before EOFlow has found a new merger partner.  As long as EOFlow is on the market anywhere, even in jurisdictions where Insulet does not currently distribute the Omnipod, it is gaining invaluable customer, market, and technical feedback, all of which allows it to improve its product and manufacturing processes.[4]  This in turn makes EOFlow a more attractive prospect to Insulet's competitors and a growing threat to Insulet's market standing.  Benjamin Decl.  ¶¶ 31-32.

In short, "if Defendants are permitted to carry out the plans they initiated prior to this lawsuit," then Insulet's "competitive advantage in the marketplace based on" its trade secrets "would be lost," which "would allow [EOFlow] to usurp [Insulet's] customers."  *See Benchmark Techs., Inc. v. Tu*, 2023 WL 8371973, at *3 & n.6 (D. Mass. May 30, 2023).  The ensuing competitive harms Insulet would suffer—"lost market share" and "lost future sales," and being "forced to compete against products that incorporate" its own trade secrets—are widely recognized as irreparable. *Veracode, Inc. v. Appthority*, Inc., 137 F. Supp. 3d 17, 89 (D. Mass. 2015).[5]

### 2.   Without an injunction, Insulet will suffer price erosion.

Permitting EOFlow to further commercialize its stolen technology would cause Insulet another irreversible economic harm: price erosion.  *See, e.g., Purdue Pharma*, 237 F.3d at 1368

---

[4] *Cf.* 3 Tr. 188:24–190:3 (McLaughlin) (testifying on how ODA trade secret was improved based on customer feedback after Omnipod's launch); 4 Tr. 9:15–10:6 (McLaughlin) (additional testimony on this point); 2 Tr. 124:9–21 (Ly) (testifying on how Insulet has improved Omnipod based on feedback from patients and physicians).

[5] *See also, e.g., Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 2014 WL 1883474, at *12 (S.D.N.Y. May 9, 2014) (collecting authority for "well-established" proposition "that a movant's loss of current or future market share may constitute irreparable harm"); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1329 (Fed. Cir. 2008) (emphasizing that "[a]dding a new competitor to the market may create an irreparable harm"); *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (affirming preliminary injunction) (evidence that "loss of market position was likely" if competitor were allowed to launch infringing product supported finding of irreparable harm and permanent injunction).

("likelihood of price erosion" is an irreparable harm); *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012) (similar).

Again, Insulet has had to invest substantial time and capital into developing the trade secrets.  The pricing of the Omnipod fairly reflects that investment:  it is carefully set so that Insulet can recoup its costs, build up funds for additional research and investment, and hopefully turn a reasonable profit.  Benjamin Decl. ¶ 22.  But by unfairly bypassing those investments through theft, EOFlow can sell the EOPatch 2 at a cheaper price and still expect to profit.  Benjamin Decl. ¶ 23.  That in turn threatens Insulet with price erosion, both in the markets where the Omnipod is already sold and in markets Insulet may want to enter.  If EOFlow is allowed to sell the EOPatch 2 at a discount in the 25 countries where the Omnipod is already available, payors will demand comparable lower prices for the Omnipod.  *Id.*  That downward pressure on pricing would likely be permanent—in Insulet's experience, the Omnipod's price does not recover even when a cheaper and inferior competitor is ultimately removed from the market.  Benjamin Decl. ¶ 24.  In markets where EOFlow already operates and Insulet may consider expansion, the cheapness of the EOPatch 2 sets a prohibitively low price ceiling for the Omnipod, which may ultimately discourage Insulet from launching there at all.  Benjamin Decl. ¶ 26.  The result in both cases is irreparable damage to Insulet's pricing and market prospects.

### 3.  Without an injunction, Insulet risks additional public disclosure of the trade secrets.

Insulet also faces the prospect of further "disclosure of" its "confidential information," which "is, in itself, an irreparable harm."  *Boston Sci. Corp. v. Lee*, 2014 WL 1946687, at *6 (D. Mass. May 14, 2014) (granting preliminary injunction).  Again, as Insulet proved at trial, Defendants have already shared significant chunks of the trade secrets with third parties, including disclosing confidential Insulet documents to Insulet's competitors and publicly disclosing aspects

of the trade secrets in improper patent applications. *See* p. 5, *supra*. Without an injunction, additional disclosures are inevitable. Again, Mr. Kim has consistently told the public that he is still in talks with Medtronic and other potential business partners, *see* p. 6, *supra*; nothing currently prevents him and EOFlow from once again sharing reams of confidential Insulet documents in due diligence, or from filing more public patent applications disclosing the trade secrets.

### 4. Without an injunction, Insulet will suffer harm to its reputation.

Given that EOFlow has broadly advertised the EOPatch 2 as an equivalent to the Omnipod for "users in the market monopolized by Insulet Corporation for the last 16 years," (Tr. Ex. 962.2), Insulet faces serious risks to its reputation and customer goodwill that has taken decades to develop. *See, e.g.*, *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 187 F. Supp. 3d 217, 223 (D. Mass. 2016) ("Examples of irreparable injuries include injuries to goodwill and reputation because they, by nature, cannot be easily measured or fully compensable in damages."); *Crane Sec. Techs., Inc. v. Rolling Optics AB*, 337 F. Supp. 3d 48, 60-61 (D. Mass. 2018) (similar). These harms would obviously occur if EOFlow enters Insulet's markets and poaches its patients. *See Arborjet*, 187 F. Supp. 3d at 223 (irreparable harm where plaintiff "will lose credibility and goodwill with [its] clients if [the defendant] is permitted to convince them to switch to a generic product"). But there is real risk that these harms will manifest even before that happens because Insulet's patients may now associate the Omnipod with an inferior product.

As Insulet proved at trial, one of the reasons why its DHF trade secret is so valuable is that it provides documentation demonstrating that the Omnipod is "safe and effective" for patients.[6] Defendants never put in the work to create a legitimate DHF for the EOPatch 2. Instead, they used

---

[6] *E.g.*, 2 Tr. 131:21–132:1 (Ly) (discussing how safety and efficacy must be demonstrated in order to secure regulatory approval); 3 Tr. 70:11-22 (O'Connor) (explaining that a DHF is critical in part "to make sure it's a safe product for people"); p. 4, *supra*.

the Omnipod's DHF and passed it off as their own to help convince Medtronic and the FDA that the EOPatch 2 had been proven safe and effective. 9 Tr. 114:15-115:4, 125:8-130:22 (Hamm) (discussing use of Insulet confidential information to develop documents for 510(k) and Medtronic acquisition). The result is that EOFlow is selling a medical device that EOFlow itself promotes as being equivalent to the Omnipod, but which lacks anything like the Omnipod's safety guarantees. Indeed, studies have already been published suggesting that the EOPatch 2 does not function properly for the full 84-hour period it is supposed to last, which poses serious health risks to the diabetes patients who think the device is delivering insulin for the full indicated period. Ly Decl. ¶ 13. Accordingly, "by virtue of trafficking in counterfeit goods, particularly ones of inferior quality, [the] Defendants have caused unquantifiable irreparable harm to the goodwill and reputation associated with" Insulet and the Omnipod Eros. *Kelly Toys Holdings, LLC v. alialialiLL Store*, 606 F. Supp. 3d 32, 52 (S.D.N.Y. 2022) (trademark and copyright claims).

### 5. Defendants' willful and malicious misappropriation and their continuing misconduct increases the likelihood that Insulet will suffer further irreparable harm.

The risk of additional irreparable harm to Insulet is compounded by Defendants' history of willful and malicious misappropriation. This Court has repeatedly recognized that when a trade-secret defendant has taken "brazen actions over a substantial period of time" that have *already* caused "irreparable injury to" the plaintiff, "it is fair to anticipate that" the defendant "would commit future, similar misdeeds in the absence of a permanent injunction." *KPM*, 729 F. Supp. 3d at 123 (finding this factor supported permanent injunction); *Benchmark Techs., Inc. v. Tu*, 2023 WL 8371973, at *3 (similar); *cf. Glob. NAPs*, 706 F.3d at 13 (similarly reasoning that district court issuing permanent injunction "had every reason to fear that [defendant] might inflict injuries that were difficult to detect" given he had "repeatedly employed nefarious tactics").

The same inference is warranted here. The jury heard and credited overwhelming evidence

of Defendants' willful and malicious misappropriation:  proof that Defendants knew in real time they were violating the law, and that they took active measures to conceal their theft.  The jury also heard evidence that Defendants persisted in their misconduct even after being sued, including by deleting evidence material to this litigation.  There is no sign Defendants are changing course now; again, recent reports have revealed that EOFlow is under investigation by Korean securities regulators for deceiving investors, and Mr. Kim is unrepentant in his intent to commercialize EOFlow's counterfeit technology through a partnership with Insulet's competitors.  *See* p. 6, *supra*. These are not actors who can be expected to comply voluntarily with the law.

"In sum, based on [Defendants'] pattern of brazen, willful, and unlawful conduct prior to" the jury's verdict of willful and malicious misappropriation and their continuing pattern of misconduct, this Court should "'ha[ve] every reason to fear that [Defendants] might inflict [future] injuries' on [Insulet] using any of or all of [the asserted] trade secrets that would not be measurable or compensable through money damages."  *Benchmark Techs.*, 2023 WL 8371973, at \*3.

## B. Money damages are inadequate to compensate Insulet for Defendants' misappropriation.

For the reasons already given, Insulet is suffering and will continue to suffer a series of "substantial injur[ies] that [are] not accurately measurable or adequately compensable by money damages."  *Allstate Ins. Co. v. Fougere*, 581 F. Supp. 3d 307, 320 (D. Mass. 2022) (quoting *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008)).  There are two additional reasons why the money damages awarded by the jury cannot possibly compensate Insulet for these harms.

*First,* the jury's damages award here does not account for the full scope of Insulet's harms. That is because neither of the damages models Justin McLean, Insulet's damages expert, laid out to the jury was focused on future injuries Insulet would suffer from ongoing misappropriation.

Start with the "market-value" approach presented by Mr. McLean, which the jury appears

to have followed at least with respect to its award of damages for misappropriation of the CAD, cannula, and ODA trade secrets. *See* McLean Decl. ¶¶ 3-4. The market-value method calculated the portion of the Medtronic merger purchase price attributable to the trade secrets. As a result, this method was necessarily focused on the value of the trade secrets *to Medtronic*, not on the harms that would occur *to Insulet* if the deal went through. McLean Decl. ¶ 5. In addition, Mr. McLean's calculations under the market-value approach were extremely conservative: for example, in apportioning the value of the Medtronic purchase price, Mr. McLean assumed that EOFlow's research and development (which was largely unsuccessful, and did not focus exclusively on the patch pump technology that ultimately attracted Medtronic) had an equal return on investment to Insulet's research and development (which of course *did* produce the patch pump technology Medtronic wanted to purchase). McLean Decl. ¶ 28.

The alternative "head-start" approach modeled by Mr. McLean also was not focused on future harms to Insulet. Instead, this method estimated the value of the trade secrets *to EOFlow*, by calculating how its prior misuse of the trade secrets would help to accelerate EOFlow's cash flows over a four-year period. McLean Decl. ¶ 28. And again, Mr. McLean's estimates under this method were markedly cautious; among other things, the head-start method only captured the value the trade secrets would provide to EOFlow over a limited period of time, and it expressly excluded certain product offerings from EOFlow (such as the EOPancreas) that likely also received a head-start benefit from misappropriation of the trade secrets. McLean Decl. ¶ 28.

As a result, the award of unjust-enrichment damages in this case was never designed to encompass all the harms Insulet would suffer from ongoing misappropriation of its trade secrets. Indeed, Mr. McLean estimates that if EOFlow's continued presence in the market caused just 5 percent price erosion for the Omnipod or 5 percent lost unit sales, Insulet's losses over a three-

year period would be greater than the compensatory damages awarded by the jury.  McLean ¶¶ 22-23.

***Second***, the "questionable financial condition" of EOFlow "reinforces the inadequacy of a remedy at law" here.  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).  According to its own public disclosures, as of September 2024 (*i.e.*, *before* the costly trial in this case), EOFlow had approximately $60 million in assets, some of which are not liquid, alongside about $36 million in debt, meaning EOFlow only has around $24 million in net assets. McLean Decl. ¶¶ 9-10.  That comes nowhere close to the $170 million required to satisfy the jury's base unjust-enrichment award, still less the full $452 million when enhanced damages are added.

Indeed, Defendants themselves have admitted that EOFlow faces financial headwinds.  In just the past few weeks, EOFlow told shareholders that the company faces a "liquidity crunch" and it "does not expect to be able to completely dispel" concerns about its finances.  ECF No. 874-4; p. 6, *supra*.  The fact that that EOFlow "itself says" that "the company is under financial stress" confirms that collection on the full damages award is unlikely.  *10X Genomics, Inc. v. Bruker Spatial Biology, Inc.*, 2024 WL 5201115, at *15 (D. Del. Dec. 23, 2024) (finding remedies at law inadequate for these reasons).  On top of this, recent developments have raised serious concerns that Defendants may be trying to conceal assets—for example, even as EOFlow made efforts to raise new capital, Mr. Kim has been actively selling off his shares in the company.  *See* p. 6, *supra*. Simply put, even granting the false premise that the damages award here c*ould* make Insulet whole, there is little chance Insulet *will* receive anything like full payment on it.

## C.    The balance of hardships strongly favors a permanent injunction.

The balance of hardships also tilts in Insulet's favor.  On the one hand, "[a]n injunction prohibiting Defendants from misappropriating" Insulet's trade secrets "does little to affect the existing legal relationship between the parties," because Defendants are "already legally barred

from committing these acts." *Builder Servs. Grp., Inc. v. Harkins*, 2023 WL 4685943, at *7 (D. Mass. July 21, 2023) (granting preliminary injunction). Doubtless Defendants will argue, as they did in opposition to a preliminary injunction, that an injunction will spell the end for EOFlow as a company. That prediction is likely overwrought. After all, EOFlow originally focused on developing different technology (using electroosmosis) for its patch pump before deciding to steal Insulet's trade secrets (*see* 6 Tr. 25:19-27:5 (Kim)), and there is no reason why the company cannot shift back to honest competition. And even as they have acknowledged financial headwinds, EOFlow and Mr. Kim have said they are "confiden[t]" that the company "still holds corporate value" despite the verdict in this case (Carroll Decl., Ex. A at 4); have stressed to investors that they are "exploring capital procurement through paid third-party capital offering and sale of control [of the company]" *id.*; and have touted "plan[s] to begin selling [the EOPatch 2] in China within the next year." *Id.* at 5. More fundamentally, harms that result from having to obey the law are not the sort that counsel against an injunction: "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986); *see also, e.g.*, *Robert Bosch LLC*, 659 F.3d at 1156 (similarly emphasizing that "[a] party cannot escape an injunction simply because ... its primary product is an infringing one").

"On the other hand, requiring [Insulet] to compete against its own" technology, "with the resultant harms described above, places a substantial hardship on" Insulet. *Robert Bosch LLC*, 659 F.3d at 1156. Equity favors an injunction that prevents those harms.

### D. The public interest strongly favors an injunction.

Finally, a permanent injunction is in the public interest. As this Court has recognized, the DTSA embodies a clear "public policy ... favoring the protection of trade secrets." *DraftKings*

*Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 121 (D. Mass. 2024) (granting preliminary injunction on DTSA and Massachusetts trade secret claims); *see also Bos. Centerless, Inc. v. DeSantis*, 2022 WL 16639138, at *2 (D. Mass. Nov. 2, 2022) (same).  That policy is directly implicated in this case.  Insulet has spent millions of dollars and engaged in years of risky trial and error to develop the trade secrets and create an innovative, life-saving medical device.  *See* pp. 3-4, *supra*.

On the flip side, there is "no public interest whatsoever" in continuing to allow a proven trade-secret thief to "distribut[e] its counterfeit goods."  *Indio Prods., Inc. v. C S P Yemaya Int'l, Inc.*, 2021 WL 2169123, at *7 (C.D. Cal. Jan. 4, 2021) (granting permanent injunction in copyright-infringement case); *cf. KPM*, 729 F. Supp. 3d at 124 (balance of hardship and public interest favored permanent injunction against use of plaintiff's trade secrets where defendants were "already legally barred from doing so").  That point has special force here, where the jury heard and credited overwhelming evidence of willful and malicious misappropriation by Defendants, including damning contemporaneous documents showing that Defendants privately acknowledged they were "stealing" (Tr. Ex 840.5) and engaging in "piracy" (Tr. Exs. 443.1, 468), even as they publicly announced their intent to target Insulet's market share (Tr. Ex. 962.2; *see also* pp. 8-10, *supra*).  In an egregious case like this one, "a permanent injunction would advance the public interest by serving as a deterrent to Defendants and third parties that seek to misappropriate the trade secrets of [Insulet] or others" who invest the time and capital necessary for legitimate innovation.  *NuScience Corp. v. Henkel*, 2009 WL 10700220, at *11 (C.D. Cal. Apr. 14, 2009).

Finally, a permanent injunction will benefit patients.  Again, EOFlow has never demonstrated the EOPatch 2's safety and efficacy under FDA standards, and studies suggest the EOPatch 2 does not function as indicated.  *See* pp. 12-13, *supra*.  The public is safer when bad

actors are enjoined from selling medical devices built through dishonest and dangerous shortcuts.[7]

At a minimum, no patients will be harmed or even meaningfully inconvenienced by a permanent injunction prohibiting further sales of the EOPatch 2.  Virtually all diabetes patients who need insulin delivery are familiar with traditional, widely available multiple daily injection (MDI) techniques using a syringe or a pen.  Ly Decl. ¶¶ 7-11.  Indeed, most diabetic patients who take insulin worldwide still receive it via MDI—in Korea, the largest market for the EOPatch 2, 95% of patients use MDI methods—and patients who now use a patch pump like the Omnipod or EOPatch 2 usually know how to use MDI methods.  Ly Decl. ¶¶ 9-10.

It also is common and straightforward for patients to switch between insulin-delivery devices and methods.  Patients who switch from the EOPatch 2 to the Omnipod can do so in a handful of days after getting a new prescription, often with assistance from Insulet personnel or trained contractors.  Ly Decl. ¶¶ 11-12.  Insulet also has the inventory and manufacturing capacity to absorb new patients moving from the EOPatch 2 to the Omnipod in markets where both devices are sold.  Benjamin Decl. ¶ 18.  Current users of the EOPatch 2 thus will have safe and easily accessible alternatives if EOFlow is enjoined from distributing the EOPatch 2.

## II.    The scope of the proposed permanent injunction is appropriate.

The terms of the injunction Insulet seeks are appropriate.  As set forth in the proposed form of injunction submitted with this motion, Insulet asks for a worldwide injunction that (1) orders Defendants to cease use of the asserted trade secrets, including further marketing,

---

[7] *Cf. Zeltiq Aesthetics, Inc. v. Brown Health Relaxation Station LLC*, 2014 WL 1818154, at *4 (E.D. Wis. May 6, 2014) (Lanham Act case) ("Injunctive relief is also in the public interest because the public may be physically injured by the performance of services using a medical device which has not been subject to any regulatory oversight."); *Versah, LLC v. UL Amin Industr.*, 2021 WL 3885365, at *8 (E.D. Mich. Aug. 31, 2021) (trademark case) (granting permanent injunction because public interest weighed in favor of "[p]rotecting the public" from "counterfeit versions [of medical devices] [that] could pose a threat to individuals' health and safety").

commercialization, or sales of the EOPatch 2 and other products derived from the trade secrets, and likewise prohibits further regulatory submissions derived from the trade secrets; (2) orders Defendants to claw back and return trade-secret information to Insulet, including information shared with third parties; (3) orders disgorgement of any "break-up fee" from Medtronic paid in connection with the terminated deal; and (4) orders assignment to Insulet of patents and patent applications disclosing or derived from the asserted trade secrets. This is all well supported.

Starting with the injunction's global reach, courts find worldwide injunctions "appropriate and necessary" where "Defendants' wrong actions have included conduct occurring" overseas. *OmniGen Research, LLC v. Wang,* 2017 WL 5505041, at *24 (D. Or. Nov. 16, 2017) (entering worldwide injunction in case involving trade-secret misappropriation and related claims where significant amount of misconduct occurred in China). And by its plain terms, the DTSA "applies to conduct occurring outside the United States if - (1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837.

Extraterritorial application of the injunction is authorized under both prongs here. EOFlow Inc. and Nephria Bio are both organized under U.S. law (ECF No. 290 ¶ 21; ECF No. 294 ¶ 22), and Mr. Kim is a U.S. citizen, *see* ECF No. 290 ¶ 23. And at trial, Defendants did not dispute extraterritorial application of the DTSA under the second prong, for good reason—the jurisdictional connection to the United States is clear.

For example, the trade-secret information misappropriated by Defendants was generated out of Insulet's Massachusetts offices and was improperly retained by ex-Insulet employees—

including Defendants DiIanni and Welsford, as well as Paul Hamm—inside the United States.[8] The trade secrets were then passed on from the United States to EOFlow in Korea through a variety of improper means.  DiIanni flew a "complete 3D CAD file for the Insulet Eros" from the United States to Korea and handed the file over to Kim and other EOFlow employees.[9]  DiIanni's consulting invoices also show that he worked from the United States when teaching EOFlow employees how to copy the Omnipod Eros's soft cannula design, and he also sent trade-secret information from the United States to EOFlow Korea concerning the ODA.[10]  Similarly, Paul Hamm's work (in his words) "stealing from Insulet's SWFMEA" and other Insulet DHF documents was done in the United States, as part of his employment at New Hampshire-based Nephria Bio.  Tr. Ex. 840.5; 9 Tr. 130:10-22 (Hamm).  That misappropriation of the Omnipod's DHF file culminated in submission of a misleading 510k application to U.S. regulators. 7 Tr. 246:5-8 (Welsford) (confirming that EOFlow 510(k) submitted in Dec. 2022).  Finally, Defendants repeatedly came into the United States to display and present the EOPatch 2 at industry conferences.  *See, e.g.*, 7 Tr. 82:11-13 (Malave) (discussing bringing EOFlow samples to 2018 ADA); 7 Tr. 97:8-18 (Malave) (discussing bringing samples to 2019 ADA conference).

---

[8] *See, e.g.*, 2 Tr. 171:2–8 (O'Connor) (discussing development of soft cannula); 3 Tr. 57:3–7 (O'Connor) (discussing development of CAD files); 3 Tr. 180:22:–181:4 (McLaughlin) (discussing development of ODA); 3 Tr. 77:8–15 (O'Connor) (discussing development of certain portions of DHF); 5 Tr. 56:24-57:7 (DiIanni) (confirming that he had Insulet CAD files and product specifications on his "home" and "personal" computers); 7 Tr. 140:25–145:5 (Welsford) (discussing his distribution of Insulet confidential material); 9 Tr. 115:14-116:9 (Hamm) (confirming that Insulet DHF files that he used to develop EOFlow documents were on a thumb drive); 9 Tr. 117:7–23 (Hamm) (confirming that he retained several DHF-related documents).

[9] 5 Tr. 71:17-80:3, 113:21-114:23, 181:5-182:8 (DiIanni); 6 Tr. 40:17-43:23 (Kim); *see* Tr. Exs. 312-1; *see also* Tr. Exs. 572, 603, 642 (additional email communications that include Kim, in which DiIanni directs Defendants to make use of Insulet CADs to solve engineering issues).

[10] *See, e.g.*, 5 Tr. 105:9–108:10 (soft cannula), 136:19–143:1 (ODA); Tr. Exs. 2145 (compilation of invoices), 485 (email from DiIanni sending Omnipod ODA data).

The specific remedial terms of the injunction are appropriate as well. Permanent injunctions in trade-secret cases frequently include broad prohibitions against further use of trade secrets, including blocks on further sales, commercialization, and similar activity derived from the trade secrets, because "[t]rade secret protection ... extends not only to the misappropriated trade secret itself but also to materials 'substantially derived' from that trade secret." *Gen. Elec. Co. v. Sung*, 843 F. Supp. 776, 778-80 (D. Mass. 1994) (enjoining production of product because it was "substantially derived from" plaintiff's trade secrets, and thus injunction was necessary to prevent defendants from "exploiting their wrongfully obtained competitive advantage"); *see also, e.g., Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 4625149, at *3-4 (N.D. Cal. Sept. 30, 2022) (entering permanent injunction with broad prohibitions on further use of trade secrets similar to the ones proposed here). Likewise, injunctions ordering a trade-secret defendant to claw back confidential materials and submit to audits are "not unduly burden[some]," because they are "necessary to prevent dissemination or further use of the" asserted trade secrets. *Comet*, , 2022 WL 4625149, at *3.[11]

Turning to the provisions regarding assignment of relevant patent applications, courts recognize that "[w]here intellectual property has been found to be misappropriated through a patent application, it is appropriate equitable relief to reassign the application." *Endo-Surgery, Inc. v. Crescendo Techs., LLC*, 2009 WL 2707805, at *7-8 (S.D. Ohio Aug. 24, 2009) (reassigning patent applications as part of permanent injunction in trade-secrets case); *Union Carbide Corp. v. Tarancon Corp.*, 742 F. Supp. 1565, 1581 (N.D. Ga. 1990) (ordering transfer to plaintiff of

---

[11] *See also, e.g.*, *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 975 (8th Cir. Dec. 2011) (affirming permanent injunction requiring the defendant "to return all proprietary information" because "[t]his injunction merely prevents [the defendant] from enjoying the unfettered benefits of [the plaintiff's efforts]").

defendant's patent found to misappropriate the plaintiff's trade secret). Finally, an order requiring EOFlow to disgorge any breakup fee from Medtronic is well within the equitable remedies permitted under the DTSA. *E.g.*, *BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 349-51 (1st Cir. 2024) (affirming order requiring DTSA defendant to disgorge profits attributable to misappropriation).

The need for these remedies and for a robust system of audits is especially pressing here. Again, overwhelming evidence demonstrated that Defendants knowingly violated the law and concealed their misconduct for years. Defendants then tried to cover up their misappropriation after being sued, through spoliation. Today, EOFlow is being investigated for failing to be truthful with investors about this litigation, and Mr. Kim has been actively selling off his shares even as the EOFlow is telling investors it will weather financial headwinds. *See* p. 6, *supra*. A broad injunction with strong enforcement mechanisms is the only way to guarantee that Defendants comply with the law going forward. *Cf. Comet*, 2022 WL 4625149, at *3-4 (finding comparable provisions appropriate after finding of willful and malicious misappropriation).

## III. A permanent injunction would not amount to a double recovery.

In light of the position they took in the recent Joint Status Report, *see* ECF No. 866 at 4, Insulet expects that Defendants will argue that a permanent injunction would amount to "an impermissible double recovery" in light of the jury's damages verdict. Defendants are incorrect.

For one thing, the DTSA provides that courts may issue an injunction "*and*" award money damages (among other forms of potential relief) to remedy a violation. 18 U.S.C. § 1836(b)(3)(A)-(B) (emphasis added). More generally, courts have regularly recognized that a permanent injunction may be appropriate in a trade-secret case even when the plaintiff "obtained multimillion dollar awards." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 753-54 (10th Cir. 2011).[12]

---

[12] *See also, e.g., KPM*, 729 F. Supp. 3d at 101-02, 112, 123-25 (finding that factors favored injunction even after plaintiff had received multi-million dollar damages award); *Rockwell*

In addition, there is no double-recovery issue when it is clear that the damages awarded in the case will not fully compensate a plaintiff for harms from further misappropriation. For example, when the money damages awarded to a trade-secret plaintiff are "measured by the amount attributable to [the defendant's] unjust enrichment," they are generally meant "to compensate [the plaintiff] for the damages sustained *in the past*, not the harm reasonably likely to occur from *future* use of the trade secret." *ResMan, LLC v. Karya Prop. Mgmt., LLC*, 2021 WL 3423345, at *4 (E.D. Tex. Aug. 5, 2021) (emphasis added) (rejecting similar double-recovery argument in DTSA case). By contrast, "an injunction prevents harm from occurring *in the future*." *Id.* (emphasis added). There is therefore no double-recovery problem with awarding such unjust-enrichment damages together with an injunction. *Id.*[13] For that reason, issuing a permanent injunction would not give Insulet a double recovery here. As already explained, Mr. McLean presented the jury with two damages models, both of which were focused on *EOFlow's* unjust enrichment from the misappropriation Defendants had *already* engaged in. Neither of these methods accounted for *future* economic loss *to Insulet* from continuing misappropriation, such as Insulet's lost sales if the EOPatch 2 launched in the United States or other jurisdictions where the Omnipod is available. *See* pp. 8-10, 15, *supra*; McLean Decl. ¶¶ 13, 20-23.

In light of this, the one case Defendants cited in the Joint Status Report (ECF No. 866 at 4) for their double-recovery argument, *DSC Commc'ns Corp. v. Next Level Commc'ns*, is inapposite. 107 F.3d 322, 329 (5th Cir. 1997). In that case, the plaintiff had been awarded damages

---

*Graphic Sys., Inc. v. DEV Indus., Inc.*, 1993 WL 286484, at *6 (N.D. Ill. July 29, 1993) (similarly recognizing that "the award of an injunction and money damages is typical in a trade secret case" (citation omitted)).

[13] *See also, e.g.*, *PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 163-64 (3d Cir. 2022) (similar where unjust-enrichment damages focused on defendant's "past uses of the misappropriated trade secrets," whereas permanent injunction was "forward-looking"); *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 926 (N.D. Ill. 2002) (similar).

entirely on a theory of "future lost profits," and so the Fifth Circuit held that the district court properly declined to issue a permanent injunction, because the plaintiff was already "sufficiently compensated" for potential future misappropriation. *Id.*, at 328-29. Not so here: as already explained, the damages awarded by the jury were focused on unjust enrichment to EOFlow from past misappropriation and do not compensate Insulet for future misappropriation.

Even if the Court disagrees and concludes that the jury's damages award compensates Insulet for *some* future harms it might suffer, that still would not support Defendants' double-recovery argument. For the reasons already given, Insulet faces a variety of harms that the case law broadly recognizes *cannot* be fully remedied through money damages—above all, being "forced to compete against products that incorporate" the company's own trade secrets. *Veracode*, 137 F. Supp. 3d at 89; pp. 14-16, *supra*. No amount of money damages can undo such harm.

Moreover, courts have recognized that when "it is apparent from the record .... that [a trade-secret plaintiff] has had, and is likely to continue to have, difficulty in collecting on the monetary judgments" in the case, it is especially appropriate to enter a permanent injunction alongside damages, because "the injunctive relief awarded by the district court may end up being the more meaningful of the two forms of relief." *ClearOne*, 643 F.3d at 754; *see also, e.g.*, *Robert Bosch*, 659 F.3d, 1150-51 (defendant's inability to pay reinforces propriety of injunction). That is the case here—EOFlow will likely be unable to satisfy the damages verdict. *See* pp. 15-16, *supra*.

## CONCLUSION

The Court should issue a permanent injunction in the form proposed by Insulet.[14]

---

[14] Once this Court has decided Insulet's motion for a permanent injunction and Defendants' post-trial motions, Insulet will submit a full proposed form of judgment for the Court's consideration. Insulet reserves the right to seek pre- or post-judgment interest on the jury's damages award and to move for an award of attorneys' fees in this case.

January 24, 2025

Respectfully submitted.

Jenny Zhang (BBO No. 689838)
Matthew Ginther (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-1000
JZhang@goodwinlaw.com
MGinther@goodwinlaw.com

Alexandra D. Valenti (*pro hac vice*)
James Breen (*pro hac vice*)
Timothy Keegan (*pro hac vice*)
Arshjit Raince (*pro hac vice*)
Danit Maor (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
AValenti@goodwinlaw.com
JamesBreen@goodwinlaw.com
TKeegan@goodwinlaw.com
ARaince@goodwinlaw.com
DMaor@goodwinlaw.com

 /s/ *Robert D. Carroll*
Robert D. Carroll (BBO No. 662736)
Robert Frederickson III (BBO No. 670111)
Scott T. Bluni (BBO No. 660187)
Alexandra Lu (BBO No. 691114)
William E. Evans (BBO No. 706382)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
RCarroll@goodwinlaw.com
RFrederickson@goodwinlaw.com
SBluni@goodwinlaw.com
ALu@goodwinlaw.com
WEvans@goodwinlaw.com

*Attorneys for Plaintiff Insulet Corporation*

26

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was filed on January 24, 2025, through the ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *Robert D. Carroll*
Robert D. Carroll (BBO No. 662736)
