IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INSULET CORPORATION,<br><br>       *Plaintiff*,<br><br>  v.<br><br>EOFLOW CO., LTD.; *et al.*,<br><br>       *Defendants*. | **No. 1:23-cv-11780-FDS**<br><br>ORAL ARGUMENT REQUESTED |

**INSULET'S SUPPLEMENTAL REPLY REGARDING
<u>PERMANENT INJUNCTION AND STAY</u>**

## **TABLE OF CONTENTS**

Introduction ................................................................................................................................... 1

Argument ...................................................................................................................................... 2

    I.   Defendants concede that, even if an injunction is awarded, Insulet is entitled to keep the backward-looking portion of the jury's damages award. .............................................. 2

    II.  The Court should enter a permanent injunction with the terms proposed by Insulet. ........ 3

    III. Any stay should be limited to permitting sales of the EOPatch 2 to existing patients in Korea, Spain, and Portugal. ................................................................................................ 7

Conclusion .................................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acevedo-Garcia v. Vera-Monroig*,
   296 F.3d 13 (1st Cir. 2002) ................................................................................................ 8

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ....................................................................... 7

*CardiAQ Valve Techs., Inc. v. Neovasc Inc.*,
   2016 WL 8710447 (D. Mass. Dec. 2, 2016) ................................................................. 7, 8

*Cognitive Edge Pte Ltd. v. Code Genesys, LLC*,
   2021 WL 4477434 (D. Mass. Sept. 30, 2021) ................................................................... 8

*Comet Techs. USA Inc. v. XP Power LLC*,
   2022 WL 4625149 (N.D. Cal. Sept. 30, 2022) ........................................................ 5, 6, 10

*Comput. Sales Int'l, Inc. v. Lycos, Inc.*,
   2005 WL 3307507 (D. Mass. Dec. 6, 2005) ..................................................................... 3

*Dopp v. HTP Corp.*,
   947 F.2d 506 (1st Cir. 1991) .............................................................................................. 3

*Forster v. Boss*,
   97 F.3d 1127 (8th Cir. 1996) ............................................................................................. 2

*Lopez v. Garriga*,
   917 F.2d 63 (1st Cir. 1990) ................................................................................................ 6

*Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*,
   931 F. Supp. 18 (D. Mass. 1995) ....................................................................................... 5

*Suzuki v. Helicopter Consultants of Maui, Inc.*,
   2017 WL 2839499 (D. Haw. May 23, 2017) .................................................................... 4

*United States v. N.Y. City Bd. of Educ.*,
   620 F. Supp. 2d 413 (E.D.N.Y. 2009) .............................................................................. 9

**Treatise**

Restatement (Third) of Unfair Competition § 44 ....................................................................... 6

**INTRODUCTION**

Defendants' concessions have significantly narrowed the remaining issues. Most importantly, Defendants do not dispute that Insulet can have an injunction together with any *backward-looking* portion of the damages award. As Insulet has demonstrated, that means the Court should issue the injunction Insulet has requested, and allow Insulet to keep at least the $52.8 million of compensatory damages tied to Defendants' avoided costs (plus prejudgment interest), together with all the exemplary damages (or, at a minimum, $87.5 million of them).

The Court should reject Defendants' request to pare down the injunction's terms. The thinly worded injunction Defendants propose as an alternative is obviously unacceptable—among other things, it allows Defendants continued unfettered use of the trade secrets, would permit EOFlow to auction the trade secrets tomorrow to Medtronic or the highest bidder, and contains no enforcement mechanisms. Nor should the Court accept Defendants' arguments for setting an artificial "head-start" time limit on the injunction—the trial record established that, even though the Omnipod Eros has been on the market for more than a decade now, *no company* has been able to reverse-engineer the trade secrets.

Finally, Defendants' half-hearted arguments for a stay are unconvincing. After multiple rounds of briefing, Defendants still cannot articulate a coherent basis for excusing them from the black-letter requirement that they post a bond or an equivalent security to stay the money judgment. Their arguments for a stay of the injunction are also deficient. In their own words, the best they can show is a "meaningful" issue for appeal, not the required strong likelihood of success. And their strategically vague "voluntary terms" for a stay, like their proposed injunction, do not protect Insulet against the irreparable harm this Court has agreed is entirely foreseeable without immediate injunctive relief.

# ARGUMENT

**I.    Defendants concede that, even if an injunction is awarded, Insulet is entitled to keep the backward-looking portion of the jury's damages award.**

Defendants spend pages (at 1-5) repeating their arguments that awarding a permanent injunction together with the jury's *entire* damages award would give Insulet a double recovery. Insulet has briefed its disagreement with these arguments at length elsewhere, ECF No. 886 at 23-25; Insulet Injunction Reply at 2-6, and Insulet maintains its position that there is no duplication at all between an injunction and the jury's damages award. Crucially, however, Defendants concede (at 2) "that injunctive relief can coexist" together "with damages limited to *past* harm."

The effect of that concession is straightforward: the parties *agree* (and the law is clear) that, together with a permanent injunction, the Court should at least allow Insulet to keep any backward-looking components of the damages award. As Insulet detailed in its opening supplemental brief, those backward-looking components are easily identified. Starting with the compensatory portion of the award, both the damages theories that Insulet presented to the jury—the market-value approach, which the jury largely followed, as well as the head-start approach—incorporated the *past* costs that Defendants sidestepped by misappropriating Insulet's trade secrets. Of the $170 million in compensatory damages the jury awarded, $52.8 million are attributable to those avoided costs—value EOFlow has *already gained* from misappropriation of the trade secrets. *See* ECF No. 931 at 3-5; McLean Decl., ECF No. 932 ¶ 21.

Defendants' position also means Insulet should be allowed to keep its exemplary damages. These "[p]unitive damages are not designed to compensate anybody," and instead "are designed to punish [past] misconduct and to deter future misconduct," so they are not "duplicative of the relief contained in [an] injunction" as a matter of law. *Forster v. Boss*, 97 F.3d 1127, 1130 (8th Cir. 1996). The Court should therefore permit Insulet to retain the $282 million the jury awarded

2

in exemplary damages; at the very least, Insulet should retain $87.5 million in exemplary damages, an amount proportionate to the avoided-costs portion of the compensatory-damages award. ECF No. 931 at 10-13; McLean Decl. ECF No. 932 ¶¶ 3, 22.

Accordingly, if the Court decides that an injunction with the jury's full damages award is a double recovery, it should issue an injunction and award Insulet at least $52.8 million in compensatory damages (plus prejudgment interest) and at least $87.5 million in exemplary damages, for a total of at least $140.3 million[1] in non-duplicative damages. *See* ECF No. 931-1.

## II. The Court should enter a permanent injunction with the terms proposed by Insulet.

Defendants insist (at 6) that the Court can only issue "an injunction much narrower than what Insulet requests," because "any injunction prohibiting worldwide sales of the EOPatch 2 product or other EOFlow expansion runs headfirst into Insulet's damages award, which was predicated on future sales of EOPatch 2 and related products." But as Insulet has already explained, to the extent there is duplication between damages and an injunction with the terms Insulet has proposed, Insulet may elect its remedies; and to the extent an election is necessary, Insulet chooses its proposed permanent injunction together with the non-duplicative damages just described.[2]

---

[1] In its opening supplemental brief, due to a computational error, Insulet (at 13) gave the total of minimum non-duplicative damages as $139.9 million; as stated above, the correct sum is $140.3 million ($52.8 million in compensatory damages plus $87.5 million in exemplary damages).

[2] Consistent with their representations at the February 25 hearing, *see* ECF No. 927 at 27:7-18, Defendants do not dispute in their supplemental brief that Insulet has the right to make this election. For good reason: "Generally, an election between inconsistent remedies is made after a verdict is entered but prior to the entry of judgment." *Dopp v. HTP Corp.*, 947 F.2d 506, 515 (1st Cir. 1991) (citation omitted). From the beginning of the case, Insulet has always maintained (and Defendants have always known) that it would seek both damages and an injunction if it succeeded on its misappropriation claims. Now that it has succeeded on those claims, Insulet has the right to choose which remedies to keep in the face of any overlap. *Accord Comput. Sales Int'l, Inc. v. Lycos, Inc.*, 2005 WL 3307507, at *7 (D. Mass. Dec. 6, 2005) (denying motion to dismiss claims on election-of-remedies grounds "[b]ecause the election of remedy is generally made after a

3

Defendants' counterproposal for an injunction is unserious. They argue that the only restriction on EOFlow's activity going forward should be a vague prohibition on "*disclos[ing]* any asserted Insulet trade secret information to any third-party company or to the general public." ECF No. 933 at 6 (emphasis added). Of course, that does not even address the most obvious fruit of Defendants' misappropriation, the illegal *use* of Insulet's core trade secrets to manufacture and sell a copycat product. Nor does this restriction facially bar the scenario Insulet fears most: another attempt by Defendants to *sell* EOFlow's counterfeit assets and intellectual property to one of Insulet's well-financed global competitors.

The only other injunction term Defendants propose (at 6) is an equally vague requirement that Defendants "destroy all copies of documents containing asserted Insulet trade secret information (e.g., Insulet's design history file, Insulet's CAD file)." But again, Defendants' misappropriation was not limited to stealing Insulet documents—the trial showed that a wide range of information and materials related to the EOPatch 2 were substantially derived from the trade secrets. To give some examples:

- The similarities between Insulet's and EOFlow's Failure Modes and Effects Analysis (FMEA) documents (part of the DHF trade secret) showed that Defendants were "using th[e] Insulet FMEA to prepare their own." 11 Tr. 47:5-11 (Cameron).

- Defendants relied on features (such as nominal dimensions) set forth in the CAD file for the Omnipod Eros to solve numerous design issues (e.g., problems with friction and insulin delivery) for the EOPatch 2. 5 Tr. 112:20-113:16 (DiIanni); 11 Tr. 23:6-22 (Cameron).

- Defendants drew on Insulet's ODA to design their own. 11 Tr. 178:11-16 (Desborough).

---

verdict is entered"); *Suzuki v. Helicopter Consultants of Maui, Inc.*, 2017 WL 2839499, at *1-2 (D. Haw. May 23, 2017) (because plaintiff "reserved his right to seek injunctive relief ... both at trial and before," he had right to elect after trial between potentially duplicative injunctive and legal relief).

- Defendants incorporated the critical dimensions for the Omnipod's soft cannula into the specifications for the EOPatch 2's cannula. 11 Tr. 35:18-36:4 (Cameron).

Thus, Insulet's misappropriated trade secrets pervade EOFlow documents that may appear on their face to have originated with EOFlow, not to mention the technology embodied within the EOPatch 2 product itself. Defendants' proposal does not address any of this. Defendants' proposal also ignores that they have shared trade-secret information with third parties, such as Medtronic and Tandem, *see* ECF No. 886; as Insulet's proposed injunction makes clear, Defendants should be required to make efforts to claw back those improper disclosures as well. Nor is the "sworn statement" Defendants suggest sufficient to ensure Insulet that EOFlow has purged itself of Insulet's confidential materials. As the case law makes clear, when a defendant is proven to have engaged in this kind of willful and malicious misappropriation, the rigorous claw-back and quarantine provisions Insulet has requested are "necessary to ensure that [Defendants] follow[] the law," and Insulet's "proposed audit" likewise "is necessary to prevent dissemination or further use of the" trade secrets. *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 4625149, at *4 (N.D. Cal. Sept. 30, 2022) (issuing injunction with similar terms).

Defendants' argument that the Court *must* set a sunset date for the injunction is equally meritless. Although "injunctions must be reasonable as to time," it hardly follows that an injunction is "unreasonable merely because it is permanent or indefinite in duration." *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 45 (D. Mass. 1995) (citation and quotation marks omitted). And Defendants are simply wrong to suggest that "[c]ourts *consistently* reject[] bids like Insulet's for a perpetual injunction." ECF No. 933 at 7 (emphasis added). Injunctions are as various as the cases that require them, but the authorities make clear that *one* valid approach in trade-secret cases is to "award[] unlimited injunctions, with the burden on the defendant to seek a modification of the injunction when the commercial advantage from the appropriation has

5

ended." Restatement (Third) of Unfair Competition § 44 & cmt. f; *see, e.g.*, *Comet*, 2022 WL 4625149, at *3-4 (issuing permanent injunction with materially similar terms and no time limit upon finding of willful and malicious misappropriation). This record supports that approach. It shows that even though the Omnipod Eros has been on the market for over a decade, *none* of Insulet's many deep-pocketed rivals has been able to make a comparable device, despite spending years and hundreds of millions of dollars trying. *E.g.*, ECF 888-1 ¶¶ 5-9; 4 Tr. 113:15-115:2 (Benjamin).

The case law Defendants cite (at 7) does not support their position. It simply explains that when the record does establish how long it would take to create a product embodying trade secrets, an injunction against using the trade secrets should only last that long. By contrast, as just discussed, the evidence in this case *does not* show the Omnipod can be reverse engineered in some set period of time.

Defendants make much (at 8-9) of the fact that Mr. McLean, in estimating damages under the head-start approach, assumed that access to the trade secrets gave Defendants at least a four-year "head start" advantage.[3] But Defendants *admit* that the jury did not even rely on that portion of Mr. McLean's testimony, *see* Defs' Permanent Injunction Opp'n at 29 n.4—instead, the jury partially adopted the market-value approach, Mr. McLean's other damages theory. In any event,

---

[3] Even as Defendants try to commandeer Mr. McLean's head-start testimony, they cannot resist rehashing arguments (at 8) that the four-year period Mr. McLean assumed "is overinclusive." But the alternative head-start theory proposed by Defendants' experts—under which the Omnipod could be reverse-engineered in a matter of months with a few hundred thousand dollars, meaning *faster and cheaper* than what it took Defendants to achieve *through misappropriation*, *compare* 16 Tr. 21:24-22:5 (Vellturo) (applying 13.5 month delay for head-start analysis) *with* 11 Tr. 24:6-14, 25:3-5 (Cameron) (EOPatch re-design using Insulet CADs took over 17 months)—was wholly implausible and properly rejected by the jury. And of course, an injunction cannot be predicated on factfinding that contradicts the verdict. *See Lopez v. Garriga*, 917 F.2d 63, 67 (1st Cir. 1990) ("When [a] court turn[s] to the matter of equitable redress, the jury's factfinding [i]s, of course, binding upon the trier as to the common issues.")

6

it is an error of law to "conflate[] [a damages expert's] head start testimony regarding the *minimum* amount of time it would have taken [a party] to independently develop the trade secrets with evidence that" a particular defendant *in fact* "could have reverse-engineered or somehow otherwise properly uncovered the trade secrets" in that period of time. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013) (emphasis added). And the record here plainly refutes that illogical leap—it shows that much better-resourced firms have tried and failed to reverse-engineer the trade secrets for over a decade. *See* p. 6, *supra*.

In the end, refusing to impose an artificial time cap on the injunction would not prejudice Defendants in any way. The injunction Insulet has proposed still allows Defendants to engineer a patch pump that is not substantially derived from the trade secrets. If Defendants are confident in their trial position that this could be done easily in a matter of months, nothing stops them from setting to work now—in which case, if their theory is right, they would likely have a legitimate product to market before an appeal in this case is over.

### III. Any stay should be limited to permitting sales of the EOPatch 2 to existing patients in Korea, Spain, and Portugal.

Defendants argue (at 9-12) that a stay of both the monetary and injunctive portions of the judgment should issue for the months-long duration of an appeal, with Defendants subject only to a handful of vaguely worded "voluntary restrictions" in the meantime. That is wrong.

As to the monetary portion of the judgment, Defendants do not seriously attempt to meet their burden for waiving the ordinary requirement that, in order to stay a damages award, the defendant must post a *supersedeas* bond "at the amount of the judgment plus 10% in interest and $500 for costs." *CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 2016 WL 8710447, at *1 (D. Mass. Dec. 2, 2016) (citing Fed. R. Civ. P. 62(d); L.R. 62.2). Their primary argument (at 11) is that because "a bond for the full amount of [the] money judgment plus 10% would be nearly $500

7

million," they should be excused from posting a bond or any other security. For one thing, if this Court concludes there are double-counting issues and so reduces the damages award in the manner set forth by Insulet, the bond would be hundreds of millions of dollars *less* than what Defendants claim. For another, a wrongdoer cannot shirk the bond requirement because its own egregious misconduct has made it responsible for a large amount of damages it cannot pay.

The case law confirms this: where there is evidence that "absent a bond to protect the judgment, Defendants will not have available funds later to satisfy the judgment," and "it will take a long time for Plaintiff to obtain the judgment [after appeal] given the representations made concerning Defendants' finances," the bond requirement should be enforced. *Cognitive Edge Pte Ltd. v. Code Genesys, LLC*, 2021 WL 4477434, at *5 (D. Mass. Sept. 30, 2021) (refusing to waive bond requirement even where record suggested it could bankrupt defendants). Defendants also make (at 11) a cursory argument that an injunction "would put EOFlow's third-party creditors in undue jeopardy," but even after multiple opportunities by the Court to brief this issue, they *still* have not provided any evidence of this.[4] At the very least, if the Court does not require Defendants to post a bond, it should require they provide "some other form of security." *CardiAQ Valve Techs.*, 2016 WL 8710447, at *2 (detailing potential sources of alternative security).

Defendants' arguments for a stay of the permanent injunction are also meritless. They note (at 10) that the "Court has already recognized the appeal in this case will be meaningful," because reasonable jurists can disagree on Defendants' statute-of-limitations defense. Needless to say, having a "meaningful," non-trivial appellate issue is not the necessary "*strong* showing of success on the merits," *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 n.3 (1st Cir. 2002) (emphasis

---

[4] Defendants' consistent refusal to provide any hard evidence concerning their finances also drives home why the post-trial discovery Insulet requested on that issue is necessary and should be granted before the Court decides whether to issue a stay. *See* ECF Nos. 872-873, 906.

added); and when, as here, "both" sides "have colorable arguments to present to the circuit court," then "the likelihood of success on appeal is [at best] no stronger in one direction than the other," meaning there is no basis for a stay, *United States v. N.Y. City Bd. of Educ.*, 620 F. Supp. 2d 413, 417 (E.D.N.Y. 2009) (denying stay of judgment pending appeal). As for the other equitable stay factors, this Court has already rightly concluded they favor Insulet, because the jury's verdict and Defendants' willful and malicious misappropriation demonstrate that "there is nothing speculative about" the risk of further irreparable harm to Insulet "at all." ECF No. 927 at 36:23-38:3.

Unable to meet the standard for staying the injunction, Defendants again resort (at 11-12) to trying to bargain their way out. But the "voluntary restrictions" they propose are plainly insufficient to protect Insulet against further irreparable harm. Among other things, under these terms, Defendants could still launch in new jurisdictions and capture those markets so long as Insulet does not get there first. Defendants also reserve the right to file "potential 'continuation' or 'divisional' applications" for their existing patent applications, including the patent application Insulet proved at trial disclosed Insulet's ODA trade secret, an exception that would swallow the rule. *See* 11 Tr. 179:2-14 (Desborough); Tr. Ex. 1634. Perhaps most concerning, Defendants insist they should be allowed to engage in all manner of "business transactions or activity" while an appeal is ongoing—including a "sale of [EOFlow's] assets," and thus necessarily of *all* Insulet's core trade secrets, to a third-party acquirer like Medtronic. *See* ECF No. 933 at 12. Allowing Defendants to do that would render this entire case, not just the appeal, "meaningless," exactly what this Court has stressed must be avoided. ECF No. 927 at 41:1-2.

As Insulet explained in its supplemental brief (at 14-21), a stay is both premature and unwarranted, but if the Court does issue a stay, it should be limited to a carve-out permitting sales

9

of the EOPatch 2 to existing customers of that device in Spain, Korea, and Portugal.[5] Those are the markets where EOFlow represents that the EOPatch 2 is the only commercially available patch pump, and among them, Korea contains EOFlow's main customer population. This carve-out would therefore preserve the status quo. It would allow EOFlow to keep its primary source of revenues and stay in business during the appeal, and allay public-interest concerns by preserving access to a patch pump in those jurisdictions. It would also reasonably guard against further irreparable harm by immediately enforcing the other injunction terms Insulet has proposed—all of which are "necessary to ensure that" willful and malicious misappropriators like these Defendants "follow[] the law." *Comet*, 2022 WL 4625149, at *3.

## CONCLUSION

If the Court concludes granting Insulet the jury's full damages award together with a permanent injunction would result in double recovery, it should issue the form of judgment set forth in Exhibit A to Insulet's opening supplemental brief (ECF No. 931-1). The Court should defer consideration of a stay pending discovery and entry of judgment; but if the Court grants a stay, it should be limited to the carve-out set forth in Exhibit B to Insulet's opening supplemental brief (ECF No. 931-2).

---

[5] Although Defendants have claimed in recent filings that the EOPatch 2 is sold in Portugal, *see* Defs.' Permanent Injunction Opp'n at 24, 27, they have never provided any evidence to substantiate that assertion. It thus is unclear whether there are any existing users of the EOPatch 2 in Portugal; but in any event, as explained, any carve-out should be strictly limited to allowing continued sales of the EOPatch 2 to any already-existing users of the device in Korea, Portugal, and Spain.

| | |
|---|---|
| March 11, 2025 | Respectfully submitted. |
| | |
| Jenny Zhang (BBO No. 689838)<br>Matthew Ginther (BBO No. 714772)<br>GOODWIN PROCTER LLP<br>1900 N Street, NW<br>Washington, DC 20036<br>(202) 346-1000<br>JZhang@goodwinlaw.com<br>MGinther@goodwinlaw.com<br><br>Alexandra D. Valenti (*pro hac vice*)<br>James Breen (*pro hac vice*)<br>Timothy Keegan (*pro hac vice*)<br>Arshjit Raince (*pro hac vice*)<br>Danit Maor (*pro hac vice*)<br>GOODWIN PROCTER LLP<br>620 Eighth Avenue<br>New York, NY 10018<br>(212) 813-8800<br>AValenti@goodwinlaw.com<br>JamesBreen@goodwinlaw.com<br>TKeegan@goodwinlaw.com<br>ARaince@goodwinlaw.com<br>DMaor@goodwinlaw.com | /s/ *Robert D. Carroll*<br>Robert D. Carroll (BBO No. 662736)<br>Robert Frederickson III (BBO No. 670111)<br>Scott T. Bluni (BBO No. 660187)<br>Alexandra Lu (BBO No. 691114)<br>William E. Evans (BBO No. 706382)<br>GOODWIN PROCTER LLP<br>100 Northern Avenue<br>Boston, MA 02210<br>(617) 570-1000<br>RCarroll@goodwinlaw.com<br>RFrederickson@goodwinlaw.com<br>SBluni@goodwinlaw.com<br>ALu@goodwinlaw.com<br>WEvans@goodwinlaw.com<br><br><br>*Attorneys for Plaintiff Insulet Corporation* |

**CERTIFICATE OF SERVICE**

    I hereby certify that a true copy of the above document was served on all counsel of record by CM/ECF on March 11, 2025.

                                               /s/ *Robert D. Carroll*
                                               Robert D. Carroll (BBO No. 662736)