### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

_____
                                         )
**INSULET CORPORATION,**                 )
                                         )
            **Plaintiff,**               )
                                         )        **Civil Action No.**
        **v.**                           )        **23-11780-FDS**
                                         )
**EOFLOW CO., LTD.; EOFLOW, INC.;**       )
**NEPHRIA BIO, INC.; and JESSE KIM,**     )
                                         )
            **Defendants.**              )
_____)


### MEMORANDUM AND ORDER ON DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL

**SAYLOR, C.J.**

This dispute concerns the misappropriation of trade secrets for the design and manufacture of an insulin patch pump, the Omnipod, produced by plaintiff Insulet Corporation. Plaintiff sued seven defendants: EOFlow Co., Ltd., and EOFlow, Inc. (collectively, "EOFlow"); Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet employees, Luis Malave, Steven DiIanni, and Ian Welsford.

After a month-long trial, a jury returned a verdict on December 3, 2024, finding six defendants—all except Malave—liable for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA"). The jury awarded plaintiff $452 million in total damages.

On February 25, 2025, pursuant to a separately negotiated Consent Permanent Injunction and Judgment between plaintiff and Malave, DiIanni, and Welsford, the Court entered a final

judgment under Fed. R. Civ. P. 54(b) and issued a permanent injunction in accordance with the terms of the parties' agreement.  (ECF Nos. 924-25).

The remaining defendants—EOFlow, Nephria Bio, and Kim—have renewed their motion for judgment as a matter of law and, in the alternative, moved for a new trial.  For the following reasons, the motions will be denied.[1]

## I.    Legal Standard

### A.    Rule 50(b)

A renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) is a challenge to the legal sufficiency of evidence supporting the jury's verdict.  *See* Fed. R. Civ. P. 50(a)(1); *see Cook v. State of R.I., Dep't of Mental Health, Retardation & Hosps.*, 10 F.3d 17, 21 (1st Cir. 1993).  The motion is "subject to a demanding standard."  *Astrolabe, Inc. v. Esoteric Techs. PTY, Ltd.*, 2002 WL 511520, at *2 (D. Mass. Mar. 29, 2002).  The jury's verdict "must be upheld unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of [the moving party] that a reasonable jury could not have returned the verdict."  *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 13 (1st Cir. 2009).  Put another way, judgment as a matter of law "is appropriate only where 'there is a total lack of evidence in support of the plaintiff's case.'"  *Astrolabe*, 2002 WL 511520, at *2 (quoting *Censullo v. Brenka Video, Inc.*, 989 F.2d 40, 42 (1st Cir. 1993)).

The court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence."  *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The jury's verdict must stand unless the evidence "points unerringly to an opposite conclusion."

---

[1] For the sake of convenience, the term "defendants" will hereafter refer only to EOFlow, Nephria Bio, and Kim unless the context indicates otherwise.

*Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir. 2001). This standard is "weighted toward preservation of the jury verdict." *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 26 (1st Cir. 2019).

Importantly, a party renewing a motion for judgment as a matter of law under Rule 50(b) is "bounded by the movant's earlier Rule 50(a) motion," and may not use a Rule 50(b) "motion as a vehicle to introduce a legal theory not distinctly articulated in its [Rule 50(a) motion]." *Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 25 (1st Cir. 2016) (alteration in original).

### B.    Rule 59(a)

A court may grant a motion for a new trial under Fed. R. Civ. P. 59(a) "only 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" *Sánchez v. Foley*, 972 F.3d 1, 16 (1st Cir. 2020) (quoting *Thomas & Betts Corp. v. New Albertson's, Inc.*, 915 F.3d 36, 60 (1st Cir. 2019)).  Although a "district court's power to grant a motion for a new trial is much broader than its power to grant a [judgment as a matter of law,]" *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009), the court's discretion is nevertheless "limited," *see Burnett v. Ocean Properties, Ltd.*, 422 F. Supp. 3d 369, 389 (D. Me. 2019), aff'd, 987 F.3d 57 (1st Cir. 2021).  Thus, the court "may not grant a motion for a new trial merely because [it] might have reached a conclusion contrary to that of the jurors." *Id.* (quoting *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598-99 (1st Cir. 1987)). Moreover, even if the court did err during the course of the trial, "[l]egal error does not warrant a new trial if it is harmless (or not prejudicial) to the moving party." *BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 353 (1st Cir. 2024).

## II.    Analysis

### A.    Renewed Motion for Judgment as a Matter of Law

Defendants contend that judgment is warranted in their favor on multiple grounds, including (1) plaintiff's claims are time-barred; (2) plaintiff did not prove that any of its trade secrets were misappropriated; (3) the evidence was insufficient to prove that the misappropriation was willful and malicious; and (4) the jury's damages award was unreasonable.

#### 1.    Statute of Limitations

Defendants repeat their position that plaintiff's claims were time-barred under the statute-of-limitations provision of the DTSA, which states in relevant part that private civil actions "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered."  18 U.S.C. § 1836(d).

Defendants raise two arguments.  First, they assert that the DTSA should be understood as applying an inquiry-notice accrual standard, under which the limitations period would begin to run when a plaintiff has reason to suspect that its trade secrets had been misappropriated. Because certain evidence presented at trial suggested that plaintiff may have had such a suspicion before the limitations cut-off date, defendants contend that plaintiff's claims are barred as a matter of law.

However, for the reasons stated in the Court's October 31, 2024 memorandum and order denying defendants' motion for summary judgment on statute-of-limitations grounds, the clear text of the statute is not reconcilable with an inquiry-notice standard.  (*See* ECF No. 753). Drawing on the principles laid out in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010)—where the Supreme Court considered a statute-of-limitations provision nearly identical to that found in the DTSA and explicitly rejected inquiry notice as the applicable accrual standard—the Court

4

determined that the triggering event under the DTSA's accrual standard is not the mere suspicion of misappropriation. Instead, a cause of action accrues under the DTSA when "the misappropriation with respect to which the action would relate" is (1) actually discovered or (2) "by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). And it does not accrue when the plaintiff merely has sufficient information to put it on inquiry notice. *See* 559 U.S. at 650-51.

Defendants next contend that even under the *Merck* accrual standard, the claims are nonetheless time-barred. In their view, "substantial evidence showed that with reasonable diligence, Insulet did or should have discovered the alleged misappropriation before [the limitations cut-off date], and no reasonable jury could have found otherwise." (Def.'s Mot. at 2). However, the record contains substantial evidence supporting the jury's finding that plaintiff neither discovered nor should have discovered the misappropriation before the limitations cut-off date. For example, although plaintiff's employees observed EOPatch 2 prototypes at industry conferences in 2018 and 2019, trial testimony indicated that an observer could not have discovered the misappropriation of the trade secrets merely by viewing the prototype from afar. Meanwhile, publicly available information concerning the EOPatch 2's design prior to the cut-off date would not have led to discovery of the misappropriation. According to evidence introduced at trial, much of the public information available at the time portrayed the EOPatch 2 as incorporating technology distinct from that used in the Omnipod. And the evidence also showed that discovery of the misappropriation would not have been possible without disassembling and studying the EOPatch 2, which was not commercially available until after the limitations cut-off date.

It may be true that certain evidence supported defendants' position, such as plaintiff's knowledge that multiple former employees worked at EOFlow.  But there was ample evidence to support the jury's finding that plaintiff did not discover, nor reasonably should have discovered, the misappropriation before the limitations cut-off date.  Defendants' motion for judgment as a matter of law will therefore be denied as to its statute-of-limitations defense.

## 2.      Trade-Secret Misappropriation

Defendants next contend that judgment in their favor is warranted because plaintiff failed to prove that its trade secrets were misappropriated.  Specifically, defendants assert that (1) plaintiff did not employ reasonable measures to protect its information and (2) plaintiff failed to prove multiple elements required to state a claim under the DTSA.

### a.      Reasonable Measures

Under the DTSA, information may only be deemed a trade secret if, among other things, "the owner thereof has taken reasonable measures to keep such information secret."  18 U.S.C. § 1839(3)(A).  In defendants' view, "[t]he evidence was wholly lacking on how [plaintiff] protected any of the specific information asserted as trade secret."  (Def.'s Mot. at 4).  They point to the testimony of their expert witness, Joseph Steinberg, who stated that plaintiff's uniform application of its security protocols to all information, trade-secret or otherwise, was unreasonable.  Defendants further note that plaintiff had few policies and trainings specifically concerning its trade secrets and that it failed to ask departing employees whether they retained trade-secret information.

The reasonableness of a company's security measures is evaluated on a case-by-case basis, taking into consideration the totality of precautions employed by the company.  *See Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 193 (1st Cir. 2023) (listing multiple security measures employed by a plaintiff—including "confidentiality provisions," restricted access to confidential

6

information, and revoked access to company materials upon an employee's termination—that together satisfied the DTSA's reasonable-measures requirement).  Importantly, "the standard is reasonableness, not perfection."  *Id.* (citing *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 30 (D. Mass. 2004)).  Thus, just because a plaintiff "could have done more to protect [its] information" does not render the measures that it did implement unreasonable as a matter of law.  *Id.*

Here, plaintiff elicited substantial evidence showing that it took reasonable measures to protect its information.  Specifically, plaintiff's expert witness, Dr. Gregory Rattray, testified that plaintiff met industry-standard security practices through its promulgation of internal-security policies, its requirement that employees execute non-disclosure agreements, and its restriction of access to trade-secret materials.  Other witnesses further elaborated on the specific steps that plaintiff implemented to keep its information confidential, including a number of physical and digital security measures.

It may be true, as defendants claim, that plaintiff could have taken a more rigorous approach to protecting its information—for example, by limiting employees' use of personal devices for work-related matters.  But the DTSA does not require perfection, nor does it require a company to take any particular step to protect its information.  The law only requires that an owner take "reasonable measures."  18 U.S.C. § 1839(3)(A).  And based on the evidentiary record, plaintiff's measures were not unreasonable as a matter of law.  The conflict in opinions offered by the expert witnesses as to the sufficiency of plaintiff's security measures was for the jury to resolve.  It is the jury's proper role to "consider the credibility of witnesses, resolve conflicts in testimony, [and] evaluate the weight of the evidence."  *Barkan*, 627 F.3d at 39.

Here, the jury permissibly resolved the conflict in favor of plaintiff. Because the record contains ample evidence supporting the jury's finding, the motion for judgment as a matter of law as to the reasonableness of plaintiff's security measures will be denied.

### b.    Trade-Secret Misappropriation

The jury found that defendants had misappropriated four trade secrets: (1) the design history file for the Omnipod Eros ("DHF"); (2) the computer-aided design files for the Omnipod ("CAD files"); (3) the occlusion-detection algorithm for the Omnipod ("ODA"); and (4) the Omnipod soft cannula. Defendants contend that plaintiff failed to prove its misappropriation claim as to each of those four trade secrets.[2]

### i.    The Design History File

Defendants first contend that the evidence did not support the jury's finding that the DHF was a protectable and misappropriated trade secret. They start by asserting that plaintiff failed to define the DHF with "reasonable precision." (Def.'s Mot. at 6). In defendants' view, plaintiff failed to reasonably define the information comprising the DHF trade secret, thereby failing to meet its burden under the DTSA.

As the Court discussed in its summary-judgment order, a plaintiff asserting a DTSA claim must "adequate[ly]" describe the asserted trade secrets "with clarity that can be understood by a lay person." *Neural Magic, Inc. v. Meta Platforms*, Inc., 659 F. Supp. 3d 138, 166-67 (D. Mass. 2023) (quoting *Sutra, Inc. v. Iceland Exp., ehf*, 2008 WL 2705580, at *4 (D. Mass. July

---

[2] Defendants also raise an objection under the DTSA's extraterritoriality provision, asserting that plaintiff failed to demonstrate that defendants "act[ed] in furtherance" of a trade-secret misappropriation committed in the United States (as opposed to South Korea), as required under the DTSA. 18 U.S.C. § 1837. However, defendants failed to raise that argument in their Rule 50(a) motion for judgment as a matter of law, and have therefore waived it. *See Cornwell*, 830 F.3d at 25 (1st Cir. 2016). Defendants' motion as to the application of the DTSA's extraterritorial provision will therefore be denied.

10, 2008)).  Although "courts have required specificity," *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 456 (D. Mass. 2017), the analysis must be undertaken with "a modicum of common sense" geared towards ensuring the trade secrets are sufficiently defined such that the defendants can effectively prepare a rebuttal and that the jury can understand the claims asserted.  *See Broad-Ocean Techs., LLC v. Lei*, 649 F. Supp. 3d 584, 594 (E.D. Mich. 2023).

Testimony offered by several witnesses support the jury's conclusion that the DHF trade secret was adequately defined.  For example, plaintiff's Vice President of Global Regulatory Affairs, Julie Perkins, described at length the contents and purpose of the DHF and the underlying regulatory scheme dictating its format.  Welsford also explained that the DHF contains the full history of a medical device's design, corroborating the description provided by plaintiff's engineer, Jason O'Connor.  Multiple other witnesses offered similar testimony as to the scope, components, and function of the DHF, supporting the jury's finding that the DHF was adequately defined for the purposes of bringing a DTSA claim.

Defendants next contend that "the evidence was insufficient for a reasonable jury to find that any [d]efendant acquired, used, or disclosed the asserted DHF compilation trade secret[.]" (Def.'s Mot. at 8).  As relevant here, under the DTSA, misappropriation means (1) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or (2) the "disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret."  18 U.S.C. § 1839(5).  And, as the Court instructed, a compilation trade secret, such as the DHF, may be deemed misappropriated under the DTSA if a defendant acquires, discloses, or uses at least a substantial portion of the unique qualities or

characteristics of the compilation that qualify it as a trade secret.  *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1314 (11th Cir. 2020).

The record contains substantial evidence supporting the jury's finding that the DHF was misappropriated.  Testimony from Paul Hamm revealed that he had improperly accessed component documents of the DHF while working for Nephria Bio.  Email correspondence between Nephria Bio and EOFlow employees further illustrated defendants' efforts to misappropriate the DHF.  DiIanni also testified that Kim directed an EOFlow associate to take the CAD files—which were part of the DHF—from him at a meeting in 2018.  Taken together, the record provided more than sufficient evidence to support the jury's finding that defendants misappropriated a substantial portion of the DHF.

Defendants further contend that no reasonable jury could find that the DHF trade secret derives independent economic value from not being generally known or readily ascertainable. (Def.'s Mot. at 9).  Under the DTSA, to qualify as a trade secret, information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(B).

Multiple witnesses at trial testified that the DHF is a critical component of developing a medical product and contains valuable confidential information about the product's design and development that could not be independently derived.  That testimony was corroborated by evidence that Medtronic, EOFlow's prospective acquirer, wanted to acquire information concerning the DHF for the EOPatch 2, further underscoring the DHF's economic value.  The jury, therefore, reasonably concluded that the DHF qualified as a trade secret.

The motion for judgment as a matter of law will therefore be denied as to the jury's finding that the DHF was a protectable and misappropriated trade secret.

### ii.    The Computer-Aided Design Files

Defendants next contend that the jury erred in finding that the CAD files were a protectable and misappropriated trade secret. They first assert that plaintiff failed to sufficiently identify the scope of the CAD files. (Def.'s Mot. at 10). Specifically, they contest the characterization of the CAD files as information that could legally constitute a trade secret in the first place, and they dispute the notion that the exemplary CAD file presented to the jury was the same as that which was misappropriated.

In its summary-judgment order, the Court addressed the question of whether the CAD files could, as a matter of law, constitute a trade secret under the DTSA. A CAD file is "a digital file format of an object generated using CAD software, containing a blueprint, technical drawing, schematic, or 3D rendering of an object." Anindita Sengupta, CAD File, Technology Glossary Definitions—G2 (last visited Mar. 12, 2025), https://www.g2.com/glossary/cad-file-definition. Because "[i]t is well settled that detailed manufacturing drawings . . . are *prima facie* trade secrets," the Court found that CAD files could qualify as a trade secret under the DTSA. *See Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) (quoting *A.H. Emery Co. v. Marcan Products*, 389 F.2d 11 (2d Cir. 1968)).

Defendants assert that the CAD files are not trade secrets because they are readily ascertainable. (Def.'s Mot. at 11). They rely primarily on testimony from various witnesses that

the information in the files could be reverse engineered because the Omnipod's dimensions—reflected in the CAD file—could readily be measured on the physical device.[3]

There was ample evidence, however, that the CAD files contained information concerning not only thousands of component dimensions, but also component orientations and positionings that are not readily ascertainable by reverse engineering. And, indeed, there was evidence that defendants' experts were not actually able to reverse engineer the Omnipod's nominal dimensions. Again, it is the proper role for the jury to resolve conflicts in the evidence presented. The fact that the jury deemed more persuasive plaintiff's evidence concerning the possibility of reverse engineering is not ground for entering a judgment in defendants' favor.

Defendants next contend that a reasonable jury could not find that any defendant acquired, used, or disclosed the CAD files. (*Id.*). But the record contains clear evidence that DiIanni handed over the Omnipod CAD files to EOFlow at a meeting with Kim and other EOFlow employees in 2018, and that EOFlow employees repeatedly referred to those files to resolve subsequent engineering issues. That evidence unquestionably supports the jury's finding that the CAD files were misappropriated.

Finally, defendants contend that no reasonable jury could conclude that the CAD files derive independent economic value from not being generally known or readily ascertainable. (*Id.*). But multiple witnesses testified otherwise, stating that CAD files contain valuable, non-public information that is critical for large-scale production of the device, which clearly supports the jury's finding. Indeed, if the CAD files were not secret and had no value, EOFlow would not have had any interest in acquiring or using them.

---

[3] Defendants also argue that the misappropriated CAD files differ from those shown to the jury. However, the jury resolved that issue in favor of plaintiff, and that determination is sufficiently supported by the record.

Accordingly, the motion for judgment as a matter of law will be denied as to the jury's finding that the CAD files were a protectable and misappropriated trade secret.

### iii.    The Occlusion-Detection Algorithm

Defendants next challenge the jury's finding that the ODA was a protectable and misappropriated trade secret. First, they contend that the evidence did not "sufficiently identify" the ODA as a trade secret. (*Id.* at 12). Specifically, defendants assert that plaintiff failed to state what constitutes the trade secret, whether it be the software code used in the ODA or some other element.

However, testimony by plaintiff's witness, Lane Desborough, explained the elements of the claimed ODA trade secret, including a number of sub-component algorithms that compose the ODA as a whole. Those elements are also memorialized in various product-design documents that were presented to the jury. Thus, the evidence supports the jury's determination that the ODA trade secret was sufficiently identified.

Defendants next contend that plaintiff's ODA is readily ascertainable, stating that the concept of occlusion detection is well known. (*Id.*). Desborough in fact testified that occlusion detection is a standard feature of all insulin pumps. But the trade secret alleged by plaintiff and described to the jury specifically concerned plaintiff's ODA—including its multiple component steps and features—not occlusion detection in general. And Desborough's testimony provided sufficient detail as to how plaintiff's ODA functions and why each component is necessary, insights that a jury could reasonably believe to not be readily ascertainable.

Defendants next contend that the evidence was insufficient for a reasonable jury to find that any defendant acquired, used, or disclosed the ODA trade secret. (*Id.* at 13). But plaintiff introduced substantial evidence indicating that DiIanni provided Kim and other EOFlow employees guidance and information drawn from plaintiff's confidential ODA materials, and that

EOFlow employees used that information in the process of developing the EOPatch 2. Defendants point out that the evidence does not show that DiIanni ever handed EOFlow's employees the physical forms on which plaintiff's ODA information was stored and described. But that is no defense to a misappropriation claim. A trade secret need not be reduced to a physical document; rather, under the DTSA, a trade secret includes "all forms and types of . . . scientific . . . or engineering *information*." 18 U.S.C. § 1839(3) (emphasis added). Moreover, it may be true that the EOPatch 2's ODA was different from the Omnipod's, but as the Court instructed the jury, use of any substantial portion of a trade secret is sufficient to constitute misappropriation, even when the user makes independent modifications or improvements to the trade secret. *See Benchmark Techs., Inc. v. Tu*, 2023 WL 8371973, at *4 (D. Mass. May 30, 2023). The jury's finding that the ODA was misappropriated is reasonable and supported by the evidence.

Finally, defendants again assert that no reasonable jury could conclude that the ODA trade secret derives independent economic value from not being generally known or readily ascertainable. (Def.'s Mot. at 13). But the record included evidence tending to show that the plaintiff's ODA plays a unique and valuable role in ensuring that the Omnipod works safely for patients, providing a sufficient basis for the jury to conclude that the ODA qualified as a trade secret under the DTSA.

The motion for judgment as a matter of law will therefore be denied as to the jury's finding that the ODA was a protectable and misappropriated trade secret.

### iv.    The Soft Cannula

Defendants next object to the jury's finding that the design and manufacturing process for the soft cannula qualified as a protectable trade secret under the DTSA and that it was misappropriated. They begin by asserting that the evidence presented failed to sufficiently

identify the alleged trade secret. (*Id.*). However, multiple exhibits introduced at trial—supplemented by testimony from plaintiff's witnesses—detailed the design and manufacturing of the soft cannula that underpinned the asserted trade secret, which is more than sufficient to support the jury's finding.

Defendants next contend once again that the soft-cannula trade secret is readily ascertainable. (*Id.* at 14). Defendants point to testimony by their witness, Boris Leschinsky, that suggested certain dimensions of the soft cannula are measurable and therefore not secret. However, as plaintiff notes, the prototype cannula that Leschinsky prepared for trial to demonstrate that it was capable of being reverse engineered failed in many respects to replicate the functionality of the Omnipod's soft cannula. A jury could reasonably view the disparity in functionality as evidence that the trade secret was not readily ascertainable. Moreover, additional testimony by plaintiff's witnesses contradicted testimony by defendants' witness as to the measurability of the soft cannula's dimensions using only a physical sample. The jury's resolution of that conflict in plaintiff's favor is well-supported by the evidence.

Defendants next assert that no reasonable jury could have found that any defendant acquired, used, or disclosed the soft-cannula trade secret. (*Id.*). Plaintiff introduced evidence that prior to its engagement with DiIanni, EOFlow had very limited experience with designing soft cannulas. Additional evidence revealed that EOFlow employees leaned heavily on DiIanni for guidance on how to engineer a soft cannula for the EOPatch 2, and that the information provided by DiIanni bore unusually specific similarities to the design and dimensions of the Omnipod's soft cannula. Thus, a reasonable jury could infer from the evidence that EOFlow and Kim impermissibly acquired and used plaintiff's soft-cannula design and manufacturing information from DiIanni to build the EOPatch 2.

Finally, defendants again assert that no reasonable jury could find that the soft-cannula trade secret derives independent economic value from not being generally known or readily ascertainable.  (*Id.*).  But plaintiff's witness O'Connor testified at length about the importance and value of the soft cannula in the Omnipod's design and success.

The motion for judgment as a matter of law will therefore be denied as to the jury's finding that the soft cannula was a protectable and misappropriated trade secret.

### 3.    <u>Willful and Malicious Misappropriation</u>

Defendants next contend that no reasonable jury could find that EOFlow Co., Ltd., and Kim engaged in "willful and malicious" misappropriation under the DTSA.  (*Id.* at 15).  Defendants do not contest that the evidence supported a finding that the misappropriation was willful, but instead focus on the sufficiency of evidence showing that EOFlow Co., Ltd., or Kim acted with malicious intent.

Under the DTSA, a plaintiff may be awarded exemplary damages of up to two times the amount of damages awarded for actual loss and unjust enrichment if the misappropriation is found to be willful and malicious.  18 U.S.C. § 1836(a)(3).  As the Court instructed the jury, conduct is "willful" if done intentionally, with a purpose or willingness to commit the act or engage in the conduct in question; meanwhile, conduct is "malicious" if done with an intent to cause injury or harm.  A defendant's "attempts to conceal its misappropriation support a finding that it was willful and malicious."  *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 107 (D. Mass. 2024) (internal quotations omitted).

At trial, plaintiff introduced evidence of internal communications between EOFlow employees, including Kim, that reflected both their knowing acquisition of the trade secrets and their intentional concealment of the misappropriation.  For example, multiple exhibits presented to the jury revealed that Kim stated that EOFlow would struggle to "gracefully" explain the

similarities in design between the EOPatch 2 and the Omnipod "without making it sound like a piracy." (Tr. Ex. 443.1). Other evidence introduced at trial showed internal EOFlow documents stressing the importance of not revealing information related to the EOPatch 2 to plaintiff's employees. A jury could reasonably infer from that evidence that Kim—and by extension, EOFlow Co., Ltd.—knowingly sought to conceal the misappropriation.

It may be true, as defendants emphasize, that EOFlow did not hire employees directly from plaintiff, and instead only hired those who had been separated from plaintiff for several years. And perhaps EOFlow did not initially hire those employees for the purpose of acquiring plaintiff's trade secrets. But those assertions do not compel a jury finding in favor of defendants. Rather, the jury could evaluate the evidence presented by both parties and reasonably conclude that defendants' actions rose to the level of willful and malicious misappropriation based on the substantial evidence of theft and subsequent concealment.

Defendants also contend that the jury's determination that only Kim, Welsford, and EOFlow Co., Ltd., acted willfully and maliciously among the defendants is illogical.[4] But the evidence presented, particularly the email correspondences involving Kim, readily allows a rational jury to understand Kim's behavior (which may be attributable to EOFlow Co., Ltd.) to be more egregious than the behavior of the other defendants.

Ultimately, the jury's determination that Kim and EOFlow Co., Ltd., acted willfully and maliciously was well supported by the record evidence. Thus, defendants' motion for judgment as a matter of law will be denied as to that issue.[5]

---

[4] Again, the Court need not address the jury's finding with respect to Welsford because he is subject to the Court's Rule 54(b) final judgment and a separate permanent injunction order, entered pursuant to a separately negotiated agreement between plaintiff and Welsford, Malave, and DiIanni. (ECF Nos. 924-25).

[5] Defendants move in the alternative for a new trial based on the jury's determination that Kim and EOFlow Co., Ltd., acted willfully and maliciously. For the same reasons supporting the denial of the Rule 50(b) motion, the motion for a new trial will be denied as to that issue.

####      4.      Damages Award

Defendants next contend that the award of monetary damages was not supported by the evidence.  Under the DTSA, damages may be awarded for "actual loss caused by the misappropriation of the trade secret . . . and . . . for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss."  18 U.S.C. § 1836(a)(3)(B).  Plaintiff did not present evidence concerning any actual out-of-pocket loss from the misappropriation.  Instead, it presented two theories of unjust-enrichment damages at trial.  The first theory estimated the "head start" that defendants obtained by acquiring plaintiff's trade secrets and building the EOPatch 2 with that information in hand.  The second theory estimated the market value of the trade secrets.

Defendants take issue with plaintiff's theories and the jury's damages award, contending that (1) plaintiff's damages theories were based on speculation and unreliable estimates and (2) joint-and-several liability between Kim and EOFlow is inconsistent with the evidence presented at trial.[6]

####      a.      Speculative and Unreliable Damages Estimates

According to defendants, plaintiff's theories of damages were speculative and unreliable because they were based on estimates by Ian McLaughlin concerning the effort that plaintiff's engineers devoted to developing each trade secret.  In defendants' view, McLaughlin's estimates were "heavily dependent on his memory" and therefore not reliable.  (Def.'s Mot. at 18).

---

[6] Defendants also raise objections to the award of damages based on two other legal theories:  (1) plaintiff failed to account for and exclude costs unrelated to the trade secret, and (2) plaintiff failed to account for defendants' limited use of the trade secrets.  (Def.'s Mot. at 20-22).  However, defendants did not raise either of those two arguments in their Rule 50(a) motion, and they are therefore waived.  *See Cornwell*, 830 F.3d at 25 (stating that a Rule 50(b) movant "cannot use such a motion as a vehicle to introduce a legal theory not distinctly articulated in its [Rule 50(a) motion]").

A calculation of "damages must be shown with reasonable certainty, though mathematical precision is not required." *Diomed, Inc. v. Vascular Sols., Inc.*, 2006 WL 516756, at *1 (D. Mass. Mar. 2, 2006). And "in business tort cases, where the focus is on the wrongfulness of the defendant's conduct, the award of damages is permissible on meager evidence." *Id.* (internal quotations omitted).

The damages evidence introduced by plaintiff in this case was sufficient to support the award. At trial, McLaughlin testified that he determined his estimates after consulting with other engineers with whom he had worked to develop the Omnipod while employed by plaintiff over the prior two decades. He also testified about his extensive experience developing the Omnipod, allowing a jury to reasonably believe that he could reliably recall the amount of effort expended to create and refine each of the trade secrets. Defendants cross-examined McLaughlin at length, but nothing arose from that examination that would require a finding that McLaughlin's estimates were obviously unreliable. DiIanni himself did not dispute McLaughlin's estimates during his testimony, even though he helped develop the Omnipod while working for plaintiff as an engineer during the relevant time period. The jury ultimately found McLaughlin's testimony credible, and this Court is not free to reject that assessment at the Rule 50(b) stage. *See Barkan*, 627 F.3d at 39.

Defendants further contend that the award of damages for the misappropriation of the DHF was particularly unreasonable because McLaughlin failed to "provide an estimate of the efforts that went into developing [the DHF]," and that, in any event, the award was overinclusive because it did not account for plaintiff's removal of two elements of the asserted DHF trade secret. (Def.'s Mot. at 19-20). But McLaughlin, along with multiple other witnesses, testified that the DHF was a compilation of information and contained the entire set of design work that

19

went into developing the Omnipod.  And at no point during McLaughlin's testimony did he suggest that his work estimates would have materially changed as a result of removing two DHF sub-components from the asserted trade-secrets list.

Plaintiff was not required to present more detailed evidence, as the evidence presented satisfied its burden to establish its damages.  And again, defendants had ample opportunity to cross-examine McLaughlin and others about the specifications of the DHF's value.  The jury's determination of the DHF damages award was thus supported by the evidence.[7]

### b.    Joint-and-Several Liability

Defendants next ask the Court to rule as a matter of law that Kim should not be found jointly and severally liable with EOFlow.  (Def.'s Mot. at 22).  Defendants assert that plaintiff is judicially estopped from seeking joint-and-several liability after it had asked the jury to only award damages of $1 per trade secret for the non-EOFlow defendants.  Defendants further contend that plaintiff did not establish a sufficient basis to support a finding of joint-and-several liability between EOFlow and Kim.

The Court ruled at the close of evidence that as a matter of law, Kim and EOFlow can be held jointly and severally liable.  That is because in a trade-secret misappropriation case where damages are based on unjust enrichment, traditional equitable principles suggest that joint-and-several liability is proper when the defendants act as "partners engaged in concerted wrongdoing," evidenced by their shared enjoyment of the fruits of the misappropriation.  *See*

---

[7] For the reasons stated in the Court's memorandum and order concerning plaintiff's motion for a permanent injunction, the damages award will be reduced to $59.4 million to avoid conferring on plaintiff an impermissible double recovery.  That order does not call into question the evidentiary basis supporting the jury's damages award.  Rather, plaintiff has elected to forgo a substantial portion of the damages award in favor of a permanent injunction that, among other things, enjoins defendants from using, possessing, selling, or otherwise distributing plaintiff's trade secrets anywhere in the world.  *See Dopp v. HTP Corp.*, 947 F.2d 506, 515 (1st Cir. 1991) (stating that "[g]enerally, an election between inconsistent remedies is made after a verdict is entered but prior to the entry of judgment").

*BioPoint*, 110 F.4th at 352.  As EOFlow's Chief Executive Officer and one of its largest shareholders, Kim stood to earn a substantial profit—approximately $100 million in personal gain from the agreed-upon sale to Medtronic, according to the evidence—from the company's misappropriation.  Kim may therefore be held jointly and severally liable for the damages award.

Moreover, judicial estoppel does not bar the application of joint-and-several liability.  "[A]t a minimum, two conditions must be satisfied before judicial estoppel can attach.  First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive.  Second, the responsible party must have succeeded in persuading a court to accept its prior position."  *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (citations omitted).  Here, plaintiff never asserted that Kim and EOFlow should *not* be held jointly and severally liable.  Indeed, it sought joint-and-several liability for all defendants, which the Court only granted as to Kim and EOFlow.  Plaintiff's request that the jury only award $1-worth of damages for Kim's misappropriation is not a concession or disclaimer of its consistent position that defendants be held jointly and severally liable.  Judicial estoppel is therefore not applicable.

Thus, the motion for judgment as a matter of law will be denied as to the application of joint-and-several liability to Kim and EOFlow.

### B.    Motion for a New Trial

Defendants move for a new trial on multiple grounds.  Defendants first repeat the arguments made in their Rule 50(b) motion to contend that the verdict and damages award were unsupported by the weight of the evidence.  (Def.'s Mot. at 23).  However, nothing in defendants' Rule 50(b) motion raised a concern that the jury's verdict and damages award were, in fact, against the weight of the credible evidence, let alone amounted to a "miscarriage of justice."  *Foley*, 972 F.3d at 16 (internal quotations omitted).  Thus, for the reasons supporting a

denial of defendants' Rule 50(b) motion, defendants' motion for a new trial on the basis of the weight of the evidence will be denied.

Defendants next assert that a new trial is warranted because the final jury instructions, verdict form, and adverse-inference instruction were flawed. (Def.'s Mot. at 24). Aside from stating that their objections are already reflected in the record, defendants do not articulate the legal error or prejudice that they believe the jury instructions and verdict form presented. And as for the adverse-inference instruction, after a thorough examination of the relevant facts, the Court found that Welsford intentionally destroyed evidence after a duty arose to preserve files for litigation. That finding properly supported an adverse-inference instruction under Fed. R. Civ. P. 37(e). To avoid potentially confusing the jury, the Court decided against referring to a separate instance of file deletion by Hamm, another Nephria Bio employee, in that adverse-inference instruction. Nothing about the final jury instructions, verdict form, and adverse-inference instruction rise to the level of an injustice that would warrant granting a new trial.

Defendants next contend that the Court's explanations and instructions during the course of trial improperly "amounted to clues to the jury" that unfairly prejudiced defendants. (Def.'s Mot. at 24). But the Court's instructions during trial were not only permissible, but were important "to acquaint the jury with the governing law." *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 47 (1st Cir. 2015). The mid-trial explanations served to clarify the applicable law and ensure that the jury could reasonably understand the case as it developed. None of the statements that defendants expressly object to in their motion are inherently unfair to defendants; rather, they merely explain the relevant aspects of trade-secret-misappropriation law.

Furthermore, defendants did not contemporaneously object to essentially any of the Court's explanations to the jury during trial. That failure alone renders defendants' argument

waived. *See Matton v. White Mountain Cable Const. Corp.*, 190 F.R.D. 21, 23 (D. Mass. 1999) (stating that "where a party seeks a new trial based on allegations of judicial misconduct, [a]n objection to the alleged misconduct is ordinarily required, either at the time of the misconduct or at the next available opportunity outside the jury's presence").

Finally, defendants assert that the Court made "numerous one-sided, unfair, and prejudicial interjections that . . . stacked the deck against [d]efendants." (Def.'s Mot. at 25). Defendants mischaracterize the Court's statements at trial. In light of the highly complex and technical concepts involved in the case, the Court intermittently posed brief, clarifying questions to the witnesses to facilitate better jury comprehension. The Court clearly acted within its authority in doing so. *See* Fed. R. Civ. P. 614(b). But beyond that, the Court's questions were especially appropriate in this context given the complicated subject matter. There was no risk of prejudice to defendants, as the questions were balanced and directed only at clarifying technical witness testimony. *See Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003).

Moreover, at trial, defense counsel at times advanced improper questions and remarks. In response, the Court directed counsel to stay within the permissible bounds of examination. It is well within the Court's authority to ensure proper, efficient, and fair proceedings, including by requiring defense counsel to adhere to applicable evidentiary and procedural rules. *See Liteky v. United States*, 510 U.S. 540, 555-56 (1994). And, again, defendants did not object to the Court's statements during trial, rendering their argument waived. *See Matton*, 190 F.R.D. at 23. A new trial will therefore not be granted.

## III.    Conclusion

For the foregoing reasons, defendants' renewed motion for judgment as a matter of law and motion for a new trial are DENIED.

**So Ordered.**

                                        /s/  F. Dennis Saylor IV
                                        F. Dennis Saylor IV
Dated:  April 24, 2025                  Chief Judge, United States District Court