## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
**INSULET CORPORATION,**                   )
                                          )
           **Plaintiff,**                  )
                                          )        **Civil Action No.**
           **v.**                          )        **23-11780-FDS**
                                          )
**EOFLOW CO., LTD.; EOFLOW, INC.;**        )
**NEPHRIA BIO, INC.; and JESSE KIM,**      )
                                          )
           **Defendants.**                 )
_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S
## MOTION FOR A PERMANENT INJUNCTION AND
## DEFENDANTS' MOTION FOR A STAY OF JUDGMENT

**SAYLOR, C.J.**

This dispute concerns the misappropriation of trade secrets for the design and

manufacture of an insulin patch pump, the Omnipod, produced by plaintiff Insulet Corporation.

Plaintiff sued seven defendants:  EOFlow Co., Ltd., and EOFlow, Inc. (collectively, "EOFlow");

Nephria Bio, Inc.; EOFlow's Chief Executive Officer, Jesse Kim; and three former Insulet

employees, Luis Malave, Steven DiIanni, and Ian Welsford.

After a month-long trial, a jury returned a verdict on December 3, 2024, finding six

defendants—all except Malave—liable for misappropriation of trade secrets in violation of the

Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").  The jury awarded plaintiff $452

million, composed of $170 million in unjust-enrichment damages and $282 million in exemplary

damages.

Plaintiff has now moved for a permanent injunction seeking, among other things, to prohibit defendants from using, possessing, selling, or otherwise distributing plaintiff's trade secrets.[1]  Plaintiff also seeks to preserve its $452 million damages award.

Defendants oppose the motion on two principal grounds.[2]  First, they contend that the requested injunction would constitute an impermissible double recovery.  Second, they assert that the scope of the proposed injunction is unduly broad.  Defendants separately seek a stay of any injunction and damages award pending appeal.

For the following reasons, the motion for a permanent injunction will be granted in part and denied in part.  In addition, the Court will enter a partial stay of its final judgment, as set forth below.

## I.    <u>Analysis</u>

### A.    <u>Permanent Injunction</u>

Plaintiff seeks entry of a permanent injunction that would, among other things, prohibit defendants from using, possessing, selling, or otherwise distributing its trade secrets—and any product, including the EOPatch 2, that uses those trade secrets—anywhere in the world.  (*See* ECF No. 931-1).  Plaintiff also seeks a reassignment of certain patents belonging to defendants that incorporate elements of its trade secrets; disgorgement of a break-up fee due to defendants from Medtronic PLC; and the granting of auditing rights to ensure defendants' ongoing compliance with the requested injunction order.

---

[1] On February 25, 2025, pursuant to a separately negotiated Consent Permanent Injunction and Judgment agreement between plaintiff and Malave, DiIanni, and Welsford, the Court entered a final judgment under Fed. R. Civ. P. 54(b) and issued a permanent injunction in accordance with the terms of the parties' agreement.  (ECF Nos. 924-25).

[2] For the sake of convenience, the term "defendants" will hereafter refer only to EOFlow, Nephria Bio, and Kim unless the context indicates otherwise.

1.      **Legal Framework**

The DTSA authorizes courts to grant injunctive relief for trade-secret misappropriation. *See* 18 U.S.C. § 1836(b)(3)(A). "A plaintiff seeking a permanent injunction is traditionally required to satisfy a four-factor test: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Greene v. Ablon*, 794 F.3d 133, 156 (1st Cir. 2015) (quoting *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008)). The First Circuit has stated that "[t]he first two factors together require 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 123 (D. Mass. 2024) (quoting *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013)). Thus, "[a]n injunction should not be granted where 'a less drastic remedy' will suffice." *Greene*, 794 F.3d at 156 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010)).

Starting with the first factor, in general, "[t]he loss of a trade secret . . . constitute[s] irreparable harm." *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004). Here, it is clear that plaintiff would face irreparable harm if defendants were permitted to make unfettered use of its trade secrets. In the absence of an injunction, defendants could freely sell or distribute products incorporating plaintiff's trade secrets, entirely undermining the value of its proprietary information. Such a prospect is not, as defendants suggest, theoretical. Indeed, EOFlow already attempted to profit from the stolen trade secrets when it agreed to terms of a sale with one of plaintiff's largest competitors, Medtronic, before

this lawsuit began.  Without an injunction, defendants could once again profit from the sale of the trade secrets—secrets that plaintiff spent several years and millions of dollars to develop— enabling others to avoid significant upfront costs and compete with plaintiff.

Moreover, although the EOPatch 2 is available only in a select few markets, its continued sale and distribution constitute a genuine threat to plaintiff's ability to expand its market, its pricing power, and its reputation.  And defendants' "brazen actions over a substantial period of time," as recognized by the jury's finding that EOFlow and Kim willfully and maliciously misappropriated certain trade secrets, only heightens the risk of future harm.  *See KPM Analytics*, 729 F. Supp. 3d at 123; *see also Benchmark Techs., Inc. v. Tu*, 2023 WL 8371973, at *3 (D. Mass. May 30, 2023).  Plaintiff has therefore met its burden on the first factor.

As to the second factor, money damages are not adequate to remedy the prospective injury.  At the very least, "the questionable financial condition of [the defendant] reinforces the inadequacy of a remedy at law."  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).  Indeed, "[a] district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the [defendant] before the alternative of money damages can be deemed adequate."  *Id.*  Here, the trial record established that defendants have at most approximately $24 million in net assets, making it highly unlikely that defendants have the financial wherewithal to satisfy the jury award, or even to come close to doing so.

As to the third factor, defendants contend that the balance of equities weighs in their favor because an injunction would force EOFlow to shut down.  But a defendant "cannot escape an injunction simply because . . . its primary product is an infringing one."  *Id.* at 1156.  And nothing prohibits defendants from developing another product through legal means, without the benefit of misappropriated trade secrets.  Meanwhile, requiring plaintiff to compete with a

product built upon its own stolen property imposes a substantial burden that far outweighs the equities, if any, in plaintiff's favor.

Finally, the public interest in providing robust protection of trade secrets strongly weighs in favor of an injunction. The public interest favors investment and innovation in new technologies, while also deterring willful misappropriation of intellectual property. And any potential short-term hardship faced by current EOPatch 2 users does not alter the appropriateness of a permanent injunction, but could rather be accommodated through other equitable means, including a temporary carve-out of the injunction for those users in order to permit an orderly transition to other means of care.

Plaintiff has therefore satisfied the four-part test supporting its motion for a permanent injunction.

### 2.     <u>Scope of Injunction</u>

The scope of the requested injunction is also reasonable and warranted under the circumstances. "Injunctions must be tailored to the specific harm to be prevented." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000). The jury found that defendants misappropriated four trade secrets belonging to plaintiff, and that EOFlow and Kim did so willfully and maliciously. As noted, multiple future harms will likely flow from defendants' violation, including the further distribution of the trade secrets and the development and sale of competing devices that make use of those trade secrets.

Defendants contest a number of aspects of the injunction. First, they oppose its worldwide application, as they would be prohibited from possessing, using, selling, distributing, or providing services using plaintiff's trade secrets anywhere in the world.

5

The text of the DTSA plainly permits a worldwide injunction, as long as (1) the offender is a citizen or permanent resident of the United States, or an organization organized under the laws of the United States, or (2) an act in furtherance of the offense was committed in the United States.  18 U.S.C. § 1837.  Here, Kim is a United States citizen, and EOFlow, Inc., and Nephria Bio are organized in the United States.  Moreover, multiple acts occurred in the United States that furthered the misappropriation of plaintiff's trade secrets, thereby extending the DTSA's reach to—and the court's authority to issue an injunction against—EOFlow Co., Ltd., a Korean company.[3]

A worldwide injunction is particularly appropriate in the context of trade-secret misappropriation to prevent further dissemination of confidential information to foreign competitors.  *See Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1377 (11th Cir. 1982) (stating that "confidential information is worthy of protection without geographic limitation because once divulged the information or the fruits of the information quickly can pass to competitors anywhere in the world"); *see also Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (finding a worldwide injunction appropriate in certain cases of trade-secret misappropriation and always appropriate in impacted foreign markets).  Defendants have already attempted to sell the trade secrets and could readily attempt to do so again to a foreign competitor.  Thus, a worldwide injunction is certainly justified under the circumstances.

Defendants next contend that the injunction should be limited in time.  They assert that a duration of only three and a half years is sufficient because that accounts for the "head start" they received from misappropriating plaintiff's trade secrets.

---

[3] Defendants did not contest the application of the DTSA's extraterritoriality provision at trial.

It may be true that courts often limit the duration of an injunction to a "period of time that would be required for independent development," including reverse engineering.  4 Roger M. Milgrim, *Milgrim on Trade Secrets* § 15.02[l][d].  However, there is limited evidence that plaintiff's trade secrets can actually be reverse engineered, let alone within a three-and-a-half-year period.[4]  There was evidence that legitimate competitors of Insulet have been unable to develop a competing product, despite investing millions of dollars attempting to do so.  The fact that plaintiff's damages expert, Justin McLean, assumed a four-year head start for the purposes of estimating defendants' unjust enrichment does not refute the fact that no other market participant has successfully developed a competing product to the Omnipod to date.  Indeed, McLean did not testify that defendants would have, in fact, developed plaintiff's trade secrets in four years.  Rather, he testified as to the time that defendants saved from their misappropriation. *See Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013).  Thus, without any evidence that plaintiff's trade secrets could actually be independently developed in a specified amount of time, a permanent injunction is appropriate. *See Milgrim on Trade Secrets* § 15.02[l][e] (stating that "courts do not always adhere to a rigidly-conceptualistic test based upon [independent-]development time but instead seek to do equity and will enter an arbitrary-term injunction if needed to accomplish the equitable result").

Defendants next contend that the proposed reassignment of patent application US 2023/0248902A1, along with any other submitted patent applications that disclose the same invention, is unwarranted.  However, "[t]he victim of trade secret misappropriation may be entitled to ownership of any patents obtained by the wrongdoer on the misappropriated trade

---

[4] Plaintiff's expert, Boris Leschinsky, claimed at trial that he was able to reverse engineer the Omnipod, but in fact his testimony demonstrated he was unable to do so successfully.  (*See* 13 Tr. 149:13-150:13; 152:22-153:5; 154:8-155:2; 155:19-156:10; 156:20-161:17).

secret." *Whiteside Biomechanics, Inc. v. Sofamor Danek Grp., Inc.*, 88 F. Supp. 2d 1009, 1018 (E.D. Mo. 2000), *aff'd sub nom. Whiteside Biomechanics, Inc. v. Danek Med., Inc.*, 13 F. App'x 950 (Fed. Cir. 2001). Plaintiff's expert, Lane Desborough, testified that the patent application at issue describes proprietary aspects of plaintiff's occlusion-detection-algorithm ("ODA") trade secret—a trade secret that the jury found to have been misappropriated by defendants. Equitable reassignment of defendants' patent applications derived from the trade secrets is appropriate to prevent continued use of those trade secrets. *See Ethicon Endo-Surgery, Inc. v. Crescendo Techs., LLC*, 2009 WL 2707805, at *8 (S.D. Ohio Aug. 24, 2009) (stating that "[e]quitable reassignment is appropriate for intellectual property that is misappropriated in a patent application" to ensure that "the wrongdoer is not improperly rewarded for its misappropriation").

Defendants next assert that the requested disgorgement of the anticipated $10 million break-up fee arising out of the terminated Medtronic acquisition is impermissibly duplicative of the jury award. Plaintiff, however, acknowledges that its damages award must be reduced by any amount received from the break-up fee. The disgorgement of the break-up fee serves as a partial payment of defendants' financial obligation, not as a duplicative windfall to plaintiff. Thus, there is no risk of duplicative awards from such a disgorgement.

Defendants finally contend that the auditing provisions of the proposed injunction are overly burdensome and invasive. But the requested auditing rights—which would permit plaintiff to conduct audits up to two times per year per defendant—are justified by the jury's finding that EOFlow and Kim engaged in willful and malicious misappropriation, and help mitigate the threat of future misappropriation.

The Court will therefore enter a permanent injunction, which will be set forth in a separate order. However, as set forth below, that injunction will be crafted to permit sales to

current users of the EOPatch 2 for a limited period of time.  Such an injunction will permit

current users to transition to other means of medical care, and will also effectively preserve the

status quo pending appeal.

### 3.    Double Recovery

Defendants next assert that a permanent injunction, combined with the jury's award of

monetary damages, constitutes an impermissible double recovery for plaintiff.  "[I]t is well

settled that, '[t]he law abhors duplicative recoveries; thus[,] double awards for the same injury

are impermissible.'"  *Americus Mortg. Corp. v. Est. of Belli*, 2014 WL 1338294, at *7 (D. Mass.

Mar. 31, 2014) (quoting *Boqan v. City of Boston*, 489 F.3d 417, 425 (1st Cir. 2007)).  Under

certain circumstances, an award of damages coupled with an injunction may constitute an

improper double recovery for a plaintiff.  *See Syntel Sterling Best Shores Mauritius Ltd. v. The

TriZetto Grp., Inc.*, 68 F.4th 792, 811 (2d Cir. 2023) (rescinding the award of monetary damages

in part because the district court entered a permanent injunction prohibiting the defendant's use

of the misappropriated trade secrets).  Thus, although the DTSA permits a court to both "grant an

injunction to prevent any actual or threatened misappropriation" and "award damages for any

unjust enrichment caused by the misappropriation," 18 U.S.C. § 1836(b)(3), the damages award

may not apply to "a period of use that overlap[s] with the period covered by the injunction,"

*PPG Indus. Inc v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 163 (3d Cir. 2022).

Again, the jury awarded plaintiff $452 million in total damages, consisting of $170

million in unjust enrichment and $282 million in exemplary damages based on the jury's finding

that defendants misappropriated four trade secrets, three of which were misappropriated willfully

and maliciously.

Plaintiff's damages expert presented two theories of unjust-enrichment damages to the jury. The first, the "head-start" theory, focused on the benefit of an accelerated development process that defendants gained as a result of the misappropriation. The second, the "market-value" theory, represented the value of the trade secrets to a prospective buyer, based in part on the agreed-upon sale of EOFlow to Medtronic. Both theories involved analyses of prospective, hypothetical sales of defendants' products and their potential future value. McLean did not present any estimate of plaintiff's "actual loss," whether suffered through lost sales, market share decline, or another metric. *See* 18 U.S.C. § 1836(b)(3)(B). Instead, McLean and plaintiff focused entirely on the benefits that accrued—or would in the future accrue—to defendants as a result of the misappropriation.

The jury's unjust-enrichment damages-award calculation was thus based in substantial part on defendants' future, unrealized gains. It therefore overlaps to a significant degree with the requested injunction, which, by its nature, is designed to prevent future harm. And both granting the requested injunction and upholding the entire jury award would, in substantial part, constitute an impermissible double recovery.

A district court may, however, fashion an award to avoid duplicative recovery. *See Villarini-Garcia v. Hosp. del Maestro*, 112 F.3d 5, 8 (1st Cir. 1997) (directing a district court to modify, but not entirely annul, the damages award to avoid partial duplication); *see also E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (stating that it "goes without saying that the courts can and should preclude double recovery" (internal quotations omitted)).

For the reasons set forth below, the Court concludes that at least a portion of the avoided-cost and exemplary-damages award is not duplicative, and it may therefore issue an injunction together with a reduced damages award. Whether it has the authority to do so, however, does not

answer the question of whether it should in fact do so.  That is a matter for plaintiff to decide, as it is an issue of election of remedies.  The time to make such an election is "after a verdict is entered but prior to entry of judgment."  *Dopp v. HTP Corp.*, 947 F.2d 506, 515 (1st Cir. 1991). Plaintiff has made that election; in its supplemental post-trial memorandum, it stated that it "chooses to elect for a permanent injunction together with the avoided-cost and exemplary damages that are not duplicative of the injunction."  (ECF No. 934 at 2).

The Court will turn, then, to the questions of whether and to what extent any portion of the avoided-cost and exemplary-damages award is not duplicative of the remedy of injunctive relief.

### a.    <u>Avoided Costs</u>

Plaintiff contends that defendants have already reaped certain benefits from their misappropriation—such as avoiding significant research, development, and regulatory costs as a result of the misappropriation—that are a portion of the jury's award.  Because those benefits are backward-looking, plaintiff contends that they do not overlap with the forward-looking injunction.

Injunctions prohibiting the future use of misappropriated trade secrets may permissibly coexist with unjust-enrichment damages based on previously avoided costs.  *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1133 (7th Cir. 2020) (upholding the jury's unjust-enrichment award, which was calculated as defendant's "avoided research and development costs," even though the district court entered an injunction prohibiting the future use, possession, and retention of plaintiff's trade secrets); *PPG*, 47 F.4th at 163-64 (upholding a damages award "for the development costs [the defendant] avoided" along with a "forward-looking permanent injunction" prohibiting future use of the plaintiff's trade secrets); *see also*

11

*Syntel*, 68 F.4th 811 (indicating that, under certain circumstances, an injunction may coexist with avoided-costs damages).

Defendants cite *Syntel* in support of their assertion that an injunction and an avoided-costs award may only be issued together when the misappropriation "diminish[es]" or "destroy[s]" the value of the trade secrets. *See* 68 F.4th at 812. Because plaintiff here did not put forth a theory of damages based on the harm that it suffered from the misappropriation, defendants assert that an avoided-costs award is inappropriate.

The court in *Syntel* identified a number of factors that bear on whether an avoided-costs award is proper in conjunction with an injunction. Those factors include (1) "the extent to which the defendant has used the secret in developing its own competing product," (2) "the extent to which the defendant's misappropriation has destroyed the secret's value for its original owner," and (3) "the extent to which the defendant can be stopped from profiting further from its misappropriation into the future." *Id.* Notably, the misappropriation at issue in *Syntel* did not implicate any of those three factors, which the court considered "unusual[]." *Id.*

Unlike in *Syntel*, defendants here used plaintiff's trade secrets to develop their own competing product. *See id.* Moreover, the jury found that EOFlow and Kim acted willfully and maliciously, raising concerns that they may again in the future engage in illicit misappropriation. Although plaintiff's damages theory did not rely on the harm that it suffered, the record nonetheless supports the conclusion that defendants' misconduct created a threat to the value of plaintiff's trade secrets—specifically, in their signed sale agreement with Medtronic that nearly disclosed the trade secrets to one of plaintiff's biggest competitors. Thus, the reasoning of *Syntel* does not require that an avoided-costs award be vacated if an injunction is to be entered.

12

### b.    <u>Avoided-Costs Damages Calculation</u>

Plaintiff has submitted a supplemental report by Justin McLean, its damages expert, to support its assertion that the avoided costs associated with the four misappropriated trade secrets total $52.8 million.[5]

Starting with the computer-aided design ("CAD") files, soft cannula, and ODA trade secrets, there is no genuine disagreement that the jury adopted McLean's market-value theory to arrive at its damages award of $83 million as to those three trade secrets.  In presenting his market-value damages estimates to the jury, McLean explained that the estimated research and development costs were "roughly" $15 million for the CAD files, $9 million for the soft cannula, and $2.2 million for the ODA.  (12 Tr. 90:2-5).  He went on to testify that he incorporated plaintiff's research-and-development costs into his calculation of the market value of each trade secret.  The market-value damages calculations presented to the jury therefore were a function of his avoided-costs estimates, which totaled approximately $26.2 million for those three trade secrets.

As for the design-history-file ("DHF") trade secret, McLean testified that its market value was approximately $232 million, with corresponding avoided costs of approximately $72

---

[5] Defendants oppose plaintiff's submission of McLean's supplemental report on the ground that it is untimely under Fed. R. Civ. P. 26(a)(2) and 37(c)(1).  They assert that the report consists of new theories and opinions that should have been disclosed long before the trial.  *See Massachusetts Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015) (stating that if a "declaration submitted after the close of expert discovery differs substantially from the [initial] report, offers a whole new theory, opinion, or methodology, or is outside of the scope or general scheme of the report, then it is an improper supplementation").  The Court shares defendants' misgivings about the permissibility of McLean's supplemental report, and will not consider it to the extent it presents new theories and analyses not previously disclosed.  However, to the extent that it simply restates or summarizes McLean's trial testimony, it appears to be harmless.  *See* Fed. R. Civ. P. 37(c)(1) (stating that if a party fails to timely disclose expert testimony, then it is precluded from using "that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified *or is harmless.*" (emphasis added)).

million.  However, by awarding only $170 million for the misappropriation of the DHF, the jury evidently did not credit the market-value theory (or the head-start theory) in its entirety.

Because the verdict form does not indicate which aspects of McLean's theory that the jury rejected, plaintiff proposes reducing McLean's estimated avoided costs of $72 million down to $52.8 million, which reflects the same ratio as that between McLean's estimated DHF market value ($232 million) and the jury's award ($170 million).  However, as defendants note, it is possible that the jury substantially rejected an avoided-costs award as to the DHF.  In any event, there is no obvious way to reconstruct the jury's reasoning, and the Court is therefore disinclined to accept plaintiff's proportionality approach.  Instead, and to ensure that there is no real risk of duplicative recovery, the Court will exclude the DHF-related avoided costs altogether in fashioning its relief.

Thus, the Court will award unjust-enrichment compensatory damages of $25.8 million, which represents the avoided costs associated with the CAD files, soft cannula, and ODA trade secrets.[6]

### 4.    Exemplary Damages

Plaintiff seeks to preserve the jury's award of $282 million in exemplary damages. Defendants assert that any reduction in the unjust-enrichment award requires a corresponding reduction in exemplary damages.  Defendants further contend that exemplary damages of any magnitude raise double-recovery concerns and should be barred altogether.

---

[6] McLean estimated that the market value of the CAD files, soft cannula, and ODA trade secrets were $47.8 million, $29.6 million, and $7.2 million, respectively.  The jury apparently reduced those values to the nearest million, ultimately awarding $47.0 million, $29.0 million, and $7.0 million for the misappropriation of those three trade secrets, respectively.  To account for the rounding, plaintiff proposes proportionally reducing the $26.6 million of estimated research-and-development costs for those three trade secrets to $25.8 million.  Because there is no genuine dispute as to the jury's adoption of plaintiff's market-value damages for those three trade secrets, the Court will enter an unjust-enrichment award of $25.8 million, comprised of $14.6 million for the CAD files, $9.0 million for the soft cannula, and $2.2 million for the ODA.

To begin, plaintiff's exemplary damages must be reduced to comply with the clear text of the DTSA, which states that "a court may . . . if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the [unjust-enrichment] damages *awarded*." 18 U.S.C. § 1836(a)(3) (emphasis added). The DTSA therefore explicitly connects the cap on exemplary damages to the total unjust-enrichment award. There is no "award" until there is a final judgment or decision. Although an award may be granted by both a court and a jury, its critical feature is that it is a final determination. Thus, an award of exemplary damages under the DTSA may not exceed two times the unjust-enrichment damages ultimately entered for plaintiff—not the unjust enrichment determined (but not ultimately awarded) by the jury.

Plaintiff cites *Dyer v. William S. Bergman & Assocs., Inc.*, 657 A.2d 1132, 1139 (D.C. 1995), in support of its position that it is entitled to the entirety of the jury's award of $282 million in exemplary damages. In that case, the D.C. Court of Appeals upheld a trial court's decision to proscribe the entire compensatory-damages award on double-recovery grounds, while nevertheless preserving the punitive-damages award. *Dyer*, 657 A.2d at 1139. But the *Dyer* court's reasoning is not persuasive in this context. First, *Dyer* involved a common-law tortious-interference claim, and was thus not governed by a statutory scheme. *Id.* at 1134. Second, the *Dyer* court applied a plain error, not *de novo*, review standard to the trial court's damages award, holding that the lower court's decision "to set aside the award of punitive damages was not 'plainly' or 'obviously' wrong." *Id.* at 1140. Finally, the *Dyer* court itself acknowledged that its own case law on "whether compensatory damages are a prerequisite for an award of punitive damages [has] not been a model of consistency." *Id.* at 1140, n.12. In short, *Dyer* does not

provide persuasive authority to depart from the text of the DTSA, and thus plaintiff's exemplary damages will be limited to two times the amount of its final unjust-enrichment award.

As noted, the jury found that EOFlow and Kim willfully and maliciously misappropriated plaintiff's trade secrets, and therefore awarded $282 million in total exemplary damages, consisting of $94 million related to the misappropriation of the CAD files, $14 million for the ODA, and $174 million for the DHF.[7]  And the Court will enter a final unjust-enrichment award for each trade secret—corresponding to the avoided costs—of $14.6 million for the CAD files, $9.0 million for the soft cannula, and $2.2 million for the ODA.  Thus, in accordance with the exemplary-damages cap of the DTSA, plaintiff's punitive damages will be reduced to $29.2 million for the CAD files and $4.4 million for the ODA, for a total of $33.6 million in exemplary damages.

Defendants nonetheless oppose an award of exemplary damages of any magnitude.  Their principal argument is that an award of exemplary damages constitutes an impermissible double recovery with a permanent injunction because they "deter future misconduct."  *Forster v. Boss*, 97 F.3d 1127, 1130 (8th Cir. 1996).  But the *Forster* court actually *upheld* an award of punitive damages alongside an injunction, stating that an "award of punitive damages . . . is not duplicative of the relief contained in the injunction" because "punitive damages are not designed to compensate anybody."  *Id.*  Rather, the primary goal of exemplary damages is to "punish misconduct"—namely, *past* misconduct.  *Id.*  Conversely, injunctions are designed as a remedial tool to prevent specific *future* harms.  *See Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009).  When "two damages awards serve different purposes[—]that is, when one is remedial and the other is punitive"—then the awards are unlikely to be duplicative.  *Giguere v.*

---

[7] The jury did not find that the soft-cannula trade secret was willfully and maliciously misappropriated.

*Port Res. Inc.*, 927 F.3d 43, 51 (1st Cir. 2019); *see also Burnett v. Ocean Properties, Ltd.*, 422 F.

Supp. 3d 400, 430 (D. Me. 2019), *aff'd*, 987 F.3d 57 (1st Cir. 2021) (stating that "[p]unitive

damages, unlike compensatory damages, are not aimed at making a plaintiff whole; thus the rule

against double recovery is inapplicable when the damages awarded are punitive" (quoting

*Medina v. D.C.*, 643 F.3d 323, 329 (D.C. Cir. 2011))).

The exemplary-damages provision under the DTSA—which applies only to willful and

malicious misappropriation—is unquestionably punitive in nature, and thus does not pose a

double-recovery risk when combined with an injunction.  Plaintiff will therefore be awarded

$33.6 million in exemplary damages, resulting in a total damages award of $59.4 million.[8]

**5.    Prejudgment Interest**

Plaintiff seeks prejudgment interest on its avoided-costs award at the Massachusetts rate

of 12 percent per year set by Mass. Gen. Laws ch. 231, §§ 6B-6C.  It asserts that defendants

realized the benefit of the avoided costs during the development of the EOPatch 2 several years

ago, and thus prejudgment interest should be entered to adjust for the time-value of that benefit.

Plaintiff, however, has waived the right to seek prejudgment interest.  It could have

requested that the question of prejudgment interest be submitted to the jury.  "But the question of

prejudgment interest was not submitted to the jury, nor did plaintiff[] ask that the jury be

instructed on it," meaning that any subsequent "award of prejudgment interest [would] be

[struck]."  *Cordero v. De Jesus-Mendez*, 922 F.2d 11, 14 (1st Cir. 1990) (quoting *Furtado v.

Bishop*, 604 F.2d 80, 98 (1st Cir. 1979)); *see also Giorgio v. Duxbury*, 2016 WL 3983232, at *2

---

[8] $25.8 million avoided-costs award + $33.6 million exemplary-damages award = $59.4 million total
damages award.

(D. Mass. July 25, 2016) (stating that "[p]laintiffs are not entitled to pre[]judgment interest where they did not submit the question of pre[]judgment interest to the jury").

Plaintiff asserts that it did not previously seek prejudgment interest because its two damages theories already accounted for the time-value of money, whereas an award of only avoided costs does not, thus justifying an award of prejudgment interest at this stage.

Regardless, an award of prejudgment interest is not warranted, because "[t]he essential rationale for awarding prejudgment interest is to ensure that an injured party is *fully compensated for its loss*."  *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195 (1995) (emphasis added).  At trial, plaintiff did not assert any actual financial loss stemming from defendants' misappropriation; instead, plaintiff's damages theories focused entirely on defendants' unjust enrichment, including their avoided costs.  It is true that those avoided-costs benefits began accruing to defendants in 2018, as they developed the EOPatch 2 using plaintiff's trade secrets.  But plaintiff has not articulated any quantifiable loss for which it must be made "whole."  *See Richwell Grp., Inc. v. Seneca Logistics Grp., LLC*, 433 F. Supp. 3d 58, 64 (D. Mass. 2019) (citing *Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)).  Nor did it seek (or receive) any damages for "actual loss" under the DTSA.  *See* 18 U.S.C. § 1836(b)(3)(B).  Moreover, plaintiff's unjust-enrichment and exemplary-damages awards—combined with the permanent injunction—adequately serve the DTSA's purpose of "deter[ring] misappropriation and provid[ing] recovery for trade[-]secret owners" without the addition of prejudgment interest.  *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2021 WL 1553926, at *15 (S.D.N.Y. Apr. 20, 2021), *aff'd in part, vacated in part*, 68 F.4th 792 (denying a request for prejudgment interest on damages awarded under the DTSA).  Thus, plaintiff's request for prejudgment interest will be denied.

18

### B.    Stay of Relief

Defendants have moved to stay judgments of both monetary and injunctive relief pending appeal.  Courts have employed different tests to evaluate the propriety of a stay as to each type of relief.

### 1.    Monetary Relief

Under Fed. R. Civ. P. 62(d), the "execution of a money judgment is automatically stayed pending appeal upon the posting of a supersedeas bond."  *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 17 (1st Cir. 2002).  Local Rule 62.2 sets the bond amount at the final damages-award amount plus 10 percent to cover interest and $500 for costs.  *See CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 2016 WL 8710447, at *1 (D. Mass. Dec. 2, 2016).  However, no bond is required if "(1) the defendant's ability to pay is so plain that the posting of a bond would be a waste of money; or (2) the bond would put the defendant's other creditors in undue jeopardy."  *Acevedo-Garcia*, 296 F.3d at 17.  If the bond requirement is waived, courts typically require some other form of security instead.  *See, e.g.*, *Bowers v. Baystate Techs., Inc.*, 2001 WL 640876, at *1 (D. Mass. June 5, 2001) (requiring a defendant to pledge a larger percentage of stock to a plaintiff as an alternative security when the defendant was unable to obtain a bond for the full judgment amount).  Ultimately, the "nature and the amount of the bond is entrusted to the discretion of the trial court."  *Acevedo-Garcia*, 296 F.3d at 17.

Here, given the damages award of $59.4 million, defendants must post a bond in compliance with Local Rule 62.2 in order to obtain a stay of the monetary judgment.  Defendants, by their own admission, lack the resources to meet the first exception to the bond requirement.  As for the second exception, defendants filed a declaration by EOFlow's head of finance stating that its current debt obligations total approximately $39 million.  It is plausible

19

that defendants' creditors may have been placed at risk if the stay applied to the entirety of the jury's $452 million award. But the cost of a bond for the final judgment award (plus 10 percent for interest and $500 for costs) will be significantly less expensive and will not likely place defendants' creditors in undue jeopardy. Thus, a stay of the monetary judgment will be entered, subject to the posting of a bond by defendants equal to $65,340,500.[9]

### 2.    Injunctive Relief

Stays of injunctive relief are "not a matter of right." *See Nken v. Holder*, 556 U.S. 418, 427 (2009). Such stays must be evaluated under the traditional four-part standard applied to injunctions. *See Acevedo-Garcia*, 296 F.3d at 16. Defendants thus bear the burden of satisfying the following: (1) they must make a "strong showing that [they are] likely to succeed on the merits" in their appeal; (2) they must show that they "will be irreparably injured absent a stay"; (3) they must show that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding"; and (4) they must show that the stay would serve "the public interest." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). In evaluating whether this burden has been met, the "first two factors"—that is, likelihood of success and irreparable injury—"are the most critical." *Id.*

Starting with the first factor, "[i]t is not enough that the chance of success on the merits [is] better than negligible." *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (quoting *Nken*, 556 U.S. at 434-35). That said, "[w]hen the request for a stay is made to a district court, common sense dictates that the moving party need not persuade the court that it is likely to be reversed on appeal." *Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 522 (D. Mass. 2019) (quoting *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 150 (D. Mass.

---

[9] That total represents the $59.4 million final monetary judgment, plus $5.94 million in interest, plus $500.

1998)).  Instead, the movant need only "establish that the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear."  *Id.*

Here, defendants' principal argument on appeal is that plaintiff's claims are time-barred as a matter of law.  Specifically, defendants maintain, as they have throughout the litigation process, that the statute-of-limitations provision under the DTSA applies an inquiry-notice standard, rather than a discovery-based standard.  An inquiry-notice standard would, in all likelihood, render plaintiff's claims time-barred.  However, for the reasons set forth in the Court's October 31, 2024 summary-judgment memorandum and order, the Court rejected defendants' proffered inquiry-notice standard as being inconsistent with both the clear text of the DTSA and the Supreme Court's reasoning in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).  (*See* ECF No. 753).  That said, reasonable minds may differ as to that determination, given that the accrual standard under the DTSA is not yet clearly established.  The appeal therefore raises a substantial question of law on which there is genuine room for meaningful difference of opinion, thereby satisfying the first factor for a stay of injunctive relief.

As for the second factor, "simply showing some possibility of irreparable injury" is not sufficient to warrant a stay.  *Gorbea*, 970 F.3d at 14 (quoting *Nken*, 556 U.S. at 434-35).  Defendants assert that a prohibition on all sales of the EOPatch 2, as contemplated under the proposed injunction, would almost immediately force them out of business, thus constituting a real risk of irreparable harm.  That risk, however, does not warrant a stay of the injunction as a whole, but rather supports a partial stay permitting continued sales to existing EOPatch 2 patients in the European Union and Republic of Korea, the only markets in which the EOPatch 2 is presently available.  Defendants could therefore maintain their current revenue stream

throughout the appeal process, but would not be permitted to use the trade secrets to expand their sales, develop competing products, or in any other way benefit from their misappropriation.

A partial stay limited only to existing EOPatch 2 patients also comports with the third factor, because it protects plaintiff from the threats posed by the misappropriation, including a potential sale of its trade secrets to a competitor, the expansion of a competing product into new markets, and the development of new products using its trade secrets. And the fourth factor is also supported by a partial stay, as the public interest is well-served by allowing current EOPatch 2 users to maintain uninterrupted access to their insulin-delivery system while the appeal process plays out.

The Court will therefore enter a temporary partial exception to the permanent injunction to permit continued sales of the EOPatch 2 device only to existing users in the European Union and Republic of Korea, as will be set forth in a separate permanent injunction order. Defendants will also be ordered to notify all current EOPatch 2 users subject to the temporary partial exception about the Court's permanent injunction order and the likely effect that it will have on their access to the device going forward.

## II.    <u>Conclusion</u>

For the foregoing reasons, plaintiff's motion for a permanent injunction is GRANTED in part and DENIED in part. Defendants' motion for a stay of judgment is GRANTED in part and DENIED in part. Total damages of $59.4 million is awarded to plaintiff without prejudgment interest. A permanent injunction order and order as to final judgment will be entered separately. **So Ordered.**

<div style="margin-left:50%">

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

</div>

Dated:  April 24, 2025