**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

INSULET CORPORATION,

                *Plaintiff*,

     v.

EOFLOW CO., LTD.; *et. al*,

                *Defendants*.

No. 1:23-cv-11780-FDS

**MEMORANDUM OF LAW IN SUPPORT OF**
**INSULET'S MOTION FOR ATTORNEY FEES AND LITIGATION EXPENSES**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

I.  Defendants willfully and maliciously misappropriated Insulet's trade secrets and
    deliberately destroyed evidence of their misconduct. ............................... 3

II. Defendants' destruction of evidence and meritless litigation tactics forced Insulet to
    spend many additional hours on this case. ................................................ 6

    A.  TRO and preliminary injunction phase. ............................................ 7

    B.  Fact and Expert Discovery. ............................................................... 8

    C.  Other pre-trial disputes. ................................................................... 10

    D.  Trial. ................................................................................................. 11

ARGUMENT .................................................................................................... 12

I.  Insulet is a prevailing party. ...................................................................... 13

II. EOFlow engaged in willful and malicious misappropriation. ................... 14

III. Insulet's fees are reasonable. ................................................................... 14

    A.  Insulet seeks an award for a reasonable number of hours. .............. 15

    B.  Insulet's proposed rates are reasonable. .......................................... 17

    C.  There is no basis for a downward adjustment of fees. ..................... 19

CONCLUSION ................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arkansas Teacher Retirement Sys. v. State Street Bank and Trust Co.*,
    513 F. Supp. 3d 202 (D. Mass. 2021) ...................................................................................18

*Blanchard v. Bergeron*,
    489 U.S. 87 (1989)...............................................................................................................15

*Blum v. Stenson*,
    465 U.S. 886 (1984)............................................................................................................17

*Brewster v. Dukakis*,
    3 F.3d 488 (1st Cir. 1993)...................................................................................................20

*Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res.*,
    532 U.S. 598 (2001)............................................................................................................13

*Carpaneda v. Domino's Pizza, Inc.*,
    89 F. Supp. 3d 219 (D. Mass. 2015) ..................................................................................19

*City of Riverside v. Rivera*,
    477 U.S. 561 (1986)............................................................................................................18

*Comet Techs. USA, Inc. v. XP Power LLC*,
    No. 5:20-cv-06408, ECF No. 585 (N.D. Cal. Jan. 28, 2025).......................................... *passim*

*Contour Design, Inc. v. Chance Mold Steel Co.*,
    2012 WL 893416 (D.N.H. Mar. 15, 2012) ........................................................................16

*Cushing v. McKee*,
    853 F. Supp. 2d 163 (D. Me. 2012) ...................................................................................20

*Dunster Live, LLC v. LoneStar Logos Mgmt. Co., LLC.*,
    908 F.3d 948 (5th Cir. 2018) ..............................................................................................13

*Farrar v. Hobby*,
    506 U.S. 103 (1992)............................................................................................................15

*Gross v. Sun Life Assur. Co. of Can.*,
    880 F.3d 1 (1st Cir. 2018)...................................................................................................15

*Haddad Motor Grp., Inc. v. Karp, Ackerman, Skabowski & Hogan, P.C.*,
    603 F.3d 1 (1st Cir. 2010)...................................................................................................20

*Hefter Impact Tech. v. Sport Maska, Inc*,
No. CV 15-13290-FDS, 2017 WL 5798642 (D. Mass. Nov. 28, 2017) .................................19

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ...........................................................................................14, 15, 19

*Hutchinson v. Patrick*,
636 F.3d 1 (1st Cir. 2011) ...........................................................................................13, 18

*Iconics, Inc. v. Massaro*,
266 F. Supp. 3d 449 (D. Mass. 2017) .................................................................................16

*Rosie D. ex rel. John D. v. Patrick*,
593 F. Supp. 2d 325 (D. Mass. 2009) .................................................................................20

*Kelly v. Riverside Partners, LLC*,
397 F. Supp. 3d 75, 95 (D. Mass. 2019) .............................................................................18

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
729 F. Supp. 3d 84 (D. Mass. 2024) ..................................................................................14

*Lackey v. Stinnie*,
604 U.S. __, 145 S. Ct. 659 (2025) ....................................................................................13

*Mass. Dept. of Pub. Health v. Sch. Commc'ns of Tewksbury*,
841 F. Supp. 449 (D. Mass. 1993) .....................................................................................20

*Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*,
2021 WL 3076780 (N.D. Ill. Mar. 10, 2021) ............................................................ *passim*

*NPS LLC v. Ambac Assur. Corp.*,
190 F. Supp. 3d 212 (D. Mass. 2016) .................................................................................16

*OmniGen Research, LLC v. Yongqiang Wang*,
2017 WL 5505041 (D. Or. Nov. 16, 2017) ..........................................................................17

*Spooner v. EEN, Inc.*,
644 F.3d 62 (1st Cir. 2011) ................................................................................................13

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
2024 WL 1116090 (S.D.N.Y. Mar. 13, 2024) .........................................................12, 16, 18

*Zepeda v. Jennings*,
No. 3:20-cv-02731, ECF No. 1241-1 (N.D. Cal. June 9, 2022) ............................................18

**Statutes**

18 U.S.C. § 1836 ........................................................................................................ *passim*

**Other Authorities**

Rule 54(d)(2)(B) ........................................................................................................................12

## INTRODUCTION

After a five-week trial during which 27 live witnesses testified and 337 exhibits were admitted into evidence, the jury found that Defendants willfully and maliciously misappropriated Insulet's core trade secrets.[1] Now that the Court has entered judgment on that verdict, it should exercise its discretion and award Insulet its reasonable attorney fees pursuant to the Defend Trade Secrets Act (DTSA). *See* ECF No. 947; 18 U.S.C. § 1836(b)(3)(D). All the relevant factors support such an award.

***First***, Insulet qualifies for fees as a "prevailing party." 18 U.S.C. § 1836(b)(3)(D). Insulet won on its core misappropriation claims, securing a $452 million damages verdict from the jury (ultimately reduced to $59.4 by the Court to avoid duplicative relief) and a permanent injunction from this Court.

***Second***, the jury expressly found that the "trade secret[s] w[ere] willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D). Rightly so. The evidence of Defendants' willful and malicious misconduct was overwhelming. It showed that Defendants built the EOPatch 2 by stealing thousands of documents embodying the proprietary design for Insulet's Omnipod, *see, e.g.*, 11 Tr. 238:20-239:2, 243:25-244:6, 245:20-25; shared confidential Omnipod documents with major Insulet competitors, *see* 12 Tr. 69:25-73:8; Tr. Exs. 1134, 1135, 1136; and "st[ole] from Insulet[]" to create a device-approval application submitted to U.S. regulators, Tr. Ex. 840.5; 9 Tr. 130:10-22. All the while, Defendants privately acknowledged that they were engaged in "a piracy" and actively concealed their theft from Insulet. Tr. Exs. 443.1, 468. Indeed, even *after* this lawsuit

---

[1] For purposes of this brief, "trade secrets" means the three trade secrets on the jury found willfully and maliciously misappropriated—the Omnipod computer-aided design (CAD) files, the occlusion detection algorithm (ODA), and the Design History File (DHF) for the Omnipod Eros. ECF No. 833 (jury verdict form). Unless otherwise indicated, "EOFlow" and "Defendants" refer to EOFlow Co., Ltd. and Jesse Kim, the defendants whose willful-and-malicious misappropriation accounts for all but $2 of the damages award, *see id*, and against whom Insulet seeks this fee award.

was filed, Defendants doubled down on their misconduct by destroying evidence, stonewalling Insulet's requests for discovery, and continually re-litigating meritless issues this Court had already resolved against them.

**Third**, the fees Insulet seeks are "reasonable." 18 U.S.C. § 1836(b)(3)(D). Goodwin timekeepers billed over 28,000 hours through February 2025 in proving Defendants' willful and malicious misappropriation.[2] Insulet paid $27,759,826.73 to Goodwin for those services. Insulet seeks only a portion of those fees. Specifically, Insulet seeks $24,790,000, which represents the time spent working on the case by the 14 attorneys on the core case team, plus hours worked by three critical paralegal and case assistant team members, with certain reductions applied as detailed below (*infra* at 19-20). Insulet also paid $6,489,020.90 in litigation costs. Of those costs, Insulet seeks only costs for e-discovery vendor services and expert fees—a sum of $5,362,559.73—in this motion. The total award Insulet seeks is thus $30,152,559.73. Given the complexity, intensity, and the high stakes of this case—and particularly given Defendants' spoliation and scorched-earth litigation tactics—these amounts are appropriate and in line with comparable awards. Indeed, the amount requested is significantly less than the $35.7 million that EOFlow spent on legal expenses, according to public statements made by Jesse Kim in March 2025. Finally, the rates underlying the award have already been approved by this Court and are industry-standard for a case of this significance (and, indeed, lower than what some of Defendants' counsel charge).

This is the kind of case the DTSA's fee-shifting provision was made for—where the trade secrets embody an innovative, life-saving medical device, the defendants' misappropriation was willful and malicious, their litigation misconduct was significant, and the plaintiff was decisively successful. For all these reasons, the Court should grant Insulet's motion.

---

[2] Insulet reserves the right to seek a further award of fees incurred in the event Defendants appeal.

## FACTUAL BACKGROUND

**I.     Defendants willfully and maliciously misappropriated Insulet's trade secrets and deliberately destroyed evidence of their misconduct.**

The trade secrets on which the jury found willful and malicious liability are the product of years of work and tens of millions of dollars of investment. ECF No. 886 at 3-4. Each is essential to the design and manufacturing of Insulet's market-leading Omnipod. *Id.* at 3-4. The CAD files, for example, reflect the entire design for the Omnipod at the most granular level of detail and capture the thousands of nominal dimensions for the device that cannot be discerned through examination of a physical sample. 3 Tr. at 50:14-51:6, 57:18-61:11; 10 Tr. 78:17-84:3. The ODA fulfills an "important requirement that the [Omnipod] detect an occlusion in less than or equal to five units of missed delivery," 3 Tr. 180:22-24, which is crucial "for the patient's safety and life," 5 Tr. 136:25-137:6. And the DHF provides a comprehensive package of information necessary to manufacture the Omnipod at scale, safely, and in compliance with regulatory requirements. *E.g.*, 10 Tr. 30:14-15.

The unique value of the trade secrets is confirmed by the fact that Omnipod first launched commercially in 2008, and still stands alone as a unique, market-leading patch-pump. ECF No. 888 ¶¶ 7-9. That is so even though many of Insulet's major competitors have failed to replicate the Omnipod's design and commercial success, even after great expenditure and effort. *Id.* ¶¶ 7-9.

After trying and failing to independently develop its own competing device, Defendants stole troves of Insulet documents embodying the trade secrets and improperly leveraged them to create a copycat patch-pump: the EOPatch 2. Among other things: EOFlow's CEO, Mr. Kim, ordered EOFlow employees to take a "complete 3D CAD file for the Insulet Eros" from a former Insulet employee, and that stolen design file was then used to solve numerous engineering problems for the EOPatch 2, 5 Tr. 78:2-12, 113:9-16, 181:2-18; Defendants fabricated a regulatory

submission for the EOPatch 2 by wholesale repurposing documentation from the Omnipod's DHF, Tr. Ex. 840.5; 9 Tr. 130:10-22; and they also relied on a full "occlusion algor[i]thm roadmap" lifted from confidential Insulet materials, Tr. Ex. 2145.16 (compilation of invoices where DiIanni states he provided the ODA "roadmap"); Tr. Ex. 485 (email from DiIanni sending Omnipod ODA data). All told, Defendants and their employees stole thousands of documents concerning the trade secrets. 11 Tr. 238:20-239:2, 243:25-244:6, 245:20-25.

Defendants knew what they were doing was wrong. They routinely shared documents clearly labelled "Insulet Confidential Information." ECF No. 886 at 5-6; 7 Tr. 140:25-145:5 (Welsford discussing his distribution of Insulet confidential material). They "LOL[ed]" about "stealing from Insulet[]" and bragged about the sheer quantity of Omnipod-related materials they had stolen. *See* Tr. Exs. 468.2, 840.5. EOFlow's CEO, Defendant Jesse Kim, cracked jokes, replete with winky face emojis, about the EOPatch 2 being a "piracy." Tr. Exs. 443.1, 468.

The trial record further showed that Defendants did not just use the trade secrets for themselves. They also shopped them around to Insulet's largest competitors and publicized them in patent applications. For example, EOFlow shared confidential documents embodying the trade secrets (in some instances without even removing Insulet logos) with Medtronic and Tandem. *See, e.g.*, 12 Tr. 69:25-73:8; Tr. Exs. 1134, 1135, 1136. And EOFlow applied for and obtained patents relating to elements of the Omnipod's ODA. 11 Tr. 179:2-14; Tr. Ex. 1634.

Because they knew they were breaking the law, Defendants concealed their theft. For example, Defendants cautioned each other about "avoiding mechanical features discussion[s]" of the pirated EOPatch 2 in public, Tr. Exs. 468.2, 443; *see also* 6 Tr. 58:20-65:19, and they conspired to "soft sell" the device's progress when talking to third parties "to make it clear [they were] not stealing trade secrets," Tr. Ex. 575.1, 6. Elsewhere, EOFlow's internal documents stressed how

the company "[n]eed[ed] to keep [Insulet] guessing on our corporate plans," Tr. Ex. 384.2; that Defendants "[j]ust need[ed] to find out what [Insulet] want[ed] while keeping a low profile on our own plans," Tr. Ex. 580.2; and that EOFlow "did not share any [non-public] material with Insulet," Tr. Ex. 566.1.

In line with this strategy, EOFlow's public disclosures focused on a technology different from the stolen design actually underlying the EOPatch 2, and Defendants misleadingly marketed this technology as distinct from Insulet's. 4 Tr. 119:20-121:21. Similarly, when they met with representatives from Insulet, Defendants showcased a different and outmoded device, the EOPatch 1. 6 Tr. 136:23-139:17. All the while, Defendants made no bones about their goals of harming Insulet: they publicly announced they were targeting Insulet by "providing an alternative to users in the market monopolized by Insulet Corporation for the past 16 years." Tr. Ex. 962.2.

Defendants took pains to hide their trail. Among other things, they engaged in mass deletion of documents associated with one of EOFlow's subsidiaries, Nephria Bio. 17 Tr. 148:6-18; ECF No. 865 at 2. Notably, this mass deletion included files once associated with Paul Hamm, who admitted he was "stealing from Insulet's SWFMEA" (or Software Failure Modes and Effects Analysis) in order to doctor a plausible 510(k) submission for the EOPatch 2. Tr. Ex. 840.5; 9 Tr. 130:10-22. Forensic discovery that Insulet was forced to move to compel revealed that Mr. Hamm's devices contained thousands of Insulet's files that were accessed during the same time period when Hamm and Nephria Bio, by their own admissions, were fabricating an FDA submission for the EOPatch 2 using the Omnipod DHF. 11 Tr. 248:8-23.

Defendants' active concealment continued during this lawsuit. Weeks after Insulet filed its initial complaint, Defendant Ian Welsford, EOFlow's Chief Technology Officer and Nephria Bio's CEO, ordered and then "triple confirm[ed]" the additional deletion of "all" data associated with

many remaining Nephria Bio accounts. Tr. Ex. 7137; 7 Tr. at 192:19-197:18. This Court ultimately concluded that Dr. Welsford engaged in "a deliberate act of destruction" and that there was "overwhelming evidence to support a finding of an intent to deprive Insulet of the information's use in the litigation." Sep. 4, 2024 Hr'g. Tr. at 9:13-12:22; *see also* 7 Tr. at 15:5-17. On top of this, Dr. Welsford tried to destroy *additional* evidence the day after the Court entered a preliminary injunction—an attempted coverup that was unsuccessful only because Defendants' counsel already had copies of the relevant files. Tr. Exs. 7153, 7154, 7156; 7 Tr. at 197:19-199:21.

## II. Defendants' destruction of evidence and meritless litigation tactics forced Insulet to spend many additional hours on this case.

Defendants' destruction of evidence greatly complicated Insulet's task of proving its case. Insulet was forced to undertake a forensic investigation, which Defendants resisted and which the Court then had to compel. ECF No. 280. Insulet also had to deal with glaring holes in Defendants' document production that took extensive time to piece together. *See, e.g.*, ECF 327 at 4-6 (detailing issues with document production in motion for forensic inspection); ECF No. 412 at 6 (detailing similar issues in connection with sanctions motion); ECF No. 413-6 (exemplary unviewable document). This was further complicated because large swaths of metadata were corrupted or deleted by Defendants' pre-suit attempts at cover-up, even where documents themselves were recovered via other means. *See* ECF No. 412 at 6 (Insulet's sanctions motion detailing Defendants' incomplete and corrupted metadata).

But that was only the beginning of the challenges Insulet faced. Even as damning evidence of their misconduct emerged, Defendants refused to take responsibility. Instead, they stonewalled Insulet's efforts to get discovery and advanced a series of meritless defenses, often repeatedly. During each phase of the case, Defendants needlessly complicated the proceedings and dramatically drove up the time and expense Insulet had to invest to protect its trade secrets.

### A.    TRO and preliminary injunction phase.

During the TRO and preliminary injunction phase of the case, Defendants repeatedly bogged down the proceedings by misrepresenting basic facts. They first asserted that they had *no* Insulet confidential information in their possession. *See* Aug. 29, 2023 H'rg at 41:21 ("There's zero evidence of any transferred information."). When initial discovery revealed that to be false, they pivoted, claiming that while the *individual* Defendants may have retained Insulet's documents, none of those documents were passed on to EOFlow. *See* ECF No. 107 at 35 ("[T]here is no evidence that [confidential files found on the individuals' systems] were ever accessed by anyone—including the Individual Defendants—since they left Insulet."). Discovery soon proved that was false, too. Unable to claim that they had not stolen Insulet's files, Defendants turned to the remarkable argument that Insulet's trade secrets were not protectible because *Defendants* had disclosed them to third parties. *See, e.g.*, Sept. 22, 2023 H'rg Tr. at 92:22-93:25.

After Insulet secured a preliminary injunction, Defendants continued to stall through misrepresentations. They moved for a modification allowing them to continue "sale[s]" of the EOPatch in Korea—insisting the change was necessary because EOFlow supposedly did not "have the identity of [its] [specific existing] customers" in Korea. ECF No. 153, at 6 n.3. Insulet soon discovered that this was false as well—Defendants *could* track their specific existing customers in Korea through a required patient registration process, and were exploiting the language of the injunction to sell to *new* customers inside *and* outside Korea. *See* ECF No. 277 at 2-5. So Insulet was forced to move to modify the injunction and seek a contempt order. ECF No. 275. Defendants responded with a meritless cross-motion seeking to alter the injunctions terms *even further* in *their* favor. ECF No. 301. This Court ultimately found that "the contempt standard has likely been met," but declined to sanction Defendants. ECF No. 351 at 55:14-56:20.

B.      **Fact and Expert Discovery.**

Because of the complexity and importance of the case (to say nothing of the extent of the misappropriation), discovery was voluminous. Insulet responded to 185 interrogatory and document requests. Carroll Decl. ¶ 6. And all told, more than 1,000,000 documents were produced, and 29 fact witnesses and another 18 experts were deposed across 59 different deposition days in the United States and Korea. Carroll Decl. ¶¶ 7-8. That alone accounts for much of the significant time and expense required for Insulet to prepare for trial. But that was not all. At every turn, Defendants hindered Insulet's efforts to get necessary discovery and needlessly prolonged the discovery process.

For example, after document discovery ostensibly closed, Insulet came across a reference in one of Steven DiIanni's invoices to an April 20, 2018 email exchange with Defendant "Jesse [Kim] with respects [sic] to bubbles that occur during fill." ECF No. 413-22; *see also*, Tr. Ex. 2145.4. No such document had been produced, even though the deadline for substantial completion had passed. ECF No. 412 at 7-8. Although Insulet repeatedly requested production of the document, EOFlow refused, claiming that it "must have been deleted at some point." *See* ECF No. 413-22 at 1. But it was not deleted. In fact, EOFlow surreptitiously produced the email the next day—months after the substantial-completion deadline, and buried in a production of more than one million pages. ECF No. 412 at 8.

This belated production, and subsequent Rule 30(b)(6) testimony about it, uncovered facts central to the case that had been concealed by Defendants during the ordinary course of document discovery. Specifically, Insulet discovered for the first time that Mr. DiIanni had, at Mr. Kim's direction, delivered a thumb drive with a complete CAD file for the Omnipod Eros to EOFlow in Korea in 2018. ECF No. 412 at 9-10. Insulet further discovered that EOFlow's counsel had that CAD file in hand, perhaps as early as August or September of 2023, at a time Defendants asserted

that EOFlow possessed *no* technical Insulet materials. *Id.* at 9-10. Only after all this was the CAD file finally produced—again, months after the substantial-completion deadline, at the very end of fact discovery, and after Mr. DiIanni was deposed. *Id.* at 10-11. Insulet was forced to request an additional deposition of Mr. DiIanni, which Defendants refused until Insulet moved the Court to compel it. *See* ECF No. 411.

Defendants took a similarly obstructionist approach to discovery concerning Paul Hamm, the former Insulet employee who went on to work for EOFlow and Nephria Bio, and who was ultimately a key witness at trial. After he was subpoenaed, Mr. Hamm admitted that he had retained confidential Insulet materials on a USB drive after he left the company, that he had used that information in the course of his work for Defendants, and that this information should still be available on his EOFlow/Nephria Bio laptop. ECF No. 240 at 3-4.

When Insulet requested this discovery from Defendants, they refused, lodging a series of meritless objections, including ever-shifting claims about which particular Defendant had custody of the laptop and associated file storage. *Id.* at 4-7. Eventually, Insulet had to move to compel a complete production of Mr. Hamm's relevant files, which was granted over Defendants' opposition. ECF No. 280. Insulet then paid for an extensive forensic analysis, which revealed some of the most damning evidence in the case, including Microsoft Teams messages showing EOFlow and Nephria Bio employees admitting that they were "stealing from Insulet[]." Tr. Ex. 840.5; 9 Tr. 130:10-22. That forensic investigation confirmed that Mr. Hamm stole thousands of Insulet files, many of which had been deleted from Defendants' servers. 11 Tr. 238:20-239:2, 243:25-245: 25.

These are just examples of Defendants' larger pattern of unreasonable discovery conduct. Defendants also sought to compel discovery of (1) Insulet's privileged litigation strategy, (2) documents that they knew did not exist, and (3) obviously privileged documents—which the Court

denied. *See* ECF Nos. 373, 427, 453, 587, 666, 700, 725, 726.

All told, Defendants forced Insulet to engage in numerous unnecessary meet-and-confers and file six motions to compel and hearings on the same (all six were granted or otherwise resolved by Insulet obtaining the discovery it sought), in addition to an array of discovery issued raised by joint status report and resolved at status conferenced.

### C.    Other pre-trial disputes.

Defendants' unreasonable handling of the run-up to trial was not confined to discovery misconduct. They also repeatedly advanced meritless legal and factual arguments that bogged down pre-trial motion practice and drove up Insulet's litigation expenses.

Some of Defendants' arguments were contrary to hornbook law. As one example, they made inflammatory claims through a purported expert, law professor Orly Lobel, that Defendants' employment agreements were contrary to public policy, and that the law of trade secrets somehow was "xenophobic." ECF No. 554 at 3-5. Insulet had to move to exclude these extraordinary "expert" opinions, a motion the Court granted in relevant part. ECF No. 834.

Defendants also filed facially meritless, overbroad, and duplicative pre-trial motions. In response to Insulet's well-founded motion concerning Dr. Welsford's spoliation, they filed a baseless and retaliatory sanctions motion, which the Court properly denied. ECF No. 453. They also took a blunderbuss approach to their *Daubert* motions and moved to exclude every single one of Insulet's expert witnesses—including routine testimony from Insulet's forensic expert that, the Court noted, simply "did what [all] forensic examinations of computers experts do." Oct. 18, 2024 Hr'g Tr. at 73:5-15. In addition, Defendants insisted on relitigating issues this Court had already decided. Most notably, across successive pre-trial, summary judgment, *Daubert*, and *in limine* papers, Defendants repeatedly argued that Insulet's trade-secret identifications, particularly of the DHF trade secret, were legally deficient. ECF Nos. 541, 540, 639, 640. Insulet defended against

these arguments multiple times; each time, the Court rejected Defendants' arguments. ECF Nos. 707, 753, 834. Undaunted by these decisions, and weeks after the deadline for summary judgment and *in limine* motions, Defendants filed *another* motion about the DHF trade secret, falsely asserting that Insulet had "admitted" that "the asserted DHF trade secret does not exist at Insulet." ECF No. 721. Insulet again had to respond to the arguments, and the Court rejected them once more. ECF Nos. 743, 769.

Lastly, on the calendar day before jury selection, Defendants filed an "emergency" motion to postpone the trial pending an interlocutory appeal. ECF No. 756. Insulet scrambled and diverted hours of attorney time from preparation on the eve of trial to write a response. Before that response was finalized, this Court denied the motion as meritless. *See* ECF No. 758 at 4.

### D.   Trial.

Defendants continued to relitigate long-decided issues during trial. They again pressed for judgment as a matter of law on Insulet's DHF trade secret, to the point where the Court was forced to admonish defense counsel: "We can't just keep going over the same thing over and over and over and over." 1 Tr. 34:5-7. And Defendants attempted to relitigate the already-decided issue of Dr. Welsford's intentional destruction of evidence, all the way up to the charge conference. Nov. 27, 2024 Jury Charge Conf. at 66:21-70:5. Throughout, Defendants forced Insulet to litigate against positions with no support in the law, including that a trade secret plaintiff must maintain a trade secret list and that such a list should appear in unsigned non-disclosure agreements.

Defendants also delayed stipulating to minor and uncontested matters until the last moment—again, weeks after Insulet had already spent time preparing to present at trial on what should have been uncontroversial. *See, e.g.*, ECF No. 791 (late stipulation regarding uncontested forensic inspection specifics). And Defendants bogged down the proceedings by, in the Court's own words, "advanc[ing] improper questions and remarks" throughout trial. ECF No. 945 at 23.

## ARGUMENT

Under the DTSA, a court may award "reasonable attorney fees to the prevailing party" if "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D). "While a grant of attorney fees is discretionary," courts look to whether the "willfulness and maliciousness of the conduct underlying the substantive claim—i.e., the misappropriation of the trade secrets," justify the award. *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 2024 WL 1116090, at *5 (S.D.N.Y. Mar. 13, 2024). Some courts have found fee awards under the DTSA especially appropriate when the defendants' conduct was "not only willful and malicious but also particularly egregious, further supporting a fee award." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 2021 WL 3076780, at *2 (N.D. Ill. Mar. 10, 2021); *cf. Syntel*, 2024 WL 1116090, at *5 (rejecting litigation conduct as relevant to the fees inquiry, but noting that defendants' "destruction [of] documents and computers" would only further support award). And where significant attorney effort has generated decisive results for plaintiffs in high-stakes DTSA cases, courts have not hesitated to grant the full amount of fees requested. *E.g.*, *Comet Techs. USA, Inc. v. XP Power LLC*, No. 5:20-cv-06408, ECF No. 585 (N.D. Cal. Jan. 28, 2025) (awarding plaintiff full amount of requested $17.4 million in fees to in trade secret case after $40 damages verdict); *Motorola Sols.*, ECF No. 1250 at 3-7 (N.D. Ill. Oct. 15, 2021) (awarding full amount of requested $34.3 million in fees in trade secret/copyright infringement case in which plaintiff was awarded $543.7 million in damages after remittitur).

Here, Insulet seeks $24,790,000 in attorney fees and $5,362,559.73 in ancillary costs,[3]

---

[3] The attached declaration of Robert Carroll provides a "state[ment] [of] the amount sought." Fed. R. Civ. P. 54(d)(2)(B)(iii). Pursuant to Rule 54(d)(2)(B)(iv), Insulet is prepared to provide the Court with detailed billing records if requested by the Court.

including for expert witness fees,[4] for a total request of $30,152,559.73— substantially less than the $35.7 million the EOFlow Defendants spent litigating the same case and which represents a 10.7% discount on fees and a 17.4% discount on costs that Insulet actually paid. *See* Carroll Decl. ¶¶ 12-16. All the statutory and discretionary considerations support awarding these fees.

## I.    Insulet is a prevailing party.

To start, Insulet is a "prevailing party" under the DTSA. 18 U.S.C. § 1836(b)(3)(D). That phrase means a "party" who has "prevailed on the merits of at least some of his claims." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res.*, 532 U.S. 598, 603-04 (2001) (interpreting identical language in 42 U.S.C. § 1988); *cf. Spooner v. EEN, Inc.*, 644 F.3d 62, 66 (1st Cir. 2011) (same standard for identical language in Copyright Act's fee-shifting provision, 17 U.S.C. § 505); *Dunster Live, LLC v. LoneStar Logos Mgmt. Co., LLC.*, 908 F.3d 948, 951-52 (5th Cir. 2018) (applying *Buckhannon* to DTSA's fee-shifting provision). The standard is flexible: "even an award of nominal damages suffices under this test," *Buckhannon*, 532 U.S. at 604, and a party need not "prevail on its central claim," *Lackey v. Stinnie*, 604 U.S. __, 145 S. Ct. 659, 670-71 (2025).

Insulet more than satisfies this standard. It *did* succeed on its central claim. The jury found that Defendants' misappropriated four of the five trade secrets asserted at trial. *See* ECF No. 833 at 2-3. This success was decisive: the jury awarded $452 million in damages. *See id.* at 10-11. This Court then entered a permanent injunction with the terms requested by Insulet, *see* ECF No. 948, and reduced the damages award to $59.4 million to avoid duplicative relief, *see* ECF No. 946. As a matter of law, that makes Insulet a prevailing party. *Cf. Comet*, ECF No. 585 at (finding that plaintiff is prevailing party where it succeeded on "the central" trade-secret theory); *Motorola Sols*,

---

[4] Insulet's ancillary costs are properly included in this request. *E.g.*, *Hutchinson v. Patrick*, 636 F.3d 1, 17 (1st Cir. 2011).

2021 WL 3076780, at *2 (similar where plaintiff was awarded $764,561,150 in damages under DTSA and state misappropriation law).

## II.    EOFlow engaged in willful and malicious misappropriation.

Among other circumstances, attorney fees may be warranted under the DTSA when "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D). There is no question that happened here. The jury found that EOFlow engaged in willful and malicious misappropriation, and awarded $282 million in exemplary damages. Overwhelming evidence supported that verdict, and showed that Defendants stole thousands of Insulet documents, shared trade secrets with Insulet's competitors, and filed ripped-off documents with regulators. This evidence of EOFlow "attempt[ing] to conceal its misappropriation," showing "intentional disregard for the valid legal restrictions" of its competitor, and engaging in misconduct going "beyond the bounds of commercial gamesmanship," is quintessential proof of willful and malicious misappropriation. *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 107-09 (D. Mass. 2024). And it plainly satisfies the DTSA's requirement for awarding fees in such cases. *See Comet Techs.*, ECF No. 585 at 7 ("beyond question" that case facially qualified for fee award where "[t]he jury awarded exemplary damages, expressly finding 'willful and malicious' conduct by [the defendant]"); *Motorola*, 2021 WL 3076780, at *3 (award of attorney fees under DTSA "further supported by the jury's verdict awarding exemplary damages").

## III.    Insulet's fees are reasonable.

The only remaining question is whether Insulet's requested fees are reasonable. They are. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Courts thus determine a "lodestar" amount by multiplying the reasonable market rate for the attorneys' services by the reasonable number of hours worked.

*See, e.g., Gross v. Sun Life Assur. Co. of Can.*, 880 F.3d 1, 22 (1st Cir. 2018). District courts may "adjust [the] lodestar calculation by other factors," *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989)), "the most critical" of which "is the degree of success obtained," *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (citation omitted). Additional factors include the experience, reputation, and ability of the attorneys, as well as to the difficulty of the issues presented and the amount at stake. *Hensley*, 461 U.S. at 429-30 n.3. These factors support Insulet's fee request.

### A.    Insulet seeks an award for a reasonable number of hours.

First, the number of attorneys and total hours are reasonable in view of the scope and significance of the case.[5] Insulet seeks fees only for work performed by 14 attorneys and three paralegal and case assistant staff.  The Goodwin team litigated the entire matter on behalf of Insulet against Defendants who were represented by 23 attorneys who made appearances. This case was procedurally dense and broad in scope. Among other things, it entailed: an extensive pre-suit investigation; three complaints, each necessary as new facts emerged in discovery; motion practice for a TRO; motion practice for a preliminary injunction that was modified, violated, and appealed; some 10 motions to compel, among myriad other discovery issues raised in joint status reports and addressed at status conferences; two sanctions motions; document discovery that saw production of more than 1,000,000 documents spanning more than 10,000,000 pages; 180 hours of fact-witness depositions on two different continents; expert discovery entailing 29 expert reports and 106 hours devoted to expert depositions; a five-week jury trial that saw 27 witnesses examined live (with another 5 appearing by videotaped deposition); and a vigorously litigated permanent injunction. Much of this was accomplished at an extraordinary pace—the case was tried just 15 months after the first complaint was filed. Given all this, it is reasonable that Goodwin spent over

---

[5] This brief focuses on the hours spent litigating the case and the hourly rates of Goodwin's professionals. Additional information regarding fees paid to Insulet's expert witnesses is included in the declaration of Robert Carroll (¶ 45).

28,000 hours of time litigating this case, and reasonable for Insulet to seek fees for that work—for which Insulet actually paid $27,759,826.73. *Cf. Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 2024 WL 1116090, at *6 (S.D.N.Y. Mar. 13, 2024) (awarding $14.5 million in fees for time spent litigating "[trade secret] litigation [that] involved complex questions of intellectual property law" including a "six-day trial," "over 1,100 court filings, over 900,000 pages of documents produced, more than 156 hours of depositions and 1,966 trial exhibits").

The case was critical to Insulet and concerned complex and intricate medical technology. The company spent years and hundreds of millions of dollars developing the technically innovative trade secrets at issue, which are essential to the company's only product line. These trade secrets have given Insulet an enduring competitive advantage over its medical device competitors. That advantage is critical to Insulet, because the company still has not recouped its extensive research and development costs. Suffice it to say, Defendant's extensive misappropriation of the trade secrets and attempt to sell its pirated technology to Medtronic, the world's largest medical-device company, was an existential threat to Insulet. The intricate subject matter and the high stakes of the case further justify the hours devoted to it.[6]

The scale of Defendants' misconduct also explains the time spent proving up Insulet's case. Again, the scope of Defendants' misappropriation was remarkable. They stole thousands of Insulet's confidential documents and spent years covering their tracks, deleting files *en masse*, even knowingly destroying relevant documents after this litigation started—all of which required Insulet to spend extraordinary resources piecing together the truth through forensic investigations.

---

[6] *Cf. Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 456 (D. Mass. 2017) (awarding fees; complex scientific concepts made litigation difficult, warranting additional attorney time spent on case); *NPS LLC v. Ambac Assur. Corp.*, 190 F. Supp. 3d 212, 226 (D. Mass. 2016) (given "high stakes litigation," Court found "hours expended by [] attorneys was not unreasonable and warrant no further reduction"); *Contour Design, Inc. v. Chance Mold Steel Co.*, 2012 WL 893416, at *2 (D.N.H. Mar. 15, 2012) (explaining that significant attorney fees award was appropriate after a 6-day trial involving "complex . . . trade secrets . . . embodied in sophisticated technology").

And rather than accept responsibility when that investigation revealed their theft, Defendants dug in and waged a war of attrition, resisting further discovery at every pass, pressing legally and factually baseless defenses, and serially re-litigating lost causes. So Defendants' conduct was "not only willful and malicious but also particularly egregious, further supporting a fee award." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 2021 WL 3076780, at *2 (N.D. Ill. Mar. 10, 2021); *OmniGen Research, LLC v. Yongqiang Wang*, 2017 WL 5505041, at *28 (D. Or. Nov. 16, 2017) (awarding fees in case with claims brought under state trade-secret law where "Defendants' conduct in th[e] case was unjustifiable" and defendants maintained "defenses which had no basis in fact" and "repeatedly disobeyed the Court's orders").

Indeed, in similar trade-secret cases, court routinely grant comparable fees for efforts that obtain comparable (and in some cases significantly lower) damages awards. *See, e.g.*, *Comet Techs.*, ECF No. 585 (awarding $17.4m in fees after $40m damages verdict); *Motorola Sols.*, ECF No. 1250 at 3-7 (N.D. Ill. Oct. 15, 2021) (awarding full amount of requested $34.3m after plaintiff secured $543.7m in damages). And EOFlow, whose counsel's rates are comparable to Goodwin's (*infra* n.5) has incurred around ***$35.7 million*** (50 billion Korean won) in legal fees in connection with the case, according to Jesse Kim's public statements. *See* Carroll Decl., Ex. A. The amount of time and expense Insulet spent in proportion to the success it obtained more than justifies the requested fee award.

### B.    Insulet's proposed rates are reasonable.

The rates Insulet paid for its team at Goodwin were likewise reasonable and "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

**First**, Insulet's decision to retain Goodwin was well-supported. The Firm consistently ranks among the best in Boston, Massachusetts, where the case was tried, and its intellectual-property litigation practice is one of the best in the country. Carroll Decl. ¶ 22. The high stakes of this case, Defendants' aggressive litigation tactics, and the complex subject matter justified hiring experienced, skilled counsel. *See City of Riverside v. Rivera*, 477 U.S. 561, 568 n.3 (1986) ("the skill requisite to perform the legal service properly" are factors justifying higher billing rates).

**Second**, the realized rates Insulet paid for the Goodwin attorneys who worked on the case—ranging from $585.75 for a law clerk to $1575.00 for lead counsel (Carroll Decl. ¶ 20)—are also well justified. EOFlow did not object to these rates in opposing Insulet's prior fees submission concerning Defendants' spoliation (presumably because its lawyers charge similar rates), and the Court already found these rates reasonable when awarding fees to Insulet in response to that motion. *See* ECF No. 866 at 7-9. That decision was correct. After all, "the rate that a private lawyer actually charges to clients in the ordinary course of his practice, though not conclusive, is a useful indicator of market value." *Hutchinson*, 636 F.3d at 16 (citing *One Star Class Sloop Sailboat*, 546 F.3d at 40). Insulet paid rates comparable to or lower than the rates charged by the lawyers Defendants used.[7] Goodwin Procter's realized rates are also consistent with those of comparable attorneys at peer firms.[8] These marketplace realities are why courts consistently have found that rates like Goodwin's in this case are reasonable.[9] The Court should find the same here.

---

[7] *See* Brian Dowling, Law 360, *Jailed Engineer Rips Quinn Emanuel, WilmerHale Legal Bill* (Sept. 25, 2023), https://shorturl.at/dNqL9 (rate for Defendants' original lead counsel, William Weinraub of Quinn Emmanuel, was $1,685 per hour as of 2023); *Zepeda v. Jennings*, No. 3:20-cv-02731, ECF No. 1241-1 at 6, 13 (N.D. Cal. June 9, 2022) (Defendants' successor counsel, Cooley LLP, charged $1,350 per hour for partners in San Francisco as of 2022).
[8] Major, Lindsey & Africa, *2024 Partner Compensation Survey* (2024), https://shorturl.at/97vWq (reporting average billing rate for AmLaw 200 partners at $1,114, equity partners at $1,218 and non-equity partners at $875).
[9] *Cf. Kelly v. Riverside Partners, LLC*, 397 F. Supp. 3d 75, 95 (D. Mass. 2019) (rates of $950 and $1,020 per hour for a partner were reasonable given education, experience and ability of counsel and "the customary market rates for large commercial law firms in the Boston area"); *Arkansas Teacher Retirement Sys. v. State Street Bank and Trust Co.*, 513 F. Supp. 3d 202, 211 (D. Mass. 2021) (rates ranging from $535 to $1,000 were reasonable); *Syntel Sterling Best Shores Mauritius Ltd.*, 2024 WL 1116090, at *6 (rates of "$585 for junior attorneys up to $1,765 for lead attorneys"

18

### C.     There is no basis for a downward adjustment of fees.

In addition to resisting a fee award entirely, Defendants will likely argue that the Court should adjust downward the amount of fees Insulet seeks. There is no basis to do so.

Again, "[a] 'preeminent' factor in" deciding whether to adjust the amount of requested fees "is the 'results obtained.'" *Hefter Impact Tech. v. Sport Maska, Inc*, No. CV 15-13290-FDS, 2017 WL 5798642, at *4 (D. Mass. Nov. 28, 2017) (quoting *Coutin v. Young & Rubicam P.R., Inc.*, 124 F.3d 331, 338 (1st Cir. 1997)). For the reasons already given, this consideration weighs decisively in favor of Insulet's request. Insulet secured a verdict of willful-and-malicious misappropriation on its core trade-secret claims and received a verdict of $452 million from the jury, nearly the maximum damages Insulet requested, and then secured a permanent injunction from this Court with a corresponding reduction on the damages total to $59.4 million. These results more than justify the amount of fees Insulet seeks, and certainly provide no basis for reducing it. *Cf. Carpaneda v. Domino's Pizza, Inc.*, 89 F. Supp. 3d 219, 230 (D. Mass. 2015) (no downward adjustment warranted given "[plaintiff] recovered . . . the full amount of his requested monetary damages").

In any event, Insulet approached this request conservatively and implemented voluntary reductions in "a good faith effort to exclude from [its] fee request hours that are excessive, redundant, or otherwise unnecessary." *Henlsey*, 461 U.S. at 434. First, Insulet is seeking time only for 14 attorneys who worked on the case, although other attorneys contributed, and for two senior paralegals and one case assistant who provided critical litigation support. Second, Insulet has voluntarily deducted or reduced time relating to its (1) patent claims, (2) ch. 93A claim, (3) civil conspiracy claim, and (4) claims against former Defendant Flex, Ltd. Insulet made additional

reasonable); *Comet Techs.*, ECF No. 585 at 22 (rates of $625 to $1,765 reasonable); *Motorola Sols.*, ECF No. 1250 at 3-7 (N.D. Ill. Oct. 15, 2021) (approving of $555-$1,565 rates).

reductions to its fee requests, which are laid out in the declaration of Robert Carroll submitted with this motion, and total to roughly $4,096,287. Some of the more significant cuts Insulet made are:

- Materially reduced time billed during the busiest parts of the case, particularly during expert discovery and trial.

- Excluded costs paid to experts Insulet did not call at trial.

- Excluded the full amount of fees and costs that Insulet sought previously in connection with its spoliation motion, even though the Court ruled that some of those fees were not associated with the spoliation and therefore were not subject to the Court's award.

- Limited costs sought to only certain expert witness fees and e-discovery vendor fees.

- Excluded all time spent on this motion (even though that time is compensable, *see Brewster v. Dukakis*, 3 F.3d 488, 494 (1st Cir. 1993)).

- Omitted all time spent working on the case after February 2025 generally.

- Instituted an additional $1 million reduction to account for (a) work on claims against defendants Malave, DiIanni, and Welsford with whom Insulet settled,[10] (b) work on the appeal of the preliminary injunction,[11] and (c) and general potential inefficiency.

Insulet seeks only $24,790,000 in fees, representing a discount of 10.7% off of what Insulet actually paid, and $5,362,559.73 in costs, representing a discount of 17.4%. In the face of comparable voluntary reductions, courts consistently award the full amount of fees requested.[12]

## CONCLUSION

Insulet respectfully requests that the Court grant its motion and award it $30,152,559.73.

---

[10] This is not necessary. Insulet's claims against these individuals stemmed from the same facts forming the bases of its allegations against the EOFlow Defendants. *See, e.g., Haddad Motor Grp., Inc. v. Karp, Ackerman, Skabowski & Hogan, P.C.*, 603 F.3d 1, 10 (1st Cir. 2010) (no apportionment necessary where claims "ar[o]se from a single chain of events"); *Mass. Dept. of Pub. Health v. Sch. Commc'ns of Tewksbury*, 841 F. Supp. 449, 457 (D. Mass. 1993) (emphasis added) ("When the facts give rise to more than one interconnected claim the district court is warranted in its discretion to award fees for time spent on all aspects of the case.").

[11] This also is not necessary. Insulet is entitled to the fees for work on the preliminary injunction appeal. *See Cushing v. McKee*, 853 F. Supp. 2d 163, 167-68 (D. Me. 2012) (court awarded percentage of fees working on unsuccessful interlocutory appeal).

[12] *See, e.g., Rosie D. ex rel. John D. v. Patrick*, 593 F. Supp. 2d 325, 330-331 (D. Mass. 2009) (approving of "voluntary surrender of hundreds of other hours" from fee request); *Comet Techs.*, ECF No. 585 at 8 (awarding requested fees without reduction because prevailing party "proactively made several additional reductions" to fee request); *Motorola Sols.*, No. 1:17-cv-01973, ECF No. 1250 at 12-13 (N.D. Ill. Oct. 15, 2021) (similar).

May 8, 2025

Matthew Ginther (BBO No. 714772)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-1000
MGinther@goodwinlaw.com

Alexandra D. Valenti (*pro hac vice*)
James Breen (*pro hac vice*)
Timothy Keegan (*pro hac vice*)
Arshjit Raince (*pro hac vice*)
Danit Maor (*pro hac vice*)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
AValenti@goodwinlaw.com
JamesBreen@goodwinlaw.com
TKeegan@goodwinlaw.com
ARaince@goodwinlaw.com
DMaor@goodwinlaw.com

Respectfully submitted.

*/s/ Robert D. Carroll*
Robert D. Carroll (BBO No. 662736)
Robert Frederickson III (BBO No. 670111)
Scott T. Bluni (BBO No. 660187)
Alexandra Lu (BBO No. 691114)
William E. Evans (BBO No. 706382)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
RCarroll@goodwinlaw.com
RFrederickson@goodwinlaw.com
SBluni@goodwinlaw.com
ALu@goodwinlaw.com
WEvans@goodwinlaw.com

*Attorneys for Plaintiff Insulet Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was filed on May 8, 2025, through

the ECF System and will be sent electronically to the registered participants as identified on the

Notice of Electronic Filing (NEF).

/s/ *Robert D. Carroll*

Robert D. Carroll
