UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INSULET CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 23-11780-FDS |
| ) | |
| EOFLOW CO., LTD.; EOFLOW, INC.; ) | |
| NEPHRIA BIO, INC.; and JESSE KIM, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION FOR AWARD OF ATTORNEYS' FEES AND
DEFENDANTS' MOTION TO STRIKE UNTIMELY EVIDENCE**

**SAYLOR, J.**

On December 3, 2024, a jury returned a verdict for plaintiff Insulet Corporation for $452 million in unjust-enrichment and exemplary damages, which was later reduced to $59.4 million. Plaintiff has moved, pursuant to 18 U.S.C. § 1836(b)(3)(D), for an award of attorneys' fees in the amount of $24,790,000. Defendants EOFlow Co., Ltd.; EOFlow, Inc.; Nephria Bio, Inc.; and Jesse Kim have opposed that motion and moved to strike billing records that plaintiff attached to its reply in support of its motion. For the reasons that follow, plaintiff's motion will be granted, with certain reductions as noted below, and defendants' motion will be denied.

**I.   Background**

Plaintiff submitted a motion for attorneys' fees and costs on May 8, 2025, that sought a total of $30,152,559.73 in attorneys' fees and expenses. All of the attorney time was billed by a single law firm (Goodwin Procter LLP). (Pl.'s Mot., Dkt. No. 951, 952). Defendants opposed that motion on May 22, 2025. (Defs.' Opp., Dkt. No. 959). Plaintiff filed a reply under seal on

July 10, 2025, in which it withdrew its request for expenses and attached the complete billing records sent by its law firm. (Pl.'s Reply, Dkt. No. 982). Plaintiff now seeks a reduced amount of $24,970,000 in attorneys' fees.

## II. Analysis

### A. Motion to Strike

Defendants have moved to strike the billing records plaintiff submitted with its reply in support of its motion for an award of attorneys' fees. (Dkt. No. 969, 970).

In general, matters raised for the first time in a reply brief are deemed waived. That is particularly true at the appellate level. *See Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 54 n.6 (1st Cir. 2020). In the district court, the rule is somewhat more flexible. Courts have frequently refused to consider evidence provided for the first time in a reply brief, although generally under circumstances where additional reasons have counseled in favor of doing so. *See, e.g., RTR Techs., Inc. v. Helming*, 815 F. Supp. 2d 411, 427 (D. Mass. 2011) (declining, under Fed. R. Civ. P. 37(c)(1), to consider documents prepared by expert witness that were not included in disclosures and were provided "less than two weeks before oral argument"), *aff'd*, 707 F.3d 84 (1st Cir. 2013); *Facey v. Dickhaut*, 91 F. Supp. 3d 12, 23 (D. Mass. 2014) (declining to consider evidence attached to summary-judgment reply brief where documents "were not provided in discovery").

Nonetheless, the First Circuit has explicitly held that a district court abused its discretion where it declined to grant a motion for reconsideration providing additional evidence in a fee-award proceeding simply because that evidence was not provided with the initial application. *See Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 528-29 (1st Cir. 1991). In light of that decision, the Court will consider whether, in the exercise of its discretion, it should consider the additional information.

Plaintiff's motion for attorneys' fees included a declaration from Robert D. Carroll, its lead attorney, that set forth three basic categories of information. The first was a summary table that listed, by month, the "Phase of the Case," the hours billed, and the total "Insulet Paid after Discounts." Thus, for example, the November 2023 entry stated, "Insulet continued to engage in discovery and filed a motion to compel a forensic protocol," resulting in 807.50 hours billed and the payment of $710,725.05 in legal fees. No other detail concerning the work performed was provided. (Decl. of Robert D. Carroll ("Carroll Decl."), Dkt. No. 951-2).

The second category was a chart setting forth the hourly rate charged by each attorney, paralegal, or case assistant, including both a "Low Realized Rate" and a "High Realized Rate." (*Id.*).

The third category was a description of the professional backgrounds of each of the identified individuals, including printouts from the firm's website. (*Id.*).

Without more, that declaration was clearly insufficient to support a fee award of any kind, never mind an award of nearly $25 million. It is well-settled that "the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir. 1984). Nonetheless, those shortcomings were corrected to a substantial degree by the further Carroll declaration, with attachments, that was submitted with the plaintiff's reply memorandum. (Reply Decl. of Robert D. Carroll ("Carroll Reply Decl."), Dkt. No. 983). Attached to that declaration were 713 pages of billing records that included daily time entries from approximately 25 different timekeepers. (Carroll Reply Decl., Ex. A.) Defendants had a fair opportunity to challenge or respond to those materials, if they so chose.[1] Although

---

[1] The initial Carroll declaration included a footnote stating that plaintiff was "prepared to provide the Court with detailed billing records if requested by the Court." (Carroll Decl. 2 n.1). It is not the role of the court, of

they did in fact move to strike the submission, they did not seek leave to file a further memorandum attacking its substance.

Under the circumstances, and in light of the First Circuit's opinion in *Weinberger*, the Court concludes that there is "insufficient reason" to deny the motion for attorneys' fees merely because the plaintiff neglected to provide proper documentation in its opening memorandum. *Weinberger*, 925 F.2d at 529. Accordingly, the Court will not strike the billing records accompanying plaintiff's reply memorandum, and will resolve the fee application on the merits.

### B.  Entitlement to Fee Award

Under 18 U.S.C. § 1836(b)(3)(D), "a court may . . . award . . . reasonable attorney's fees to the prevailing party" in a DTSA case if "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D). In interpreting other statutes that use the term "reasonable attorney's fees," the Supreme Court has held that such language allows recovery of paralegal time as well, but not out-of-pocket costs, such as expert witness fees. *See West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 99-100 (1991) (allowing recovery of "separately billed paralegal and law clerk time" but not "expert services" under 42 U.S.C. § 1988). And because the statute is phrased in permissive terms using the word "may," whether to award attorneys' fees is a matter of discretion for the court. *Cf. Efron v. Mora Dev. Corp.*, 44 F.4th 72, 76 (1st Cir. 2022) (reviewing fee award under 42 U.S.C. § 1988, which provides that court "may allow . . . a reasonable attorney's fee" under certain circumstances, for abuse of discretion on appeal).

Both preconditions for a fee award under the DTSA are met here. The Supreme Court

---

course, to request additional information if required; it is the role of the moving party to supply it. In any event, defendant was on notice that plaintiff might later seek to add further evidentiary support for its request.

has recognized that the term "prevailing party" is a "legal term of art," and that when the term is used in a statute, it should be interpreted according to its technical meaning as of the statute's enactment. *See Lackey v. Stinnie*, 145 S. Ct. 659, 666-67 (2025) (quoting *Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 603 (2001)). At the time the DTSA was enacted in 2016, "prevailing party" was defined as "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *Prevailing Party*, BLACK'S LAW DICTIONARY (10th ed. 2014). Here, the jury returned a verdict awarding damages to plaintiff, and the court entered a final judgment in plaintiff's favor soon thereafter. Therefore, plaintiff clearly qualifies as a "prevailing party" under 18 U.S.C. § 1836(b)(3)(D). And the jury found that defendants EOFlow Co., Ltd., and Jesse Kim "misappropriated the CAD, ODA, and DHF trade secrets willfully and maliciously." (Dkt. No. 947 at 3). Therefore, both conditions are satisfied.

Nonetheless, and as discussed above, attorneys' fee awards under the DTSA are permissive, not mandatory. That raises the question of the standard to be applied while considering the application for fees.

Defendants contend that the standard courts apply when determining whether to award fees under the Copyright Act, 17 U.S.C. § 505, should apply to cases brought under the DTSA as well. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 200 (2016). The Court is not convinced. The relevant portion of the Copyright Act simply provides that "the court may . . . award a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. As the Supreme Court has noted, this provision "authorizes fee-shifting, but without specifying standards that courts should adopt, or guideposts they should use, in determining when such awards are appropriate." *Kirtsaeng*, 579 U.S. at 202. For that reason, courts have considered

5

various factors in copyright cases when determining whether a fee award is merited, including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Markham Concepts, Inc. v. Hasbro, Inc.*, 71 F.4th 80, 85 (1st Cir. 2023) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

   The DTSA, on the other hand, lays out specific circumstances under which attorneys' fees may be awarded, all involving some form of misconduct by the party from whom fees are sought: "[I]f a claim of the misappropriation is made in bad faith, . . . a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, [the court may] award reasonable attorney's fees to the prevailing party." 18 U.S.C. § 1836(b)(3)(D). A finding of bad faith or willful and malicious misappropriation is therefore a prerequisite to awarding any fees at all, and no purpose would be served by considering the same factors twice. Thus, although the DTSA grants a court discretion to deny a fee award even when the predicate conditions are met, surely the preferable approach is to award fees in most cases, and to entirely deny a fee award only where there are clear and compelling reasons to do so.

   Defendants further suggest that the "astonishing" nature of plaintiff's fee request supports denying a fee award altogether. (Def.'s Opp. 8-9, Dkt. No. 959). To be sure, the First Circuit has said that such a denial may be appropriate under relatively extreme circumstances. *Spooner v. EEN, Inc.*, 644 F.3d 62, 69 (1st Cir. 2011) ("If the requested fees are gluttonously high, a court has discretion to deny fees entirely."). But this is not such a case. Although counsel did not litigate this case in an economical fashion, as discussed in further detail below, plaintiff faced substantial damage to its business from what the jury found was "willful[] and malicious[]"

misappropriation of its trade secrets—which, in substance, involved the wholesale theft of the design of its principal product. Accordingly, the Court will not deny the motion outright on the ground that plaintiff requests an excessive amount of fees.

### C. Reasonable Attorneys' Fees

The Court now turns to the assessment of whether the requested attorneys' fees are "reasonable." Most courts to have considered fee awards under the DTSA have used the familiar "lodestar approach" to calculating fee awards. *See, e.g.*, *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2024 WL 4476538, at *3 (D. Mass. Oct. 11, 2024). Under that approach, a district court has "broad" discretion to determine what reasonable fees and costs should be awarded. *United States v. Metropolitan Dist. Comm'n*, 847 F.2d 12, 14 (1st Cir. 1988). The court need not accept the hours and rates offered by the prevailing party. Indeed, the attorneys' records should be "scrutinized with care." *Grendel's Den, Inc.*, 749 F.2d at 950. However, "trial courts need not, and indeed should not, become green-eyeshade accountants," because "[t]he essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

The lodestar approach first "requires the district court to ascertain the number of hours productively expended and multiply that time by reasonable hourly rates." *Spooner*, 644 F.3d at 68. The party seeking the award bears the burden of establishing both the time and rate components of the calculation, *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), and may do so by providing "contemporaneous time and billing records and information establishing the usual and customary rates in the marketplace for comparably credentialed counsel," *Spooner*, 644 F.3d at 68 (citing *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 295-96 (1st Cir. 2001)).

In fashioning the lodestar, the court first determines "how much compensable time counsel spent on the case, deleting any 'duplicative, unproductive, or excessive hours.'"

*Spooner*, 644 F.3d at 68 (quoting *Gay Officers Action League*, 247 F.3d at 295). "[T]he court has a right—indeed, a duty—'to see whether counsel substantially exceeded the bounds of reasonable effort.'" *Metro. Dist. Comm'n*, 847 F.2d at 17 (quoting *Pilkington v. Bevilacqua*, 632 F.2d 922, 925 (1st Cir. 1980)).

After determining the number of hours reasonably expended, the court then multiplies the compensable time by the prevailing rates in the community, thereby yielding the lodestar amount. *Gay Officers Action League*, 247 F.3d at 295. In deciding a reasonable hourly rate, the court must consider "the type of work performed, who performed it, the expertise that it required, and when it was undertaken." *Hefter Impact Techs., LLC v. Sport Maska, Inc.*, 2017 WL 5798642, at *2 (D. Mass. Nov. 28, 2017) (quoting *Grendel's Den*, 749 F.2d at 950).

Although the calculated lodestar amount "represents a presumptively reasonable fee," *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992), the court retains "extremely broad" discretion to adjust it up or down based on other factors not captured in the calculation, *see, e.g.*, *Pérez-Sosa v. Garland*, 22 F.4th 312, 320-21 (1st Cir. 2022). Those factors include

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Diaz v. Jiten Hotel Mgmt.*, 741 F.3d 170, 177 n.7 (1st Cir. 2013) (quoting *Hensley*, 461 U.S. at 430 n.3) (internal quotations omitted).

   1.   **Hours Reasonably Expended**

Plaintiff seeks attorneys' fees in the amount of $24,790,000 for 28,182.5 hours of work performed over the course of roughly a year and a half. In the initial Carroll declaration, plaintiff

8

provided a high-level and somewhat cursory overview of the tasks accomplished during each month of the litigation and how many hours were worked in each month. In the second declaration, it provided monthly time and billing records that included specific time entries, with certain redactions to protect privileged communications. The Court will assess those records in accordance with the factors identified by the First Circuit and the Supreme Court. *See Hensley*, 461 U.S. at 430 n.3. In addition, the Court will rely on its own "overall sense" of how the litigation progressed in determining the reasonableness of plaintiff's request. *See Fox*, 563 U.S. at 838 (stating that "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time").

The Court's review of the records is challenging from a variety of perspectives, not the least of which is the sheer magnitude and complexity of the time entries. In addition, certain overarching concerns mandate careful scrutiny of the requested fees.

One set of issues arises from the size of the litigation team. While the litigation was relatively complex, it is unclear why so many attorneys—again, approximately 25 timekeepers billed time to this matter—were required to prepare for a case that took 16 months from the filing of the complaint to the return of the jury verdict (after a trial lasting three and a half weeks). For a number of reasons, oversized staffing of trial teams leads inevitably to substantial inefficiencies that in turn generate fees far beyond what is reasonably necessary.

To begin, the greater the number of the attorneys, the more time is consumed simply communicating with one another—attending meetings, reading emails, preparing memoranda, and the like. Necessarily, communications are committed to writing that would be handled on a more casual basis with a smaller team.

It is likewise true that when large teams of attorneys prepare briefs, pleadings, and other litigation documents, substantial inefficiencies almost invariably arise. Thus, for example, if eight attorneys help to prepare a memorandum in support of a motion, all eight are likely to review drafts and offer comments. While the final product may be somewhat more polished than if only two or three attorneys were working on it, it is also true that any marginal benefit comes at the cost of considerably higher legal fees that are normally difficult to justify as reasonable.

Furthermore, the more layers of attorneys between the most senior members of the trial team and the most junior, the greater the chance of imperfect communication and therefore increased costs. Among other things, that type of staffing greatly increases the likelihood that the relatively junior attorneys will misunderstand the nature or significance of their assignments within the case as a whole and spend substantial time on matters that prove to be unnecessary or insignificant.

A further set of issues arises out of the nature of attorney timekeeping in a complex case. Attorney time entries frequently include block billing with relatively vague descriptions, such as "review documents" or "conduct legal research," or cryptic entries that are difficult to understand and assess. The Court certainly understands the nature of attorney timekeeping—a ministerial task that is unrewarding and often uncompensated—and is both cognizant of and sympathetic to the demands placed on attorneys, particularly at large firms. However, a practical consequence is that it is often quite difficult to tie specific entries to specific tasks, and therefore more difficult for the Court to assess the reasonableness of the entries. That, in turn, requires that the Court rely more heavily on estimates and its "overall sense of [the] suit" in assessing the requested fees. *Fox*, 563 U.S. at 838.

Here, the huge volume of time entries, the vagueness of many entries, the frequent use of block billing, and the lack of any useful summaries or compilations makes it exceptionally challenging for the Court to render a precise item-by-item analysis of the reasonableness of the attorneys' fees. Rather than deny the fee petition on that basis, the Court will instead attempt to ascertain a reasonable fee amount based on a sampling of entries and the Court's "overall sense" of the litigation.

With that backdrop, the Court will address several sample months as representative of the overall litigation.

### a.     January 2024

In January 2024, plaintiff's counsel billed for 1154.1 hours worked.[2] Plaintiff's summary description for that month simply states that it "filed its Motion to Compel the Hamm Laptop and filed a motion seeking leave to file second amended complaint." (Carroll Decl. ¶ 14).

From the bills provided, it appears that plaintiff's attorneys billed roughly 88 hours for the preparation of the motion to compel the Hamm laptop and the reply in support of that motion, which amounted to a total of 16 pages of briefing. Eleven Goodwin timekeepers contributed to the ultimate product. The production of the laptop was an important issue in the litigation, as it included key information regarding defendants' misappropriation. Nonetheless, more than two weeks of full-time work to produce 16 pages of briefing on a fairly straightforward legal issue appears excessive. Other courts have recognized similar time spent on discovery disputes to be unreasonable. *See, e.g.*, *Balasubramaniam v. Source Consulting, LLC*, 2025 WL 3213685, at *2 (D. Mass. Nov. 18, 2025) (finding 106.9 hours expended in connection with motion to compel

---

[2] The bills indicate that 34.1 of those hours were worked by attorneys for whose time plaintiff is not seeking recovery.

11

"excessive and duplicative" and reducing by 50%); *Novi Footwear Int'l Co. Ltd. v. Earth OpCo LLC*, 740 F. Supp. 3d. 73, 79 (D. Mass. 2024) (finding 65.2 hours "over the course of approximately six months" preparing a motion to compel "and thereafter working to obtain discovery from the defendants" to be reasonable).

As for the motion to amend, it appears that plaintiff's attorneys billed roughly 60 hours preparing the motion for leave to file the second amended complaint, preparing the reply in support of the motion, and attending the hearing on the motion. A significant portion of work on the motion was completed in December 2023, and therefore the total of 60 hours does not even represent the total amount of time spent preparing these papers. Ten Goodwin timekeepers worked on those filings, despite the fact that the motion and the reply together amounted to only 26 pages of briefing. Again, it is hard to see how the entirety of the fees for that work can be considered reasonable.

Notwithstanding the brief summary description of the monthly tasks—which identifies only two matters—it appears that counsel actually worked on many other issues during January 2024.[3] For example, a review of the billing records suggests that plaintiff's lawyers spent more than 535 hours on discovery-related matters during January 2024, including approximately 240 hours on matters related to document discovery and 125 hours on interrogatories. The Court does not doubt that this was a complex case in which discovery was difficult and complex. It is also true that at least some of the relevant documents were in Korean. Nonetheless, it is noteworthy that counsel employed more than 13 weeks of full-time work on fact discovery during a period of a single month where no depositions were conducted. That strongly suggests

---

[3] The summary monthly description for January 2024—which, again, listed only two tasks—was substantially incomplete. The time expended on the motion to compel and motion for leave to amend, which was roughly 148 hours, amounts to only about 13 percent of the hours plaintiff's counsel billed for that work.

12

that plaintiff's attorneys spent an unreasonable amount of time on discovery during the month, and by extension throughout the litigation.

Finally, although plaintiff noted that it implemented many voluntary reductions to the total number of hours sought, it apparently did not exclude time spent working on the Federal Circuit appeal of the preliminary injunction entered in October 2023.  Plaintiff did not succeed in that appeal, in which the Federal Circuit overturned this Court's preliminary injunction.[4]

It is unclear whether plaintiff is entitled to a fee award for the time it spent unsuccessfully opposing this appeal.  On the one hand, courts have often recognized that whether a plaintiff is a "prevailing party" under various fee-shifting statutes should be analyzed holistically, with a view of the entirety of the litigation.  *See, e.g.*, *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991) ("[A] plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage.").  On the other, courts have also recognized that "[t]he prevailing plaintiff should not . . . recover statutory fees for time spent on unsuccessful issues or matters that are clearly severable from successful matters."  MARTIN A. SCHWARTZ & JOHN E. KIRKLIN, SECTION 1983 LITIGATION: STATUTORY ATTORNEY'S FEES § 2.05 (4th ed. 2025).

There is at least a colorable argument that the preliminary injunction proceedings were severable from the merits issues on which plaintiff ultimately prevailed.  Thus, the Court could potentially deny fees altogether for the time plaintiff's lawyers spent litigating the preliminary injunction, before both this court and the Federal Circuit.  That approach, however, strikes the

---

[4] The Federal Circuit opinion stated that "[n]o costs" would be awarded in connection with the appeal.  *See Insulet Corp. v. EOFlow, Co. Ltd.*, 104 F.4th 873, 885 (Fed. Cir. 2024).  This reference to "costs," however, which can be awarded by an appellate court pursuant to Federal Rule of Appellate Procedure 39, does not include statutory attorneys' fees.  *See Hines v. City of Albany*, 862 F.3d 215, 221 (2d Cir. 2017) ("Rule 39 'costs' do not include Section 1988 attorneys' fees.").  So that court's decision does not, of its own force, prevent this court from using a fee award for time spent litigating the appeal.

13

Court as unnecessary, particularly where defendants have not argued for such a reduction. Plaintiff's ultimate failure on the preliminary injunction does, however, further counsel in favor of an overall reduction of the fee award.

### b.     April – June 2024

During April, May, and June 2024, plaintiff's counsel submitted bills for 1,422.5, 1,892, and 1,754.7 hours worked, respectively.[5] During those months, counsel engaged in discovery, both fact and expert, which apparently included some travel to Korea for depositions in May 2024. Again, the Court recognizes that fact discovery in this matter was extensive and contested. Nonetheless, those figures—more than 5,000 attorney hours over the course of only three months—appear excessive. Indeed, a number of reported trade secrets cases (albeit lacking some of the features that made this case particularly time-consuming) have been litigated in their entirety, including jury trials, in less than that amount of time. *See, e.g.*, *BioPoint, Inc. v. Dickhaut*, 2023 WL 4471971, at *1 (D. Mass. Jul. 11, 2023) (prevailing plaintiff in trade secret and Chapter 93A case sought fees for 3,690.6 hours of work in proceeding that "ran for over three years" and included "both jury and bench trials").

In May 2024, the "core case team" at Goodwin billed for 1,816.7 hours worked during that month. That included more than 860 hours devoted to preparing for, taking, and summarizing depositions. To be fair, it appears that counsel took and defended 11 total depositions during this month, which obviously required a substantial amount of work. But some of those were relatively short depositions lasting four hours or fewer, once again raising the question of whether the total hours worked were reasonable. And the sheer number of

---

[5] Removing time worked by attorneys who were not part of the "core case team" yields 1370.6 hours in April 2024, 1816.7 hours in May 2024, and 1740.3 hours in June 2024.

14

individuals who worked on the depositions likely resulted in inefficiencies and duplication of work.[6]

The amount of block billing by attorney timekeepers presents another set of issues. For example, attorney Shweta Rao billed 3.8 hours on May 3, 4.3 hours on May 4, 4.7 hours on May 5, and 4.7 hours on May 6 to "[r]eview documents for Korean depositions." She did not conduct any of these depositions herself, so it is unclear what precisely was accomplished during that time. Ms. Rao's time entries then became somewhat more specific when she billed for "[a]nalyze and summarize documents for Kim, Lessard, and Han deposition" for 3.8 hours on May 7, 5.1 hours on May 8, 8.6 hours on May 9 (which also included "collat[ing] documents" for those same depositions), 8.3 hours on May 10, 7.3 hours on May 11, and 1.1 hours on May 12. As of May 13, Ms. Rao began billing time separately for "[a]nalyz[ing], summariz[ing], collat[ing], and index[ing] documents" for each of these three depositions: 4.3, 2.9, and 2.7 hours on May 13; 4.9, 3.3, and 3.1 hours on May 14; 6.5 hours for the Kim deposition on May 15; and 3.2 hours for the Kim deposition on May 16. That yields a total of 82.6 hours for which the billing records are unclear as to what work product was actually generated.[7] And Ms. Rao was far from the only attorney timekeeper working to prepare for these depositions, raising further questions as to the reasonableness of these hours.[8]

---

[6] For example, ten attorneys and two support staff billed for time related to strategizing, preparing for, and taking Jesse Kim's deposition. Obviously, the deposition of EOFlow's CEO was highly consequential, and plaintiff's attorneys needed to prepare thoroughly. Nonetheless, spreading the work out among so many different attorneys must necessarily have led to wasted time and effort.

[7] At Ms. Rao's average realized rate of $783 per hour in 2024, plaintiff was billed $64,675.80 for that work.

[8] Ms. Rao was also not the only timekeeper who engaged in block billing during the month. (*See* Carroll Reply Decl., Ex. A (R. Frederickson, 5/9/24: "Prepare for Han deposition," 5.6 hours; J. Zhang, 5/5/24: "Prepare for Cho deposition," 7.5 hours; A. Raince, 5/11/24: "[R]eview and analyze documents for Han prep," 10.5 hours; S. Bluni, 5/21/24: "Document review," 4 hours)).

15

### c. January - February 2025

Plaintiff's counsel billed for 534.3 hours worked in January 2025 and 478.5 hours worked in February 2025, for a total of 1,012.8 hours worked across these two months.[9] The trial concluded on December 4, 2024, so there was obviously no trial preparation occurring during these months.

In January 2025, of the 525 hours billed, 231 were spent working on plaintiff's motion for a permanent injunction and its supporting declarations.[10] That figure alone—nearly six weeks of full-time work for one motion (albeit an important one)—is enough to raise serious concerns about the reasonableness of the hours plaintiff's counsel billed during the month. Further concerns result from the fact that a number of timekeepers again engaged in block billing during this month. (*See* Carroll Reply Decl., Ex. A., Dkt. No. 983-1 (R. Carroll, 1/13/25: "Research for and review and edit draft briefs and declarations; multiple communications with team concerning same," 2.9 hours; S. Bluni, 1/2/25: "Reviewing joint status report and meetings regarding same; call with Donnelly team regarding draft settlement agreement, including prep and follow ups," 2.5 hours; R. Frederickson, 1/24/25: "Analyze and revise declarations and permanent injunction," 3.1 hours; S. Rao, 1/16/25: "Create and coordinate filing errata addendum, and redaction addendum; proof and plug cite holes for the January 2025 Benjamin declaration," 4.8 hours)).

### d. Conclusion

That sampling of time entries clearly suggests that the use of attorney time throughout

---

[9] Removing time worked by attorneys not part of the "core case team" yields 525 hours in January 2025 and 475.6 hours in February 2025, or 1,000.6 hours total.

[10] The memorandum in support of the permanent injunction was 25 pages long, and was supported by declarations that were 11, 26, and 7 pages long.

this litigation was far from efficient, and therefore plaintiff's counsel "substantially exceeded the bounds of reasonable effort," *Metro Dist. Comm'n*, 847 F.2d at 17. Accordingly, the Court will reduce the fee award.

The Court concludes that a 40 percent overall reduction is fair in light of the identified issues and deficiencies. That total represents a 30 percent reduction for overall inefficiency and a further 10 percent reduction for failure to provide adequate summaries, descriptions, or other computations to the court. Plaintiff does not provide a total figure for the number of hours worked by the "core case team" for whose time it seeks fees, but reducing the total hours billed by 30 percent still yields 19,727.8 hours of compensable time. As detailed above, the billing records submitted indicate that plaintiff's attorneys handled the work inefficiently at times, and the sheer volume of records provided makes it unduly difficult to scrutinize the reasonableness of each billing entry individually. Based on the Court's "overall sense of [the] suit," it finds that a 30 percent reduction in the fee award is appropriate to account for the unreasonable number of hours worked by plaintiff's counsel. *See Fox*, 563 U.S. at 838.

The Court will further reduce the fee award by an additional 10 percent based on plaintiff's failure to provide useful summaries or other descriptions concerning its billing records. It is true that after being put on notice by defendant's response that the Carroll Declaration was likely insufficient to justify a fee award, plaintiff provided more than 700 pages of its legal bills from this case. The supplemental response indicated that certain entries were highlighted to reflect work for which it was not seeking compensation or for which it was only seeking partial compensation; others were redacted to protect privileged material, and plaintiff apparently did not seek recovery for those entries either. (Carroll Reply Decl. ¶¶ 6-7, Dkt. No. 983). However, plaintiff provided no summaries of what the total reduction in hours as a result

of these deductions was, nor of the precise calculations which led it from the $27,759,826.73 plaintiff was charged by its lawyers to the $24,790,000 it seeks in attorneys' fees.

More importantly, plaintiff did not provide any other summaries or descriptions of the work provided beyond the actual time entries. It is not the role of the court to sort through and summarize the time expended; that is the role of the party seeking the fee award. Other courts in this district have similarly reduced fee awards where little or no effort was made to arrange or summarize the billing records in a useful manner to permit the court's thorough review. *See, e.g., KPM Analytics*, 2024 WL 4476538, at *8 (reducing fee award by 60 percent where "there were deficiencies in [plaintiff's] attorney's fees submission that made it difficult for the Court to fully assess their request"); *Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*, 125 F. Supp. 3d 301, 306 (D. Mass. 2015) (reducing the award by 50 percent based on deficiencies in counsel's submission, including block billing, and excessive and redundant entries). For those reasons, the Court finds that a further 10 percent reduction is appropriate.

In summary, the Court finds that the amount of $24,790,000 in attorneys' fees plaintiff is seeking should be reduced by 30 percent for an unreasonable number of hours billed and by a further 10 percent for failing to provide sufficient descriptive information to the Court, for a total of a 40 percent reduction.

### 2. Reasonable Hourly Rates

Over the three calendar years in which this case was pending, the rates charged by Goodwin's timekeepers generally increased. Below is a table representing the rates charged in

each year, based on the Court's estimate of the effective rate actually charged to Insulet following discounts:[11]

| Attorney | Title (Graduation Year) | 2023 Rate | 2024 Rate | 2025 Rate |
|---|---|---|---|---|
| Carroll | Partner (2001) | $1,305 | $1,440 | $1,575 |
| Frederickson | Partner (2007) | $1,170 | $1,260 | $1,440 |
| Bluni | Partner (1998) | $945 | $1,013 | $1,058 |
| Valenti | Partner (2012) | $1,125 | $1,215 | $1,395 |
| Lu | Partner (2014) | n/a | $1,215 | $1,395 |
| Cedrone | Partner (2014) | $1,058 | $1,170 | n/a |
| Zhang | Senior Associate (2013) | $1,058 | $1,143 | n/a |
| Evans | Senior Associate (2016) | $1,058 | $1,143 | $1,233 |
| Breen | Senior Associate (2016) | $1,058 | $1,143 | $1,233 |
| Keegan | Senior Associate (2019) | $896 | $1,067 | $1,206 |
| Ginther | Senior Associate (2017) | $833 | $968 | $1,157 |
| Raince | Associate (2022) | $639 | $783 | $986 |
| Rao | Law Clerk (2021) | $639 | $783 | $873 |
| Maor | Associate (2023) | n/a | $693 | $873 |
| Lessard | Trial Specialist Paralegal | $513 | $558 | $608 |
| Fitzgerald | Senior Litigation Paralegal | n/a | $509 | $554 |
| Scola | Case Assistant | $315 | $342 | $374 |

---

[11] The bills submitted to the Court reflect that Insulet usually received a 10 percent discount on Goodwin's listed rates. (*See* Carroll Reply Decl., Ex. A).

In their opposition, defendants do not appear to contest the reasonableness of these hourly rates. (*See generally* Defs.' Opp., Dkt. No. 970). Nor did defendants challenge the reasonableness of Goodwin's rates in connection with the earlier motion for fees in this case. (Dkt. No. 865). And, as a general matter, "the rate that a private lawyer actually charges to clients in the ordinary course of his practice, though not conclusive, is a useful indicator of market value." *Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 16 (1st Cir. 2011). Accordingly, the Court will not reduce the hourly rates charged by Goodwin's timekeepers.

### III. Conclusion

For the foregoing reasons, the Court will reduce plaintiff's requested fee award of $24,790,000 by 40%, for a total award of $14,874,000. Plaintiff's motion for attorneys' fees and litigation expenses is therefore GRANTED as to attorneys' fees in the amount of $14,874,000, and otherwise DENIED. Defendant's motion to strike is DENIED.

**So Ordered.**

Dated: February 5, 2026

/s/ F. Dennis Saylor IV  
F. Dennis Saylor IV  
United States District Judge